IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RAYMOND WINGER, M.D.,

                Plaintiff,

v.                                           Civil Action No.: 13-CV-1428-JTM-GLR

MEADE DISTRICT HOSPITAL,

                Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Meade District Hospital (the "Hospital" or "Defendant") by and through its undersigned counsel of record, and pursuant to Fed. R. Civ. P. 56 and D. Kan. R. 56.1, submits this memorandum of law in support of its Motion for Summary Judgment.

## NATURE OF THE CASE

Plaintiff, a physician who worked for the Hospital for approximately two months, sues the Hospital claiming that it violated 42 U.S.C. §1983 by allegedly depriving him of the benefits of his employment contract and damaging his reputation under color of state law and without substantive and procedural due process.  Plaintiff also claims that the Hospital failed to pay him $1,200.00 in moving expenses in breach of his employment contract.

The Hospital terminated Plaintiff and revoked his temporary practice privileges after it received several complaints from its medical staff regarding Plaintiff's substandard care of two patients on or around June 9, 2013.  Because of these complaints, the Hospital referred the cases to its third-party peer-review provider, Doctors Who Care ("DWC").  They found that Plaintiff had failed to meet the standard of care required of physicians in the community.  The Hospital informed Plaintiff of DWC's initial findings, and agreed to allow Plaintiff to provide information

to DWC to provide the rationale for the care he provided.  However, Dr. Winger then unilaterally decided not to participate in the Hospital's outside, third-party review process and instead sent confidential patient medical information to an outside doctor with no involvement in the patient care for the two patients and with no authorization to receive or review medical records from the Hospital.   When Plaintiff failed to participate in the Hospital's peer-review process, the Hospital's Risk Management Committee determined that, based on the review provided by DWC, Plaintiff had failed to meet the required standard of care.  Plaintiff was informed that his temporary practice privileges at the Hospital would be terminated.  As a result, the Hospital was required to report the termination of those privileges to the Kansas State Board of Healing Arts ("KSBHA"), which would then report that termination to the National Practitioner's Data Bank ("NPDB").  The Hospital's CEO informed Plaintiff of this process and told Plaintiff that he would consider whether Plaintiff would be allowed to resign or would be terminated.

After Plaintiff submitted a letter of resignation on July 3, 2013, dictating certain terms as part of that resignation (i.e., that he would be paid 60 days pay as though the termination of the Physician Employment Agreement was "without cause"), the Hospital's CEO rejected those terms and terminated Plaintiff on July 8, 2013.  On July 9, 2013, the Hospital made the required reports to the KSBHA and the NPDB.  Plaintiff's provision of care to the two patients at issue is still under review by the KSBHA.

Plaintiff also claims that the Hospital did not reimburse him for $1,200.00 of qualified moving expenses pursuant to his employment agreement.  However, the Hospital did reimburse Plaintiff for approximately $2,800.00 in qualified moving expenses.  The Hospital denied Plaintiff request for reimbursement based on a cancelled check for $240 that was unaccompanied by any supporting documentation to demonstrate that it represented a payment for a qualified

2

moving expense; the Hospital also denied a rental bill from Circle O Motel and RV Park for $825 which represented a living expense and not a qualified moving expense.  Payment for these items was denied because they were not qualified moving expenses.

## OVERVIEW

After being granted temporary privileges to practice at Meade District Hospital (the "Hospital"), Plaintiff was employed as a doctor at the Hospital on May 6, 2013 pursuant to a Physician Employment Agreement that provided that it could be terminated for "failure of the Physician to practice his profession at a standard that is consistent with the standards of care required of physicians in the community."   Plaintiff's temporary privileges were granted pursuant to the Hospital's Medical Staff By-Laws that provide that temporary privileges may be terminated by the Hospital's CEO "at any time … *without hearing or appeal... The CEO … may terminate temporary privileges at any time without eligibility for the procedural rights outlined in Article VIII."*

Nonetheless, after the Hospital received numerous complaints from its medical staff regarding Plaintiff's provision of care to two patients on June 9, 2013, the Hospital, even though it was not required to do so pursuant to the By-Laws, referred the cases for peer review through Docs Who Care ("DWC"), a third-party peer review organization.  When DWC determined that Plaintiff had provided substandard care in the two referred cases, the Hospital provided Plaintiff with the opportunity to respond to the DWC determination to provide his rationale for the care he provided.  Nonetheless, Plaintiff unilaterally declined to provide a response or participate in the Hospital's proffered peer review process because he "just didn't feel it would be productive."

Instead, Plaintiff sent the two patients' medical charts and other medical records to James Wiley, D.O., a doctor at another facility who had no involvement in the care of the two patients

3

and with no authorization to receive or review medical records from the Hospital. Then, rather than providing a response to DWC's assessment to the Hospital's Risk Management Committee, Plaintiff provided a letter from Dr. Wiley dated June 25, 2013 that contained no discussion of the assessments made by DWC or the details of the care provided to the patients.

Because of Plaintiff's blatant refusal to participate in the Hospital's peer-review process, and Plaintiff's clear breach of his confidentiality agreement with the Hospital through the provision of the patients' confidential medical information to an outside doctor without the Hospital's authorization, the Hospital was left to make a determination regarding Plaintiff's standard of care based on the determination of DWC. As a result, the Risk Management Committee determined that Plaintiff had not met the standard of care required with regard to these patients' care. The Hospital's CEO informed him that the Hospital would be terminating his temporary practice privileges at the Hospital and that the Hospital would therefore be required to report the termination of those privileges to the Kansas State Board of Healing Arts ("KSBHA") which would then report that termination to the National Practitioner's Data Bank ("NPDB"). The Hospital's CEO also informed Plaintiff that he would consider whether Plaintiff would be allowed to resign or would be terminated.

In a last ditch effort to save face, Plaintiff submitted a letter of resignation on July 3, 2013, but only on his own terms. As a result, on July 8, 2013, the Hospital's CEO gave Plaintiff a letter rejecting those terms and his resignation, and terminating his employment pursuant to the Physician Employment Agreement. On July 9, 2013, the Hospital made the required reports to the KSBHA.

None of these facts are disputed. Nonetheless, Plaintiff presses a Section 1983 claim that he was denied substantive and procedural due process when his temporary privileges were

4

revoked and his Physician Employment Agreement was terminated.  But, the Hospital's Medical Staff By-Laws clearly indicate that Plaintiff was not entitled to the formal hearing and appeal rights set forth for holders of full practice privileges.  Furthermore, Plaintiff's blatant refusal to participate in the peer review process that was provided to him is fatal to any claim that he was denied due process as part of his termination.  In addition, Plaintiff cannot state a claim based on the Hospital's legally required reports to the KSBHA and NPDB, because he cannot point to any false information that was provided to those organizations in the Hospital's legally required reports. Finally, Plaintiff cannot identify any policy, practice or custom of the Hospital that was a moving force behind any alleged violation of his constitutional rights.

Furthermore, Plaintiff's claim for breach of contract for allegedly unpaid moving expenses is just as meritless as his §1983 claim.  Just as he refused to provide a substantive response to the Risk Management Committee, he provided a cancelled check to a relative that he now claims was for moving expenses and a bill for the rent in the home he lived in while practicing at the Hospital.  Plaintiff can point to no evidence that these items constituted qualified moving expenses pursuant to the Physician Employment Agreement.

Finally, the Hospital is immune from any claim for punitive damages that Plaintiff may seek to raise.  As a result, this Court should grant Defendant summary judgment on all of Plaintiff's claims, as more fully explained below.

## STATEMENT OF UNCONTROVERTED FACTS

### I.      Plaintiff's Employment With the Hospital

1.      Plaintiff was hired by the Hospital on or about May 6, 2013, pursuant to the terms of a Physician Employment Agreement entered into between the parties.   Pretrial Order Stipulations [ECF 23] at 2.

2.      The Physician Employment Agreement provided that it could be terminated for "failure of the Physician to practice his profession at a standard that is consistent with the standards of care required of physicians in the community."  Physician Employment Agreement, ¶4B.ix, Complaint [ECF 1], Exhibit A.

3.      The Physician Employment Agreement provided that:

> The Physician will maintain, throughout the term of this Agreement, status as a member of the Active Medical Staff of the Hospital in accordance with the bylaws, rules, regulations and protocols of the Hospital and its Medical Staff.  Failure to maintain membership as an Active Medical Staff shall constitute a breach of this Agreement by the Physician.  While a member, the Physician shall comply with all provisions of the Medical Staff Bylaws, as well as any other Hospital bylaws, rules, regulations and protocols and shall participate in the quality assessment review, utilization reviews, and risk management functions in the Hospital.

Physician Employment Agreement, ¶2E, Complaint [ECF 1], Exhibit A.

4.      The Physician Employment Agreement provided that it could be terminated for "default by the Physician in the performance of any term, condition, provision or requirement of this Agreement".  Physician Employment Agreement, ¶4B.x, Complaint [ECF 1], Exhibit A.

5.      When Plaintiff was hired he was granted "temporary privileges based on [the Hospital's CEOs] own personal power."  Exhibit A: Deposition of Raymond Winger, M.D. ("Winger Dep."), 71:14-16; Exhibit B:  Grant of Temporary Privileges.

6.      Plaintiff was only granted temporary privileges because there was "particular paperwork … to be done by another institution because they didn't have the personnel to do that at Meade;" i.e., Plaintiff's full application for privileges was not completed at the time of his employment.  Winger Dep. 71:10-16.

7.      The Hospital's CEO did not discuss with Plaintiff that he would be brought on in a provisional status for a period of time and then afterwards his status would be changed to an active physician with full privileges.  Winger Dep. 71:4-16.

6

8.      Dr. Winger understood that he "would be operating under those temporary privileges."  Winger Dep. 71:18-19.

9.      Meade District Hospital's Medical Staff By-Laws provide that:

> The Chief Executive Officer may, *at any time*, upon the recommendation of the Chief of Staff, terminate an applicant's or Staff Member's temporary privileges *without hearing or appeal*, effective as of the discharge from the Hospital of the applicant's or Staff Member's last patient under his or her care…

Winger Dep. 136:25-137:7; Exhibit 17, Medical Staff By-Laws, Article III, Paragraph P (emphasis added).

10.      Meade District Hospital's Medical Staff By-Laws also provide that:

> Temporary clinical privileges are those privileges granted on a case-by-case basis when there is an important patient care need that warrants an immediate authorization to practice for a limited period of time while the full credentials information is being approved.  Temporary privileges may be granted by the CEO with recommendations from the Chief of Staff and only after appropriate license, adequate liability coverage and clinical competence has been established along with the National Practitioner Data Bank having been queried … *The CEO or Governing Board Chairman may terminate temporary privileges at any time without eligibility for the procedural rights outlined in Article VIII.*

Winger Dep. Exhibit 17, Medical Staff By-Laws, Article VI, Paragraph D (emphasis added).

## II.      Plaintiff's Care of Two Patients is Questioned by the Hospital's Medical Staff And The Hospital Initiates a Third-Party, Peer-Review Process

11.   On June 9, 2013, Plaintiff provided medical care to two patients at the Hospital that resulted in reports of substandard care from several of the Hospital's medical staff.  Winger Dep. Ex. 18 at PL 104; Ex. 19 at PL 132.

12.   On June 10, 2013, the Hospital's Risk Management Committee called a special meeting and resolved to have the care of the two patients reviewed by a third-party peer review organization called Docs Who Care ("DWC").  Winger Dep. Ex. 5.

13.   On June 15, 2013, DWC provided the Hospital with its assessment of Plaintiff's care,

4830-9350-2752.1

finding a level 2 deviation from the standard of care with one patient, and a level 3 deviation from the standard of care with the second patient.  Winger Dep. 92:4-96:21; Ex. 6-7.

**III.     Plaintiff Refuses to Participate in the Hospital's Third-Party Peer Review Process, and Instead Breaches His Confidentiality Agreement**

14.   On June 20, 2013, the Hospital's Risk Management Committee met with Plaintiff to provide him an opportunity to explain his rationale for the treatment provided.   Winger Dep. 97:20-99-11; Ex. 8.

15.   During that meeting, the Hospital's Risk Management Committee agreed to allow Plaintiff to provide his rationale for the patient care he provided to DWC as part of the peer review process.  Winger Dep. 99:2-11; Ex. 8.

16.   However, Plaintiff never did provide a response to DWC.  Winger Dep. 99:12-14.

17.   Plaintiff testified that he was given an opportunity to respond to DWC, but he did not feel it would be productive to respond to DWC.  Winger Dep. 100:7-11.

18.   Instead, Plaintiff declined to participate in the Hospital's proffered third-party peer review and sent the patients' confidential medical information to James Wiley, D.O.   Winger Dep. 101:24-103:21; Ex. 9.

19.   Plaintiff did so because he felt Dr. Wiley's letter "would be coming any day and it would be just as good as [DWC]'s letter."  Winger Dep. 102:7-9.

20.   In the letter to Dr. Wiley, Plaintiff provided confidential patient medical information on the two patients, including patient identifiers (name, etc.) and the patients' health conditions, treatment received, progress notes, and lab reports.  Winger Dep. 103:21-106:9; Ex. 9.

21.   On May 7, 2013, Plaintiff signed a confidentiality statement and acknowledgement as

8

part of his employment with the Hospital, in which he agreed to be bound to not disclose "[m]edical information, risk management, peer review, medical staff, credentialing, quality assurance and hospital proprietary information … to unauthorized sources outside the [Hospital]."  Winger Dep. 111:9-112:15, Ex. 11.

22.  The Hospital did not authorize Plaintiff to send the two patients' confidential medical information to Dr. Wiley.  Winger Dep. 113:19-21.

23.  Dr. Wiley did not provide care to the two patients, nor was the Plaintiff's provision of this information to Dr. Wiley part of providing care to the two patients.  Winger Dep. 114:14-16; 115:8-11.

24.  Dr. Wiley was not an authorized person to receive the confidential medical information of the Hospital's patients.  Winger Dep. 115:12-15.

25.  On June 25, 2013, Dr. Wiley wrote a brief letter stating that he found the care provided to the two patients was appropriate.  Winger Dep. 108:5-17; Ex. 10.

26.  Dr. Wiley's letter did not provide any indication of what information Dr. Wiley reviewed in reaching his conclusion.  Winger Dep. 110:7-9.

27.  Dr. Wiley's letter also did not provide any detail about the patients' cases whatsoever. Winger Dep. 110:3-5.

IV.  **After Refusing to Participate in the Hospital's Peer Review Process, Plaintiff's Temporary Privileges are Terminated and His Physician Employment Agreement is Terminated Pursuant to Its Terms**

28.  On July 2, 2013, the Risk Management Committee held another meeting to determine what Plaintiff's response to the DWC assessments was.  Winger Dep. 117:1-12; Ex. 12.

29.  At that meeting, Plaintiff provided the letter from Dr. Wiley, but did not provide any

9

response to the DWC assessment.  Winger Dep. 117:10-12; Ex. 12.

30.  Plaintiff was then excused from the meeting, and the Hospital Risk Management Committee decided to terminate his temporary practice privileges because Plaintiff had been given the ability to respond to the third party reviewer previously; did not do so; and the Risk Management Committee determined that he had failed to provide the standard of care required of physicians in the community.  Winger Dep. 118:9-12; 123:7-123:19; Ex. 12.

31.  Also on July 2, 2013, the Hospital's CEO, Michael Thomas, met with Plaintiff and informed him about the standard of care determinations.  Winger Dep. 124:2-8; Ex. 13.

32.  At that meeting, Mr. Thomas and Plaintiff discussed the possibility of Plaintiff resigning or being terminated.  Winger Dep. 124:2-8; Ex. 13.

33.  On July 3, 2013, Plaintiff offered his resignation.  Winger Dep. 1251-7; Ex. 14.

34.  On July 8, 2013, Mr. Thomas again met with Plaintiff and provided a letter terminating his employment, referencing the terms of the Physician Employment Agreement and the Hospital's Medical Staff Bylaws.  Winger Dep. 126:1-129:17; Ex. 15.

35.  On July 16, 2013, the Hospital made the required reports to the Kansas State Board of Healing Arts ("KSBHA") acknowledged receipt of legally required reports made by the Hospital, notifying it that Plaintiff's temporary practice privileges had been terminated.  Exhibit C: Receipt of Reports to KSBHA.

36.  Plaintiff is continuing to participate in a review of his care by the KSBHA.  Winger Dep. 138:4-140:18, Ex. 18-19.

37.  Plaintiff is doing so to rebut the medical opinions of either the Hospital or DWC; he has not claimed that any of the information provided in the reports is false information.  Winger Dep. 140:6-140:17.

38.   Plaintiff has practiced medicine as recently as the date of his deposition, October 21, 2014.  Winger Dep. 17:2-20.

**V.      Plaintiff's Unpaid Moving Expense Claim**

39.   Plaintiff's Physician's Employment Agreement provided that "[t]he Hospital will pay not to exceed $4,000 for expenses directly attributable to the moving and transportation of Physicians home and office furnishings to Meade, Ks.  Hospital will reimburse Physician within 10 days of the submission of qualified receipts." Physician's Employment Agreement, ¶3B.vi, Complaint [ECF 1], Ex. 1.

40.   Approximately $2,800.00 in Plaintiff's moving expenses were paid by the Hospital. Winger Dep. 141:14-18.

41.   Plaintiff does not possess any documentation for the additional $1,200.00 in moving expenses he seeks in this lawsuit.  Winger Dep. 142:25-143:3.

42.   $250.00 of the alleged moving expenses Plaintiff seeks were for money paid to his son and his son's friends for allegedly moving Plaintiff's belonging from storage in Meade, Kansas to his home.  Winger Dep. 143:14-17.

43.   The remainder of the alleged moving expenses Plaintiff seeks was for a rental bill from Circle O Motel and RV Park.  Winger Dep. 143:12-14.

44.   The Hospital never told Plaintiff that he would be reimbursed for temporary housing as a moving expense or that sums paid to family members would be reimbursed as moving expenses.  Winger Dep. 143:20-144:21.

<u>ARGUMENT AND AUTHORITIES</u>

**I.   STANDARD FOR SUMMARY JUDGMENT**

Summary judgment shall be entered when the evidence shows "that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  When a party fails to establish a genuine issue of fact for trial about an element essential to the case upon which that party will bear the burden of proof at trial, summary judgment should be entered in the movant's favor.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Summary judgment is not a "disfavored procedural shortcut," but rather "an integral part of the federal rules as a whole," "designed to secure the just, speedy and inexpensive determination of every action."  *Id.* at 327.

To avoid summary judgment, the non-moving party must produce more than a "scintilla" of evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Plaintiff must do more than simply show some metaphysical doubt as to the material facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).   A plaintiff cannot simply rest on allegations and denials in the pleadings without significant probative evidence to support the complaint.  Fed. R. Civ. P. 56(e).   "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."  *Smith v. Board of County Comm'rs*, 96 F Supp. 2d 1177, 1180 (D. Kan. 2000) (quoting *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988)). If, as here, there are no material facts in dispute from which a reasonable jury can find for Plaintiff, Defendants are entitled to judgment as a matter of law.

## II.  PLAINTIFF'S §1983 CLAIM FAILS

As the undisputed facts in this case demonstrate, Plaintiff's Physician Employment Agreement and temporary privileges were terminated because Plaintiff had refused to participate in the Hospital's proffered third-party peer review process and had been determined to have failed to provide the required standard of care by that outside reviewer and the Hospital's Risk

12

Management Committee.  Indeed, instead of participating in the peer review process, Plaintiff breached his confidentiality agreement with the Hospital by providing confidential medical information regarding the Hospital's patients to an unauthorized recipient.

Nonetheless, Plaintiff claims that he was deprived of substantive and procedural due process due to his termination and the revocation of his temporary privileges, thereby harming a property interest he had in his continued contract and a liberty interest he has in his reputation. Plaintiff's claim fails for three reasons:

(1)     Plaintiff's claim based on his alleged property interest fails because he was terminated pursuant to the terms of the Physician Employment Agreement and the Hospital's Medical Staff Bylaws which define the contours of any property interest Plaintiff may have had; and

(2)     Plaintiff's claim based on his liberty interest in his reputation fails because the reports made by the Hospital do not contain any false information, were made as required by law, and Plaintiff cannot demonstrate that he has been prevented from practicing medicine as a result of the reports.

(3)     Plaintiff cannot identify any policy, practice, or custom of the Hospital that was a moving force behind any alleged violation of his constitutional rights.

For these reasons, Plaintiff's §1983 claim cannot survive summary judgment.

**A.  Plaintiff's Property Interest Claim Fails**

To trigger Fourteenth Amendment due process protections, Plaintiff must first show that he possesses a property or liberty interest in his employment. *See Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Vinyard v. King*, 728 F.2d 428, 430 & n. 5 (10th Cir.1984). "[A] property interest is determined by whether the terms of employment created by contract, federal statute, city charter or an employee manual 'create a sufficient

13

expectancy of continued employment to constitute a property interest which must be afforded constitutionally guaranteed due process.'" *Vinyard*, 728 F.2d at 432 (footnotes omitted) (quoting *Hall v. O'Keefe*, 617 P.2d 196, 200 (Okla.1980)); *see Roth*, 408 U.S. at 577.  The Tenth Circuit has repeatedly held that a property interest in an employment agreement or a physician's staff privileges only extend as far as the documents, i.e., agreements and by-laws, allow.  *See, e.g., Le Baud v. Frische*, 156 F.3d 1243 (10th Cir. 1998)(finding that where there were no restrictions on a Hospital's discretion to revoke a doctor's privileges, no property interest protected by federal constitutional guarantees existed).

Here, Plaintiff's Physician Employment Agreement was clearly linked to the Hospital's Medical Staff Bylaws.  *See* SOF ¶3 (Physician Employment Agreement required Plaintiff to maintain status as a member of the Active Medical Staff of the Hospital in accordance with the provisions of the Medical Staff Bylaws.)   In conjunction with the Physician Employment Agreement, Plaintiff was granted temporary practice privileges pursuant to the Medical Staff Bylaws' terms.   SOF ¶¶ 5-10.   Those bylaws provided that Plaintiff's temporary practice privileges could be terminated at any time, without hearing or appeal, and without recourse to the procedural rights set forth for holders of full practice privileges.  SOF ¶¶9-10.  Thus, as in *Le Baud*, there were no restrictions on the Hospital's discretion to revoke Plaintiff's temporary privileges and therefore no property interest in those privileges exists.  *Le Baud*, 156 F.3d at 1243.

As a result of the revocation of Plaintiff's temporary privileges, Plaintiff was immediately in breach of the Physician Employment Agreement.  *See* SOF ¶3. (Physician Employment Agreement required Plaintiff to maintain status as a member of the Active Medical Staff of the Hospital in accordance with the provisions of the Medical Staff Bylaws.)

14

4830-9350-2752.1

Furthermore, Plaintiff was required to comply with "all provisions of the Medical Staff Bylaws, as well as any other Hospital bylaws, rules, regulations, and protocols and shall participate in the … risk management functions in the Hospital."  SOF ¶3.  But Plaintiff refused to participate in the Hospital's risk management function when he refused to provide information in response to the Hospital's third-party peer review provider, DWC.  SOF ¶¶16-17.  By refusing, he breached the Physician Employment Agreement.  Plaintiff also breached his confidentiality agreement with the Hospital by providing the two patients' confidential medical information to an unauthorized party.  SOF ¶¶18-24.  Again, this was in breach of the Physician Employment Agreement.  These breaches by Plaintiff provided good cause for his termination pursuant to the Physician Employment Agreement's own terms.  SOF ¶4 (Physician Employment Agreement permitted termination for good cause for "default by the Physician in the performance of any term, condition, provision or requirement of this Agreement.")

Finally, after conducting a professional review action including a review by a third-party, outside peer review organization, Plaintiff was properly determined to have failed to "practice his profession at a standard that is consistent with the standards of care required of physicians in the community."  SOF ¶¶11-30.  As described above, Plaintiff had no protectable property interest in any particular mechanism or set of procedures because he had only been granted temporary practice privileges while his application for full privileges was being completed.  *See* SOF ¶¶5-10.  Nonetheless, the Hospital provided Plaintiff with a process for him to provide a rationale for the care he provided to the two patients at issue.  SOF ¶¶11-30.  Because Plaintiff refused to participate in that process, the Hospital only had the information provided to it by its medical staff and the determination by its outside third-party reviewer, DWC, to determine whether Plaintiff had failed to meet the required standard of care.  Based on the available

15

information, obtained after a reasonable effort to obtain the relevant facts, the Hospital's Risk Management Committee determined in good faith that Plaintiff had failed to meet that standard. The Hospital's termination of the Physician Employment Agreement therefore also complied with the provisions of ¶4B.ix.

Any property interest Plaintiff might claim is defined by the contours of the Physician Employment Agreement and the Hospital's Medical Staff Bylaws. Because the Hospital complied with the terms of those documents when it terminated his temporary privileges and his employment, Plaintiff's claim based on any property interest must fail.

### B. Plaintiff's Liberty Interest Claim Also Fails

Plaintiff also claims that his liberty interest in his reputation was harmed by the Hospital's reports to the KSBHA, and the resulting reports to the NPDB. However, Plaintiff can point to no false information provided by the Hospital in its legally required reports to those agencies that the Hospital was aware was false. SOF ¶37. This is fatal to Plaintiff's claim based on any alleged liberty interest.

Under HCQIA, any health-care entity that takes final peer-review action that adversely affects a physician's hospital privileges for a period longer than thirty days must report that final action to the state board of medical examiners. *See* 42 U.S.C.A. § 11133(a)(1). The board of medical examiners must then report this information to the National Practitioner Data Bank. *See* 45 C.F.R. § 60.11(b).

As the Tenth Circuit held in *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1333 (10th Cir.1996):

> The Health Care Quality Improvement Act confers immunity on any person who makes a report to the National Practitioner Data Bank "without knowledge of the falsity of the information contained in the report." 42 U.S.C. § 11137(c) (1994). Thus, *immunity for reporting exists as a matter of law unless there is sufficient evidence for a jury to conclude the report was false and the reporting party knew it was false.*

16

*Brown*, 101 F.3d at 1334 (emphasis added).  Since Plaintiff can point to no false information provided in the Hospital's reports to the KSBHA, the Hospital is immune from Plaintiff's claim based on that reporting.

Further, Plaintiff's claim that his reputation was harmed by the Hospital's reports to the KSBHA fails because the Supreme Court has rejected the assertion of reputation as a discrete interest protected by the Due Process Clause of the Fourteenth Amendment. Reputation alone does not implicate any "liberty" or "property" interests sufficient to invoke the procedural protection of the Due Process Clause; hence, to establish a claim under § 1983 and the Fourteenth Amendment, more must be involved than simply defamation by a state official. *Paul v. Davis*, 424 U.S. 693, 701–712, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

> [A plaintiff's] interest in reputation is simply one of a number which the State may protect against injury by virtue of its tort law, providing a forum for vindication of those interests by means of damages actions. And any harm or injury to that interest, even where, as here, inflicted by an officer of the State, does not result in a deprivation of any "liberty" or "property" recognized by state or federal law, nor has it worked any change of respondent's status as theretofore recognized under the State's laws. For these reasons, we hold that the interest in reputation asserted in this case is neither "liberty" nor "property" guaranteed against state deprivation without due process of law.

Indeed, even in situations in which a plaintiff attempts to connect his reputation with his "right to earn a living" to create a protectable liberty interest, "[a] liberty interest is not violated when one is discharged without public disclosure of the reasons for the discharge." *Dickeson v. Quarberg*, 844 F.2d 1435, 1440 (10th Cir.1988). To be actionable, statements accompanying a discharge or removal of hospital staff privileges (1) "must impugn the good name, reputation, honor, or integrity of the [individual]," (2) "must be false," (3) "must foreclose other employment opportunities," and (4) "must be published."  *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir.1994)(citations omitted).

Here, Plaintiff has again provided no evidence that anything in the reports made to the

KSBHA were false, nor has he shown that those reports have foreclosed other employment opportunities. Indeed, he testified that he continues to practice medicine to this day. SOF ¶38. As one court noted:

> The National Practitioner Data Bank acts as a clearinghouse for information about individual physicians. Access to information contained in the Data Bank is not available to the general public, but is restricted to a limited group of persons and entities. See 45 C.F.R. § 60.11(a).

*Pfenninger v. Exempla, Inc.*, 116 F.Supp.2d 1184, 1196 (D. Colo. 2000). "Where communications are not made public, they cannot form the basis of a claim for impairment in one's good name and reputation." *Id.*, citing *Bishop v. Wood*, 426 U.S. 341, 348 (1976). As in *Pfenninger,* while it is true that the report of action against Plaintiff is available to any state licensing board or health care entity to which he applies for membership or practice privileges, *see* 45 C.F.R. § 60.11(a)(3), (4), Plaintiff has produced no evidence indicating that any individual, or entity, sought access to the report. Because no false information exists in the Report, and Plaintiff cannot show that the report has prevented him from practicing medicine, he cannot claim deprivation of a liberty interest based on the statement in those reports. *See Pfenninger*, 116 F.Supp.2d at 1196. Thus, Plaintiff's claim based on an alleged property interest also fails.

### C.     Plaintiff's §1983 Claim Also Fails Because He Cannot Identify Any Policy, Practice, Or Custom of the Hospital that Was the Moving Force Behind the Alleged Violation of His Constitutional Rights

In order for a government entity to be held liable under §1983, a plaintiff must identify a policy, practice, or custom of the entity than can be shown to be a moving force behind the alleged violation of his constitutional rights. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). Section 1983 liability can be imposed upon a municipality only for underlying, identifiable constitutional violations attributable to official municipal policy. *Monell v. New*

18

*York City Department of Social Services,* 436 U.S. 658, 694 (1978).  Plaintiffs suing under 42 U.S.C. §1983 must show that the injury was caused by a municipal custom or policy.  *Los Angeles County v. Humphries*, 131 S. Ct. 447 (2010).

Plaintiff cannot meet the requirements to establish a claim for damages under §1983 against the Hospital because he cannot show that the Hospital (1) executed a custom or policy when it terminated his employment agreement and revoked his temporary privileges or that (2) any such custom or policy caused Plaintiff to suffer deprivation of constitutional or other federal rights.  As a result, Plaintiff's Section 1983 claim fails.  *See Moss v. Kopp*, 559 F.3d 1155, 1168 (10th Cir. 2009).

### III.  Plaintiff's Breach of Contract Claim For Moving Expenses Also Fails

Plaintiff's Physician's Employment Agreement provided that "[t]he Hospital will pay not to exceed $4,000 for expenses directly attributable to the moving and transportation of Physicians home and office furnishings to Meade, Ks.  Hospital will reimburse Physician within 10 days of the submission of qualified receipts." SOF ¶39.  Plaintiff admits that approximately $2,800.00 in Plaintiff's moving expenses were paid by the Hospital.  SOF ¶40.  Plaintiff also admits that he does not possess any documentation for the additional $1,200.00 in moving expenses he seeks in this lawsuit.  SOF ¶41.

Nonetheless, Plaintiff testified that $250.00 of the alleged moving expenses Plaintiff seeks were for money paid to his son and his son's friends for moving Plaintiff's belonging from storage in Meade, Kansas to his home.  SOF ¶42.  The remainder of the alleged moving expenses represent a rental bill from Circle O Motel and RV Park.  SOF ¶43.

Under Kansas contract law, "The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction." *Osterhaus*

19

*v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011). When possible, a court ascertains the parties' intent from the four corners of the operating agreement, construing "all provisions together and in harmony with each other rather than by critical analysis of a single or isolated provision." *Investcorp, L.P. v. Simpson Investment Co., L.C.,* 267 Kan. 840, 848 (1999)(*quoting Metropolitan Life Ins. Co. v. Strnad*, 255 Kan. 657, 671 (1994)). When the language of the contract is clear, there is no room for construction or modification of the terms. *Metropolitan Life Ins. Co.*, 255 Kan. at 671.

Here, there can be no doubt as to the meaning of the Physician Employment Agreement's provisions regarding moving expenses. Such expenses were only to be paid "for expenses directly attributable to the moving and transportation of Physicians home and office furnishings *to* Meade, Ks." SOF ¶39 (emphasis added). A check to Plaintiff's son and his friends for moving furnishings from storage in Meade, Kansas to a home does not qualify as expenses for moving such furnishing *to* Meade, Kansas. Nor does the cancelled check Plaintiff provided constitute a "qualified receipt" for such a service as required by the Physician Employment Agreement. Even more obviously, Plaintiff's rental expense at the Circle O Motel and RV Park (*see* SOF ¶43) clearly bears no relationship to moving "Physicians home and office furnishings." Indeed, Plaintiff admitted that the Hospital never told Plaintiff that he would be reimbursed for temporary housing as a moving expense or that sums paid to family members would be reimbursed as moving expenses. SOF ¶44. Given these facts and the clear meaning of the Physician Employment Agreement, Plaintiff's claim for breach of contract must fail.

### IV. Plaintiff's Claim for Punitive Damages Also Fails

Finally, the law is clear that punitive damages cannot be imposed against municipalities or similar agencies in a 42 U.S.C. §1983 lawsuit. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981); *Younen v. Tintic School District*, 343 F.3d 1296, 1306-07 (10th Cir. 2003)(no

punitive damages allowed against municipal agencies or school districts).  As the court held in *Davis v. West Community Hospital*, 755 F.2d 455, 467 (5th Cir. 1985), a district hospital such as Defendant Hospital is immune from punitive damages in a §1983 lawsuit.  Further, damages for breach of contract are limited to pecuniary losses sustained and thus punitive damages are not recoverable for Plaintiff's claim of breach of contract with regard to his alleged moving expenses.  *See Temmen v. Kent-Brown Chev. Co.*, 227 Kan. 45, 605 P.2d 95 (1980).  Thus, Plaintiff's claim for punitive damages should also be dismissed.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, Defendant respectfully requests this Court enter an Order granting summary judgment in its favor on all of Plaintiff's claims and dismiss this case in its entirety.

Dated this 5th day of December, 2014.

Respectfully Submitted,

**s/ Alan L. Rupe**
Alan L. Rupe, #08914
Mark A. Kanaga, #25711
Kutak Rock LLP
1605 N. Waterfront Parkway, Suite 150
Wichita, KS 67206
Telephone: (316) 609-7900
Facsimile:  (316) 630-8021
alan.rupe@kutakrock.com
mark.kanaga@kutakrock.com
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the above and foregoing with the Clerk of the

Court by using the CM/ECF system, which will send notification of the filing to the following:

Donald N. Peterson, II
WITHERS GOUGH PIKE PFAFF & PETERSON, LLC
200 W. Douglas
Suite 1010
Wichita, KS 67202
dpeterson@withersgough.com

*Attorneys for Plaintiff*

this 5th day of December, 2014.

s/ Alan L. Rupe
Alan L. Rupe, #08914

22

4830-9350-2752.1