```
 1   .

 2              IN THE UNITED STATES DISTRICT COURT

 3                 FOR THE DISTRICT OF KANSAS

 4   .

 5   .

 6   RAYMOND WINGER, M.D.,

 7        Plaintiff,

 8   .

 9      vs.             Case No. 13-CV-1428-JTM/GLR

10   .

11   MEADE DISTRICT HOSPITAL,

12        Defendant.

13   .

14   .

15                      VIDEOTAPED

16                   DEPOSITION OF

17                 RAYMOND WINGER, M.D.,

18   taken on behalf of the Defendant, pursuant to

19   Notice to Take Deposition, beginning at 1:07 p.m.,

20   on October 21, 2014, at the law offices of Withers

21   Gough Pike Pfaff & Peterson, LLC, 200 West

22   Douglas, Suite 1010, in the City of Wichita,

23   County of Sedgwick, and State of Kansas, before

24   Cameron L. Gooden, Certified Court Reporter.

25   .
```





EXHIBIT
A

1    hospital, have you had any employment since then?

2          A.   Just recently I got a -- I was called a

3    locum tenens or a temporary position for a

4    temporary position assignment in the emergency

5    room.

6          Q.   And where is that at?

7          A.   Do I need to say?

8          Q.   Yes.   Yeah.

9          A.   Okay.   It's at Independence, Kansas.

10         Q.   Okay.   Is there a -- is there like a

11   county hospital there or?

12         A.   I'm not sure how it's -- I don't know if

13   it's -- some hospitals are county, some are church

14   hospitals, or...

15         Q.   Okay.   What -- what is the name of the

16   hospital?

17         A.   Mercy.

18         Q.   Okay.   And when did you first start doing

19   locum tenens work?

20         A.   A couple weeks ago.

21         Q.   Okay.   Now, had you applied for any other

22   positions since leaving Meade and -- and before

23   starting this work?

24         A.   Yes.

25         Q.   Okay.   Where have you applied?



```
 1    had their own tack -- or their own retirement plan
 2    that was outside of the Social Security system, I
 3    believe.
 4         Q.   Okay.  And when you were brought on
 5    originally did he discuss with you that you would
 6    be brought on in a provisional status for a period
 7    of time and then afterwards your status would be
 8    changed to an active physician with full
 9    privileges?
10         A.   No.  The only thing I filled my
11    application for privileges, which were that
12    particular paperwork was to be done by another
13    institution because they didn't have the personnel
14    to do that at Meade.  And he said that he was
15    granting me temporary privileges based on his own
16    personal power.
17         Q.   Okay.
18         A.   And I would be operating under those
19    temporary privileges.
20         Q.   Okay.  Okay.  And so you -- you started
21    work there around May 6th of 2013, does that sound
22    correct?
23         A.   Yes, that sounds correct.
24         Q.   Okay.  And let's talk a little bit then
25    about the incidents that are at issue in this --
```



1           (THEREUPON, Defendant's Deposition

2     Exhibit No 6 was marked for identification.)

3           BY MR. KANAGA:

4           Q.   Okay.  The next document I'll mark as

5     Defendant's Exhibit 6.  And it appears that this

6     is the letter that resulted from the review by

7     Docs Who Care on June 15th, 2013, correct?

8           A.   Correct.

9           Q.   And this review mentions the pneumo --

10    sorry -- pneumothorax issue that I believe you

11    alluded to before.

12          A.   Correct.

13          Q.   And also mentions the concern about the

14    code being carry -- carried on too long, correct?

15          A.   Correct.

16          Q.   Okay.  So the -- this Docs Who Care

17    review, you -- you were made aware that -- that

18    this result had come back from Docs Who Care,

19    correct?

20          A.   Yes.  I -- I saw one of the letters.  And

21    I believe one of the letters, I'm not sure which,

22    and then it was a short time letter it was taken

23    away from me and I didn't have it any more.

24          Q.   Okay.

25               THE REPORTER:  I'm sorry.  It was taken



1    away from me and --

2        A.   I didn't have it any more.  This is the

3    first I've seen the Docs Who Care letter.

4        BY MR. KANAGA:

5        Q.   I thought --

6        A.   Since whenever.

7        Q.   Since -- since when you saw it before at

8    that time?

9        A.   Yeah.

10       Q.   Okay.  Okay.

11       A.   And then today.

12       Q.   Okay.

13            (THEREUPON, Defendant's Deposition

14   Exhibit No 7 was marked for identification.)

15       BY MR. KANAGA:

16       Q.   Let me mark this next exhibit as Exhibit

17   7.  And this appears to be a similar letter from

18   June 15, 2013, but this relates to the care of the

19   female patient, correct?

20       A.   Correct.

21       Q.   Okay.  And here the concerns are the

22   problems having to do with the patient's

23   bradycardia, is that correct?

24       A.   I haven't had a chance to read this.

25       Q.   Oh, okay.  Go ahead.



800 E. 1st Street
Wichita, KS 67202
316-201-1612          5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com          6420 W. 95th Street
Overland Park, KS 66212
913-383-1131

1       A.   Yeah, it talks about the patient's

2   bradycardia.  And it also mentions cardiac enzyme

3   levels, the blood test that I alluded to.

4       Q.   Okay.  And the Docs Who Care

5   determination was that the -- the transfer should

6   have been conducted or should have been done,

7   correct?

8       A.   He says there is nothing gained for the

9   patient by waiting to transfer.

10      Q.   Okay.  And the sentence before that he

11  says, once it became clear that the patient had

12  rising cardiac enzyme levels the patient should

13  have been transferred to the cardiologist's care.

14  Is that correct?

15      A.   That is correct.

16      Q.   Okay.  Then it mentions the -- the nurses

17  believing that -- that you had been ignoring what

18  was being reported, correct?

19      A.   That's what it says.

20      Q.   Okay.  And then it mentions that at least

21  in the opinion of the Docs -- Docs Who Care it

22  appeared that you had put your personal situation

23  above that of the patient, correct?

24      A.   That's what it says.

25      Q.   Okay.  And then there is also a mention



Appino & Biggs Reporting Service, Inc.
Technology Specialists in Today's Complex Litigation

800 E. 1st Street            5111 SW 21st Street           6420 W. 95th Street
Wichita, KS 67202            Topeka, KS 66604              Overland Park, KS 66212
316-201-1612                 785-273-3063                  913-383-1131
                             www.appinobiggs.com

10/21/2014          **RAYMOND WINGER, M.D.**          95

1    about a lack of familiarity in the usage of

2    Atropine.  Do you -- do you know what that's

3    referring to?

4         A.   Yes.

5         Q.   Okay.  What -- what would have been the

6    use of Atropine, that would have been called for

7    here?

8         A.   The patient had a low blood pulse and the

9    initial -- in the ACLS guidelines they say that if

10   you have a bradycardia with symptoms -- and she

11   had altered mental status and felt fatigued and

12   felt bad, that the -- one of the first things that

13   you do is give a dose of Atropine.  Well, the ACLS

14   guidelines say you give .5-milligrams of Atropine.

15   Well, it turns out in the Meade hospital, I -- I

16   guess that their dosage is .4.  Their bottle is --

17   that's how big it is, or their syringe.  So the

18   nurses are used to giving .4, and not .5, so fine,

19   give .4.

20        Q.   Okay.

21        A.   I mean, it's a tenth of a cc difference,

22   no big deal.

23        Q.   Okay.  And so -- but that was the -- I

24   think you had talked about that earlier.  That was

25   the dose that you had -- had her receive, correct,



Appino & Biggs Reporting Service, Inc.
Technology Specialists in Today's Complex Litigation

800 E. 1st Street            5111 SW 21st Street         6420 W. 95th Street
Wichita, KS 67202           Topeka, KS 66604            Overland Park, KS 66212
316-201-1612                785-273-3063                913-383-1131
                            www.appinobiggs.com

10/21/2014            **RAYMOND WINGER, M.D.**            96

1    **the Atropine you had called for as you were making**

2    **your way to the hospital?**

3        A.    Correct.

4        **Q.    Okay.**

5        A.    And now when he says finally there seems

6    to be some lack of familiarity in the use of

7    Atropine --

8            THE REPORTER:  I'm sorry.  State that

9    again.

10       A.    Okay.  When the -- when the letter says,

11   finally there seems to be some lack of familiarity

12   in the usage of Atropine.  You'll have to ask him

13   what he was alluding to.

14           BY MR. KANAGA:

15       **Q.    Okay.  And then as far as the standard of**

16   **care the -- the note here is that it would -- it**

17   **would be considered a three under -- under Docs**

18   **Who Care's evaluation, correct?**

19       A.    That's what he says, he alludes to that,

20   correct.

21       **Q.    Okay.**

22           THE REPORTER:  Can we take a quick break?

23           MR. KANAGA:  Sure.

24           THE VIDEOGRAPHER:  It's 3:35 p.m., we're

25   going off the record.



800 E. 1st Street
Wichita, KS 67202
316-201-1612

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Overland Park, KS 66212
913-383-1131

1          (THEREUPON, a recess was taken.)

2          THE VIDEOGRAPHER:  It's 3:44 p.m., we're

3     back on the record.

4          BY MR. KANAGA:

5          Q.   Okay.  So we took a short break there,

6     correct?

7          A.   Correct.

8          Q.   And when we last stopped we were talking

9     about the letters from Docs Who Care and we

10    reviewed those, correct?

11         A.   Correct.

12              (THEREUPON, Defendant's Deposition

13    Exhibit No 8 was marked for identification.)

14         BY MR. KANAGA:

15         Q.   Okay.  Next I'm going to mark Exhibit No.

16    8.

17              MR. KANAGA:  (Indicating).

18              MR. PETERSON:  Thank you.

19         BY MR. KANAGA:

20         Q.   And this is dated June 20th of 2014, and

21    appears to be minutes of a risk management

22    meeting, possibly the meeting you were referring

23    to earlier, but a meeting where you, Miss Chance

24    and Doctor Feldmeyer, along with Mickey Thomas

25    were present.



800 E. 1st Street
Wichita, KS 67202
316-201-1612

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Overland Park, KS 66212
913-383-1131

1      A.   Right.  I believe this is the risk

2   management meeting after the staff meeting.  I

3   think this is what this alludes to.

4      Q.   Okay.

5      A.   Here it says, she will arrange for that

6   with Docs Who Care.

7      Q.   Okay.  And it's -- so and arranging for

8   that is that you'll be provided an opportunity to

9   provide a response to the reviewer, correct?

10      A.   Now, the -- initially at this time

11   without having -- I don't think we received a Docs

12   Who Care response.  I wanted to have input to Docs

13   Who Care, tell them my side.  And I think that's

14   what this alludes to.  At some point in time that

15   I wanted to have Docs Who Care give them my side

16   of the issues, whatever they might be.

17      Q.   Okay.  So let's kind of try to clarify

18   the -- the timeline if we can.  If you'll go back

19   to Exhibit 6.

20      A.   Okay.

21      Q.   Okay.  So that letter is dated June 15,

22   2013, correct?

23      A.   Right.

24      Q.   And Exhibit 7 is also dated June 15,

25   2013, correct?



800 E. 1ˢᵗ Street
Wichita, KS 67202
316-201-1612

5111 SW 21ˢᵗ Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95ᵗʰ Street
Overland Park, KS 66212
913-383-1131

10/21/2014          **RAYMOND WINGER, M.D.**          99

1       A.    Correct.

2       **Q.    Okay.  So then at this June 20th meeting**

3  **basically were -- were you told that there had**

4  **been a response from Docs Who Care, but -- but**

5  **then as you mentioned you wanted to provide your**

6  **side of the story to Docs Who Care, is that**

7  **correct?**

8       A.    That is correct.

9       **Q.    Okay.  And you were told that you would**

10 **be allowed to do that, correct?**

11      A.    Right.

12      **Q.    Okay.  Then -- so did you ever write a**

13 **response to Docs Who Care?**

14      A.    No.

15      **Q.    Okay.  Then --**

16      A.    The reason was -- he -- he had -- this

17 Docs Who Care person, whoever they were, they had,

18 in my opinion, they had already rendered their

19 opinion.  It -- it was here (indicating).

20      **Q.    Okay.**

21      A.    And so it's a little hard for me to go

22 back and antedate -- or precede his -- his

23 response.  Do you understand what I'm saying?  How

24 can I go back and have input now?  He's already

25 rendered his response.



Appino & Biggs Reporting Service, Inc.

Technology Specialists in Today's Complex Litigation

800 E. 1st Street          5111 SW 21st Street          6420 W. 95th Street
Wichita, KS 67202          Topeka, KS 66604          Overland Park, KS 66212
316-201-1612              785-273-3063              913-383-1131
                          www.appinobiggs.com

1      Q.   But it appears that you -- you directly

2   asked to be able to provide input?

3      A.   That is true.

4      Q.   Okay.

5      A.   I -- I didn't afford the opportunity to

6   do that.

7      Q.   Okay.  So you were -- you were given an

8   opportunity to respond to Docs Who Care, but you

9   didn't feel that it would be productive to respond

10   to Docs Who Care, is that correct?

11      A.   Correct.

12      Q.   Okay.

13      A.   Now, the reason -- what I did is I

14   thought that at this point in time the criticism

15   was two-fold that the code had went on too long

16   for the male patient, and then on the female

17   patient that I hadn't responded to the blood test

18   enzymes.  And those were the only two criticisms

19   that I was -- had heard of.  And so before this

20   meeting -- I believe, it's before this meeting I

21   had sent the -- all of the records that I knew of

22   and those two criticisms to Doctor Wiley in

23   Liberal.  And I thought, I mean his opinion is as

24   good as anybody else's or better than most.  He is

25   the director of emergency room services at Liberal



```
 1   hospital.
 2        Q.   Okay.  And how did you know Doctor Wiley?
 3        A.   I didn't.  I contacted the peer review
 4   coordinator at Liberal and briefly told them my
 5   situation, and she referred me to -- I believe
 6   it's Jean Hutton, who is the assistant
 7   administrator or the vice administrator for the
 8   Liberal hospital.  And I told her the situation
 9   and she said she would talk with Doctor Wiley and
10   see if he would be willing to render an opinion.
11   And then I -- subsequent to that I called --
12   called her, and then I sent the chart records and
13   a brief letter to Jean Hutton and she gave them to
14   Doctor Wiley.
15        Q.   Okay.  And so if I understand correctly
16   from what you've testified, your -- you were given
17   the opportunity to respond to the Docs Who Care,
18   but you felt it would be more productive to send
19   the information to Doctor Wiley and get his
20   opinion.
21        A.   I believe Doctor Wiley -- I've had -- I
22   had already sent that letter to Doctor Wiley some
23   time before that.
24        Q.   Okay.  And so when you asked for the
25   opportunity to respond on the Docs Who Care
```



800 E. 1st Street
Wichita, KS 67202
316-201-1612

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Overland Park, KS 66212
913-383-1131

1   **matter, did -- did you not mean it or?**

2        A.    No.  I meant it at the time, you know,

3   and subsequently after thought -- after the

4   meeting of -- that I'm asking this guy to retract

5   or change his opinion.  And I just -- I don't

6   know.  I just didn't feel it would be productive.

7   I thought Doctor Wiley's -- his letter would be

8   coming any day and it would be just as good as the

9   other guy's letter.

10       **Q.    Okay.  So just so we're clear, as far as**

11  **the process that had been laid out for you by the**

12  **hospital and -- and by Miss Chance, you declined**

13  **to do that and wanted to present Doctor Wiley's**

14  **findings, correct?**

15       A.    Right.

16       **Q.    Okay.**

17       A.    What -- the Liberal quality assurance

18  lady told me that there are two criterias for peer

19  review criticisms.  One, is that it had to be

20  objective or measurable.  And two, is that the

21  person that's being criticized would have a chance

22  to present his side, you know, at the initial

23  complaint to whoever is doing the review -- peer

24  review process.  But I thought that this Docs Who

25  Care thing had already been done.  How do I -- how



Appino & Biggs Reporting Service, Inc.
Technology Specialists in Today's Complex Litigation

800 E. 1st Street          5111 SW 21st Street          6420 W. 95th Street
Wichita, KS 67202          Topeka, KS 66604           Overland Park, KS 66212
316-201-1612               785-273-3063                913-383-1131
www.appinobiggs.com

1    do I go back and present my side initially?

2         Q.   Well, I'm -- I guess I'm trying to

3    understand, because it looks like the hospital was

4    trying to give you an opportunity to give -- give

5    your side of the story to Docs Who Care?

6         A.   Correct.  On the 20th.

7         Q.   Right.  Right.

8         A.   This letter -- this letter is on the 15th

9    from Docs Who Care.

10        Q.   Right.

11        A.   They had already rendered their opinions.

12        Q.   And so -- and so you -- you just felt

13   like it wouldn't be useful to participate in the

14   process that was offered?

15        A.   I guess as good, productive or useful.

16        Q.   Okay.

17        A.   I'm asking this guy to change his mind.

18             (THEREUPON, Defendant's Deposition

19   Exhibit No 9 was marked for identification.)

20        BY MR. KANAGA:

21        Q.   Okay.  Well, let's look at Defendant's

22   Exhibit 9.  And I just want you to -- if you could

23   flip through this document real quick.

24        A.   Yes.

25        Q.   Okay.  Is this the letter that you



800 E. 1st Street
Wichita, KS 67202
316-201-1612                    5111 SW 21st Street
                               Topeka, KS 66604
                               785-273-3063
                               www.appinobiggs.com                    6420 W. 95th Street
                                                                      Overland Park, KS 66212
                                                                      913-383-1131

1   **mentioned sending to Doctor Wiley?**

2       A.   Yes.

3       **Q.   Okay.  And are the attachments that are**

4   **included with this document, are they -- are they**

5   **the attachments that you provided along with that?**

6       A.   Yeah.  And as a matter of fact Jean

7   Hutton or Doctor Wiley retained those attachments

8   for purposes of their records I assume.

9       **Q.   Okay.**

10      A.   So that if there is any issue with the --

11  their response they could -- they would have

12  something to refer to.

13      **Q.   Okay.**

14      A.   So supportive documentation.

15      **Q.   Okay.  And just if you turn with me to**

16  **page 166.**

17      A.   Okay.

18      **Q.   Can you tell me what -- what this**

19  **document is?**

20      A.   Yes.  This is a -- this is just a summary

21  note of what took place in the emergency room with

22  the male patient.

23      **Q.   Okay.  And it gives the male patient's**

24  **name, correct?**

25      A.   Correct.



800 E. 1ˢᵗ Street            5111 SW 21ˢᵗ Street            6420 W. 95ᵗʰ Street
Wichita, KS 67202          Topeka, KS 66604          Overland Park, KS 66212
316-201-1612               785-273-3063               913-383-1131
                           www.appinobiggs.com

10/21/2014          **RAYMOND WINGER, M.D.**          **105**

1          Q.    And provides sort of the information

2     about the patient's care and -- and that sort of

3     thing?

4          A.    Correct.

5          Q.    The patient's health condition and so

6     forth.

7          A.    Correct.

8          Q.    Okay.  And on page 167.

9          A.    Yes.

10         Q.    These are labeled as progress notes, this

11    -- this is for the female patient, correct?

12         A.    Correct.

13         Q.    And it lists her name, correct?

14         A.    Yes.

15         Q.    And then it describes what her medical

16    conditions were and what treatment steps were

17    given, correct?

18         A.    Yes.

19         Q.    Okay.  Turning to page 168.

20         A.    Yes.

21         Q.    This appears to be a continuation of

22    progress notes about the female patient and her

23    medical condition, correct?

24         A.    Correct.

25         Q.    Okay.  And again on 169, just a



1  continuation of those progress notes for the

2  female patient, correct?

3     A.   Yes, correct.

4     Q.   And again -- and then turning to the next

5  page that's Bates stamped 170 in the bottom right

6  corner, this appears to be a -- from 170 to 171

7  appears to be the -- some lab results for the

8  female patient, correct?

9     A.   Yes.

10    Q.   Okay.  And then it looks like the last

11 page, page 172, is an article from a healthcare

12 website, correct?

13    A.   Yes.

14    Q.   Okay.  So to your recollection is this

15 all of the information that Doctor Wiley, that you

16 provided to Doctor Wiley for him to review?

17    A.   Yes.

18    Q.   Did you have any --

19    A.   It's just that I'm not sure that these

20 progress notes are the same ones that I gave him,

21 but I believe they are.

22    Q.   Okay.

23    A.   Because they're signed by Doctor

24 Feldmeyer and not by me, and I'm the guy that made

25 the note.  And this may have happened because of



800 E. 1st Street          5111 SW 21st Street          6420 W. 95th Street
Wichita, KS 67202          Topeka, KS 66604             Overland Park, KS 66212
316-201-1612               785-273-3063                 913-383-1131
                           www.appinobiggs.com

1      Q.    Okay.  Let's look at Exhibit 10.

2            (THEREUPON, Defendant's Deposition

3      Exhibit No 10 was marked for identification.)

4      BY MR. KANAGA:

5      Q.    And this is a letter dated June 25th,

6      2013, correct?

7      A.    Yes.

8      Q.    And in it Doctor Wiley -- it's a letter

9      from Doctor Wiley to you, correct?

10     A.    Uh-huh.

11     Q.    And it notes that after reviewing the

12     documentation that you sent I find that the care

13     provided was appropriate, correct?

14     A.    Yes.

15     Q.    And then it says, if any other details

16     are needed I will be glad to respond.  Correct?

17     A.    Yes.

18     Q.    Does this document provide any

19     information, this one page, about what information

20     he may have reviewed in coming to this

21     determination?

22     A.    Do you want to rephrase that?

23     Q.    Does -- does this document, Defendant's

24     Exhibit 10, does it give any indication of what

25     information Doctor Wiley was basing his



Appino & Biggs Reporting Service, Inc.
Technology Specialists in Today's Complex Litigation

800 E. 1st Street          5111 SW 21st Street          6420 W. 95th Street
Wichita, KS 67202          Topeka, KS 66604          Overland Park, KS 66212
316-201-1612          785-273-3063          913-383-1131
www.appinobiggs.com

1    documentation he looked at.

2         Q.   Okay.  I may have misspoke.  Let me ask

3    you a new question.  Does Doctor Wiley's letter

4    contain any information about the patient cases?

5         A.   No.

6         Q.   Okay.  Does it give an indication -- I'll

7    go back to my earlier question.  Does it give an

8    indication of what he reviewed?

9         A.   No.

10        Q.   Okay.  And does -- when -- when you got

11   this letter then -- well, strike that.  We'll --

12   we'll come back to that.

13             (THEREUPON, Defendant's Deposition

14   Exhibit No 11 was marked for identification.)

15             BY MR. KANAGA:

16        Q.   Okay.  So I'm going to mark this

17   Defendant's Exhibit 11.  And before I give you

18   this one, did -- did you have any conversations

19   with Doctor Wiley while he was reviewing the

20   material, phone conversations?

21        A.   I never had any conversations with Doctor

22   Wiley.

23        Q.   Okay.  So --

24        A.   I only had a conversation with Jean

25   Hutton.  And she said that she would give this



1   information to Doctor Wiley.

2       Q.   Okay.  So your only communications were

3   the letter, which it sounds like you sent through

4   Miss Hutton?

5       A.   Correct.

6       Q.   And then the letter that you received

7   back from Doctor Wiley.

8       A.   Yes.

9       Q.   Okay.  So this is Defendant's Exhibit 11.

10  And this is a confidentiality statement and

11  acknowledgment.  At the bottom of the page, is

12  that your signature?

13      A.   Yes.

14      Q.   Okay.  And is that dated May 7th, 2013?

15      A.   Yes.

16      Q.   Okay.  And so that would have been prior

17  to when you sent the material to Doctor Wiley,

18  correct?

19      A.   Yes.

20      Q.   Okay.  And then in the second paragraph

21  would you read -- go ahead and read out loud that

22  paragraph to me.

23      A.   As an employee of Artesian Valley Health

24  System the discrete daily use of confidential

25  information is required.  Medical information,



800 E. 1st Street
Wichita, KS 67202
316-201-1612

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Overland Park, KS 66212
913-383-1131

10/21/2014          **RAYMOND WINGER, M.D.**          112

1    risk management, peer review, medical staff,

2    credentialing, quality assurance and hospital

3    proprietary information must not be treated with

4    gossip with my fellow employees, nor disclosed to

5    unauthorized sources outside the Artesian Valley

6    Health System.  At times I may be involved with

7    information pertaining to patients rather than an

8    employee as well as physicians and other

9    professionals.  I will have the responsibility to

10   assure privacy and confidentiality of any

11   information gathered in reporting such

12   information.

13        **Q.   Okay.  And so in signing this agreement**

14   **you agreed to be bound by that, correct?**

15        A.   Correct.

16        **Q.   Okay.  And as we mentioned before, the**

17   **hospital had provided you the opportunity to**

18   **respond to Docs Who Care, but instead you provided**

19   **the information that we saw attached to your**

20   **letter to Doctor Wiley for his review, correct?**

21        A.   It's not the instead of.  I think I wrote

22   Doctor Wiley before they gave me -- I think I

23   wrote to Doctor Wiley before that -- they said

24   we'll give you the opportunity to respond or to

25   put your input to the DWC, and I didn't do it.



Appino Biggs Reporting Service, Inc.
Technology Specialists in Today's Complex Litigation

800 E. 1st Street          5111 SW 21st Street          6420 W. 95th Street
Wichita, KS 67202          Topeka, KS 66604          Overland Park, KS 66212
316-201-1612              785-273-3063              913-383-1131
www.appinobiggs.com

1    And I had already -- at the time that that took

2    place I had already written the letter to -- I had

3    already sent the letter to Doctor Wiley.

4         Q.   Okay.  So the letter to Doctor Wiley

5    contains patient information, correct?

6         A.   The letter to Doctor Wiley?

7         Q.   The attachments --

8         A.   Yes.

9         Q.   -- the attachments are -- are patients'

10   information.

11        A.   Right.

12        Q.   They list the patient's names.

13        A.   Right.

14        Q.   They provide their health conditions.

15        A.   Right.

16        Q.   They provide information about treatment

17   that was given to these patients.

18        A.   Right.

19        Q.   And the hospital had not authorized you

20   to send that information to Doctor Wiley, correct?

21        A.   That's correct.

22        Q.   Okay.  So in providing the information

23   the -- these patients' medical information to

24   Doctor Wiley you breached this confidentiality

25   agreement, correct?



800 E. 1st Street
Wichita, KS 67202
316-201-1612

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Overland Park, KS 66212
913-383-1131

1      A.   Incorrect.

2      **Q.   Okay.  And explain that to me.**

3      A.   If I talk to a patient -- talked to

4    somebody, another doctor about a patient or have

5    them look at records or something or an X-ray, you

6    know, if I want a second opinion and I called

7    somebody about a second opinion, I don't think

8    that's breaching confidentiality.

9      **Q.   And -- and why is that?**

10      A.   I think it's part of my gathering

11   information to do my job or perform my job.  It's

12   what I gather -- it's like -- like a book, like

13   accessing the information.

14      **Q.   Was Doctor Wiley involved in providing**

15   **care to these two individuals?**

16      A.   No.

17      **Q.   Okay.  Did he -- did your provision of**

18   **information to him help in any way assist with**

19   **their care?**

20      A.   Well, it was -- it was part of my being

21   on staff, being my professional duties, part of --

22   you know, part of my obligation is to take care of

23   patients, but I've got medical records obligations

24   and I've got peer review.  And, you know, that's

25   part of my job, too, is to respond and interact



Appino Biggs Reporting Service Inc.
Technology Specialists in Today's Complex Litigation

800 E. 1st Street          5111 SW 21st Street          6420 W. 95th Street
Wichita, KS 67202          Topeka, KS 66604          Overland Park, KS 66212
316-201-1612          785-273-3063          913-383-1131
www.appinobiggs.com

1   with that and I thought that was part of that

2   process.

3        Q.   Right.  Well, I guess my question is a

4   little bit different.  We have two individuals,

5   you know, particular people whose patient

6   information was given to a doctor.  One of those

7   individuals was deceased, and my question to you

8   is, is providing that information to Doctor Wiley

9   was in no way part of providing care to those two

10  patients, correct?

11       A.   Correct.

12       Q.   Okay.  And Doctor Wiley is not an

13  authorized source, or an authorized person to

14  receive patient information, correct?

15       A.   Correct.  I -- I know what you're

16  alluding to, and I will have to get a hold of the

17  Kansas Board of Healing Arts or the -- or the

18  Kansas Medical Society to respond, because it is

19  common practice for doctors to get opinions of

20  some other -- from somebody else and to hold that

21  information confidentiality.  You know, you

22  respect that as a professional duty, it's an

23  obligation.

24       Q.   Yeah.  I'll be honest with you, I'm not

25  questioning the professional duty of -- of Doctor



10/21/2014        **RAYMOND WINGER, M.D.**        117

1        BY MR. KANAGA:

2        **Q.    Okay.  I'll mark this as Exhibit 12.  Let**

3    **me know when you've had a chance to look it over.**

4        A.    Yes, go ahead.

5        **Q.    Okay.  Now, in the first paragraph it**

6    **describes that you had sent records to the**

7    **physician in Liberal, which was Doctor Wiley,**

8    **correct?**

9        A.    Yes.

10        **Q.    And that you had provided the letter to**

11    **-- to Mickey Thomas, correct?**

12        A.    Yes.

13        **Q.    Okay.  And after -- and Mickey noted that**

14    **the reviewer did not address the issues and the**

15    **Docs Who Care review, correct?**

16        A.    I don't remember him bringing that up.

17    Are you telling me that that's what it says here?

18        **Q.    Yeah, the end of paragraph 1.**

19        A.    Yes.  That is what it says.

20        **Q.    Okay.  Do you -- do you recall that?**

21        A.    No.  But it doesn't really make a lot of

22    sense, because my -- Doctor Wiley would not have

23    communicated with Docs Who Care.  Docs Who Care

24    didn't even know they existed until Doctor Wiley.

25        **Q.    Right.  I -- I believe what this is**



800 E. 1st Street
Wichita, KS 67202
316-201-1612

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Overland Park, KS 66212
913-383-1131

1    saying is what you and I went over before, that

2    the letter from Doctor Wiley doesn't address any

3    of the issues raised in the Docs Who Care letter.

4    And what I'm asking is, do you recall Mickey

5    making a comment like that and you not -- you just

6    not having a response?

7         A.   No, I can't recall that.  But I -- I

8    would not have commented on it.

9         Q.   Okay.  And -- and then do you recall that

10   you were excused and a final determination of care

11   was made?

12        A.   Correct, yes.

13        Q.   Okay.  And then it describes in paragraph

14   3 and 4 the standards of care that were arrived at

15   for each of the two cases.  And then the last

16   paragraph states that you would be informed and

17   corrective action will take place, is that

18   correct?

19        A.   Yes.  Now, I -- I -- up until this time

20   right now I have never seen that paragraph 3 or

21   paragraph 4, and I never have ever been told that

22   these were issues of contention.  When we had

23   these meetings, when we had this particular

24   meeting I went in the meeting and Mickey said you

25   have been criticized for your -- something to the



Appino & Biggs Reporting Service, Inc.
Technology Specialists in Today's Complex Litigation

800 E. 1st Street          5111 SW 21st Street          6420 W. 95th Street
Wichita, KS 67202          Topeka, KS 66604            Overland Park, KS 66212
316-201-1612              785-273-3063                913-383-1131
                         www.appinobiggs.com

1     **Q.   Paragraph 5.**

2     A.   Do you want me to read that out loud?

3     **Q.   No, I'm sorry.  You're not asked to give**

4  **any opinion on numbers 3 or 4, correct?  You're --**

5  **you're --**

6     A.   Are you asking me now?

7     **Q.   I am asking you now.  What's being said**

8  **there is that corrective and disciplinary action**

9  **is going to be taken.**

10    A.   Correct.

11    **Q.   Correct.  Because you had been given the**

12 **opportunity to respond to the third party reviewer**

13 **previously?**

14    A.   Do you want to rephrase that?

15    **Q.   Had you been given the ability to respond**

16 **to the third party reviewer previously?**

17    A.   Yes.

18    **Q.   Okay.  And you didn't, correct?**

19    A.   Correct.

20    **Q.   Okay.**

21         MR. KANAGA:  I think we're on Defendant's

22 Exhibit 13.

23         (THEREUPON, Defendant's Deposition

24 Exhibit No 13 was marked for identification.)

25         MR. KANAGA:  I didn't mark that one.



1      BY MR. KANAGA:

2      **Q.   Okay.  So this is a meeting described on**

3   **July 2nd, 2013, between you and -- and Mickey**

4   **Thomas.  Do you recall being informed of the**

5   **standard of care determinations, and then you had**

6   **a discussion with Mickey about a potential**

7   **resignation or a termination, is that correct?**

8      A.   Correct.

9      **Q.   Okay.  And you -- you recall at that time**

10  **discussing possibly that you would just resign or**

11  **that you could be terminated?**

12     A.   That wasn't a possibility.  Mickey said

13  that I would need to resign immediately or I would

14  be terminated immediately.

15     **Q.   Okay.**

16     A.   And so I said, well, now you've talked to

17  attorneys and I'm sure you've consulted any number

18  of people, surely you would give me a chance to

19  talk to my attorney to see what -- to see his

20  input.  And so he agreed to give me a few days to

21  talk to my attorney.

22     **Q.   Okay.**

23        **(THEREUPON, Defendant's Deposition**

24  **Exhibit No 14 was marked for identification.)**

25     BY MR. KANAGA:



800 E. 1st Street
Wichita, KS 67202
316-201-1612

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Overland Park, KS 66212
913-383-1131

1         Q.   Okay.  And then this is Defendant's

2    Exhibit 14, and this is a letter where you

3    resigned -- where you offered your resignation,

4    correct?

5         A.   Correct.

6         Q.   Okay.  And that was done on July 3rd,

7    2013, correct?

8         A.   I believe so.  That's what the date says.

9         Q.   Okay.  And just for the record, that is

10   your signature on the letter --

11        A.   It is.

12        Q.   -- at the bottom?  Okay.  So in any event

13   had Mr. Thomas accepted your resignation on July

14   3rd you would no longer be employed by the

15   hospital after that date, correct?

16        A.   Would you rephrase that?

17        Q.   So had Mr. Thomas accepted your

18   resignation you wouldn't -- would not have been an

19   employee after July 3rd of 2013, correct?

20        A.   I believe so.

21        Q.   Okay.

22             (THEREUPON, Defendant's Deposition

23   Exhibit No 15 was marked for identification.)

24        BY MR. KANAGA:

25        Q.   Okay.  I'm going to mark this as



800 E. 1ˢᵗ Street
Wichita, KS 67202
316-201-1612

5111 SW 21ˢᵗ Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95ᵗʰ Street
Overland Park, KS 66212
913-383-1131

1    Defendant's Exhibit 15.  Okay.  This is a letter

2    that appears, originally dated July 5th, but then

3    changed to July 8th, correct?

4       A.   Yes.

5       Q.   Do you recall receiving this letter from

6    Mr. Thomas?

7       A.   I recall receiving a letter and I'm not

8    sure I can recall receiving this letter because I

9    was pretty distraught and I didn't really read it.

10      Q.   Okay.  Well, let's turn now to page --

11   the page that's marked 184.

12      A.   All right.

13      Q.   Okay.  And this is where he discusses

14   your contract termination in -- in the letter.

15   And you'll note in the first paragraph it says

16   that it's being terminated pursuant to paragraph

17   4, termination subparagraph B with cause.  Which

18   is -- and the sub item there is failure of the

19   physician to practice his profession at a standard

20   that is consistent with the standards of care.  Is

21   that correct?

22      A.   Yes.

23      Q.   Okay.  And so the -- the determination

24   that was made by the hospital with the help of its

25   third party outside reviewer was that you had not



800 E. 1st Street
Wichita, KS 67202
316-201-1612

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Overland Park, KS 66212
913-383-1131

1        Q.    Okay.   Which you -- which you disagreed

2    with?

3        A.    Correct.

4        Q.    Okay.   Okay.   So let's look briefly at

5    Exhibit 17.

6              (THEREUPON, Defendant's Deposition

7    Exhibit No 17 was marked for identification.)

8              BY MR. KANAGA:

9        Q.    And these are the medical staff bylaws we

10   were discussing earlier.   And if you'll turn with

11   me to page, the page labeled 386.   And under

12   provisional status section F, in that first

13   paragraph it mentions that individuals who are

14   granted a privilege for the first time shall be in

15   a provisional status.   Members shall remain in

16   provisional status for a minimum period of 12

17   months and may remain for a maximum of 24 months.

18   Is that correct?

19       A.    That's -- yes.

20       Q.    Okay.   So at the time these incidents

21   took place and at the time your employment was

22   terminated you were still on a provisional status,

23   correct?

24       A.    Correct.

25       Q.    Okay.   And then if you'll turn with me to



Appino & Biggs Reporting Service, Inc.

Technology Specialists in Today's Complex Litigation

800 E. 1st Street          5111 SW 21st Street          6420 W. 95th Street
Wichita, KS 67202          Topeka, KS 66604          Overland Park, KS 66212
316-201-1612          785-273-3063          913-383-1131
www.appinobiggs.com

1    page 390, paragraph P -- or section P at the -- at

2    the bottom of the page, termination of temporary

3    privileges.  If you could just confirm for me that

4    that was the same paragraph cited in the

5    termination letter that we looked at before.

6    Exhibit 15.

7        A.   All right.  Yes.

8        Q.   Okay.  Okay.  Now, in general, are you

9    aware that when a hospital terminates someone's

10   privileges they're required to make a report to

11   the Board of Healing Arts?

12       A.   No, I didn't know that.

13       Q.   Okay.  And are you aware that the -- are

14   you aware that when a hospital terminates a

15   doctor's privileges they're required to make a

16   report to the national practitioner's database?

17       A.   Say that second one again.

18       Q.   Are you aware that when a hospital

19   terminates a doctor's privileges they're required

20   to make a report to the national practitioner's

21   database?

22       A.   I was not aware of that.

23       Q.   Okay.

24       A.   I believe you.

25            (THEREUPON, Defendant's Deposition



**Appino & Biggs** Reporting Service, Inc.
Technology Specialists in Today's Complex Litigation

800 E. 1st Street          5111 SW 21st Street          6420 W. 95th Street
Wichita, KS 67202          Topeka, KS 66604             Overland Park, KS 66212
316-201-1612               785-273-3063                 913-383-1131
                           www.appinobiggs.com

1    Exhibit No 18 and No 19 was marked for

2    identification.)

3        BY MR. KANAGA:

4        **Q.   Okay.  I'm going to mark the next two**

5    **exhibits, Exhibits 18 and 19, could you take a**

6    **look at both of these?  Do you recognize these**

7    **documents?**

8        A.   Yes.

9        **Q.   Okay.  And what are these documents?**

10       A.   I believe these are my responses to the

11   peer review issues at the Kansas State Board of

12   Healing Arts as sent to me, the same cases.

13       **Q.   Okay.  And so I take it, then, basically**

14   **what we had talked about before, you are currently**

15   **participating in a process to review whether those**

16   **determinations were correct and -- and whether**

17   **they should be reviewed or changed by the Board of**

18   **Healing Arts, correct?**

19       A.   Correct.

20       **Q.   Okay.  And that -- and I think you**

21   **mentioned before that process is ongoing?**

22       A.   Correct.

23       **Q.   Okay.  And these -- you mentioned these**

24   **represent your -- your responses giving a**

25   **description of the various issues.**



 1       A.   Correct.

 2       Q.   **Okay.  Now, in your responses, when you**

 3  **made these responses, you discussed some of the**

 4  **things that we talked about today about the**

 5  **reasons why you disagree with the -- with any**

 6  **determination that the standard of care was**

 7  **inappropriate, correct?**

 8       A.   Do you want to run that by me again.

 9       Q.   **Sure.  So --**

10       A.   In these (indicating).

11       Q.   **In these (indicating), your purpose is to**

12  **give the Board of Healing Arts the information**

13  **from your side of the case as to why your**

14  **treatment for these patients was appropriate,**

15  **correct?**

16       A.   Correct.

17       Q.   **Okay.  And so it also then shows the**

18  **reasons why you believe any opinions, whether by**

19  **Docs Who Care or Meade hospital's own risk**

20  **management committee, why those are incorrect**

21  **opinions, correct?**

22       A.   Well, there is more than one way to treat

23  a person correctly.  I can only defend -- I'm not

24  sure -- I feel most in this case that I can defend

25  what I do.



Appino & Biggs Reporting Service, Inc.
Technology Specialists in Today's Complex Litigation

800 E. 1st Street          5111 SW 21st Street          6420 W. 95th Street
Wichita, KS 67202          Topeka, KS 66604          Overland Park, KS 66212
316-201-1612          785-273-3063          913-383-1131
www.appinobiggs.com

10/21/2014               **RAYMOND WINGER, M.D.**                    140

1        Q.    Okay.

2        A.    And I cannot defend -- I cannot say, you

3    know, defend somebody else's opinion.

4        Q.    Right, right.

5        A.    I think that's left upon them to defend.

6        Q.    Right.  And so the issue -- the issue is

7    not so much that there is false information.  The

8    issue is -- is that you're giving information

9    showing that the reasons why you provided the care

10   you provided and why that was appropriate care,

11   correct?

12       A.    Correct.

13       Q.    And that information is being provided to

14   correct the -- or to rebut the opinions of either

15   the hospital or Docs Who Care that it was not

16   appropriate, correct?

17       A.    Correct.

18       Q.    Okay.

19            MR. KANAGA:  If we could take, like, a 10

20   minute break.  I just want to take a look at stuff

21   and see where we are.

22            MR. PETERSON:  Sure.

23            THE VIDEOGRAPHER:  It's 4:42 p.m., we're

24   going off the record.

25            (THEREUPON, a recess was taken.)



800 E. 1ˢᵗ Street
Wichita, KS 67202
316-201-1612

5111 SW 21ˢᵗ Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95ᵗʰ Street
Overland Park, KS 66212
913-383-1131

1          THE VIDEOGRAPHER:  It's 4:49 p.m., we're

2     back on the record.

3          BY MR. KANAGA:

4          Q.   Okay.  Doctor Winger, we took just a

5     quick break, correct?

6          A.   Correct.

7          Q.   And during that time you had an

8     opportunity to consult with your attorney,

9     correct?

10         A.   Correct.

11         Q.   Okay.  I just have a couple questions, I

12    want to move to your unpaid moving expenses claim.

13         A.   Sure.

14         Q.   So my understanding from your complaint

15    is that there was an original amount of $2,800 in

16    moving expenses that you put forward and that was

17    reimbursed, correct?

18         A.   Correct.

19         Q.   And there is another $1,200 in moving

20    expenses that you claim has not been reimbursed,

21    correct?

22         A.   Correct.

23         Q.   Okay.  Can you describe what

24    documentation you provided to Meade hospital to

25    substantiate the $1,200 in moving expenses?



800 E. 1st Street
Wichita, KS 67202
316-201-1612

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Overland Park, KS 66212
913-383-1131

```
 1        A.   Yeah.   I've given the documentation to
 2   them.
 3        Q.   Okay.
 4        A.   But I can tell you what they were for.
 5        Q.   Okay.
 6        A.   My accountant says the IRS allows you --
 7   if you're moving to a location and you don't
 8   readily have a place to move into, you can allow
 9   for storage and you can allow for temporary
10   housing until you find a place up to about three
11   months of temporary housing, and that was based on
12   that.  I was in temporary housing for three
13   months, I had three months of storage and
14   temporary housing expense plus paying people to
15   move my items.
16        Q.   Okay.
17        A.   And that hadn't occurred or I hadn't
18   submitted those earlier.
19        Q.   Okay.  And what then was the amounts that
20   you were paid for, the 2800, what did the -- what
21   did that amount go towards?
22        A.   Almost all of that went for having people
23   pack up my items and bring them over to me from
24   Wichita.
25        Q.   Okay.  And -- but as far as right now you
```



800 E. 1st Street
Wichita, KS 67202
316-201-1612

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Overland Park, KS 66212
913-383-1131

10/21/2014          **RAYMOND WINGER, M.D.**          143

1   **don't have any documentation for the $1,200 of**

2   **moving expenses, is that correct?**

3         A.   I don't -- I might scramble them up.  I

4   may have -- have made a copy somewhere, I can dig

5   around.  But Meade does have -- I gave them copies

6   of the receipts and stuff like that.

7         Q.   **Okay.  And you're certain these are**

8   **receipts to, like, other companies and so forth**

9   **and -- or are they receipts from family members?**

10        A.   Well, there is the storage expense to

11  Meade whatever, and Meade -- I think it's the

12  newspaper owns the storage facility.  And then

13  there is the expense of the motel, and that was

14  Circle D.  And my son and his friends, I paid them

15  $250 to move all of my stuff out of storage, over

16  to the house and put it away.

17        Q.   Okay.

18        A.   And that was my son, it was 250 bucks or

19  something like that, it was not too much.

20        Q.   **Okay.  And was there ever any discussion**

21  **that you had with Mickey Thomas or anyone else at**

22  **Meade hospital that temporary housing was**

23  **something that would be covered as a reimbursable**

24  **moving expense?**

25        A.   Well, they just said moving expenses.



Appino Biggs Reporting Service Inc.

Technology Specialists in Today's Complex Litigation

800 E. 1st Street          5111 SW 21st Street          6420 W. 95th Street
Wichita, KS 67202          Topeka, KS 66604             Overland Park, KS 66212
316-201-1612              785-273-3063                 913-383-1131
                         www.appinobiggs.com

10/21/2014          **RAYMOND WINGER, M.D.**          144

1          Q.    Okay.

2          A.    And I leave it for the IRS or some

3     accounting person to define that.

4          Q.    Okay.

5          A.    And so that was what it was.

6          Q.    Okay.

7          A.    I thought that would qualify.

8          **Q.    But -- but Meade hospital didn't tell you**

9     **that?**

10         A.    They didn't specify one way or the other,

11    they said moving expenses.

12         **Q.    Okay.  And then the -- the same question**

13    **as far as the $250 paid to your son and his**

14    **friend, there was never any discussion that**

15    **payments to family members for assistance in**

16    **moving would be considered a reimbursable moving**

17    **expense, correct?**

18         A.    They didn't specify whether that was

19    reimbursable or not reimbursable, it wasn't

20    specified.

21         **Q.    Okay.**

22              MR. KANAGA:  Okay.  I'm going to mark one

23    last exhibit.  I think we are on Exhibit 20.

24              THE REPORTER:  20.

25              MR. KANAGA:  Yeah.



Appino & Biggs Reporting Service, Inc.
Technology Specialists in Today's Complex Litigation

800 E. 1st Street          5111 SW 21st Street          6420 W. 95th Street
Wichita, KS 67202          Topeka, KS 66604          Overland Park, KS 66212
316-201-1612          785-273-3063          913-383-1131
www.appinobiggs.com

Meade District Hospital
Risk Management Special Meeting

Date:        June 10, 2013              Time:  12:30 pm

Present:     Michael Thomas, CEO        Sarah Lewis-Finke, APRN
             Jane Chance, RN            Michael Thomas, CEO

1. Special meeting was called to discuss incidents 2506 and 2507.  Those present
   agreed with recommendation to send records to "Docs Who Care" for outside
   peer review.  Call schedule will be adjusted.


*Jane Chance*

Jane Chance, RN
Risk Manager

Confidential pursuant
to KSA 65-4915 and
65-4921 et. Seq.



A00095

CONFIDENTIAL

Case 6:13-cv-01428-JTM  Document 25-1  Filed 12/05/14  Page 42 of 174



**DWC**
MEDICAL SERVICES

Review for Meade District Hospital

Date: June 15, 2013   Second Review

Patient:  Acct # 578072

This trauma case is reviewed in detail.  From the review it appears that the patient suffered life-ending injuries and the post mortem CT scans help to confirm that.  Nevertheless, it sounds as if the attempt to resuscitate the patient were not well organized without anyone taking clear control and yet the physician seems to have be tentative in talking with family and guiding the efforts.  It also appears that no nurse took charge when the physician stepped out of the room, and yet everyone was frustrated by the fact that the physician did not exhibit leadership.

My first concern is that based on the information given in the report consideration should have been given to the fact that the patient might have a tension pneumothorax.  A simple insertion of a 16 gauge needle into the chest would have confirmed this and may have helped in the resuscitation effort.  A chest tube could have been inserted.  I see no indication that this was considered.  In actual fact, the massive injuries probably would have taken his life.  However, in some trauma situations treating a tension pneumothorax can be lifesaving.  Is the physician who was in charge in this code Advanced Trauma Life Support certified?  That course is extremely valuable helping all providers maintain an organized approach to trauma management.  Also, all nurses who may be called on in the trauma code situation should have TNCC training.

Another concern is that the code was carried on too long.  There is no benefit to that if nothing else is being done.

It appears that the physician did not deal very compassionately with the wife.

Standard of Care 2.  The organization of this effort was not what it should have been but in this case it does not appear to have contributed to the bad outcome.

Confidential pursuant
to KSA 65-4915 and
65-4921 et. Seq.

*Quality Assessment Services*

913-397-7800 • Toll free  877-397-7800 • Fax  913-397-7801 • www.docswhocare.com • staff@docswhocare.com • 1337 S. Fountain Drive, Olathe, KS 66061



A00001

CONFIDENTIAL



## DWC
MEDICAL SERVICES

Review for Meade District Hospital

Date: June 15, 2013

Patient:  MR # 26711  Acct # 578068

This record has been reviewed in detail.  This 91 year old female is documented to be very active for her age and seems to have acute malaise and a pulse of 36 on admission.  I note that she was on Digoxin.  There seems to have been significant delay in transferring this patient to the care of a cardiologist.  It is uncertain whether that is truly a reluctance on the part of the cardiologist to have the patient transferred or whether the local physician failed to impress the need for the transfer to the cardiologist.  Further both physician assistant and the physician seem to fail to recognize the seriousness of the situation in this patient and the fact that she was an active 91 year old.

The following are my concerns:

The potential seriousness of the patient's bradycardia seems to have been ignored by the PA and the physician.  From my extensive experience in rural areas I would have made an early decision to transfer the physician to the cardiologist in case went into complete heart block and needed pacing.

Once it became clear that the patient had rising cardiac enzyme levels the patient should have been transferred to the cardiologist care.  There is nothing gained for the patient by waiting to transfer.

It is evident from the nurses' notes that there was considerable frustration on their part that the physician seemed to be ignoring what was being reported.  Further it appears that the physician was putting his personal situation above that of the patient.

Finally, there seems to have been some lack of familiarity in the usage of atropine.

In view of the potential of a negative outcome for this patient caused by the delays in the decision to transfer her the Standard of Care for this patient must be a 3.  If the patient suffered a negative outcome at the receiving facility that I am not aware of then the SOC could be a 4.

Confidential pursuant
to KSA 65-4915 and
65-4921 et. Seq.

*Quality Assessment Services*

913-397-7800 • Toll free  877-397-7800 • Fax  913-397-7801 • www.docswhocare.com • staff@docswhocare.com • 1337 S. Fountain Drive, Olathe, KS 66061



A00103

CONFIDENTIAL

**Meade District Hospital**
**Risk Management Meeting**
**Medical Staff**

**Date:**     June 20, 2014                          **Time:** 1:45 pm

**Present:**     Raymond Winger, MD          Jane Chance, RN
                Michael Thomas, CEO           S.T. Feldmeyer, MD

1. The Risk Management Log was reviewed and approved as presented.

2. Incident #2506 and #2507 were reviewed with Dr. Winger. Standard of care was discussed. Dr. Winger asked that he be allowed the opportunity to provide a response to the reviewer. Jane will arrange for that with Docs Who Care. After final response from DWC, medical staff will and again meet to discuss and determine the final standard of care.


*Jane Chance*

Jane Chance, RN
Risk Manager

Confidential pursuant to KSA 65-4915 and 65-4921 et. Seq.



DEFENDANT'S EXHIBIT
8

A00096

CONFIDENTIAL

James Wiley DO
Southwest Medical Center
315 W 15th Str.
Liberal, Kansas 67901

Dear Dr. Wiley,

I need assistance in responding to a couple of medical care criticisms. I would appreciate your response to these issues.

#1 There was a concern that I managed a **'Code-Blue for too long a period of time**.'
The patient, █████████, had an atv accident and suffered a serious intracerebral injury, but much less of injury to his heart. He responded to fluid and epinephrine to maintaining adequate blood pressure and sinus rhythm. Glascow of 3, fixed dialated pupils. Eagle Med would not transport him, because he wasn't 'stable'.

    At this point, I usually find an opportunity to talk with the family and prepare them for a dire outcome. As I was talking to the wife, she said she wanted me to do 'everything possible if he has any chance at all'. She repeated this a few times. I now recognize that she is the legal representative of █████████, and I am obliged to follow her wishes. When I was an ER Doctor at Irwin Army Hospital, I would transfer him to the ICU under the care the on call hospitalist. I am at Meade Hospital and we have no such luxury. We continued to give ACLS care and he succumbed in due course.

Included: ER/Code Blue Note

#2 There was a concern that I **did not respond to the cardiac enzymes** of the following patient. █████████, 92 yrs, came in to the hospital with weakness, lethargy, and nausea (Digoxin Toxicity). She had no chest pain and no sob or distress.
She had a junctional rhythm with acceptable BP. I obtained a Dig level (2.13H .80-1.50), and cardiac enzymes. I called the Cardiologist, Dr. Stavens twice, initially with the initial presentation as his group had treated Ruth and was familiar with her, and later I called Dr Stavens again after the dig level and cardiac enzymes were back. I followed his instructions which were that he would only recommend transport if he could do an intervention that was warranted. He said if we were to transport her he would watch her conservatively as we were doing.

Included: Progress notes of conversation with Dr Stavens, Lab, Dr Savens bio, document showing Digoxin causing Troponin increase.

Please assist as able,
Thank you,

Ray Winger MD

Confidential pursuant
to KSA 65-4915 and
65-4921 et. Seq.



A00165

CONFIDENTIAL

#1

**MEADE DISTRICT HOSPITAL**
**ARTESIAN VALLEY HEALTH SYSTEM**
**MEADE, KS**

**CODE BLUE NOTE**

NAME:
NUMBER: NC
ACCOUNT: 578072
PATIENT TYPE: E.R.

DOB:
ADMIT DATE: 06/09/13
PHYSICIAN: Harris Davis
SERVICE TYPE: E

**EMERGENCY ROOM NOTE/CODE BLUE NOTE**
**DATE:** 6-9-13

This 66-year-old patient arrived in the Emergency Room per ambulance at 15:25. Patient had, during transport, exhibited nonresponsive behavior. An IV was started and patient was intubated. Epinephrine was administered to resume heart rate. After the arrival in the Emergency Room, we continued the Epinephrine, evaluated the patient on examination we had a patient with multiple unknown trauma who exhibited distal mottling, pupils were fixed and nonresponsive. The patient was still being bagged for breathing, however he was producing a spontaneous pulse. At 15:49, pulse ceased, CPR was administered, 1 mg. Epinephrine was administered. We continued to provide CPR for another minute. The patient's second attempt to epinephrine IV and at that point time his pulse was obtained at 15:53. ABGs were obtained at the same time. We had an active vital sign. At 16:01 the patient's pulse started to decrease and by 16:03 pulse was again not present. We continued to give Epinephrine every 3-4 minutes and continued the CPR. At 16:06 another mg. of Epi was pushed. CPR was present. Eagle Med had arrived for transport. Patient was exhibiting spontaneous pulse. Again at 16:09 the pulse started to decrease and Epinephrine was administered. Continued with CPR. At 16:12 we continued with the Epinephrine. After talking to Trauma Surgery in Wichita, and the family, we presented the fact that this patient with fixed pupillary dilation and no central response, was presenting considerable difficulties. Again, we continued the Epinephrine every 3-4 minutes IV push, followed by a minute or two of CPR, than a minute or two of spontaneous cardiac activity after which it again ceased. By 16:36, Dr. Winger had talked to the family and we ceased giving Epinephrine. At 16:37 we ceased bagging. At 16:39 the patient was pronounced dead. The family was present and agreed with the above orders. It is to be noted that the patient was on the ground prior to the ambulance retrieving the patient an unknown length of time. At no point in time did we ever have a pupillary response, no corneal reflexes were noted. The patient did not every exhibit spontaneous respirations and pulse was only maintained with constant Epinephrine and almost constant CPR. As noted, at 16:39 code was called and patient was pronounced deceased.

**Diagnoses:**
1. **Status post ATV accident**
2. **Unresponsive**
3. **Subarachnoid hemorrhage**
4. **Large pneumothorax**
5. **Multiple rib fractures, left**
6. **Contusion/hematoma left kidney**
7. **Aorta & vena cava collapse**

Confidential pursuant to KSA 65-4915 and 65-4921 et. Seq.

# ✓ #/

**MEADE DISTRICT HOSPITAL**
**ARTESIAN VALLEY HEALTH SYSTEM**
**MEADE, KS**

### PROGRESS NOTES

NAME: ████████████
NUMBER: 26711
ACCOUNT: 578068
PATIENT TYPE: I/P

DOB: ████████
ADMIT DATE: 06/09/13
PHYSICIAN: Seeley T Feldmeyer MD
SERVICE TYPE: M

06-09-2013

Overall this is an elderly white female that comes in very fatigued, light headed and weak. Initial impression was bradycardia and dehydration with low sodium. She does not have a history of vomiting and diarrhea recently.

**Problem:** Dehydration. Patient has a high glucose of 149 and a low sodium of 128. History of drinking at least four half gallon containers of water every day and also taking salt tablets. Plan on getting a hemoglobin A1C to see that she is not become diabetic and we will slowly rehydrate her with 125 cc an hour of IV fluid and repeat lab daily.

**Problem:** Junctional rhythm. This is an old problem for this lady. She has prior hospitalization that show junctional rhythm and Dr. Evans has seen her, done a stress test on her and found that her heart condition is not remarkable at her age. She has been on cholesterol lower medication in the past but it is not listed as an outpatient medication at the present time. We will do a Digoxin level and monitor her electrolytes.

**Problem:** Anemia. Patient has a hemoglobin/hematocrit of 8 and 27. This is remarkable low considering that she is dehydrated. When she rehydrates I expect this number to go down and she is considerably anemic which would account for her decreased energy level recently. We will need to work up this anemia. We will start with doing a stool guaiac x 3, serum protein electrophoresis as her globulin was high in relation to her albumin and check her serum ferritin level.

**Problem:** Thyroid. She has been on 75 mcg of Thyroxine in the past and we will assess by lab in the morning.

**Problem:** Elevated liver function test. The patient has anemia and elevated liver function test, a history of gallbladder removal. We would like to assess and we will start by getting a liver spleen scan sonogram in the morning.

### ADDENDUM

I had a brief telephone consult with Dr. Stavens that ████████████ had a junctional rhythm and that she had this previously and reverted to normal sinus rhythm where digoxin level had come down previously and had been rehydrated. I told him that she was

Confidential pursuant
to KSA 65-4915 and
65-4921 et. Seq.

A00167

CONFIDENTIAL

#2
2

**MEADE DISTRICT HOSPITAL**
**ARTESIAN VALLEY HEALTH SYSTEM**
**MEADE, KS**

**PROGRESS NOTES**

NAME:
NUMBER: 26711
ACCOUNT: 578068
PATIENT TYPE: I/P

DOB:
ADMIT DATE: 06/09/13
PHYSICIAN: Seeley T Feldmeyer MD
SERVICE TYPE: M

06-09-2013: The patient had an episode earlier this afternoon of not being mentally appropriate. She stood up by the side of the bed and peed on her self and pulled out the IV line. She had an episode of gradual increase in her troponin from the 0.3 initially to 0.11 to 0.31. Her current electrolytes done just a short while ago are potassium 5.0, sodium 129 and chloride at 96. I called Dr. Stavens and he said that the dig toxicity could account for both her mental process and her troponin rising a little bit. He said that the only reason to transfer her would be if they could do something particularly an invasive procedure like a stent or a study. He said with her anemia and various other factors that they could not do it, there would be contraindications of doing it at this time so they could not do more than what we are doing here and he recommended to continue with conservative management. He asked about the patient's feeling about being transported and I said that she did not want to go and so he recommended that he stay here at this time and continue with the management course that we are doing. He also agreed to simplify her blood pressure medications and when I suggested Enalapril and Carvedilol as a recipe to go back to on he agreed emphatically that this was a good idea to simplify her medications. He would recommend to hold off on the HCTZ which could mess up her digoxin and to stay with those two medications in particular Enalapril go up on this initially as long as she had good renal function and then add a little bit of Carvedilol to this later as needed. We will continue our course and observe the patient.

RW/BLH
D: 6/09/13 17:15
T: 6/10/13 12:09

Electronically reviewed and signed by: DCTNAME, RADCRED      SIGNDATE
<<COSIGNATURE_PENDING>>

Confidential pursuant to KSA 65-4915 and 65-4921 et. Seq.

A00168

CONFIDENTIAL

#2
3

**MEADE DISTRICT HOSPITAL**
**ARTESIAN VALLEY HEALTH SYSTEM**
**MEADE, KS**

**PROGRESS NOTES**

NAME:
NUMBER: 26711
ACCOUNT: 578068
PATIENT TYPE: I/P

DOB:
ADMIT DATE: 06/09/13
PHYSICIAN: Seeley T Feldmeyer MD
SERVICE TYPE: M

dehydrated, anemic, high potassium and I anticipated her having a high dig level and then in fact she did have a high dig level. She has a reasonably excellent exercise tolerance for her age at 91. She can walk and do yard work 30 minutes at a time without difficult two months ago and could walk around the block a couple of months ago when she was feeling well. Her only complaint to disability is decrease hearing. After reviewing the situation with her he said that he would recommend just continuing the heart enzymes and call him if anything shows up, hold her Digoxin and that he would expect her digoxin to be high which it is and he said to discuss with the patient that at some point in the future she may need to have a pacemaker and that he would be glad to see her as an outpatient.

RW/BLH
D: 6/09/13 11:54
T: 6/10/13 10:31

Electronically reviewed and signed by:  DCTNAME, RADCRED        SIGNDATE
<<COSIGNATURE_PENDING>>

Confidential pursuant
to KSA 65-4915 and
65-4921 et. Seq.

A00169

CONFIDENTIAL

Reported Date/Time: 06/17/13  9:31
MEDICAL DIRECTOR:
S FELDMEYER, MD.

4

NAME.:
ACCT#: 578068
ROOM.: 111-A DISCH  6/09/13 ~ NO PENDING ORDERS

ADMIT: 06/09/13

Meade District Hospital
510 E CARTHAGE STREET
MEADE, KS 67864
LABORATORY -- COMPARATIVE REPORT

PAGE    1

CLIA# 17D0453239

LACUMV2

SEX.......: F
AGE.......: 91 Y
DOB.......:
PAT. PHONE:
MR#.......: 26711

ATTENDING: FELDMEYER SEELEY MD
SECOND....
PRIM CARE.:

## CHEMISTRY

| Collect Dt/tm | 060913 2001 | 060913 2001 | 060913 1755 | 060913 1608 | 060913 1608 | 060913 1608 | 060913 1358 | REFERENCE | |
|---|---|---|---|---|---|---|---|---|---|
| Report Dt/tm: | 060913 2029 | 060913 2028 | 060913 1826 | 060913 1656 | 060913 1638 | 060913 1631 | 060913 1433 | RANGE | UNITS |
| GLUCOSE | | | 124 H | | | | | 74 - | 118 mg/dL |
| BUN | | | 34 H | | | | | 8 - | 26 mg/dL |
| CREA-S | | | 1.70 H | | | | | 0.44 - | 1.00 mg/dL |
| CALCIUM | | | 8.2 L | | | | | 8.5 - | 10.3 mg/dL |
| BICARBONATE | | | 23 | 23 | | | | 22 - | 33 mEq/L |
| SODIUM | | | 128 L | 129 L | | | | 136 - | 144 mEq/L |
| CHLORIDE | | | 95 L | 96 L | | | | 101 - | 111 mEq/L |
| CKMB | | 9.5 HC | 8.5 HC | | | | | | |
| TROPONIN | 1.05 H | | 0.57 H | | 6.0 | | 4.0 | 0.0 - | 6.0 ng/mL |
| AGE | | | 91 | | | 0.31 H | | 0.00 - | 0.14 ng/mL |
| POTASSIUM | | | 4.8 | 5.0 | | | | | yrs |
| eGFR AA | | | 36 | | | | | 3.6 - | 5.1 MEQ/L |
| eGFR NON AA | | | 30 | | | | | | |

| Collect Dt/tm | 060913 1358 | 060913 1209 | 060913 1209 | 060913 0523 | 060913 0523 | 060913 0523 | 060913 0523 | REFERENCE | |
|---|---|---|---|---|---|---|---|---|---|
| Report Dt/tm: | 060913 1429 | 060913 1239 | 060913 1238 | 060913 0551 | 060913 0546 | 060913 0544 | 060913 0543 | RANGE | UNITS |
| GLUCOSE | | | 134 H | | | | 149 H | 74 - | 118 mg/dL |
| BUN | | | 34 H | | | | 33 H | 8 - | 26 mg/dL |
| CREA-S | | | 1.50 H | | | | 1.70 H | 0.44 - | 1.00 mg/dl |
| TOTAL PROTEIN | | | | | | | 7.0 | 6.5 - | 8.4 g/dL |
| ALBUMIN | | | | | | | 3.5 | 3.5 - | 5.0 g/dL |
| GLOBULIN | | | | | | | 3.5 H | 1.5 - | 3.0 g/dL |
| A/G RATIO | | | | | | | 1.0 L | 1.5 - | 2.5 |
| T BILI | | | | | | | 0.9 | 0.3 - | 1.2 mg/dL |
| ALK PHOS | | | | | | | 109 L | 34 - | 104 U/L |
| LDH | | | | | | 281 H | | 98 - | 192 U/L |
| CHOLESTEROL | | | | | | 176 | | 100 - | 200 mg/dL |
| TRIGLYCERIDES | | | | | | 130 | | 0 - | 150 mg/dL |
| HDL | | | | | | 40 | | 40 - | 60 mg/dL |
| LDL | | | | | | 118 H | | 0 - | 100 mg/dL |
| CALCIUM | | | 8.6 | | | | 8.0 | 8.5 - | 10.3 mg/dL |
| MAGNESIUM | | | | | | 1.9 | | 1.8 - | 2.5 mg/dL |
| ALT | | | | | | | 161 H | 14 - | 54 U/L |
| AST | | | | | | | 211 H | 15 - | 41 U/L |
| BICARBONATE | | | 23 | | | | 20 L | 22 - | 33 mEq/L |
| SODIUM | | | 128 L | | | | 128 L | 136 - | 144 mEq/L |
| CHLORIDE | | | 96 L | | | | 95 L | 101 - | 111 mEq/L |
| CK | | | | | | 312 | | 38 - | 234 U/L |
| CKMB | | 3.6 | | 1.8 | | | | 0.0 - | 6.0 ng/mL |
| TROPONIN | 0.11 | | 0.03 | | 0.00 | | | 0.00 - | 0.14 ng/mL |
| AGE | | | 91 | | | | 91 | | yrs |
| POTASSIUM | | | 4.9 | | | | 5.6 HC | 3.6 - | 5.1 MEQ/L |
| eGFR AA | | | 42 | | | | 36 | | |
| eGFR NON AA | | | 35 | | | | 30 | | |

REPORTED DATE/TIME: 06/17/13 09:31

LEGEND:  L-Low, H-High, C-Critical, A-Abnormal, *E-Error

Confidential pursuant
to KSA 65-4915 and CONTINUED
65-4921 et. Seq.

Page 1

A00170

CONFIDENTIAL

Reported Date/Time: 06/17/13  9:31
MEDICAL DIRECTOR:
S FELDMEYER, MD.

Meade District Hospital
510 E CARTHAGE STREET                                                           PAGE     3
MEADE, KS 67864
LABORATORY -- COMPARATIVE REPORT          CLIA# 17D0453239

NAME: ▮                                                                              LACUMV2
ACCT#: 578068                            SEX.......: F
ROOM.: 111-A DISCH  6/09/13 - NO PENDING ORDERS    AGE.......: 91 Y          ATTENDING: FELDMEYER SEELEY MD
                                         DOB.......:                         SECOND...:
ADMIT: 06/09/13                          PAT. PHONE: ▮                        PRIM CARE.:
                                         MR#.......: 26711

## CHEMISTRY

## TDM & TOXICOLOGY

|  |  | REFERENCE | |
|---|---|---|---|
| Collect Dt/tm: | 060913 0523 | RANGE | UNITS |
| Report Dt/tm: | 060913 0642 | | |
| DIGOXIN | 2.13 H | 0.80 - 1.50 ng/mL |

NEW CHEMISTRY REFERENCE RANGES AS OF 04/19/07

REPORTED DATE/TIME: 06/17/13 09:31  ▮                                    215 Page:     4 CONTINUED

LEGEND:  L-Low, H-High, C-Critical, A-Abnormal, *E-Error

| Collect Dt/tm | 060913 0523 | REFERENCE | |
|---|---|---|---|
| Report Dt/tm: | 060913 0552 | RANGE | UNITS |
| WBC | 9.0 | 4.5 - 10.5 K/uL |
| #NEU | 7.00 H | 2.00 - 6.90 10^3ul |
| #LYM | 1.4 | 0.6 - 3.4 10^3ul |
| #MON | 0.60 | 0.00 - 0.90 10^3ul |
| #EOS | 0.0 | 0.0 - 0.7 10^3ul |
| #BAS | 0.0 | 0.0 - 0.2 10^3ul |
| %NEU | 77.2 H | 42.0 - 75.0 % |
| %LYM | 15.8 L | 20.0 - 45.0 % |
| %MON | 6.6 | 0.0 - 12.0 % |
| %EOS | 0.1 | 0.0 - 6.0 % |
| %BAS | 0.3 | 0.0 - 1.0 % |
| RBC | 3.55 L | 4.20 - 5.40 M/uL |
| HEMOGLOBIN | 8.3 L | 12.0 - 16.0 g/dl |
| HEMATOCRIT | 27 L | 38 - 47 % |
| MCV | 75.5 L | 80.0 - 96.0 fL |
| MCH | 23.3 L | 27.0 - 31.0 pg |
| MCHC | 30.8 L | 32.0 - 36.0 g/dL |
| PLATELET | 422 | 150 - 450 K/uL |
| RDW | 15 H | 11 - 14 % |
| MPV | 8 | 0 - 99 fL |
| MANUAL DIFF | NOT INDICATED | |
| RBC MORPH | INDICATED | |
| HYPOCHROM | 1+ | |
| POIK | 1+ | |
| MICRO | 1+ | |
| ANISO | 1+ | |

Confidential pursu---
to KSA 65-4915 a::
65-492 216 Pageaq. 3 CONTINUED

REPORTED DATE/TIME: 06/17/13 09:31  ▮

LEGEND:  L-Low, H-High, C-Critical, A-Abnormal, *E-Error

A00171

CONFIDENTIAL

Digoxin and Troponin i increased - eHealthMe                http://www.ehealthme.com/ds/digoxin/troponin+i+increased

#2
6

# eHealthMe
**Healthcare big data for *ordinary* people**

Browse a drug A B C D E F G H I J K L M N O P Q R S T U V W X Y Z
Browse a condition A B C D E F G H I J K L M N O P Q R S T U V W X Y Z
Enter a condition or a drug, separate drugs by a comma    + Search
How to?    Check drugs    Check symptoms    ask a question

Login  o  Sign up

## From FDA reports: Digoxin and Troponin i increased

This is a study of Troponin i increased among people who take Digoxin. The study analyzes: the time on Digoxin when people have Troponin i increased, gender and age of these people, the severity of Troponin i increased, how they recovered, and common conditions and drugs used besides Digoxin. In total 50,023 Digoxin users are studied. The study is created by eHealthMe based on reports from FDA and is updated regularly.

*Do you have a question?* Healthcare is personal: one drug can work differently between women and men, or for people of different ages. How do you find patients like you to answer your question, and ensure only patients like you can answer it? Our Personalized Q&A can help. Start now

**Erectile Dysfunction Exercises**

**Bipolar Disorder Test**

**Early Signs of Dementia**

**5 Foods to Never Eat**

**Causes of Fibromyalgia**

**Lose Belly Fat Quickly**

**Fibromyalgia Pain Relief**

### Cancer Treatment Options
cancercenter.com
There is hope. Chat privately with our oncology info experts today.



eHealthMe enables ordinary people to use healthcare big data from FDA and social media. **10,177,406** healthcare professionals and patients have studied on eHealthMe (their testimonials). Our original studies have been used on these medical publications:

# THE LANCET

## PROCEEDINGS



### Related study
- Digoxin side effects

### Related symptom
- Troponin I increased

### Monitor the drug
- Digoxin

**Digoxin**
Digoxin has active ingredients of *digoxin*. It is used in atrial fibrillation/flutter, heart rate irregular, heart failure, heart attack, heart palpitations. Commonly reported side effects of Digoxin include breathing difficulty, atrial fibrillation/flutter, nausea, weakness, hypotension.

**Troponin i increased**
Troponin i increased has been reported by people with high blood pressure, chronic myeloid leukaemia, multiple myeloma, depression, pain.

On May, 28, 2013: **50,023** people reported to have side effects when taking Digoxin.

**4 Signs of a Heart Attack**
AdChoices ▷

Among them, **28** people (0.06%) have Troponin I increased.


Trend of "Troponin i increased in Digoxin" reports
2003 (1)  2004 (2)  2006 (1)  2007 (4)  2008 (3)  2009 (5)  2010 (2)  2011 (4)  2012 (6)

## Time on Digoxin when people have Troponin i increased :

|  | < 1 month | 1 - 6 months | 6 - 12 months | 1 - 2 years | 2 - 5 years | 5 - 10 years | 10+ years |
|---|---|---|---|---|---|---|---|
| Troponin i increased | 50.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 50.00% |

## Gender of people who have Troponin i increased when taking

Confidential pursuant to KSA 6 —4216 and 65-4921 et. seq.

of 6                                                      6/18/2013 10:46 AM

A00172

CONFIDENTIAL

June 25, 2013

Ray Winger, MD
Box 1198
Meade, Kansas  67864

Dear Dr. Winger:

After reviewing the documentation that you sent, I find that the care provided was appropriate.

If any other details are needed, I will be glad to respond.

Sincerely,

James Wiley, DO

Confidential pursuant
to KSA 65-4915 and
65-4921 et. Seq.



A00100

CONFIDENTIAL



## CONFIDENTIALITY STATEMENT AND ACKNOWLEDGMENT
### EMPLOYEE

I understand and agree that in the performance of my duties as an employee of Artesian Valley Health System (AVHS), I must hold all patient personal and health information and all Hospital and LTCU information in strict confidence. This information must not be repeated or discussed with anyone outside of the direct care of the patient.

As an employee of Artesian Valley Health System, the discrete, daily use of confidential information is required. Medical information, risk management, peer review, medical staff credentialing, quality assurance, and hospital proprietary information must not be treated as gossip with my fellow employees, nor disclosed to unauthorized sources outside Artesian Valley Health System. At times, I may be involved with information pertaining to patients, residents, and employees as well as physicians and other professionals. I will have the responsibility to assure the privacy and confidentiality of any information gathered and in reporting such information.

I also understand and agree that in the performance of my duties as an employee of Artesian Valley Health System, I must comply with AVHS's Corporate Compliance Program and Code of Conduct. I acknowledge that I have not been, nor am now, involved in any situation which should be reported pursuant to the Code of Conduct, except such situation or situations as have already been reported by me in writing; and I have not used, and will not use, any hospital or LTCU facility or information obtained from Artesian Valley Health System in a manner detrimental to Artesian Valley Health System.

I further understand that Artesian Valley Health System has policies and procedures to assure compliance with regulations promulgated under the Health Insurance Portability and Accountability Act. I agree to abide by all such policies and procedures.

I understand that some penalties for breaches of confidentiality and for breaches in the Artesian Valley Health System Corporate Compliance Program and Code of Conduct are subject to certain provisions of state and federal laws. I understand that violation of any breach of Hospital and LTCU policies related to confidentiality or the Artesian Valley Health System Corporate Compliance Program or Code of Conduct may result in disciplinary action as stated in AVHS's Personnel Policy and Procedure Manual. Disciplinary action may include my immediate termination.

By signing this statement, I am stating and acknowledge that I have read and understand the Confidentiality Program, the Artesian Valley Health System Corporate Compliance Program and Code of Conduct and agree to abide by their terms. By signing this statement, I am also stating that I understand that the Corporate Compliance Program and Code of Conduct require that I report in advance to my supervisor or appropriate Compliance Officer any potential violation of the kind set forth therein.

This statement will be read and signed **annually** by me and will remain on file in the Hospital's or LTCU's employee personnel file.

5/7/2013
**DATE**

**SIGNATURE OF EMPLOYEE**

DEFENDANT'S
EXHIBIT

11

A00288
CONFIDENTIAL

**Meade District Hospital**
**Risk Management Meeting**
**Medical Staff**

**Date:**     July 2, 2013        **Time:** 9:30 am

**Present:**    S. T. Feldmeyer M.D.     Michael Thomas, CEO
             Jane Chance, RN         Raymond Winger, MD

1. Mickey began the meeting stating that at the previous Risk Management meeting, Dr. Winger had requested to respond to the review received from Docs Who Care (DWC) and that to date no such response had been received from him. Dr. Winger, contrary to the request of the Risk Manager to not do so, had sent records to a physician in Liberal to review the cases. The review letter was received by Dr. Winger on the weekend. The letter was not on official letter head and was signed by Dr. Wiley. The envelope was not seen. The letter was delivered to Mickey on 7-1-2013. The letter simply stated that review was complete and standard of care was met. Mickey asked Dr. Winger to present the review to the committee. Mickey brought attention to the fact that the reviewer did not address the issues in the DWC review which were in question by him. Dr. Winger had no comment.

2. Dr. Winger was excused from the meeting for discussion of final standard of care determination.

3. Incident # 2506 was given a standard of care three as recommended by DWC. Rational for determination was non treatment of a Non ST Segment MI. The patient was not treated for an MI or possible coronary artery thrombosis or anything that would have caused harm such as the anemia. The reviewer felt the MI should be treated first and all other problems such as anemia and Digoxin toxicity secondly. The incidence of elevated Troponin levels with use of Digoxin was negligible, which was the basis for Dr. Winger's non treatment of the elevated Troponin.

4. Incident #2507 was initially assigned a standard of care two by DWC. It was the opinion of medical staff that this should be upgraded to a three. Rationale for the three was the non recognition, non treatment of a fatal pressure pneumo-thorax although the failure to address the pneumothorax did not affect the outcome it resulted in the hospital being legally exposed because of unrecognized immediate cause of death.

5. Dr. Winger will be informed and corrective action will take place. Mickey will meet with him today.

*Jane Chance*
Jane Chance, RN Risk Manager

Confidential pursuant
to KSA 65-4915 and
65-4921 et. Seq.



DEFENDANT'S
EXHIBIT
12

A00097

CONFIDENTIAL

**Meade District Hospital**
**Risk Management Meeting**
**Medical Staff**

**Date:**      July 2, 2013                      **Time:** 3:30 pm

**Present:**      Michael Thomas, CEO          Raymond Winger, MD

1. Mickey presented the final standard of care determinations to D. Winger and informed him that these incidents would require reports to the Board of Healing Arts. Dr. Winger asked that he be provided a copy of said report.

2. Mickey stated his concerns regarding questionable quality of care. At this time termination and resignation options were discussed. **Dr. Winger will cease to practice at MDH effective today.** Letter of resignation versus termination will be determined by Friday.

_Michael Thomas_

Michael Thomas, CEO

Confidential pursuant
to KSA 65-4915 and
65-4921 et. Seq.



A00098

CONFIDENTIAL

**Raymond Winger, M.D.**
**Box 1198**
**Meade, Kansas 67846**

July 3, 2013

**HAND-DELIVERED**

Mr. Michael Thomas
MEADE DISTRICT HOSPITAL
510 E. Carthage – P.O. Box 820
Meade, KS 67846

RE: Resignation

Dear Mr. Thomas:

This letter is to inform you that effective Friday, July 5, 2013, I hereby resign my position as an employed physician at Meade District Hospital.

I appreciated the opportunity afforded to me by MDH, but for various reasons, it just is not a good fit on a long-term basis.

It is my understanding that MDH agrees that the Physician Employment Agreement entered into on April 1, 2013 is terminated effective July 5 by mutual agreement. If this is not correct, please notify me right away.

I do plan to continue to reside in Meade, so if there is anything I can do for MDH or the Plains Clinic on a temporary or short-term basis, please let me know.

Best of luck to you and MDH.

Sincerely,

Raymond Winger, M.D.



A00279

CONFIDENTIAL



**MEADE** DISTRICT HOSPITAL
ARTESIAN VALLEY HEALTH SYSTEM

July 8, 2013

Raymond Winger, M.D.
PO Box 1198
Meade, KS  67864

RE: Resignation

Dear Dr. Winger:

This letter is to inform you that I do not accept the terms of your resignation and have elected to terminate your employment and hospital privileges with cause.  This action is explained in the attached original letter I presented to you on July 2nd in my office.

You may contact me if you have any questions.

Sincerely,

Michael Thomas
Chief Executive Officer

ENCLOSURE

PO Box 820 • 510 E. Carthage • Meade, KS  67864
620.873.2141 • www.meadehospital.com
Member Kansas Hospital Association

DEFENDANT'S
EXHIBIT
15

A00183

CONFIDENTIAL



**MEADE** DISTRICT HOSPITAL
A R T E S I A N  V A L L E Y  H E A L T H  S Y S T E M

July 2, 2013

Ray Winger, M.D.
PO Box 1198
Meade, KS 67864

RE: Contract Termination

Dear Dr. Winger:

Per the terms of your employment contract with Artesian Valley Health System, I am hereby terminating said contract pursuant to paragraph 4. **Termination**, subparagraph, B. **With Cause**, item ix. and I recite:

> ix. failure of the Physician to practice his profession at a standard that is consistent with the standards of care required of physicians in the community;

Per the terms of the Meade District Hospital Medical Staff By-Laws, physicians who are practicing under Temporary Privileges are afforded no appeal rights. Article III. Paragraph P. and Article VI Paragraph D as recited below.

## P. TERMINATION OF TEMPORARY PRIVILEGES

The Chief Executive Officer may, at any time, upon the recommendation of the Chief of Staff, terminate an applicant's or Staff Member's temporary privileges without hearing or appeal, effective as of the discharge from the Hospital of the applicant's or Staff Member's last patient under his or her care. However, where there is a determination of imminent danger to the health of any patient if treatment is continued by the applicant or Staff Member holding temporary privileges, the termination shall be immediately effective. The Chief of Staff shall arrange for alternate medical coverage for the patient(s) of the applicant or Staff Member whose temporary privileges have been terminated. In making such arrangements, due regard shall be given to the wishes of each impacted patient.

A00184

CONFIDENTIAL

**D. TEMPORARY CLINICAL PRIVILEGES**

Temporary Clinical Privileges are those privileges granted on a case-by case basis when there is an important patient care need that warrants an immediate authorization to practice for a limited period of time while the full credentials information is being approved.  Temporary privileges may be granted by the CEO with recommendations from the Chief of Staff and only after appropriate license, adequate liability coverage and clinical competence has been established along with the National Practitioner Data Bank having been queried.  Practitioners granted temporary privileges shall conform to the same standards of performance and the expectations outlined in these Bylaws and associated Rules, Regulations, policies and procedures as a Member of the Medical/Adjunct Staff and are not eligible for the procedural rights outlined in Article VIII.  The CEO or Governing Board Chairman may terminate temporary privileges at any time without eligibility for the procedural rights outlined in Article VIII.

This termination is effective this 2nd day July, 2013.

Sincerely,

Michael Thomas, CEO

A00185

CONFIDENTIAL

# Introduction

A Hospital's Medical Staff Bylaws constitute a contract between the Hospital and its Practitioners. They set forth the rules of conduct that govern the behaviors, structures and processes of the members of the Medical Staff in the delivery of patient care and the management of relationships within the Hospital. Because of the unique relationship that has historically existed between Hospital leadership and the Medical Staff, Bylaws are critically important documents. For that reason, it is important that they are kept current with the changing times, communicate the standards of a fast paced healthcare environment, reflect those practices and behaviors that will best protect the delivery of high quality, safe patient care and promote the growth and development of the Medical Staff along with the quality of the contribution this body brings to the creation of high quality, timely and customer-focused patient experiences.

The Bylaws are adopted by the Hospital Governing Body and are not typically enforceable until such approval is achieved. They contain an organizational structure for the Medical Staff within the Hospital along with the minimum standards and qualifications that members must meet and maintain. This structure addresses qualifications for staff membership including the application and appointment/reappointment processes and the granting of the privileges that define an individual physicians practice within the hospital. Bylaws generally also address a diverse number of issues that have become important as the healthcare environment has continued to evolve. These include the duties and privileges of Adjunct Staff, ethical standards, committee and committee leadership responsibilities, and the delineation of hospital staff responsibilities as they relate to the Medical Staff. They also tend to delineate the procedures by which the Medical Staff functions within and interacts with the Hospital. This generally includes procedures for activities such as the admission and discharge of patients, working with consulting physicians, managing patients with no primary care provider, and managing medical records. The Bylaws also define the relationship of the Medical Staff to the Governing Body and the process for communicating and demonstrating accountability for those responsibilities that are delegated to the Medical Staff.



DEFENDANT'S EXHIBIT

1

A00367

MEADE DISTRICT HOSPITAL

MEDICAL STAFF BYLAWS

TABLE OF CONTENTS

|  | Pages |
|---|---|
| **ARTICLE I – Preamble** | **6-11** |

A.  Medical Staff Responsibilities
B.  Need for a Medical Staff Organization
C.  Purposes
D.  Standards
E.  Definitions

**ARTICLE II – Medical Staff Year**                    **12**

**ARTICLE III – Medical Staff Membership**            **13-27**

A.  Eligibility
B.  Qualifications
    1.  Licensure
    2.  Drug Enforcement Administration Registration
    3.  Geographic Proximity
    4.  Educational Preparedness
    5.  Clinical and Professional Competence
    6.  Malpractice Insurance
    7.  Continuing Education
    8.  Annual Health Assessment
    9.  Corporate Compliance
    10. Medical Staff Citizenship
    11. Quality Improvement
    12. Medico-Administrative Appointment
    13. Waiver of Qualifications
    14. Harassment Prohibited
C.  Preapplication
D.  Notice of Change Information
E.  No Entitlement to Appointment
F.  Provisional Status
G.  Discrimination Prohibition
H.  Ethical Behavior Standard
I.  Agreement to Live by the Bylaws
J.  Medical Staff Policies and Procedures
K.  Proctoring
L.  Leave of Absence

A00368

1. Medical Leave of Absence
2. Military Leave of Absence
M. Resignation from the Medical Staff
N. Request for Reinstatement
O. Organ Procurement
P. Termination of Temporary Privileges
Q. Conditions for Privileges of Dentists
R. Conditions for Privileges of Podiatrists
S. Conditions for Privileges of Adjunct Staff
T. Automatic Loss of Privileges
U. Appeal Process
V. Authority for Documentation and Verification Services
W. Quality Referrals

**ARTICLE IV – Appointment to the Medical Staff**                    28-33
A. Initial Appointment
B. Appointment
   1. Responsibilities of the Applicant
   2. Application
   3. Verification of Information
   4. Release of Information Consent
   5. Release of Liability
   6. Obligations to Bylaws
   7. Level of Review
      a. Chief of Staff
      b. Medical Staff Committee
      c. Governing Body
   8. Time Frame
   9. Results of Recommendations
      a. Recommend Appointment
      b. Defer Appointment
      c. Deny Appointment
      d. Rights of the Practitioner
      e. Governing Body
  10. Final Action

**ARTICLE V – Reappointment to the Medical Staff**                   34-39
A. Reappointment
   1. Responsibilities of Practitioners
   2. Verification of Information
   3. Responsibilities of the Medical Staff
   4. Level of Review
      a. Chief of Staff
      b. Medical Staff Committee
      c. Governing Body
   5. Discretionary Hearing

3

A00369

    6. No Recommendation
    7. Conflict Resolution
    8. Timeframe
    9. Results of Recommendations
       a. Recommend Appointment
       b. Defer Appointment
       c. Deny Appointment
       d. Interim Reappointment
       e. Rights of Practitioner
       f. Governing Body
   10. Final Action

**ARTICLE VI – Granting Clinical Privileges**    **40-43**
  A. Applicant's Responsibilities
  B. Renewal of Privileges
  C. Additional Clinical Privileges
  D. Temporary Clinical Privileges
    a. Interim Appointment and Privileges
    b. Locum Tenens
    c. Disaster Privileges (in the event of an officially declared emergency/disaster)
    d. Telemedicine Temporary Privileges
    e. Visiting Practitioner Privileges

**ARTICLE VII – Corrective Action**    **44-50**
  A. Corrective Action
  B. Subsequent Action
  C. Summary Restriction or Suspension
  D. Automatic Suspension or Limitation
    1. Licensure
       a. Revocation or Suspension
       b. Restriction
       c. Probation
    2. Controlled Substances Administration
       a. Restriction
       b. Probation
    3. Professional Liability
       a. Restrictions
    4. Loss of Medicare or Medicaid Provider Status
    5. Failure to Comply with DOH or CMS Mandated Requirements
  E. Medical Staff Deliberation

**ARTICLE VIII – Professional Review Procedure**    **51-58**
  A. Right to Hearing
  B. Hearing Requirements
  C. Appellate Review

A00370

**ARTICLE IX – Medical Staff Categories**                    **59-64**
   A.  Active Staff
   B.  Associate Staff
   C.  Courtesy Staff
   D.  Consulting Staff
   E.  Honorary Staff
   F.  Affiliate Staff
   G.  Emergency Department Staff
   H.  Contract Staff
   I.  Temporary Disaster Staff
   J.  Adjunct Staff
   K.  Change of Staff Category

**ARTICLE X – Officers**                    **65-67**
   A.  Qualification of Officers
   B.  Nomination of Officers
   C.  Election of Officers
   D.  Vacancies in Office
   E.  Removal of Officer
   F.  Duties of Officers
       a.  Chief of Staff
       b.  Vice Chief of Staff
       c.  Immediate Past Chief of Staff

**ARTICLE XI – Clinical Departments**                    **68**
   A.  Designation of Departments
   B.  Assignment to Departments
   C.  Future Departments

**ARTICLE XII – Committees**                    **69-74**
   A.  Medical Staff Committee
   B.  Meetings
   C.  Attendance
   D.  Notice of Meetings
   E.  Quorum
   F.  Minutes
   G.  Special Appearance Requirement
   H.  Other Committees and Functions
   I.  Rights of Adjunct Staff Committee Members
   J.  Rights of Ex Offico Members
   K.  Rights of Non-Staff Committee Members
   L.  Credentialing Responsibilities
   M.  Pharmacy and Therapeutic Responsibilities
   N.  Utilization Review Responsibilities
   O.  Blood Utilization Review Responsibilities
   P.  Surgery Review Responsibilities

A00371

Q. Bioethics Responsibilities
R. Physician Well-Being Responsibilities

**ARTICLE XIII – Confidentiality**                                    75

**ARTICLE XIV – Immunity and Releases**                               76

**ARTICLE XV – Rules and Regulations**                                77

**ARTICLE XVI – Adoption and Amendment to Bylaws**                    78

**ARTICLE XVII – Voting Process**                                     79

**ARTICLE XVIII – Approval**                                          80

A00372

# ARTICLE I

## PREAMBLE

Meade District Hospital is a Critical Access Hospital, operated by The Artesian Valley Health System and serving the communities of Meade, Plains, Fowler and adjacent counties. The Hospital has a mission "to enhance the lives of those who entrust us with their care by providing and exceptional healthcare experience with compassion and quality while meeting the unique needs of all members of our communities". Our mission is achieved through a commitment to the core values of Honor, Courage and Commitment.

## A. MEDICAL STAFF RESPONSIBILITIES

The Medical Staff of Meade District Hospital is responsible for the quality of medical care delivered in the Hospital and its associated clinics and support services. The Medical Staff is accountable for accepting and discharging this responsibility, subject to the ultimate authority of the Hospital's Governing Body. As critical leaders to the healthcare teams that assure the delivery of high quality, safe patient care and the creation of great patient experiences, the members of the Medical Staff carry serious responsibilities. The Governing Body of the Hospital expects the Medical Staff members to exercise those responsibilities in a way that supports the Hospital's mission, vision and values. The cooperative efforts of the Medical Staff, Chief of Staff, Chief Executive Officer and Governing Body are necessary to fulfill the Hospital's obligations to its patients and communities. The Medical Staff recognizes that these goals can best be achieved by providing means for effective self-regulation and communication.

## B. NEED FOR A MEDICAL STAFF ORGANIZATION

In order to insure adequate and proper care of patients and to fulfill the corporate citizenship responsibilities to the communities served by the Hospital, it is important that the Physicians and Adjunct Staff come together to fulfill the critical responsibilities that only they can bring to the success of the Hospital in achieving it obligations to its stakeholders. The Physicians and Adjunct Staff working at Meade District Hospital, acting by the authority delegated to them by the Governing Body, hereby organize themselves into a structure called the Medical Staff of Meade District Hospital and adopt these Bylaws.

## C. PURPOSES

The purposes of the Medical Staff are:

1. To strive to ensure that all patients admitted to or treated in Meade District Hospital receive patient-focused quality care without regard to race, creed, color, sex, age, national origin, ancestry, economic status, educational background, marital status, disability, sexual orientation, or source of payment.

A00373        7

2.  To develop and maintain rules of self-governance and conduct for the Medical Staff that assure the quality of the professional care performed within Meade District Hospital, including recommendations for appointment and reappointment.

3.  To provide a forum whereby issues concerning the Medical Staff may be discussed by the Medical Staff and with the Governing Body.

4.  To provide oversight of care, treatment, and services provided by credentialed practitioners, providing for quality, safe patient care and treatment that conform to the most current standards of practice.

5.  To promote and maintain professional, collegial relationships within the Medical Staff and with other members of the healthcare team.

6.  To recognize and respect the Medical Staff's reporting responsibility and accountability to the Board of Trustees.

## D.  STANDARDS

Standards for patient care, education, healthcare team participation and community service shall be no less than those established by recognized accrediting, regulatory and professional organizations along with those internal standards recognized by the Governing Body as promoting the mission, vision and values of the Hospital.  By accepting membership to the Hospital's Medical Staff, each Member agrees to abide by those standards and keep current with any changes to those standards as the healthcare industry continues to evolve and work toward the delivery of greater quality and the creation of greater patient experiences.

## E.  DEFINITIONS

For the purpose of these Bylaws and associated Rules and Regulations, the following terms are defined:

1.  **"CHIEF EXECUTIVE OFFICER"** – The individual hired by the Governing Body to act in the most senior leadership position in the Hospital and act on the Governing Body's behalf in overseeing and directing day-to-day operations.

2.  **"GOVERNING BODY"** – "Board of Trustees" – the collective body with ultimate leadership responsibilities for the organization and that define Medical Staff accountabilities and authority to act in the delivery of high quality and safe patient care.

3.  **"HOSPITAL"** Meade District Hospital located at 510 E Carthage, Meade, Kansas.

4.  **"MEDICAL STAFF"** – The formal organization of physicians ( MD and DO), Dentists, Podiatrists, and Licensed Independent Practitioners who meet the qualifications for Active, Associate, Consulting and Courtesy Staff status being recognized by the Governing Body as constituting the membership of the Medical Staff and having

accountability for the delivery of high quality and safe patient care. It reports to, and is accountable to, the Governing Body.

5. **"MEDICAL STAFF COMMITTEE"** – The committee of the Medical Staff that acts as a committee-of-the-whole in carrying out the duties and responsibilities delegated to the Medical Staff.

6. **"BYLAWS"**-Refers to these Bylaws of the Medical Staff of Meade District Hospital. The Bylaws are developed by the Medical Staff and approved by the Governing Body. They define the role and structure of the Medical Staff and its associated Adjunct Staff. They may be amended by a vote of the Medical Staff and by approval of the Governing Body in accordance with the process outlined in these Bylaws. In addition to the Medical Staff Bylaws, there shall be policies, procedures, and Rules and Regulations that shall be applicable to all members of the Medical Staff and other individuals who are granted clinical privileges. All Medical Staff Rules, Regulations, policies, and procedures shall be considered an integral supplement to the Medical Staff Bylaws, subject to the amendment and adoption provisions contained in the Bylaws or as otherwise defined in the Bylaws.

7. **"GOOD STANDING"** – The member of the Medical Staff is in compliance with the requirements and responsibilities of the staff membership and is not subject to any current investigations or past or current actions that may impact his or her ability to exercise clinical privileges.

8. **"EMERGENCY SERVICES"** – Those health care services provided to evaluate and treat medical conditions of recent onset and severity that would lead a prudent layperson, possessing an average knowledge of medicine and health, to believe that urgent and/or unscheduled medical service is required.

9. **"PRACTITIONER"** – A collective term that refers to all Physicians, Dentists, Podiatrists, Licensed Independent Practitioners, and Adjunct Staff that has applied for and/or been granted membership to the Medical Staff and/or granted privileges to render care in the Hospital.

10. **"CREDENTIALING"** – The process of obtaining, verifying and assessing the qualifications of an applicant to provide patient care, treatment and services. The credentials review process is the basis for making appointments and reappointments to the membership of the Medical Staff. It also provides information for granting clinical privileges. All appointments granted or renewed are not to exceed a period of two years.

11. **"COMMUNITY CALL"** – The call system whereby the Medical Staff members are obligated to provide medical care to unassigned patients. Unassigned patients are those who do not have an established primary care physician or physician providing care in the specialty relevant to the patient's current problem. The purpose of "community call" is to fairly distribute the responsibility for care of unassigned patients among the Medical Staff.

9

A00375

12. **"CREDENTIALS"** - Documented evidence of licensure, education, training, experience, or other qualifications.

13. **"CLINICAL PRIVILEGES"** – A specific scope and content of patient care services authorized for a health care practitioner by the Governing Body based on evaluation of the individual's credentials and performance.

14. **"PROVISIONAL PRIVILEGES"** - Once evidence of competence has been initially determined for new applicants and Members requesting new privileges, a period of provisional privileges is generally appropriate where a specified number of cases or patient care activities are monitored and reviewed to validate that clinical competence.

15. **EX OFFICO** – A member of a committee or body by virtue of an office or position held, without voting rights unless otherwise expressed.

16. **"PEER RECOMMENDATION"** -  Information submitted by an individual(s) in the same professional discipline as the applicant or individual under review reflecting their perception of the Practitioner's clinical practice, ability to work as part of the team, corporate citizenship, and ethical behavior, or the documented peer evaluation of practitioner-specific data collected from various sources for the purpose of evaluating current competence.

17. **"PROCTOR"** – An Active member of the Medical Staff, in good standing, with privileges in the clinical or specialty area being proctored and who is assigned to mentor and monitor a Practitioner in some aspect of that clinical or specialty area.

18. **"PROTECTED HEALTH INFORMATION"** – Any information, whether oral or recorded in any form or medium: a) that relates to the past, present or future physical or mental condition of an individual, the provision of health care to the individual, or the past, present or future payment for the provision of health care to an individual, and b) that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.

19. **"DISASTER PRIVLEGES"** – Privileges granted when the emergency management plan has been activated and the hospital is unable to meet the immediate patient needs resulting in a need for additional licensed health practitioners.

20. **"DUE PROCESS"** – A legal premise based on the concept of "fundamental fairness". As construed by the courts, it includes an individual's right to be adequately notified of charges or proceedings involving him, and the opportunity to be heard at these proceedings.

21. **"FORMULARY"** – A listing of those medications approved for use in the Hospital. The Medical Staff, in cooperation with the Pharmacist, will systematically review the formulary by therapeutic class and make any necessary revisions.  The Medical Staff

A00376

members will order medications from this approved listing and participate in a formalized review and approval process to add or delete medication to or from this listing.

22. **"INFORMED CONSENT"** – A legal condition whereby a person can be said to have given consent based upon an appreciation and understanding of the facts and implications of an action.

23. **"BUSINESS DAYS"** – Monday through Friday, excluding holidays.

24. **"DENTIST"** – Any person who is legally licensed to practice dentistry in the State of Kansas.

25. **"ORAL SURGEON"** – Any person who is legally licensed to practice dentistry in the State of Kansas and who, in addition, has successfully completed a postgraduate program in oral surgery accredited by a nationally accredited body approved by the U.S. Office of Education and holds a health profession specialty certification in the field of oral surgery issued by the Kansas State Board of Dentistry.

26. **"RULES AND REGULATIONS"** - Refers to those rules adopted by the Medical Staff or the Medical Staff Committee and approved by the Governing Body which describes the proper conduct of Medical Staff members and offers clarification to expected levels of performance, compliance with new regulatory requirements and incorporation of newly recognized standards of practice.

27. **"NATIONAL PRACTITIONER DATA BANK"** – The entity established by the Secretary of the United States Department of Health & Human Services to collect and release certain information relating to the professional competency and conduct of physicians, dentists, and other healthcare practitioners pursuant to the Health Care Improvement Act of 1986, as amended.

28. **"ADVANCED PRACTICE PROFESSIONAL"** - Advanced Practice Professional is an umbrella term appropriate for a licensed registered nurse prepared at the graduate degree level as either a Clinical Specialist, Nurse Anesthetist, Nurse-Midwife, or Nurse Practitioner. All Advanced Practice Nurses should hold a graduate degree in nursing and be certified and able to function at various levels of independence based on state and local requirements. Although not entitled to Active, Associate, Courtesy or Consulting membership on the Medical Staff, Advanced Practice Professionals shall be members of the Adjunct Staff to the Medical Staff and nonetheless be governed by and subject to these Medical Staff Bylaws. They shall be required to make application and meet the qualifications for appointment to the appropriate Adjunct Staff category, meet all qualifications for membership to the Adjunct Staff category, perform all duties and obligations as may be required by these Bylaws and the Medical Staff Rules and Regulations, strictly adhering to the ethical principles of their respective national, state and/or county associations, and be subject to all disciplinary proceedings as may hereinafter be set forth.

11

29. **CERTIFIED REGISTERED NURSE ANESTHETIST" (CRNA)** An Advanced Practice Nurse with additional training to administer anesthesia and provide care during the period of anesthesia.

30. **"MIDWIFE"** An Advanced Practice Nurse with additional training in delivering babies and providing prenatal and postpartum care to women.

31. **"NURSE PRACTITIONER"** - A registered nurse (RN) who has completed advanced education (a minimum of a master's degree) as an Advanced Practice Nurse and training in the diagnosis and management of common medical conditions, including chronic illnesses.

32. **"PHYSICIAN ASSISTANTS"** – A graduate of an accredited program with certification by the National Commission on Certification of Physician Assistants (NCCPA). Although not entitled to Active, Associate, Courtesy or Consulting membership on the Medical Staff, Physician Assistants shall be members of the Adjunct Staff to the Medical Staff and nonetheless be governed by and subject to these Medical Staff Bylaws. They shall be required to make application and meet the qualifications for appointment to the Adjunct Staff category, meet all qualifications for membership to the Adjunct Staff category, perform all duties and obligations as may be required by these Bylaws and the Medical Staff Rules and Regulations, strictly adhering to the ethical principles of their respective national, state and/or county associations, and be subject to all disciplinary proceedings as may hereinafter be set forth.

33. **"ADJUNCT STAFF"** – Collectively refers to physician assistants and advanced practice professionals, who have applied for membership and clinical privileges under the Medical Staff. While they are not entitled to Active, Associate, Courtesy or Consulting staff membership to the Medical Staff, they are governed by and subject to these Medical Staff Bylaws.

34. **"DATE OF RECEIPT"** – Means the date any Notice or other communication was delivered personally; or if such Notice or communication was sent by mail, means the date it is deposited, postage prepaid, in the United States mail; or if such Notice or communication is sent by e-mail, means the date that is recorded in the computer memory as having been sent; or if such Notice or communication was sent by fax, the date recorded on the delivery verification report as having been sent.

A00378

## ARTICLE II

### MEDICAL STAFF YEAR

For the purpose of these bylaws the Medical Staff year commences on the 1st day of January and ends on the 31st of December of each year.   The annual meeting of the Medical Staff for the purpose of the election of officers, annual update of these Bylaws and their associated Rules, Regulations, policies and procedures shall be held during the month of January with appropriate notice as stipulated in these Bylaws.

13

A00379

# ARTICLE III

## MEDICAL STAFF MEMBERSHIP

### A. ELIGIBILITY

Membership on the Medical and Adjunct Staffs of the Hospital is a privilege which shall be extended only to professionally competent Physicians, Dentists, Podiatrist, Licensed Independent Practitioners and Adjunct Staff who continuously meet the qualifications, standards and requirements set forth in these Bylaws and in such Hospital Rules, Regulations, policies and procedures as are adopted from time to time by the Medical Staff and the Governing Body. All individuals practicing Medicine, Dentistry, Podiatry or in an Adjunct Staff category in this Hospital, unless excepted by specific provisions of these Bylaws, must first have been appointed to the Medical/Adjunct Staff.

### B. QUALIFICATIONS

Only Physicians, Dentists, Podiatrists, Licensed Independent Practitioners and Adjunct Staff who qualify for licensed status in the state of Kansas, and can document their background, experience, training, demonstrated competence, adherence to the ethics of their profession, good reputation, adequate physical and mental health status, and ability to work with others to a sufficient degree to assure the Medical Staff and the Governing Body that any patient treated by them in the Hospital will be given quality medical care, shall be qualified for membership to the Medical/Adjunct Staff. No Practitioner shall be entitled to membership or to the exercise of particular privileges in the Hospital merely by virtue of the fact that he or she is duly licensed to practice in this or any other State, or that he or she is a member of a professional organization, or that he or she had in the past, or presently has, such privileges at another hospital.

Although not entitled to Active, Associate, Courtesy or Consulting membership on the Medical Staff, Adjunct Staff shall nonetheless be governed by and subject to these Medical Staff Bylaws in the category of Adjunct Staff. They shall be required to make application and meet the qualifications for appointment and reappointment to the appropriate Adjunct Staff category, perform all duties and obligations as may be required by these Bylaws and the associated Rules, Regulations, policies and procedures, strictly adhere to the ethical principles of their respective national, state and/or county associations, and be subject to all disciplinary proceedings as may hereinafter be set forth.

Acceptance of membership on the Medical/Adjunct Staff shall constitute the Staff Member's certification that he/she has in the past, and his/her agreement that he/she will in the future, strictly abide by the Principles of Medical Ethics of the American Medical Association, Code of Ethics of the American Osteopathic Association, Code of Ethics of the American Dental Association, Medical Staff Code of Conduct or such Codes of Ethics of any professional body that may apply to the exercise of clinical privileges requested by the Medical/Adjunct Staff member.

14

A00380

1. **LICENSURE** – Only Physicians, Dentists, Podiatrists, Licensed Independent Practitioners and Adjunct Staff who possess a full, unrestricted license to practice in the State of Kansas may be members of the Medical/Adjunct Staff.

2. **DRUG ENFORCEMENT ADMINISTRATION REGISTRATION** – Only Practitioner and Adjunct Staff (when applicable) holding a valid DEA registration may be members of the Medical/Adjunct Staff unless waived by the Governing Body with appropriate restrictions.

3. **GEOGRAPHIC PROXIMITY** – Only practitioners located within the geographic service area of the Hospital, as defined by the Governing Body as close enough to provide timely care for their patients, shall be eligible for Medical/Adjunct Staff membership. All Medical/Adjunct Staff members agree to notify the Chief of Staff and CEO, in writing, at least sixty (60) days in advance of any geographic relocations of practice. To qualify for application, new applicants must be able to demonstrate that they have practices located within the designated geographic area or will have located in that area within six (6) months of application.

4. **EDUCATIONAL PREPAREDNESS** – Practitioners must have successfully completed a residency training program and/or fellowship recognized by the Accreditation Council for Graduate Medical Education (ACGME) or American Osteopathic Association (AOA) in the specialty for which they are applying for privileges; or be board certified or board admissible by one for the ABMS or AOA specialty boards in the specialty for which the practitioner is applying for privileges or graduated from an accredited program recognized by the United States Office of Education with completion of an appropriate certification.

5. **CLINICAL AND PROFESSIONAL COMPETENCE** – Members of the Medical/Adjunct Staff are required to document clinical and professional competence in the form of:
   a. background, experience, training and demonstrated competence
   b. adherence to the ethics of their profession
   c. good reputation and character, including the applicant's physical health and mental and emotional stability
   d. professional cooperation with hospital staff in providing quality and orderly patient care and service

Applicants and new members are required to demonstrate that they are the individuals identified in the credentialing documents by presenting a government issued picture identification prior to providing services in or for the Hospital.

All Medical/Adjunct Staff members agree to notify the Chief of Staff and the CEO, in writing, of any limitation or cessation of professional practice at least thirty (30) days in advance of such limitation or cessation. All Medical/Adjunct Staff members agree to notify the Chief of Staff and CEO, in writing, within thirty (30) days of any change in clinical privileges at other hospitals, whether voluntary or involuntary.

15

A00381

6. **MALPRACTICE INSURANCE** – Members of the Medical/Adjunct Staff are required to carry sufficient malpractice insurance, the level to be determined by the Medical Staff Committee from time to time and approved by the Governing Body. A lapse in coverage or the addition of a restriction to a Medical/Adjunct Staff member's policy for any reason must be reported in writing to the Chief Executive Officer within twenty-four (24) hours of the Medical/Adjunct Staff member becoming aware of the lapse or restriction. A current "certificate of insurance" must be on file at all times in the Practitioner's credentials file.

All Medical/Adjunct Staff members agree to notify the Chief of Staff and Chief Executive Officer, in writing, within thirty (30) days of any new notices of medical malpractice claims. This notice will indicate the date when the alleged event took place and the general nature of the alleged malpractice.

With the exception of Honorary membership, each member of the Medical/Adjunct Staff and each applicant for such membership or for any clinical privileges at the Hospital (with or without Medical Staff membership) shall, as a condition of membership or granting of such privileges, have and maintain malpractice insurance in a minimum amount of $1 million per occurrence and $3 million aggregate as determined by the Medical Staff Committee and the Governing Body. The insurance shall be issued by a company admitted in the State of Kansas and approved for issuance of such insurance by the Kansas State Office of the Insurance Commissioner, and acceptable to both the Medical Staff Committee and the Governing Body. The insurance company shall also be one that contributes to the guarantee fund designed to protect insurance in the event of insolvency. Insurance shall cover all services for which the Medical/Adjunct Staff member has privileges. Proof of compliance with this requirement, in the form of a current certificate of insurance evidencing compliance with all terms of the Bylaws, and such other evidence as the Medical Staff Committee and Governing Body shall specify, shall be submitted to the Medical Staff Committee or the Chief Executive Officer at the initial time of request for appointment or privileges and annually thereafter 30 days prior to the expiration of policy or on a date specified by the Medical Staff Committee and the Governing Body or whenever the Staff Member should change insurance carriers. A Medical/Adjunct Staff member shall immediately cease the exercise of any clinical privileges in the event that he or she no longer has the required insurance coverage. A Medical/Adjunct Staff member shall immediately (within 24 hours) notify the Chief of Staff and CEO of any restrictions or changes imposed on his or her coverage. A Medical/Adjunct Staff shall immediately notify the Chief of Staff and CEO if he or she becomes aware of issues of insolvency on the part of his or her insurance carrier or any other issues that could impact the availability of coverage. Staff membership may only be maintained when insurance has lapsed for special circumstances which will be documented and approved by the Medical Staff Committee and the Governing Body.

7. **CONTINUING EDUCATION** – All members of the Medical/Adjunct Staff, except Honorary members, must provide evidence of obtaining continuing educational credits as stipulated by Kansas State Law, prior to reappointment. At least 75% of these CMEs will

16

be related to privileges that the member currently holds or is requesting. In addition the Medical/Adjunct Staff member will provide a copy of the CMEs obtained and submitted for continued licensure in the State of Kansas.

8. **ANNUAL HEALTH ASSESSMENT** – An initial health assessment on initial appointment shall consist of a physical evaluation by a physician of the individual applicant's choice. Subsequent annual health assessment will be completed thru the hospital Human Resources department with significant findings reported to the Governing Body.

9. **CORPORATE COMPLIANCE** – All members of the Medical/Adjunct Staff agree to abide by all federal and State regulations with respect to professional billing practices, including not to cooperate or participate- in the division of any fee for professional services.

10. **MEDICAL STAFF CITIZENSHIP** - All members of the Medical/Adjunct Staff agree to abide by all the decisions of all duly-appointed Medical Staff committees and cooperate in safe patient care, treatment, and services and Medical Staff activities, including hospital performance and quality improvement, utilization review, peer review, corporate compliance, HIPAA compliance and attending the required number of Medical Staff meetings.

11. **QUALITY IMPROVEMENT** – Staff Members agree to actively participate in quality assurance, quality improvement and peer improvement activities of the Medical Staff and Hospital and to hold knowledge of the content of these activities as strictly confidential.

12. **MEDICO-ADMINISTRATIVE APPOINTMENTS** – A member of the Medical Staff who is appointed to perform administrative duties (Chief of Staff, Director of Laboratory, Medical Director, etc.) must be a member in good standing of the Medical Staff and shall be subject to the same credentialing procedures as are all other applicants for membership and clinical privileges for any clinical roles they may fulfill.

If Medical Staff members occupy Medico-Administrative positions and are terminated under the provisions (voluntarily, involuntarily, expiration of term limit) that placed them in those positions, such action shall not affect the Practitioner's status on the Medical Staff and will not alter the clinical privileges specifically granted to the Practitioner by the Board of Directors. The removal from a Medico-Administrative positions is not subject to the procedural rights afforded in Article VIII.

13. **WAIVER OF QUALIFICATIONS** – Any qualification requirements of the Bylaws not required by law or governmental regulations and not considered a current standard of medical practice, may be waived at the discretion of the Medical Staff Committee with the approval of the Governing Body, upon determination that such a waiver will serve the bests interests of the patients and the Hospital and not place patients, the Hospital, other Practitioners or employees at risk.

A00383

14. **HARASSMENT PROHIBITED** - Harassment by a Staff Member against any individual (i.e. against another Medical Staff member, Adjunct Staff member, Hospital employee, contract worker, patient, vendor, visitor) on the basis of race, religion, color, national origin, ancestry, age, disability, medical disability, marital status, sex, gender, or sexual orientation shall not be tolerated.

"Harassment" is verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of his/her race, religion, color, national origin, ancestry, age, disability, medical disability, marital status, sex, gender, or sexual orientation or that of his/her relatives, friends, or associates and that has the purpose or effect of 1) creating an intimidating, hostile, or offensive working environment, 2) unreasonably interfering with an individual's work performance, or 3) that otherwise adversely affects an individual's employment opportunities.

Harassing conduct includes 1) epithets, slurs, negative stereotyping, or threatening, intimidating or hostile acts that relate to race, religion, color, national origin, ancestry, age, disability, medical disability, marital status, sex, gender, or sexual orientation and 2) written or graphic material that denigrate or show hostility or aversion toward an individual or group because of race, religion, color, national origin, ancestry, age, disability, medical disability, marital status, sex, gender, or sexual orientation and that is placed on walls, bulleting boards, intranets, or elsewhere on the employer's premises or circulated in the workplace.

Sexual harassment is unwelcome verbal or physical conduct of a sexual nature (which may include verbal harassment epithets, derogatory comments or slurs), physical harassment (such as unwelcome touching, assault interference with movement or work) and visual harassment (such as the display of derogatory jesters, cartoons, drawing, posters or stories).

Sexual harassment includes unwelcome advances, requests for sexual favors or any other verbal, visual or physical conduct of a sexual nature when 1) submission or rejection of this conduct by an individual is used in a factor in decisions affecting hiring, evaluation, retention, promotion, or other aspects of employment; or 2) this conduct interferes with the individual's employment or creates an intimidating, hostile, or offensive work environment. Sexual harassment also includes conduct that indicates that employment and/or employment benefits are conditioned upon acquiescence in sexual activities or which interferes with the educational process of any students.

All allegations of harassment shall be investigated by the Medical Staff Committee in cooperation with Hospital Administration and, if confirmed, will result in appropriate corrective action, including, but not limited to, reprimands, suspensions, restrictions, revocation of all or any part of Medical Staff or Adjunct Staff membership and/or clinical privileges as outlined in these Bylaws.

C.    **PREAPPLICATION**

18

A00384

In order to be eligible to apply for membership on the Medical/Adjunct Staff, an applicant must meet the basic requirements of:

1. current unrestricted license to practice Medicine, Surgery, Dentistry, Podiatry in the State of Kansas or a current unrestricted license as a physician assistant, nurse practitioner, certified registered nurse anesthetist, or midwife in the same State.
2. eligible to render services in the Medicare, Medicaid and other federally sponsored health programs.
3. professional liability insurance which covers all privileges requested, in not less than the minimum amounts, if any, as from time-to-time may be determined by the Medical Staff Committee with the approval of the Governing Body and with an insurance carrier admitted in the State of Kansas and acceptable to the Governing Body.
4. meeting the geographical restrictions established by Meade District Hospital and/or providing documentation to support plans to establish such practice in compliance with the geographic restrictions within six (6) months of the date of application.

A practitioner who does not meet these basic qualifications is ineligible to apply for Medical/Adjunct membership, and the application shall not be accepted for review, except that members of the Honorary Staff do not need to comply with the basic qualifications. If it is determined during the processing that an applicant does not meet all of the basic qualifications, the review of the application will be discontinued. An applicant who does not meet the basic qualifications is not entitled to the procedural rights set forth in Article VIII, but may submit comments and a request for reconsideration of the specific qualifications that adversely affected such practitioner. The comments and request shall be reviewed by the Medical Staff Committee and the Governing Body, which shall have the sole discretion of whether to consider any change in the basic qualifications.

## D.    NOTICE OF CHANGE IN INFORMATION

Each individual granted clinical privileges shall be obligated to notify the Chief of Staff and the Chief Executive Officer immediately in writing of any new information or change in the information provided in connection with his or her most recent application for appointment or reappointment to the Medical/Adjunct Staff. This obligation shall extend to but not be limited to information concerning malpractice judgments or settlements, any action on liability insurance (if the action involves the termination of coverage notice will be given within twenty-four (24) hours of the Practitioner becoming aware), actions resulting in the individual's appointment or clinical privileges being denied, revoked, suspended, reduced, not renewed, or voluntarily surrendered while under investigation or involuntarily relinquished at any hospital or health care facility or by the Medical Disciplinary Board of the State of Kansas or any other state, and actions where the individual's membership in local, state or national medical societies is involuntarily terminated, actions where his narcotics license or license to practice any profession in any state has been suspended, modified or terminated, or there is contact by an investigator from a regulatory agency such as the FDA, DEA, MBC, OIG, etc. regarding an investigation of the practitioner. Individuals granted privileges are also obligated to notify the Chief or Staff and CEO immediately in writing of details of any investigations or actions by a government agency or third party payor challenging or sanctioning the applicant's practices related to patient

A00385

admission, treatment, discharge, charging, collection or utilization practices including, but not limited to, Medicare and Medicaid fraud and abuse proceedings and convictions.

## E.   NO ENTITLEMENT TO APPOINTMENT

No individual shall be entitled to appointment to the Medical Staff or Adjunct Staff or the exercise of particular clinical privileges in the hospital merely by virtue of the fact that such individual:

1.   is licensed to practice a profession in this or any other state
2.   is a member of any particular professional organization
3.   has had in the past, or currently has, appointment or privileges at any hospital
4.   resides in the geographic service area of the Hospital as defined by the Governing Body

## F.   PROVISIONAL STATUS

All initial appointees to Active, Courtesy, Consulting and Adjunct Staff, or appointees to the Active, Associate, Courtesy, Consulting, or Adjunct Staff after termination of a prior appointment, and individuals who are granted a privilege for the first time shall be in a provisional status. Members shall remain in provisional status for a minimum period of twelve (12) months and may remain for a maximum of twenty-four (24) months. The Medical Staff Committee shall initiate action to terminate the membership of an Active, Associate, Courtesy, Consulting or Adjunct member in provisional staff who does not qualify for advancement to non-provisional status within twenty-four (24) months following the initial appointment and the individual will be so notified.

The initial period of provisional appointment shall be for not less than twelve (12) months. All provisional Medical/Adjunct Staff members shall be subject to such requirements and procedures as are specified in the Medical Staff Rules and Regulations as well as such monitoring, proctoring, consultation and co-management requirements and procedures and such limitations on the number and type of admissions as the Medical Staff Committee shall determine as necessary or appropriate to assure that appropriate care is provided. If a Practitioner is unable to meet proctoring and peer review requirements set forth as part of the application process, the Medical Staff and/or Governing Body may require additional proctoring or peer review to satisfy their interest in clinical competence. The provisional period can be extended up to a total of twenty-four (24) months from the date of the initial provisional appointment. A Staff Member in provisional status shall have all the prerogatives and responsibilities of the Active, Associate, Courtesy, Consulting or Adjunct members, as appropriate, in non-provisional status. If deemed necessary to assure appropriate patient care, provisional privileges can be canceled at any time by the Governing Body. In such a case, the Practitioner shall have the opportunity to exercise the procedural rights as outlined in Article VIII.

## G.   DISCRIMINATION PROHIBITION

Appointment and reappointment to the Medical/Adjunct Staff shall not be denied to any individual for reasons of sex, race, national origin, creed, color, age, martial status, or disability

A00386

except when that disability renders the person incapable, despite reasonable accommodations, of performing the essential functions of the Staff appointment.

## H.     ETHICAL BEHAVIOR STANDARD

All members of the Medical/Adjunct Staff shall conduct their professional activities in accordance with the ethical code of their professional associations, in accordance with the education laws covering professional practice, the Bylaws, Rules and Regulations of the Medical Staff and the Values and Code of Conduct established by the Hospital. Any ethical behavior that is expected of the workforce-at-large within the Hospital is expected of the Medical and Adjunct Staff members also.

## I.     AGREEMENT TO LIVE BY THE BYLAWS

Acceptance of membership on the Medical/Adjunct Staff shall constitute the staff member's agreement to abide by and be governed by these Bylaws, Rules and Regulations, and all relevant hospital policies, as they now exist or as they may be amended. Every applicant and individual appointed to the Medical/Adjunct Staff agrees to the following:

1. to provide appropriate continuity of quality care and supervision of his/her patients;

2. to abide by Medical Staff Bylaws, Rules and Regulations, and policies and procedures;

3. to accept committee assignments;

4. to prepare and complete in a timely fashion legible medical records for all patients in whose care he or she is involved along with any other documents and documentation that is important to the operations and regulatory and legal compliance of the organization;

5. to actively participate in the hospital's quality and performance improvement activities along with being subject to reviews as part of those activities;

6. to participate in the staffing of the emergency care system and meeting the needs of the system for "Community Call"; as is appropriate; and

7. to participate in the hospital's disaster planning and drills.

## J. MEDICAL STAFF POLICIES AND PROCEDURES

The Medical Staff shall adopt such policies and procedures as may be necessary to implement more specifically the general principles found within these Bylaws, and to comply with newly established regulatory requirements and recommended standards of practice by recognized professional bodies.

## K. PROCTORING

21

A00389

Each Practitioner in provisional status, requesting new privileges, and/or experiencing performance concerns identified through peer review shall complete such proctoring as stipulated by the Medical Staff Committee and approved by the Governing Body. Proctoring shall be in accordance with criteria set forth in the Proctoring Guidelines and may include direct observation of performance and/or chart review. A Practitioner with proctoring status shall remain subject to proctoring until the Medical Staff Committee has determined that proctoring has been successfully completed based on established criteria and the recommendation for termination of proctoring, advancement to independent practice or termination of privileges is acted on by the Governing Body unless the privileges subject to proctoring are terminated in compliance with these Bylaws because of concerns related to immediate jeopardy and/or patient safety. Documentation by the assigned proctor and the Medical Staff Committee shall indicate whether the Practitioner has met all the qualifications and criteria set forth in the proctoring and is recommended to advance to a more independent level of practice. Proctoring shall be performed by a member in good standing of the Medical Staff with privileges in the areas or specific procedure being proctored. Such proctoring shall not entitle the Practitioner to procedures set for in Article VIII.

If, at the time of reappointment, it is determined that a sufficient amount of clinical activity has not occurred to evaluate a Practitioner's clinical competence, proctoring may be imposed by the Medical Staff Committee with the approval of the Governing Body. Such proctoring shall not entitle the practitioner to procedures set forth in Article VIII.

If an initial appointee fails to receive documentation required within the proctoring term, his/her Medical/Adjunct Staff membership or particular clinical privileges, as applicable, may be terminated. If a Medical/Adjunct Staff member requesting additional privileges fails, within the proctoring term, to receive the documentation set forth in the proctoring term, the applicable privileges may be terminated. If a Medical/Adjunct Staff member requesting reappointment fails to receive the documentation set forth in the proctoring term, the reappointment of privileges may be denied. Thereafter the procedures set forth in Article VIII will be followed unless the failure to receive documentation required in the proctoring term is because of a failure to have a sufficient number of cases proctored because of limited clinical activity or exclusion by these Bylaws.

## L.  LEAVE OF ABSENCE

A Medical/Adjunct Staff member who wishes a leave of absence must, unless excused by the Chief of Staff and CEO for good cause, submit a written request for the leave to the Chief of Staff and CEO at least thirty (30) days prior to the commencement of the leave. The Chief of Staff, in cooperation with the CEO, shall determine, subject to the approval of the Medical Staff Committee and the Governing Body, whether or not to grant the leave. The leave of absence may not be for more than twelve (12) consecutive months.

An approved leave is renewable for one (1) year for a total not to exceed twenty-four (24) consecutive months from the initial date of leave. Renewals shall be processed following the

22

A00388

same procedures as for an initial leave, except that the Practitioner must request a renewal of the leave thirty (30) days prior to the end of the initial leave.

Failure, without good cause to submit a timely request for a leave or renewal of leave to the Chief of Staff and CEO shall be deemed a voluntary resignation from the Medical/Adjunct Staff and the Practitioner shall not, as a result, be entitled to the procedural rights of Article VIII.

If a leave of absence is granted or renewed, a Practitioner shall not have privileges to admit or treat patients and not have any other prerogatives or responsibilities of Medical/Adjunct Staff membership during the period of the leave. At least thirty (30) days prior to termination of leave, a Practitioner shall submit a written request for reinstatement of membership and clinical privileges. At the request of the Chief of Staff and CEO, the Practitioner shall submit a summary of relevant activities while on leave including, if requested, information relevant to required credentials, competency and health. Thereafter, the Chief of Staff, subject to the approval of the Medical Staff Committee and Board of Directors, shall make a recommendation regarding the reinstatement of the member's privileges. A determination that a Practitioner be denied reinstatement shall be considered a denial of privileges and may be appealed as such pursuant to Article VIII of these Bylaws. Reinstatement of membership and clinical privileges may be subject to proctoring and peer review activities determined to be appropriate by the Medical Staff Committee and approved by the Governing Body to access and verify clinical competence. Such proctoring shall not entitle the Practitioner to procedures set forth in Article VIII.

A Staff Member granted a leave of absence prior to the termination of his/her provisional staff status shall, when his/her leave of absence is terminated, serve as a provisional staff member for not less than one year. If any questions remain as to the current competence of the Staff Member at the conclusion of the provisional period, the Medical Staff Committee or the Governing Body may require the applicant to provide supplemental documentation or participate in additional proctoring.

Failure, without good cause, to submit a requested summary of activities during an approved leave shall be deemed a voluntary resignation from the Medical Staff and is not appealable under Article VIII. All Staff members who are deemed to have voluntarily resigned under this section are eligible to reapply for Medical Staff membership pursuant to these Bylaws.

**Medical Leave of Absence**

The Medical Staff Committee shall, with approval of the Governing Body, determine the circumstances under which a particular Practitioner shall be granted a leave of absence for the purpose of obtaining treatment for a medical condition or disability. Medical leaves are subject to all the conditions and requirements outlined in the Leave of Absence section.

**Military Leave of Absence**

Requests for a leave of absence to fulfill military service obligations shall be granted by the Medical Staff Committee with approval of the Governing Body. Military leaves are subject to all the conditions and requirements outlined in the Leave of Absence section.

A00389

## M. RESIGNATION FROM THE MEDICAL STAFF

A member who desires to resign from the Medical/Adjunct Staff must submit a letter of resignation to the Chief of Staff and Chief Executive Officer. The Medical Staff Committee shall forward its recommendations to the Governing Body, which shall take the final action. A request for resignation shall not be considered until all obligations to the Hospital have been satisfactorily met by the member, including completion of all medical records. Any member not complying with these conditions shall be considered as having resigned from the Medical Staff not in good standing.

## N.   REQUEST FOR REINSTATEMENT

Previous Staff Members requesting reinstatement less than 12 months from the date of a resignation or leave of absence approved by the Governing Body and having left in good standing, may be reinstated as requested without additional proctoring and competency-based verification activities at the discretion of the Medical Staff Committee and the approval of the Governing Body.   If any additional privileges are requested, the procedure for initial appointment will be followed.   Previous Medical/Adjunct Staff members who request reinstatement 12 months or more from the date of resignation or leave of absence approved by the Governing Body and having left in good standing, must serve a provisional period of not less than 12 months.  Previous Medical/Adjunct Staff members who left because of a failure to comply with any requirements outlined in the Bylaws, Rules, Regulations, policies or procedures or was subject to an involuntary relinquishment of membership or privileges, or elected to voluntarily relinquish membership or privileges while under investigation, or who failed to leave in good standing is not eligible to request reinstatement for forty-eight (48) month after the date prior membership was terminated. In processing a request for reinstatement, the Medical Staff Committee with the approval of the Governing Body reserves the right to place any additional requirements on the applicant as is deemed necessary.

## O. ORGAN PROCUREMENT

The Chief Executive Officer may grant temporary privileges for organ procurement procedures only for licensed physicians who are members of an organ procurement team from a hospital in the United States accredited by the Joint Commission on Accreditation of Healthcare Organizations or an accredited Organ Procurement Organization.

## P. TERMINATION OF TEMPORARY PRIVILEGES

The Chief Executive Officer may, at any time, upon the recommendation of the Chief of Staff, terminate an applicant's or Staff Member's temporary privileges without hearing or appeal, effective as of the discharge from the Hospital of the applicant's or Staff Member's last patient under his or her care. However, where there is a determination of imminent danger to the health of any patient if treatment is continued by the applicant or Staff Member holding temporary privileges, the termination shall be immediately effective. The Chief of Staff shall arrange for alternate medical coverage for the patient(s) of the applicant or Staff Member whose temporary

A00390

privileges have been terminated.  In making such arrangements, due regard shall be given to the wishes of each impacted patient.

## Q. CONDITIONS FOR PRIVILEGES OF DENTISTS

Dentists who are members of the Medical Staff may only admit patients if a physician member of the Medical Staff conducts and directly supervises the admitting history and physical examination (except the portion relating to Dentistry) and assumes responsibility for the care of the patient's medical problems present at the time of admission or which may arise during hospitalization which are outside the lawful scope of practice of the Dentist.  A physician member of the Medical Staff shall determine the risk and affect of any proposed treatment or surgical procedure on the general health status of the patient.  When a dispute exists regarding proposed treatment between a physician member of the Medical Staff and a Dentist based on medical or surgical factors, the treatment will be suspended insofar as possible until the dispute is resolved by the Chief of Staff and the Medical Staff Committee as is appropriate.

Privileges granted to Dentists shall be based on their training, experience, demonstrated competence, judgment, current capabilities, and licensure.  The scope and extent of surgical procedures that each dentist may perform shall be specifically delineated and granted in the same manner as all other surgical procedures and shall be under the overall supervision of the Chief of Staff or his/her designee who has appropriate experience and clinical privileges to provide such supervision.  Dentists may write orders and prescribe medications within the limits of their licensure and privileges granted pursuant to these Bylaws.

Oral surgeons who admit patients without significant medical problems may perform an admission history and physical examination and assess the medical risks of the procedure on the patient if they have privileges to do so.  Criteria to be used in granting such privileges shall include, but shall not necessarily be limited to, the following:  successful completion of a post-graduate program in oral surgery accredited by a nationally recognized accrediting body approved by the United States Office of Education; and, as determined by the Medical Staff, evidence of current competence to conduct such a history and physical and assessment. Patients with significant medical problems admitted to the Hospital by qualified Oral Surgeons shall receive the same basic medical appraisal as patients admitted to other services.

Dentists can be Active Members who may vote and hold office.

## R. CONDITIONS FOR PRIVILEGES OF PODIATRISTS

Podiatrists who are members of the Medical Staff may only admit patients if a physician member of the Medical Staff conducts and directly supervises the admitting history and physical examination (except the portion relating to Podiatry) and assumes responsibility for the care of the patient's medical problems present at the time of admission or which may arise during hospitalization which are outside the lawful scope of practice of the Podiatrist.  A physician member of the Medical Staff shall determine the risk and affect of any proposed treatment or surgical procedure on the general health status of the patient.  When a dispute exists regarding proposed treatment between a physician member of the Medical Staff and Podiatrist based on

25

A00391

medical or surgical factors, the treatment will be suspended insofar as possible until the dispute is resolved by the Chief of Staff and the Medical Staff Committee as is appropriate.

Privileges granted to Podiatrist shall be based on their training, experience, demonstrated competence, judgment, current capabilities, and licensure. The scope and extent of surgical procedures that each Podiatrist may perform shall be specifically delineated and granted in the same manner as all other surgical procedures and shall be under the overall supervision of the Chief of Staff or his/her designee who has appropriate experience and clinical privileges to provide such supervision. Podiatrists may write orders and prescribe medications within the limits of their licensure and privileges granted pursuant to these Bylaws.

Podiatrists can be Active Members who may vote and hold office.

**S. CONDITIONS FOR PRIVILEGES OF ADJUNCT STAFF**

**1. DEFINITION** - The term Adjunct Staff shall include all Advanced Practice Professional and Physician Assistants granted clinical privileges through the Medical Staff but who are not Members of the Medical Staff.

**2. DETERMINATION OF ADJUNCT STAFF STATUS** - The Governing Body shall determine the categories of Adjunct Staff eligible to practice in the Hospital with recommendations from the Medical Staff.

**3. PROFESSIONAL LIABILITY INSURANCE** - The Governing Body shall determine the adequate limits for liability insurance for each category in the Adjunct Staff. In the event that a specific amount is not defined, insurance coverage will be consistent with amounts specified in the applicable Articles of these Bylaws.

**4. RESPONSIBILITIES** - All Adjunct Staff members are subject to these Medical Staff Bylaws and the Medical Staff Rules and Regulations and policies and procedures of this Hospital and the Hospital's performance improvement program.

**5. CREDENTIALING AND PRIVILEGING PROCESSES** - The following categories of Adjunct Staff shall be eligible for Clinical Privileges under the supervision of, or in collaboration with, a physician Member(s) of the Medical Staff possessing clinical privileges to provide such services as the Adjunct Staff Member is requesting. Employees of the Hospital and contract employees in these categories shall also be subject to this process.
      a. Nurse Practitioners
      b. Certified Registered Nurse Anesthetists
      c. Midwives
      d. Physician Assistants

**6. QUALIFICATION** - Only an Adjunct Staff member who can meet the qualification outlined in these Bylaws may be eligible for membership. The Board may, in consultation with the Medical Staff Committee, establish additional qualifications for membership for any particular category of the Adjunct Staff.

26

A00392

**7. CLINICAL PRIVILEGES -** Clinical privileges appropriate to each category of Adjunct Staff shall be developed by the Medical Staff Committee with Hospital Administration input and Governing Body approval and will be subject to the same application, review, approval, proctoring and peer review activities as outlined in these Bylaws.

**8.   INITIAL APPOINTMENT -** An Adjunct Member shall complete an application approved by the Governing Body which contains information specified in Article IV, as applicable.  Verification and processing activities will be consistent with those set forth in Article IV and the responsibilities and prerogatives set forth in that section shall apply to the Adjunct Member applicant.

**9.  REAPPOINTMENT -** The process for reappointment shall be the same as set forth in Article V of these Bylaws.

**10.  AUTOMATIC LOSS OF PRIVILEGES -** In addition to the conditions for automatic loss of privileges outlined in these Bylaws and associated Rules and Regulations, an Adjunct Staff member's privileges will terminate without the right to appeal if the Adjunct Member's supervising or collaborating physician loses his or her Medical Staff privileges pertaining to approved activities of the Adjunct Member, resigns his or her status as the supervising or collaborating physician of the Adjunct Member or resigns from the Medical Staff, unless and except to the extent possible, prior to such loss or resignation, a qualified supervising or collaborating physician for such Adjunct Member replaces the supervising or collaborating physician who is subject to the loss or resignation.

**11.  APPEAL PROCESS -** Performance concerns for employed Adjunct Staff members will be subject the corrective action and problem-resolution activities outlined in the Human Resources policies and procedures of the organization.  In the event that the performance concerns can result in the loss or curtailment of privileges, the Adjunct Staff member is eligible for the appeal processes outlined in these Bylaws for the purpose of providing Medical Staff recommendation to the Governing Body for their final decision.  Performance concerns for contracted Adjunct members will be subject to corrective action and problem-resolution activities as defined in the contract.  Performance concerns for Physician-affiliated Adjunct Staff shall be subject to the provisions for these Bylaws.  An appeal for an appealable action may be taken only by the Adjunct Staff Member and may not be taken by his or her supervising or collaborating physician, employer or any other party.

## T. AUTHORITY FOR DOCUMENTATION AND VERIFICATION SERVICES

The Medical Staff Committee and Governing Body may designate a verification service to serve as a designee of the Medical Staff, Chief of Staff, CEO and/or Governing Body to provide documentation collection and verification services with respect to applicants for appointment and reappointment.   The documentation collection and verification services shall be limited to collecting verified, objective data related to the information supplied by applicants during the appointment and reappointment processes.  The Medical Staff and Governing Body remain

A00393

responsible for evaluating and making recommendations with respect to applications for appointment and reappointment for membership and/or clinical privileges. By applying for appointment or reappointment, each applicant for appointment or reappointment authorizes the Medical Staff, Chief of Staff, CEO and Governing Body to use the services of a documentation collection and verification service for the limited purpose described in this Section.

## U. QUALITY REFERRALS

Any Medical Staff member who receives a quality referral from the responsible peer review organization on patients treated at the Hospital must provide a copy of the quality referral to the Quality Department within five (5) days.

A00394

## ARTICLE IV

## APPOINTMENT TO THE MEDICAL STAFF

The Governing Body shall make appointments, reappointments, grant clinical privileges or make revocations of appointments to the Medical/Adjunct Staff. The Governing Body shall act on appointments, reappointments, reappointments or revocation of appointments only after· there has been a recommendation from the Medical Staff as provided for in these Bylaws. In the event of an unwarranted delay on the part of the Medical Staff, the Governing Body may act without such recommendations on the basis of documented evidence of the applicant's or staff member's professional, clinical and ethical qualifications obtained from reliable sources other than the Medical Staff. For the purpose of this section, unwarranted delay means ninety (90) days from the date of receipt of the completed application by the Chief of Staff.

## A. INITIAL APPOINTMENT

1. Initial appointments to any category of the Medical/Adjunct Staff shall be provisional for a minimum period of one (1) calendar year. The period of time and qualification requirements stated in these Bylaws for promotion from Associate to Active Staff may be altered as to specific applicants on the recommendation of the Medical Staff Committee and approval of the Governing Body.
2. Members on provisional status are accorded all rights to the category to which they have been assigned. Appointments to the Medical/Adjunct Staff shall require that each appointee assume such reasonable duties and responsibilities as the Medical Staff and the Governing Body shall require.
3. New appointees to the Medical/Adjunct Staff are subject to regular review and the review mechanism is as defined in these Bylaws. During the term of a provisional appointment, the individual receiving the appointment shall be evaluated by the members of the Medical Staff as determined by the Medical Staff Committee and the Governing Body as to the individual's clinical competence and general behavior and conduct in the hospital. Provisional clinical privileges shall be adjusted to reflect clinical competence at the end of the provisional period, or sooner if warranted. Continued appointment after the provisional period shall be conditioned on an evaluation of the factors to be considered for reappointment.
4. After the initial first year of provisional appointment, the Chief of Staff, in conjunction with the Medical Staff Committee, Chief Executive Officer, and Hospital's Quality Committee, will review information concerning the practitioner's professional performance, judgment and clinical and technical skills over the past year. If the practitioner has met the expected standards of patient care, clinical ability and obligations to the Hospital, the provisional appointment will be converted to a regular appointment of the Medical Staff. If the Practitioner has not met the expected standards of care and obligations to the Hospital for reasons such as lack of volume, the provisional privileges can be extended up to a total of 24 months from the date of original appointment. If the Practitioner has not met the expected standards of patient care or demonstrated the required clinical or professional ability or met the required obligations to the Hospital, the

29

A00395

Governing Body upon recommendation of the Medical Staff will act to terminate membership.

5. Reappointment, thereafter, shall occur within a period not to exceed two years.

**B.   APPOINTMENT**

**1. Responsibilities of the Applicant**

The applicant shall have the burden of producing adequate information on a signed application form along with supporting documentation for a proper evaluation of education, training, experience and clinical competency.  They must also provide for the adequate evaluation of other qualifications and must be able to resolve any doubts about such qualifications [i.e., challenges to licensure, adequacy of malpractice coverage, certifications, past experiences, reporting of impeding, past or present liability actions, etc.].  The applicant must demonstrate a willingness to appear for interviews and a good faith effort to facilitate the initial appointment process through the timely response to requests for information.  After the appointment process but before exercising clinical privileges, the applicant will complete health assessment as outlined in these Bylaws and the Hospital policies and procedures.

**2. Application**

All requests for application shall be made in writing to the Chief Executive Officer or designee.  A pre-application form will be sent in response to all requests for an application. The pre-application form will elicit information from the potential applicant about the proposed scope of medical services as well as inform the potential applicant about the current status of any open and closed Medical Staff positions.  The process of closing Medical Staff services will be the responsibility of the Governing Body based on their responsibility to assure the appropriate utilization and dispersement of resources.  Upon review of the pre-application form and verification that the requesting practitioner meets preliminary criteria for membership, a full application is mailed out.  Applications for appointment to the Medical Staff shall be in writing, and shall be submitted on the appropriate forms.  These forms shall be obtained from the Chief Executive Officer or his/her designee.

A complete application is one that contains 1) completion of all blanks on the application form including necessary additional explanations; 2) boxes checked as needed; 3) all questions answered; 4) all signatures in place; 5) verification that the information is complete, this is, all information necessary to properly evaluate an applicant's qualification has been received and is consistent with the information provided in the application form; 6) letters of reference and information from training programs and past hospitals and other affiliations have been received, including letters from department chairpersons or other physicians who have worked with or observed the applicant; 7) delineation of the requested privileges;  8) authorization for the Hospital to carry out background checks and the release of all records and documents that in the judgment of the Chief of Staff, Medical Staff committee and Governing Body, may be material to an evaluation of the applicant's qualifications and 9) acknowledgement that he/she has received a copy (or has been given access to) and read the Medical Staff Bylaws and Rules and Regulations and that he/she

A00396

agrees to be bound by the terms thereof, as they may be amended from time to time. Clinical references provided by the applicant must consist of peers who can speak to the applicant's clinical, professional and ethical performance within the past three (3) years.

In the event an application is determined to be incomplete, the Chief of Staff shall notify the applicant of any areas of incompletion and/or the failure of others to respond to such information collection or verification efforts within 45 days of when the initial application is received and it shall then be the applicant's obligation to obtain all the required information. Failure to complete the application and/or submit any additional requested information within thirty (30) days of a request shall be deemed a voluntary withdrawal of the application and not subject to the procedural rights under Article VIII of the Bylaws.

### 3.  Verification of Information

The Chief of Staff and Hospital, through the personnel and/or outside service assigned to facilitate the credentialing and privileging activities, will conduct primary source verification to assure evidence of current licensure, relevant training or experience, current competence, and the ability to perform the privileges requested. At a minimum, the following items will be verified: licensure, challenges to licensure, education, relevant post graduate education (residency, fellowships), board status, adequacy of malpractice insurance, malpractice history, affiliations with healthcare institutions,(i.e. voluntary or involuntary relinquishment of medical staff membership; reduction, limitation of, suspension of or loss of privileges; and status of current memberships and privileges.) Clinical competence, as well as the ability to perform the privileges requested, hospital citizenship and facilitation of a team approach to the delivery of high quality care will be determined by professional and administrative references. Queries will be made to the National Practitioner Data Bank (NPDA) pursuant to the Health Care Quality Improvement Act of 1986, the Medicare/Medicaid Cumulative Sanctions Report published by the Office of the Inspector General (OIG) and any other data source that is recognized on a national, international, state or local level as providing valid and reliable information related to practitioner competence and ethical standing. To ensure the practitioner requesting privileges is the same practitioner identified in the credentialing documents, each practitioner will be required to submit government issued photo identification in person. Historical data and information going back a minimum of ten years will be sought. In the event that the Hospital has difficulty securing requested information from a source supplied by the applicant, the applicant is responsible for facilitating the information retrieval within a reasonable period of time or supplying alternate sources of information when appropriate. Failure to be able to retrieve the necessary information in a reasonable period of time, shall be deemed a voluntary withdrawal of the application resulting in the termination of the application process and not subject to the procedural rights under Article VIII of the Bylaws.

### 4.  Release of Information Consent

The applicant authorizes the Hospital to consult with members of the medical staffs and administrative teams of other healthcare institutions with which the applicant has been associated and with others that may have information bearing on the Practitioner's

31

A00397

competence, character and ethical qualifications  Furthermore, the applicant consents to the Hospital's inspection of all records and documents that may be material to an evaluation of the professional qualifications and competence to carry out the privileges requested as well as moral and ethical qualifications for staff membership.  Should any of those documents contain patient identifiable information, the applicant will facilitate the removal of such information without impacting the other content to facilitate Hospital review.  Failure to authorize the Hospital to verify such information related to qualifications, competence and moral and ethical performance constitute an immediate withdrawal of the practitioner's request for privileges and not subject to the procedural rights under Article VIII of the Bylaws.

**5.   Release from Liability**

Applicants to the Medical Staff will release all representatives of the Hospital and of its Medical Staff from liability for their acts performed (in good faith and without malice) in connection with evaluating privileged or confidential information.

**6.   Obligation to Bylaws**

Applicants and members of the Medical Staff pledge to be bound by the terms of the Bylaws and any rules and regulations established to govern the behaviors and performance of the Medical Staff members.  All members of the Medical Staff agree to be bound by the terms of the Bylaws, as they may be amended from time-to-time, if he/she is granted membership or clinical privileges and to be bound by the terms thereof, without regard to whether or not he/she is granted membership and/or clinical privileges, in all matters relating to consideration of the application and reapplication process.

**7.   Levels of Review**

    **a.   Chief of Staff**

        Only a completed and verified appointment application shall be submitted to the Chief of Staff.  The Chief of Staff shall collect the references and other investigational information, with the assistance of designated Administrative staff and/or a contracted verification service deemed to be pertinent to the applicant's review.  After review and recommendation by the Chief of Staff, the application shall be forwarded to the Medical Staff Committee.

    **b.  Medical Staff Committee**

        The Chief of Staff shall convene a Medical Staff Meeting consisting of a majority or three (3) members (whichever is large) of the Medical Staff.  The committee shall consider the completed application and supporting materials, make such investigations as it deems proper and necessary, and shall make a report of its investigations and determinations, including specific recommendations for

32

A00398

delineating the applicant's clinical privileges to the CEO and Board of Trustees through the Chief of Staff.

c.  **Governing Body**

Recommendations from the Medical Staff Committee and Chief of Staff will be forwarded to the Governing Body for final review and approval. Whatever recommendation is made at any level of review, the ultimate approval will be granted by the Governing Body. The Governing Body will act on the referred recommendation at its next regularly scheduled meeting after a Medical Staff Committee recommendation is made. The Governing Body may, its discretion, refer a recommendation back to the Medical Staff Committee for further consideration, stating the reasons for such referral and setting a time limit within which a reconsidered recommendation shall be made. Upon referral back, the Medical Staff Committee shall reconsider its previous recommendation and then make a supplemental reporting to the Governing Body.

The Governing Body, after receiving the recommendation from the Medical Staff Committee, after referral back to the Medical Staff Committee, or after the conflict resolution procedure, if any, shall make a preliminary determination. If the preliminary determination is consistent with the last recommendation of the Medical Staff Committee, and if adverse, and the affected applicant or Staff Member has been afforded the right to a hearing before an adhoc hearing committee of the Medical Staff Committee, the preliminary determination shall be deemed final. If the preliminary decision is consistent with the last recommendation of the Medical Staff Committee and is favorable to the applicant or Staff Member, the decision shall be deemed final. If the preliminary determination of the Governing Body is adverse and the affected applicant or Staff member has not previously been afforded a right to a hearing before an adhoc hearing committee of the Medical Staff Committee, the Governing Body shall afford the affected applicant or Staff member a hearing before the Governing Body or a committee thereof. Such hearing shall be conducted in accordance with procedures set forth in Article VIII. After the hearing, the Governing Body shall make its decision and this decision shall be deemed final.

8.  **Time Frame**

The processing of an application of a new applicant shall be completed within 90 days from the receipt of a complete application with recommendations to the Governing Body unless there are extenuating circumstances that make the delay unavoidable. If the application not ready for recommendation to the Governing Body in 90 days, the issues causing the delays will be referred to the Governing Body for review and determination of next steps.

9.  **Results of Recommendations**

33

A00399

**a. Recommend Appointment**

If the recommendation at every level of review is for an appointment, the application shall be promptly forwarded to the Governing Body for final action. The applicant shall be notified by letter from the Chief Executive Officer within ten (10) business days indicating membership, clinical privileges and any change in status.

**b. Defer Appointment**

If the recommendation at any level of review is to defer the application for further consideration, the applicant shall be notified by certified letter from the Chief Executive Officer within ten (10) business days indicating the intent to defer and any additional information that is required to complete the reappointment process.

**c. Deny Appointment**

If the recommendation of the Medical Staff Committee is for non-appointment, either with respect to membership or clinical privileges, such recommendation shall state the reasons.   They shall be related to standards of patient care, objectives of the organization, or the character, competency, and/or qualifications of the applicant.  The Chief Executive Officer notify the applicant within ten (10) business days by certified mail, return receipt requested.

**d. Rights of the Practitioner**

No such adverse recommendations coming from the Medical Staff Committee shall be forwarded to the Governing Body for action until after the applicant has exercised or has been deemed to have waived his or her rights to a Professional Review Procedure, as provided in Article VIII of the Bylaws.

**e. Governing Body**

Recommendations from the Medical Staff Committee and Chief of Staff will be forwarded to the Governing Body for final review and approval.   Whatever recommendation is made at any level of review, the ultimate approval will be granted by the Governing Body.

**10. Final Action**

In all instances, the final action of the Governing Body shall be communicated to the applicant in writing.

A00400

## ARTICLE V

## REAPPOINTMENT TO THE MEDICAL STAFF

The Governing Body shall make reappointments, grant clinical privileges or make revocations of appointments to the Medical/Adjunct Staff. The Governing Body shall act on reappointments or revocation of appointments only after there has been a recommendation from the Medical Staff as provided for in these Bylaws. In the event of an unwarranted delay on the part of the Medical Staff, the Governing Body may act without such recommendations on the basis of documented evidence of the applicant's or staff member's professional, clinical and ethical qualifications obtained from reliable sources other than the Medical Staff. For the purpose of this section, unwarranted delay means ninety (90) days from the date of receipt of the completed application by the Chief of Staff.

### A.  REAPPOINTMENT

1. Reappointments to any category of the Medical/Adjunct Staff shall never exceed a period of two (2) years. The period of time and qualification requirements stated in these Bylaws may be altered as to specific applicants on the recommendation of the Medical Staff Committee and approval of the Governing Body.
2. Reappointments to the Medical/Adjunct Staff shall require that each appointee assume such reasonable duties and responsibilities as the Medical Staff and the Governing Body shall require.
3. Reappointments to the Medical/Adjunct Staff are subject to regular review and the review mechanism is as defined in these Bylaws. During the term of a provisional appointment, the individual receiving the appointment shall be evaluated by the members of the Medical Staff as determined by the Medical Staff Committee and the Governing Body as to the individual's clinical competence and general behavior and conduct in the hospital. Clinical privileges shall be adjusted to reflect clinical competence at the end of each reappointment process, or sooner if warranted. Continued appointment shall be conditioned on an evaluation of the factors to be considered for reappointment.

### B.  REAPPOINTMENT PROCESS

#### 1.  Responsibilities of Practitioners

The Practitioner shall submit a completed and signed reappointment application, and in doing so, agrees to provide updated information of hospital appointments, voluntary or involuntary relinquishment of medical staff membership, or licensure status, voluntary or involuntary limitation, reduction, suspension or loss of clinical privileges at any other hospitals, involvement in liability claims, voluntary or involuntary cancellation of professional liability insurance or license, Medicare/Medicaid/Drug Enforcement Administration sanctions, including both current and pending investigations and challenges and any removal from a managed care organization panel for quality of care or unprofessional conduct. The

35

A00401

Practitioner shall submit any other information deemed necessary in the evaluation of current competence and professional standing.

The practitioner will pledge to provide for the continuous care of his or her patients in a manner that is consistent with currently recognized standards of care and as stipulated in these Bylaws and their associated Rules, Regulations, policies and procedures.

## 2. Verification of Information

The Hospital and Chief of Staff, through the personnel and/or agency assigned to facilitate the credentialing and privileging activities, will conduct primary source verification to assure evidence of current licensure, relevant training or experience for privileges held and requested, current competence, and the ability to perform the privileges requested.  At a minimum, the following items will be verified:  licensure, challenges to licensure, education, relevant post graduate training, board status, malpractice coverage and claims history, affiliations at healthcare relevant institutions, voluntary or involuntary relinquishment of medical staff memberships or limitations, reductions, suspensions of or loss of clinical privileges.  Historical information going back to the last application date will be sought.

## 3. Responsibilities of the Medical Staff

Current competence will be determined by the results of quality and performance improvement activities and recommendations from peer review activities.  This recommendation will be based on the ongoing monitoring of the practitioner's professional performance, judgment and clinical/technical skills.  The ability to perform the privileges requested will be confirmed by professional reference(s), the Chief of Staff and the Medical Staff in the reappraisal activities.  Professional and clinical references offered by the Practitioner shall consist of peers who can speak to his or her clinical, professional and ethical performance since his or her last application to the Medical/Adjunct Staff.  In addition, the practitioner must have a current (within one year) health assessment at the time of reappointment.

## 4. Levels of Review

### a. Chief of Staff

Only a completed and verified application for membership to the Medical Staff shall be submitted to the Chief of Staff.  The Chief of Staff shall collect the references and other investigational information with the assistance of designated Administrative Staff or a contracted verification service deemed to be pertinent to the applicant's review.  After review and recommendation by the Chief of Staff, the application shall be forwarded to the Medical Staff Committee.

### b. Medical Staff Committee

A00402

The Chief of Staff shall convene a Medical Staff Meeting consisting of a majority or three (3) members (whichever is larger) of the Medical Staff. The committee shall consider the completed reappointment application and supporting materials, including meeting attendance, documented evidence of continuing education, results of quality assurance and improvement activities, and make such investigations as it deems proper and necessary. The committee shall make a report of its investigations and determinations, including specific recommendations for reappointment unless two-thirds (2/3) of its members vote to deny or defer. The committee's report shall not be binding but must be forwarded to the Chief Executive Officer with recommendations for review by the Governing Board.

c. **Governing Body**

Recommendations from the Medical Staff Committee and Chief of Staff will be forwarded to the Governing Body for final review and approval. Whatever recommendation is made at any level of review, the ultimate approval will be granted by the Governing Body.

The Governing Body may, at its discretion, refer a recommendation back to the Medical Staff Committee for further consideration, stating the reasons for such referral and setting a time limit within which a reconsidered recommendation shall be made. Upon referral back, the Medical Staff Committee shall reconsider its previous recommendation and then make a supplemental reporting to the Governing Body.

The Governing Body, after receiving the recommendation from the Medical Staff Committee, after referral back to the Medical Staff Committee, or after the conflict resolution procedure, if any, shall make a preliminary determination. If the preliminary decision is consistent with the last recommendation of the Medical Staff Committee and is favorable to the applicant or Staff Member, the decision shall be deemed final. If the preliminary determination is consistent with the last recommendation of the Medical Staff Committee, and if adverse, and the affected applicant or Staff Member has been afforded the right to a hearing before an adhoc hearing committee of the Medical Staff Committee and an Appellate Review, the preliminary determination shall be deemed final. If the preliminary determination of the Governing Body is adverse and the affected applicant or Staff member has not previously been afforded a right to a hearing before an adhoc hearing committee of the Medical Staff Committee and an Appellate Review, the Governing Body shall afford the affected applicant or Staff member the procedural right as outlined in Article VIII. After the affected Staff Member has exhausted his or her rights to one hearing and one Appellate Review or waived his or her rights, the Governing Body shall make its decision and this decision shall be deemed final.

5. **Discretionary Hearing**

37

A00403

If the Governing Body shall have any questions as to any action or recommendation of the Medical Staff Committee with respect to an application for appointment, renewal of appointment, assignment of clinical privileges, or with respect to corrective action, the Governing Body may, at its discretion, conduct a hearing on the matter before the Board itself or a committee thereof. Such hearing may be conducted at a time and place and with such notice to the affected applicant or Staff Member as shall be determined by the Governing Body. The hearing shall be conducted in any manner that the Governing Body or its committee shall determine. At no time shall this hearing be considered to replace the hearing stipulated under Article VIII. The affected applicant or Staff Member shall not be entitled to representation by an attorney. After the hearing, the Governing Body shall make its decision and this decision shall be deemed final.

### 6. No Recommendation

If the Medical Staff Committee does not present a reconsidered recommendation within the time limits specified by the Governing Body, the Governing Body may take action on its own initiative, after notifying the Medical Staff Committee and providing a period of not less than fifteen (15) additional days within which the Medical Staff Committee may make its reconsidered recommendation. If the Governing Body's preliminary determination is adverse, the procedures set for in Article VIII shall apply.

### 7. Conflict Resolution

In all cases where the last recommendation of the Medical Staff Committee is in conflict with the preliminary determination of the Governing Body, the Governing Body may submit the matter to a Joint Conference Committee for further review, discussion and recommendation. The Joint Conference Committee will consist of Medical Staff and Governing Body representation which includes the CEO. The Joint Conference Committee may invite an affected applicant or Staff Member to appear before the Joint Conference Committee and may also invite other individuals to appear before the Committee. In each case, this appearance shall be under the conditions as may be established by the Joint Conference Committee. The affected applicant or Staff Member shall not be entitled to representation by an attorney.

### 8. Time Frame

The processing of an application of a reapplicant shall be completed within 90 days with recommendations to the Governing Body unless there are extenuating circumstances that make the delay unavoidable. If the application not ready for recommendation to the Governing Body in 90 days, the issues causing the delays will be referred to the Governing Body for review and determination of next steps.

### 9. Results of Recommendation

#### a. Recommend Appointment

38

A00404

If the recommendation at every level of review is for reappointment, with privileges as requested, the application shall be promptly forwarded to the Governing Body for final action. The applicant shall be notified by letter from the Chief Executive Officer within ten (10) business days indicating membership, clinical privileges and any change in status.

b.   **Defer Appointment**

If the recommendation at any level of review is to defer the appointment for further consideration, the applicant shall be notified by certified letter from the Chief Executive Officer within ten (10) business days indicating the intent to defer and any additional information that is required to complete the reappointment process.

c.   **Deny Appointment**

If the recommendation of the Medical Staff Committee is for non-appointment, either with respect to membership or clinical privileges, such recommendation shall state the reasons. They shall be related to standards of patient care, objectives of the organization, or the character, competency, and/or qualifications of the applicant. The Chief Executive Officer shall promptly notify the applicant by certified mail return receipt requested and provide notification of any rights to appeal on the part of the applicant.

d. **Interim Reappointment**

If the application for reappointment has not been acted on by the Governing Body prior to the expiration date of appointment, for reasons other than due to the re-applicant's failure to return documents or otherwise demonstrate timely cooperation in the reappointment process, the Medical Staff Committee and Governing Body, shall approve a time- and member-specific Interim Reappointment to the Medical Staff for a period not to exceed 90 days. The member shall continue to be subject to the reapplication review process as outlined in these Bylaws. At the end of the 90 day Interim Reappointment, the Medical Committee and Governing Body must make a decision regarding the reappointment or termination of membership and clinical privileges.

e.   **Rights of the Practitioner**

No such adverse recommendations coming from the Medical Staff Committee shall be forwarded to the Governing Body for action until after the applicant has exercised or has been deemed to have waived his or her rights to a Professional Review Procedure, as provided in Article VIII of the Bylaws.

f. **Governing Body**

Recommendations from the Medical Staff Committee and Chief of Staff will be forwarded to the Governing Body for final review and approval. Whatever recommendation is made at any level of review, the ultimate approval will be granted by the Governing Body.

**11. Final Action**

In all instances, the final action of the Governing Body shall be communicated to the applicant in writing.

A00406

## ARTICLE VI

## GRANTING CLINICAL PRIVILEGES

All members of the Medical/Adjunct Staff shall be eligible for clinical privileges as demonstrated by their individual education, training, experience, and competence, and as recommended by the Medical Staff Committee, the Chief of Service, and approved by the Governing Body. No member of the Medical/Adjunct Staff shall be permitted to perform any diagnostic or therapeutic procedures which do not fall into the scope of their delineation of privileges, except in an emergency.

### A. APPLICANT'S RESPONSIBILITITS

Each applicant shall have the burden of establishing their qualifications and competency for the clinical privileges desired or requested.

### B. RENEWAL OF PRIVILEGES

Clinical privileges will be renewed every two years at the time of Medical/Adjunct Staff reappointment. An increase in privileges will require a review that follows the process for initial appointment. Renewal of clinical privileges and the increase or curtailment of those privileges, shall be based upon direct observation of care provided, peer review activities, and the review of patient records.

### C. ADDITIONAL CLINICAL PRIVILEGES

A member of the Medical/Adjunct Staff may apply for additional clinical privileges in writing to the Medical Staff Committee. The application shall in all respects be processed in the same manner as an application for appointment or reappointment and the applicant shall in all respects have the same rights and be subject to the same requirements as apply to an application for appointment or reappointment to the Medical/Adjunct Staff.

### D. TEMPORARY CLINICAL PRIVILEGES

Temporary Clinical Privileges are those privileges granted on a case-by case basis when there is an important patient care need that warrants an immediate authorization to practice for a limited period of time while the full credentials information is being approved. Temporary privileges may be granted by the CEO with recommendations from the Chief of Staff and only after appropriate license, adequate liability coverage and clinical competence has been established along with the National Practitioner Data Bank having been queried. Practitioners granted temporary privileges shall conform to the same standards of performance and the expectations outlined in these Bylaws and associated Rules, Regulations, policies and procedures as a Member of the Medical/Adjunct Staff and are not eligible for the procedural rights outlined in Article VIII. The CEO or Governing Board Chairman may terminate temporary privileges at any time without eligibility for the procedural rights outlined in Article VIII.

41

A00407

## 1. Interim Appointment and Privileges

When appropriate to meeting the patient care needs of the Hospital, if the Medical Staff is in receipt of a complete application, the Chief of Staff and CEO, may, on the authority of the Governing Body, grant an interim appointment and interim privileges to a qualified practitioner who is applying for full Medical Staff membership and clinical privileges, to fulfill an important patient care, treatment and service need, and when the completed application raises no concerns and is awaiting review and approval of the Medical Staff Committee and the Governing Body. The interim appointment and interim clinical privileges is for a limited period of time not to exceed ninety (90) days and may only be granted once appropriate license, adequate liability coverage and clinical competence has been established along with the National Practitioner Data Bank having been queried. Practitioners granted interim appointment and privileges shall conform to the same standards of performance and the expectations outlined in these Bylaws and associated Rules, Regulations, policies and procedures as a Member of the Medical/Adjunct Staff and are not eligible for the procedural rights outlined in Article VIII.

## 2. Locum Tenens

Locum tenens privileges are granted to a physician working temporarily in an assigned practice or hospital. Locum Tenens may be used as the demands of the Hospital may warrant to assure adequate access to patient care and clinical management.

The Chief of Staff and CEO will review and grant locum tenens privileges. Without applying for full membership, locum tenens temporary privileges can be granted for an initial period of up to ninety (90) days, not to exceed two (2) such occurrences per year. Privileges shall be limited to the treatment of patients of the practitioner or practitioner group for whom he/he is serving as locum tenens. He/she shall not be entitled to admit his/her own patient to the Hospital.

## 3. Disaster Privileges (In the Event of an Officially Declared Emergency/Disaster)

"Disaster privileges" may be granted when the emergency management plan has been activated and the hospital is unable to meet the immediate patient needs resulting in a need for additional licensed health practitioners.

The Chief of Staff and CEO will review and grant temporary disaster privileges. The individuals granting privileges are not required to grant privileges to any individual who wishes to volunteer and are expected to make decisions promptly, to the extent practicable, on a case-by-case basis at his or her discretion.

Volunteers considered eligible to act as Licensed Independent Practitioners must, at a minimum, present a valid government issued photo identification issued by a state or federal agency (i.e. driver's license or passport) and at least ONE of the following criteria before

42

disaster privileges may be granted. (Any one of the following five items must be presented before disaster privileges may be granted.)

- Current license to practice medicine
- A current picture hospital ID card that identifies individual and professional designation
- Primary source verification of license
- Identification indicating that the individual is a member of a Disaster Medical Assistance Team (DMAT) or Medical Reserves Corps (MRC), Emergency System for Advance Registration of Volunteer Health Professionals (ESAR-VHP) or other recognized state or federal organization with responsibilities for emergency response
- Identification indicating that the individual has been granted authority to render patient care, treatment, or services in disaster circumstances (such authority having been granted by a federal, state or municipal entity)
- Identification by a current hospital or medical staff member who possesses personal knowledge regarding the volunteer's ability to act as a licensed practitioner during a disaster

The name of the practitioner's primary hospital affiliation will be ascertained. Primary source verification of licensure will begin as soon as the immediate situation is under control and is to be completed with 72 hours from the time the Practitioner presents to the organization. In the extraordinary circumstance that primary source verification cannot be completed within 72 hours (e.g., no means of communication or a lack of resources), verification will be done as soon as possible. In this extraordinary circumstance, the following will be documented: why the primary source could not be performed in the required timeframe; evidence of a demonstrated ability to continue to provide adequate care, treatment and service; and a reasonable attempt to rectify the situation as soon as possible. In the event that the volunteer practitioner does not provide care, treatment or service under the disaster privileges, primary source verification is not required. As soon as is possible, the Hospital's administration will query the National Practitioner Data Bank, State licensing agency, malpractice carrier, other appropriate agencies which can confirm credentials and hospitals where current privileges are held by the practitioner. An AMA profile will be secured to evaluate that information that would normally be achieved through primary source verification. Records of these queries will be retained.

The hospital will make a decision, based on the information obtained, within 72 hours, related to the continuation of the disaster privileges initially granted. Any information gathered that is not consistent with that provided by the practitioner must be referred to the Chief of Staff and Chief Executive Officer immediately who will determine any additional necessary action including but not limited to revocation of emergency temporary privileges.

Once temporary disaster privileges are granted, a record of the practitioner's action shall be maintained. The record shall indicate that the Practitioner exercising the "disaster privileges" does so at the request of an attending Physician on staff at the Hospital. Practitioners granted temporary disaster privileges must practice under the direction of an attending physician currently on the Medical Staff at the Hospital.

A00409

The practitioner who is granted disaster privileges will be issued an identification badge identifying him or her as having temporary disaster privileges. The conclusion of the emergency will be determined by the hospital CEO. Once the emergency had been determined to be concluded, any emergency disaster privileges granted will be simultaneously concluded.

**4. Telemedicine Temporary Privileges**

There shall be no right to Telemedicine privileges by virtue of meeting the Medical Staff membership criteria. Telemedicine privileges shall not be granted unless the available information supports, with reasonable certainty, a favorable determination regarding the requesting practitioner's qualifications, ability and judgment to exercise the privileges requested. Practitioners granted Telemedicine Privileges shall be subject to proctoring and monitoring requirements as set forth by the Medical Staff Committee and approved by the Governing Body.

**5. Visiting Practitioner Privileges**

There may be occasions when physicians from other institutions many visit the Hospital. Such visiting practitioners may be asked to engage in consultation or the review of patient care programs. Arrangements for hospital privileges for the duration of the visiting practitioner appointment should be made through the existing privileging process.

44

A00410

## ARTICLE VII

### CORRECTIVE ACTION

Whenever a Practitioner shall engage in, make, exhibit acts, statements, demeanor or professional conduct, either within or outside the Hospital, which is reasonably likely to be, detrimental to patient safety or to the delivery of quality patient care, which will or will likely result in the imposition of sanctions by any governmental authority, which does not meet accepted standards or aims of the Medical Staff, or which is disruptive to the operations of the Hospital, or which is in violation or contrary to these Bylaws or the associated Medical Staff Rules, Regulations, policies or procedures, an investigation or corrective action with respect to such Practitioner may be requested by any member of the Medical/Adjunct Staff, by the Chief Executive Officer, or by the Governing Body or may be initiated by the Medical Staff Committee. All requests for corrective action shall be supported by references to the specific activities or conduct which constitute grounds for the request.

### A. CORRECTIVE ACTION PROCESS

The Chief Executive Officer or the Chairperson of the Governing Body shall each have the authority to suspend all or any portion of the clinical privileges of a Medical/Adjunct Staff member whenever there is reasonable basis to believe that failure to take such action may result in danger to the health and/or safety of any individual or there is reasonable basis to believe that failure to do so may interfere with the orderly operations of the Hospital. The involved Medical/Adjunct Staff member and Chief of Staff shall be notified promptly in writing of the precautionary suspension and the reasons therefore. This notice shall constitute a request for investigation and appropriate corrective action.

Any person may provide information to the Medical Staff Committee, Chief of Staff or the Chief Executive Officer about the conduct, performance or competence of a staff member. All such complaints shall be forwarded to the Chief of Staff for review unless the Chief of Staff him or herself is the subject of the complaint, in which case the information shall be forwarded to the Chief Executive Officer. When reliable information indicates that a staff member may have exhibited acts, demeanor or conduct reasonably likely to meet one of the above criteria, an investigation will be initiated through the Hospital's quality program and under the direction of the Chief of Staff.

If the Chief of Staff determines an investigation is warranted, the Chief of Staff shall notify the CEO of the affected practitioner for which an investigation is to be undertaken and the conduct being considered. The fact finding aspect of the investigation will be completed within ten (10) days of the request and be submitted to the Medical Staff Committee for review and recommendation. The practitioner shall be given an opportunity to provide information to the Committee in a manner and upon such terms, as the committee deems appropriate. The committee may, but is not obligated to, conduct interviews with persons involved. All members of the Medical and Adjunct Staff must cooperate with the investigation. The investigation under this provision shall not be deemed to be a "hearing" as described in Article VIII.

45

A00411

If the Practitioner elects to interview during the investigation, the goal shall be to discuss, explain or refute information directly related to the behavior or actions that lead to the investigation. The interview shall not constitute a hearing, but shall be preliminary, and none of the procedural rights provided in these Bylaws with respect to the hearing shall apply thereto. A record of such interview shall be made and included in the report to the Medical Staff Committee.

At the next regular meeting of the Medical Staff Committee, unless deferred by the Committee because of a need for additional time to complete the investigation, the Committee shall act thereon. If the Committee defers its action to further the investigation, that investigation must be completed within 30 days. If the affected Practitioner is under summary suspension at the time of investigation, the investigation and recommendations of the Medical Staff Committee must be submitted to the Governing Body for action within fourteen (14) days from the date of the suspension.

As soon as possible after the conclusion of the investigation, the Medical Staff Committee shall notify the Chief Executive Officer of their recommendation for action which may include;
1. Determining no corrective action be taken
2. Deferring action for a reasonable time where circumstances warrant
3. Seek outside peer review
4. Issuing letters of admonition, warning, reprimand, or censure. In the event that such letters are issued, the affected member may make a written response which shall be placed in the member's file but is not eligible for procedural rights outlined in Article VIII.
5. Directing the medical staff member to undergo a medical and/or psychiatric examination by a physician chosen by the Medical Staff Committee
6. Recommending the imposition of probation or limitation upon continued medical staff membership or the exercise of clinical privileges including, without limitation, requirements for co-admission, mandatory consultation, or monitoring
7. Recommending reduction, modification, suspension or revocation of clinical privileges
8. Recommending reduction or limitation of any prerogatives directly related to membership on the Medical/Adjunct Staff
9. Recommending suspension, modification, probation or revocation of Medical/Adjunct staff membership.

At the next regular meeting of the Governing Body after receipt of the recommendation of the Medical Staff Committee, the Governing Body shall consider the matter and shall recommend confirmation, modification or rejection of any previous recommendation or decision concerning the matter. The Governing Body decision shall be shared with the Chief of Staff within five (5) calendar days after the meeting at which Governing Body action was taken on the matter under consideration. The Chief of Staff shall forward the action of the Governing Body to the Medical Staff Committee. The CEO will forward the Governing Body decision to the affected Practitioner.

If additional time is needed by the Governing Body to complete its consideration of the matter, it shall notify the affected Practitioner, Chief of Staff and Medical Staff Committee. However, in

46

A00412

no event shall the Board of Directors take more than sixty (60) days for consideration of the matter after it receives the recommendation of the Medical Staff Committee.

If the decision of the Governing Body is adverse, the Practitioner shall be entitled to notice of the recommendation by the Chief Executive Officer in accordance with the provisional of Article VIII and shall otherwise be entitled to all the rights provided in Article VIII of the Bylaws.

## B.  SUBSEQUENT ACTION

1. If the Governing Body decision set forth in this section is adverse and not subject to a condition that would exclude the Practitioner from the procedural rights outlined in Article VIII, the decision shall be communicated to the Practitioner in writing along with an explanation of the Practitioner's right under Article VIII.
2. If the staff member does not exercise his or her rights under Article VIII, the Medical Staff Committee shall forward its recommendation to the Governing Body within 30 days.
3. The decision of the Governing Body shall be deemed final action.
4. Notwithstanding the foregoing, the Medical Staff Committee may, in alternative, and with adequate notice to the Chief Executive Officer, enter into a remedial agreement with the affected practitioner to resolve the problem. This option is only available in situations where the practitioner is cooperative and the Medical Staff Committee, Chief of Staff and Chief Executive Officer agree that there is a high probability of success and the delay in other action will not place patients, hospital personnel or the organization at risk. This remedial agreement is subject to the final approval of the Governing Body. If the affected practitioner fails to abide by the terms of the remedial agreement, the practitioner will be subject to the recommended corrective action procedures of this Article.

## C. SUMMARY RESTRICTION OR SUSPENSION

Whenever a staff member's conduct appears to require that immediate action be taken to protect the life or well-being of a patient or whenever the staff member's conduct presents a danger of immediate and serious harm to the life, health, or safety of any patient, prospective patient or other person, the Chief of Staff and Chief Executive Officer or their designee(s) may summarily restrict or suspend the Medical/Adjunct Staff membership or clinical privileges of such Practitioners. Unless otherwise stated, such summary restriction or suspension shall become effective immediately upon imposition. The Practitioner will receive verbal notice immediately followed by written notice delivered by certified mail, return receipt required. Verbal notice shall be given as soon as possible to units, personnel and medical staff members with a need to know of the decision.   The Chief of Staff and Chief Executive Officer shall have the responsibility and duty of cooperatively enforcing all summary suspensions.

1. The summary restriction or suspension shall remain in effect for the period stated or, if none, until resolved as set forth herein. Unless otherwise indicated by the terms of the summary restriction or suspension, the Staff Member's patients shall be promptly assigned to another practitioner with the necessary skills and privileges by the Chief of Staff. Where feasible, the wishes of the patient in the choice of substitute staff member will be considered.

47

A00413

2. As soon as practicable after a summary restriction or suspension has been imposed, a meeting of the Medical Staff Committee shall be convened to review and consider the action. When necessary, the Medical Staff Committee shall direct further investigation of the issues through the quality program and hold such interviews as may be appropriate with respect to the affected member.  If deemed appropriate, outside peer review activities may be requested.  The Committee will complete its review and make its decisions and recommendations within ten (10) days after the suspension or restriction. The suspended Practitioner may attend and make a statement concerning the issues under investigation on such terms as the Committee may impose.  In no event shall any meeting of the committee constitute a "hearing" within the meaning of Article VIII.  The Medical Staff Committee may modify, continue, or terminate the summary suspension, but in any event, it shall promptly furnish the affected member, Chief of Staff and Chief Executive Officer with its decision.   Unless the Chief of Staff or Medical Staff Committee terminates the summary suspension or restriction within fourteen (14) days of its effective date, the member shall be entitled to his or her rights as set forth in Article VIII, but not otherwise.

## D. AUTOMATIC SUSPENSION OR LIMITATION

In the following instances, the Staff member's privileges or membership may be suspended or limited as described.  This action shall be final without the right to hearing under Article VIII or further appellate review.  The Chief of Staff and Chief Executive Officer shall have the responsibility and duty of cooperatively enforcing all automatic suspensions.

1. **Licensure**

   a) **Revocation or Suspension**

   Whenever a member's license or other legal credential authorizing practice in this State is suspended, revoked, or has lapsed, the member shall immediately notify the Chief of Staff and Chief Executive Officer and his or her medical staff membership and clinical privileges shall be automatically suspended, or revoked as of the date such action becomes effective. Reinstatement by the licensing or accrediting agency does not guarantee reinstatement by the organization. Requests for reinstatement will be considered through the normal procedures for requesting membership and clinical privileges.

   b) **Restriction**

   Whenever a member's license or other legal credential authorizing practice in this state is limited by the applicable licensing or certifying authority, the member shall immediately notify the Chief of Staff and Chief Executive Officer and any membership or clinical privileges which the member has been granted which are within the scope of said limitation or restriction shall be automatically limited or

48

A00414

restricted in a similar manner as of the date such action becomes effective and throughout its term. Reinstatement by the licensing or accrediting agency does not guarantee reinstatement by the organization. Requests for reinstatement will be considered through the normal procedures for requesting membership and clinical privileges.

### c)  Probation

Whenever a member is placed on probation by an applicable licensing or certifying authority, the member shall immediately notify the Chief of Staff and Chief Executive Officer and clinical privileges shall automatically become subject to the same terms and conditions of the probation as of the date such action becomes effective and through its term. The Medical Staff Committee and the Governing Body reserve the right to take any additional steps and create additional restrictions as may be deemed appropriate. Automatic reinstatement by the applicable licensing or certifying authority does not guarantee reinstatement by the organization. Requests for reinstatement will be considered through the normal procedures for requesting membership and clinical privileges.

## 2.  Controlled Substances Administration

### a)  Restriction

Whenever a member's DEA certification is revoked, limited, suspended or has lapsed, the member shall immediately notify the Chief of Staff and Chief Executive Officer and the member's right to prescribe such medications shall automatically become subject to the same terms of the action as of the date such action becomes effective and throughout its term. Reinstatement of a DEA certification does not guarantee reinstatement by the organization. Requests for reinstatement will be considered through the normal procedures for requesting membership and clinical privileges.

### b)  Probation

Whenever a member is placed on probation by the applicable licensing or certifying authority, the member shall immediately notify the Chief of Staff and Chief Executive Officer and the member's right to prescribe such medications shall automatically become subject to the same terms of the probation, as of the date such action becomes effective and throughout its term. Reinstatement by the applicable licensing or certifying authority does not guarantee reinstatement by the organization. Requests for reinstatement will be considered through the normal procedures for requesting membership and clinical privileges.

## 3.  Professional Liability Insurance

49

A00415

A member who fails to maintain the level and type of professional liability insurance coverage as required by the Hospital shall automatically be suspended from exercising all clinical privileges at the Hospital, until the situation is remedied to the satisfaction of the Chief of Staff, Chief Executive Officer and Governing Body or further action is taken under these Medical Staff Bylaws.

### a) Restrictions

Whenever a member is notified of a restriction on his or her professional liability insurance, such as non-coverage for certain classes of procedures, the member shall immediately notify the Chief of Staff and Chief Executive Officer and the member's clinical privileges shall automatically become subject to the same terms and conditions of the restrictions as of the date such action becomes effective and through its term. Reinstatement by the applicable authority or agency does not guarantee reinstatement by the organization. Requests for reinstatement will be considered through the normal procedures for requesting membership and clinical privileges.

### 4. Loss of Medicare or Medicaid Provider Status

A member who loses his or her status as a Medicare or Medicaid provider shall automatically be suspended from exercising all clinical privileges at the Hospital, until the situation is remedied to the satisfaction of the Chief of Staff, Chief Executive Officer, Medical Staff Committee and Governing Body or further action is taken under these Medical Staff Bylaws. Reinstatement of payor status does not guarantee reinstatement by the Hospital. Requests for reinstatement will be considered through the normal procedures for requesting membership and clinical privileges

### 5. Failure to Comply with Department of Health (DOH) or CMS Mandated Requirements

Failure to comply with DOH or CMS mandated administrative requirements (i.e. timely response to treat an emergency room patient, completion of records, etc.) following notice will result in a thirty day suspension from the Medical/Adjunct Staff. Failure to correct the deficiency within the 30 day suspension period will result in termination from the Medical/Adjunct Staff. If the reason for suspension is for an issue for which a suspension has been issued in the past or is considered serious enough that it could place a patient in jeopardy should it occur again, completion of the suspension or correction of the issue does not guarantee reinstatement by the Hospital. Requests for reinstatement will be considered through the Corrective Action procedures of these Bylaws, Rules and Regulations.

### E. MEDICAL STAFF DELIBERATION

As soon as practicable after action is taken or warranted as described in 1,2,3,4, or 5 above, the Medical Staff Committee shall convene to review and consider the facts and may recommend to

A00416

the Governing Body such further disciplinary action as it may deem appropriate as allowable in these Bylaws.

A00417

# ARTICLE VIII

## PROFESSIONAL REVIEW PROCEDURE

### A. RIGHT TO HEARING

Except as otherwise provided for herein, any Practitioner who is a member of the Medical/ Adjunct Staff in good standing as well as other individuals holding clinical privileges and whose reappointment to the Medical Staff has been denied, or any Practitioner whose clinical privileges have been curtailed, suspended, revoked or denied, or any Practitioner who has received an adverse recommendation shall have a right to a hearing before a panel of individuals appointed by the Chief of Staff. No member of the panel shall be in direct economic competition with the affected Practitioner or have any material conflict of interest, which would prevent him/her from discharging his/her duties in an unbiased manner. Such panel shall consist of an odd number of members.

For the purpose of this Article, the phrases "adverse recommendation" and "adverse decision" and "final decision that will adversely affect" are defined as a recommendation or decision to restrict or deny a Practitioner's request for appointment or reappointment to the Medical Staff, or to reduce or limit the Practitioners clinical privileges as a member of the Medical/Adjunct Staff or to otherwise adversely affect the Practitioner's clinical privileges in a way that reduces the Practitioner's ability to exercise those privileges. .

Except as otherwise provided in these Bylaws and procedural policies, the following recommendations or actions are grounds for a Hearing upon the timely and proper request of the practitioner:

1. Denial of initial staff appointment;
2. Denial of staff reappointment;
3. Suspension of staff membership;
4. Revocation of staff membership;
5. Denial of appointment or reappointment in requested staff classification or failure to advance in clinical privileges;
6. Reduction in staff classification;
7. Suspension or limitation of the right to admit patients;
8. Denial or restriction of requested clinical privileges;
9. Reduction in clinical privileges;
10. Suspension of clinical privileges;
11. Revocation of clinical privileges;

When a Practitioner receives notice of an adverse decision of the Governing Body and the Practitioner has not previously had an opportunity for both a Hearing and an Appellate Review at the time of the Medical Staff Committee review, the Practitioner shall be entitled to a Hearing and an Appellate Review or only an Appellate Review if the Practitioner has had a Hearing, but has not previously had an opportunity for an Appellate Review. Notwithstanding any other provisions in these Bylaws, no Practitioner shall be entitled to more than one Hearing and one

52

A00418

Appellate Review regarding any matter which is the basis of an adverse recommendation or adverse decision or a final decision that will adversely affect the Practitioner.

The applicant will during the pending of his/her application, reapplication, request for clinical privileges and corrective action processes exhaust all administrative remedies provided by these Bylaws before initiating any legal proceedings in any court and will abide by the procedures for professional review and professional conduct outlined in these Bylaws.

## B. HEARING REQUIREMENTS

A Practitioner, who is entitled to a Hearing as set forth above, shall receive written notice from the Chief Executive Officer containing the following information: (1) a statement that an adverse action is proposed or taken against the practitioner; (2) the reason for such adverse action; (3) the time limits within which to request a Hearing; and (4) a summary of his/her rights in the Hearing. Within five (5) business days of an adverse recommendation by the Medical Staff Committee or an adverse decision by the Governing Body, the body which made the adverse recommendation or decision shall notify the affected Practitioner of the information outlined in this paragraph.

The Practitioner requesting a Hearing must do so in writing, delivered in person or by certified mail to the Chief Executive Officer within ten (10) days following receipt of any notice that an action affecting his/her Medical/Adjunct Staff status has been recommended. If a Hearing is not requested within ten (10) days, the Practitioner shall be deemed to have accepted the recommended action and waived his or her rights to a Hearing. It shall become effective immediately and the practitioner shall have waived all rights due under the provisions of this Article.

If the affected Practitioner requests a Hearing within the time and in the manner required in these Bylaws, the Chief of Staff shall appoint a Hearing committee of not less than three (3) members of the Active Staff. No members of the Committee shall be in direct competition with the Practitioner, have a direct economic relationship with the Practitioner, or be directly involved in the issue under investigation or have any conflict that could negatively influence his or her ability to act without prejudice. If the Chief of Staff is a member of the Hearing Committee, he/she shall serve as the Chairperson. If the Chief of Staff is not a member of the Hearing Committee, he or she shall designate one of the members of the Hearing Committee to act as Chairperson of the Committee unless a Hearing Officer is appointed.

At the request of the Practitioner, the Hearing Committee, the Chairman of the Hearing Committee or the Board of Directors, the Board Chairperson or his designee may appoint a Hearing Officer to preside at the Hearing. The Hearing Officer shall be an attorney at law qualified to preside over quasi-judicial Hearings. The Hearing Officer must not act as a prosecuting officer or as an advocate for the Hospital, the Board of Directors, the Professional Staff, the body whose action prompted the Hearing, or the Practitioner. If requested by the Hearing Committee, the Hearing Officer may participate in deliberations of such body and be a legal advisor to it, but the Hearing Officer shall not be entitled to vote.

53

A00419

The chair shall arrange for the Hearing and shall give written notice to the requesting Practitioner of the time, place and date of the hearing which shall take place within thirty (30) days after the date of the Hearing request or as soon as possible, if the Practitioner is under summary suspension. The place of the Hearing shall be on the premises of the Meade District Hospital in Meade, Kansas.

There shall be at least a majority of the members of the Hearing Committee present at the Hearing and no member may vote by proxy. Postponement of the Hearing shall be granted only for good cause determined in the sole discretion of the Hearing Committee.

The Practitioner requesting the Hearing shall be entitled to be accompanied by an attorney or one other person of the Practitioner's choice. The attorney or other person representing the Practitioner shall not be permitted to participate in the Hearing other than advising his/her client.

The Practitioner shall provide a list of witnesses to the Hospital and Chairperson of the panel at least seven (7) days prior to the commencement of the Hearing, unless the hearing is held within seven (7) days of the request and then, as soon as possible in advance of the Hearing. The Hospital shall provide the Practitioner and the chair of the panel with a list of the witnesses expected to testify at the Hearing on behalf of the Hospital. This list of witnesses shall be provided at least seven (7) days prior to the commencement of the Hearing, unless the Hearing is held within seven (7) days of the request and then, as soon as possible in advance of the Hearing. Prior to the Hearing, upon written request, the affected Practitioner shall be given a copy of the records of the Medical Staff Committee and if the Governing Body has considered the matter, the records of the Governing Body, which relate to the consideration of the Practitioner's matter.

The Chairperson shall act to provide that all participants in the Hearing have a reasonable opportunity to be heard and to present oral and documentary evidence, that decorum is maintained and that the proceeding be completed in as expeditious manner as is possible under the circumstances. The Chairperson shall be entitled to determine the order or procedure during the Hearing. The Hearing shall not be conducted strictly according to rules of law relating to the examination of witnesses or presentation of evidence but a level of professional courtesy and decorum will be maintained at all times. The Chairperson and members of the hearing panel may directly question any of the participants in the Hearing, including witnesses. A quorum is sufficient to proceed.

The Practitioner and the Hospital shall have the following rights:

1. a record shall be made of the proceeding, copies of which shall be available to the practitioner upon payment to the Hospital of any reasonable costs or charges associated with their preparation;
2. to call, examine and cross-examine witnesses;
3. to introduce evidence determined to be relevant by the panel regardless of its admissibility in a court of law;
4. to impeach any witness;
5. to rebut any evidence;
6. to submit a written statement at the close of the Hearing; and

54

7.  the assistance of counsel or other representative subject to the limitation set forth in this Article.

The body (Medical Staff Committee or Governing Body, whichever is appropriate) whose adverse recommendation or adverse decision is the basis for the Hearing shall appoint one of its members or some other representative (including an attorney if it so elects) to attend the Hearing and present facts in support of its adverse recommendation or adverse decision and to examine witnesses including the affected Practitioner.   It shall be the obligation of such member or representative to present appropriate evidence in support of the adverse recommendation or adverse action, but the affected Practitioner shall thereafter be responsible for supporting his/her challenge to the adverse recommendation or adverse decision by an appropriate showing that the charges or grounds involved lack factual basis or are either arbitrary, unreasonable or capricious.

At the close of the Hearing and before committee deliberation, the affected Practitioner or the body which made the adverse recommendation or adverse decision shall be entitled to submit a written memoranda concerning any issue relating to the adverse recommendation or adverse decision, and such memoranda shall become a part of the Hearing record.   The written memoranda must be submitted within five (5) working days of the close of the Hearing or at such other reasonable time after the close of the Hearing as shall be set by the Hearing Committee.  The written memorandum shall be delivered to the Chief Executive Officer who shall mail copies to each member of the Committee and the affected Practitioner. Notwithstanding the provisions of this paragraph, the affected Practitioner and the body making the adverse recommendation or adverse decision may waive their right to file written memorandum and permit the Hearing Committee to make a decision after the close of the Hearing without waiting for the time to lapse within which the parties could file a written memoranda.

The Chairperson may recess the Hearing and reconvene the same within fifteen (15) days for the convenience of the participants or for the purpose of obtaining new or additional evidence or consultation, all without special notice.  Upon conclusion of the presentation of evidence, the hearing shall be closed.  The panel may, at a time convenient to itself, conduct its deliberations outside the presence of the practitioner for whom the hearing was convened.

Within fifteen (15) days of the final adjournment of the Hearing, the panel shall make a written report and recommendation to the Medical Staff Committee or Governing Body (the body who adverse recommendation or adverse decision is the basis of the hearing).    Such report and recommendation shall include a statement of the basis for the recommendation.  The report may recommend confirmation, modification, or rejection of the adverse action.

Within thirty (30) days after receipt of the Hearing panel's report and recommendation, the Medical Staff Committee shall render a written recommendation in the matter, including a summary that will serve as the basis for its recommendation for the Board's decision, and shall forward a copy of its decision to the Chief Executive Officer.  The Chief Executive Officer will forward a copy to the Practitioner for whom the Hearing was held within five (5) business days of receipt.  The Medical Staff Committee shall transmit a copy of the decision and supporting

55

materials to the Governing Board of review and decision. The decision of the Governing Board is final.

## C. APPELLATE REVIEW

The grounds for appeal from an adverse decision shall be that:

1. there was substantial failure to comply with the Hospital or Medical Staff Bylaws and Rules, Regulations, policies and procedures in the conduct of the Hearing so as to deny due process or a fair hearing or
2. the decision was made arbitrarily or capriciously; or the evidence did not support the decision or
3. the recommendations of the Hearing Panel or Board committee were not supported by the evidence.

If the affected Practitioner chooses to request an Appellate Review, he or she shall make such a request within ten (10) calendar days from the date of mailing of the notice of determination of the Hearing. The request must be in writing and mailed to the Chief Executive Officer by certified mail, return receipt requested or delivered in person. The request for an Appellate Review will be deemed to be given on the date the request is received by the Chief of Staff.

If the affected Practitioner requests an Appellate Review, the Chairperson of the Governing Body shall appoint a committee which shall be composed of not less than three (3) board members, who shall comprise the Appellate Review Committee. If the Chairperson of the Governing Body is a member of the Appellate Review Committee, he/she shall serve as the Chairperson unless a Hearing Officer is appointed or he/she shall appoint a member of the Appellate Review Committee to serve as Chairperson. No member can vote by proxy.

At the request of the Practitioner, the Appellate Review Committee, the Chairperson of the Appellate Review Committee or the Board of Directors, the President or his designee may appoint a Hearing Officer to preside at the Appellate Review. The Hearing Officer shall be an attorney-at-law qualified to preside over quasi-judicial Hearings. The Hearing Officer must not act as a prosecuting officer or as an advocate for the Medical Center, the Board of Directors, the Professional Staff, the body whose action prompted the Appellate Review, or the Practitioner. If requested by the Appellate Review Committee, the Hearing Officer may participate in deliberations of such body and be a legal advisor to it, but the Hearing Officer shall not be entitled to vote. A person shall not be disqualified to serve as Hearing Officer for an Appellate Review Committee because the person acted as a Hearing Officer for the Hearing Committee on the same matter.

Either a Hearing Officer, if one is appointed, or the Chairperson of the Appellate Review Committee shall preside over the Appellate Review to determine the order of procedure during the Appellate Review to assure that all participants have a reasonable opportunity to present relevant oral argument and written memoranda, to maintain decorum and to otherwise sit and preside over procedural matters relating to the Appellate Review. The

56

A00422

Hearing Officer can advise the Appellate Review Committee on procedural matters, and the Hearing Officer can elicit information from any of the participants in order to aid the Appellate Review Committee in making a recommendation. However, the Hearing Officer shall not be entitled to vote.

Whenever an appeal is requested as set forth in the preceding sections, the Chairperson of the Board shall, within ten days after receipt of such request, schedule and arrange for an appellate review. The Board shall cause the affected individual to be given notice of the time, place, and date of the appellate review. The date of Appellate Review shall be not less than 20 days, nor more than 40 days, from the date of receipt of the request for Appellate Review; provided, however, that when a request for Appellate Review is from an appointee who is under a suspension then in effect the Appellate Review shall be held as soon as the arrangement may reasonably be made and not more than 14 days from the date of receipt of there request for Appellate Review. The time for Appellate Review may be extended by the Chairperson of the Board for good cause.

The Review Panel may accept additional oral or written evidence subject to the same rights of cross-examination or confrontation provided at the Hearing Panel proceedings. Such additional evidence shall be accepted only if the party seeking to admit it can demonstrate that he/she was deprived of the opportunity to admit it at the hearing and then only at the discretion of the Review Panel.

If a new matter is introduced at the Appellate Review which was not considered at the Hearing, the Appellate Review need not be conducted strictly according to the rules of law relating to the examination of witnesses or the presentation of evidence. Any relevant matter upon which reasonable persons customarily relies on in the conduct of serious affairs shall be considered, regardless of the existence of any common law or statutory rule that might make evidence inadmissible over objection in a civil or criminal action.

If new matter is introduced at the Appellate Review, the Practitioner and the body which made the adverse recommendation or decision which is the subject of the Hearing have the following rights: to call and examine witnesses, to cross examine witnesses, to introduce documents and other written matter, and to rebut any evidence.

The Appellate Review Committee may, without special note, recess the Appellate Review and reconvene the same for the convenience of the participants or for the purpose of obtaining additional evidence of consultation. Such recess shall be in the sole discretion of the Appellate Review Committee. Upon the conclusion of the presentation of oral and written evidence, the Appellate Review shall be closed. The Appellate Review Committee may there upon, at a time convenient to itself, conduct its deliberations outside the presence of the affected Practitioner.

If the Practitioner does not testify in the Practitioner's own behalf, then the Practitioner may be called and examined by the Appellate Review Committee or any participants at the Appellate Review.

A00423

At the close of the Appellate Review and before committee deliberation, the affected Practitioner or the body which made the adverse recommendation or adverse decision shall be entitled to submit a written memoranda concerning any issue relating to the adverse recommendation or adverse decision, and such memoranda shall become a part of the Appellate Review record.   The written memoranda must be submitted within five (5) working days of the close of the Appellate Review Hearing or at such other reasonable time after the close of the Hearing as shall be set by the Hearing Committee.   The written memorandum shall be delivered to the Chief Executive Officer who shall mail copies to each member of the Committee and the affected Practitioner.   Notwithstanding the provisions of this paragraph, the affected Practitioner and the body making the adverse recommendation or adverse decision may waive their right to file written memorandum and permit the Hearing Committee to make a decision after the close of the Hearing without waiting for the time to lapse within which the parties could file a written memoranda.

If the entire Board of Governing Body comprises the Appellate Review Committee, then within thirty (30) calendar days after the close of the Appellate Review, the Governing Body shall meet and make a final decision regarding the affected Practitioner. The Board of Directors shall forward its final decision in writing to the Chief Executive Officer. The Chief Executive Officer shall forward a copy of the Board of Directors final decision to the affected Practitioner within five (5) working days. If the Governing Body's final decision is adverse to the Practitioner, the written final decision shall include in concise language the reason(s) for the adverse final decision.

If the Appellate Review Committee is composed of less than the entire Board of Directors, then within five (5) calendar days after the close of the Appellate Review Hearing and the time for filing written memoranda has expired, the Appellate Review Committee shall make a written report and recommendation and shall forward the same together with the Appellate Review record and all other relevant documentation confirmation, modification, or rejection of the previous recommendation or decision to the Governing Body. A copy of the Appellate Review Committee report shall be delivered to the affected Practitioner.

If the Appellate Review Committee is composed of less than the entire Board of Directors, then within thirty (30) calendar days after receiving the Appellate Review Committee report and recommendation and the Appellate Review record, the Board of Directors shall meet and make a final decision regarding the affected Practitioner. The Board of Directors shall forward its final decision in writing to the Chief Executive Officer. The Chief Executive Officer shall forward a copy of the Board of Directors final decision to the affected Practitioner. If the Board of Director's final decision is adverse to the Practitioner, the written final decision shall include in concise language the reason(s) for the adverse final decision.

An accurate record of the Appellate Review shall be kept. The mechanism shall be established by the Appellate Review Committee and may be accomplished by the use of a Court Reporter, electronic recording unit, detailed transcription, the taking of adequate minutes, or any combination thereof. No record, except of the decision and the reasons for the decision of the Appellate Review Committee shall be kept during the deliberation phase of the Appellate Review, which Deliberations may be conducted in private session if the

58

Hearing Committee so elects.   The practitioner shall be entitled to copies of the record upon payment of a reasonable charge associated with the preparation thereof.

 Notwithstanding any provision to the contrary herein, the Board of Directors, and any members of the Board of Directors, whether sitting at Appellate Review Committee or otherwise, shall have the right to the advice of any attorney at all times whether or not a Hearing Officer has been appointed.

No applicant or Medical staff appointee shall be entitled as a matter of right to more than one Appellate Review on any single matter which may be the subject of an appeal.

A00425

## ARTICLE IX

## MEDICAL STAFF CATEGORIES

All appointments to the Medical/Adjunct Staff shall be made by the Governing Body after receiving a recommendation from the Medical Staff Committee and shall be to one of the following categories of the staff. Appointments and reappointments shall never exceed a period of two years.

## A. ACTIVE STAFF

The Active Staff shall consist of those physicians who have been advanced from Associated Staff and who attend, admit or are involved in the treatment of at least 12 patients or perform 24 or more outpatient procedures per year at the Hospital. Each appointee to the Active Staff shall agree to assume all the functions and responsibilities of appointment to the Active Staff, including, where appropriate, care for unassigned patients, emergency service care, consultation, and staff education. Active Staff appointees shall be entitled to vote, hold office, serve on Medical Staff committees, and serve as chairpersons. Only Active Staff members will be eligible to serve in the capacity of Chief of Staff. Candidates for the Active Staff must have served on the Associate Staff for at least one year prior to becoming eligible for advancement to the Active Staff.

### 1. Responsibilities

Active staff members shall:

      a. actively participate in medical staff activities and responsibilities, such as committee and department assignment;

      b. assume all the functions and responsibilities of appointment to the Active Staff, including care for unassigned patients, emergency services obligations and consultation and participation in emergency preparedness;

      c. faithfully perform the duties of any office or position to which elected or appointed;

      d. participate in quality and performance improvement activities to include but not be limited to monitoring and peer review; and

      e. provide timely and continuous care for their patients.

### 2. Perogatives

Active Staff members may:

      a. vote in all general and special meetings of the Medical Staff and applicable departments and committees;

      b. hold office, serve on Medical Staff committees, and serve as chairs of such committees.

60

A00426

### 3. Transfer of Active Staff Member

After two (2) consecutive years in which a member of the Active Medical Staff fails to regularly care for patients in this hospital or be regularly involved in regular medical staff functions as determined by the Medical Staff without resignation, That member shall be automatically transferred to the appropriate category, if any, for which the member is qualified or placed in an Inactive Staff category which would require reapplication.

When there is a shortage of Hospital beds, as determined by the Chief Executive Officer, the admitting privileges of Active and Associate Staff, except in Emergency cases, will take priority over those of Associate and Courtesy staff.

## B. ASSOCIATE STAFF

The Associate Staff shall consist of physicians who will be considered for advancement to full staff status after having completed a period of initial membership and provisional privileges of not less than one year. During this initial provisional period, the Associate Staff member's performance shall be monitored and evaluated. Associate Staff members who complete the initial period of membership in good standing shall be eligible for advancement to the Active Staff. Persons appointed to the Associate Staff shall not be entitled to vote but may serve on Medical Staff committees (but not as chairpersons) and shall attend meetings as required by the Bylaws. They shall be ineligible to hold elective office.

### 1. Responsibilities

Associate Staff Members shall:

    a. actively participate in medical staff activities and responsibilities, such as committee and department assignment;

    b. assume all the functions and responsibilities of appointment to the Associate Staff, including care for unassigned patients, emergency services obligations and consultation and participation in emergency preparedness;

    c. participate in quality and performance improvement activities to include but not be limited to monitoring and peer review; and

    d. provide timely and continuous care for their patients.

### 2. Perogatives

Associate Staff members may:

    a. serve on medical staff committees but may not serve as chairs of such committees.

## C. COURTESY STAFF

61

A00427

The Courtesy Staff shall consist of physicians who are qualified for Active Staff appointment but who do not desire Active status yet who wish to admit an occasional patient to the hospital. Persons appointed to the Courtesy Staff may not vote, may not hold office and may not admit more than 12 patients a year or perform more than 24 outpatient procedures per year at the hospital. If such physicians wish to exceed that number, they must join the Active Staff or receive a waiver from the Medical Staff Committee and the Governing Body which is subject to review annually.

### 1. Responsibilities

Courtesy staff members shall:

    a.  provide timely and continuous care for their patients;

    b.  cooperate in quality and performance improvement activities along with monitoring and peer review;

    c.  respond fully and promptly to any inquires regarding the care of patients at the hospital; and

    d.  be entitled to admit and treat patients within the limits of their assigned clinical privileges and designated patient volume restrictions.

## D. CONSULTING STAFF

The Consulting Staff shall consist of physicians appointed for the specific purpose of providing consultation in the diagnosis and treatment of patients and whose expertise is not normally available in this community. Appointment to the Consulting Staff does not entitle the appointee to independently admit patients, to vote, to hold staff offices or to serve on Medical Staff committees. Consulting Staff members may admit patients to the hospital provided that an attending physician, who is a member of the Active Staff, co-admits the patient and countersigns the admitting order with 72 hours. The attending physician has the ultimate responsibility for the patient's general medical condition throughout the hospitalization and the coordination of care. Consulting staff members must be members of the Active Staff or equivalent at another hospital where they actively participate in a continuous quality improvement program and other quality review evaluation and monitoring activities similar to those required of the Active Staff of this Hospital.

### 1. Responsibilities

Consulting staff members shall:

    a.  provide timely and continuous care for their patients;

    b.  work closely with the Active Staff to assure the delivery of high quality care;

    c.  cooperate in quality and performance improvement activities along with monitoring and peer review;

    d.  respond fully and promptly to any inquires regarding the care of patients at the hospital;

A00428

e. be entitled to admit and treat patients within the limits of their assigned clinical privileges.

## E. HONORARY STAFF

The Honorary Staff shall consist of Medical Staff members who have retired from active hospital practice or other physicians who are of outstanding reputation, not necessarily residing in the community. Persons appointed to the Honorary Staff shall not be eligible to admit or attend patients. Honorary staff may not vote, hold office or serve on standing Medical Staff committees but may be appointed to special committees.

## F. AFFILIATE STAFF

The Affiliate Staff shall consist of physicians who are otherwise eligible for staff membership, but because of distance or other reasons, do not wish to admit or treat patients at the hospital, but would like to avail themselves of the ancillary services provided such as laboratory, radiology, and home care services. Members of the Affiliate Staff may not vote or hold office and are not required to attend meetings or serve on committees.

## G. EMERGENCY DEPARTMENT STAFF

The Emergency Department Staff shall consist of Emergency Department physicians who are under contract with the hospital to provide emergency services to patients utilizing the Emergency Department. Emergency Department Staff shall have Active or Associate status on the Medical Staff with all privileges and rights associated therewith with the exception that they shall not have admitting privileges to the Hospital.

## H. CONTRACT STAFF

The Contract Staff consist of those physicians who by virtue of a contract with the hospital have clinical duties. They shall be members of the Medical Staff and shall meet the requirements for continuing membership. Contractual services shall be governed by the terms of the contract with the Hospital and shall not be subject to appeal as provided by these bylaws. Termination of the employment contract or relationship shall result in the automatic termination of the Medical Staff membership if specified in the contract. Contract staff do not generally admit or treat patients to their own services but may request temporary privileges for no more than three (3) patients each calendar year. Contract staff may not serve as a voting member of the Medical Staff and may not hold office.

## I. TEMPORARY DISASTER STAFF

The Temporary Disaster Staff consists of those physicians who respond to a need of medical management of patients once the Hospital Emergency Response Plan has been activated. Once temporary disaster privileges are granted, a record of the practitioner's action shall be maintained. The record shall indicate that the Practitioner exercising the "disaster privileges" does so at the request of an attending Physician on staff at the Hospital. Practitioners granted

63

A00429

temporary disaster privileges must practice under the direction of an attending physician currently on the Medical Staff at the Hospital.

## J.  ADJUNCT STAFF

### 1.  Advanced Practice Staff

The Advanced Practice Staff shall consist of those non-physician healthcare professionals who have extended education, training and expertise in the care of hospitalized patients within their area of expertise.  These professionals include, but are not limited to Advanced Registered Nurse Practitioners, Certified Registered Nurse Anesthetists and Certified Nurse Midwifes.  They must hold a current Kansas license with delineated privileges that provide for independent practice.

Advanced Registered Nurse Practitioner members must have a sponsoring physician who is a member of the Active Medical Staff.  ARNPs shall demonstrate a written contract of collaboration with a physician or group of physicians who is/are Active Medical Staff member(s).  They may admit patients to the hospital in collaboration with a physician member of the Active Medical Staff.  Each admission must have clear documentation of this collaboration.

Certified Nurse Midwife members shall demonstrate a written contract of collaboration with a physician or group of physicians who is/are Active Medical Staff member(s).  This letter of contractual agreement shall designate, according to ACOG guidelines, the availability of a MD/OB–GYN  with C/Section privileges granted by the hospital to respond upon request and in compliance with currently recognized standards of care and practice.  This agreement shall be on a 24 hour/7 day a week basis.  CNMs shall admit and discharge patients independently within their scope of practice and in accordance with their delineation of obstetrical privileges.

Certified Registered Nurse Anesthetists shall act under the guidelines established by the State of Kansas consistent with the Medicare waiver for CRNAs practicing in rural areas.  The surgeon responsible for the care of the patients during each surgical case will write an order for anesthesia to be ordered and administered per the CRNA (specifying name).  The CRNA is then responsible for the pre-operative assessment, intra-operative management and post-operative anesthesia management of the patient consist with currently recognized standards of practice.

### 2.  Physician Assistants

A graduate of an accredited program with certification by the National Commission on Certification of Physician Assistants (NCCPA).  A Physician Assistant must have must have a supervising physician who is a member of the Active Medical Staff.  A Physician Assistant shall demonstrate a written contract of supervision with a physician or group of physicians who is/are Active Medical Staff member(s) and that relationship will be appropriately filed with the appropriate state licensing agency.  They may not independently admit patients to

64

the Hospital and may tend patients in the hospital under the supervision of a physician member of the Active Medical Staff. Each admission must have clear documentation of physician involvement.

## K. CHANGE OF STAFF CATEGORY

Any Medical Staff member who desires to change his Staff category may make such request in writing to the Chief of Staff and CEO. The Governing Body shall act on the request after recommendation from the Medical Staff Committee

65

A00431

# ARTICLE X

## OFFICERS

In order to efficiently carry out the purposes of this Hospital, the Medical Staff shall select officers and delegate specific responsibilities and functions.

The officers of the Medical Staff shall be:

> d.   Chief of Staff
> e.   Vice Chief of Staff
> f.   Immediate Past Chief of Staff

## A. QUALIFICATIONS OF OFFICERS

Officers must be members of the Active Medical Staff at the time of nomination and election and be a member in good standing.   Officers must remain a member in good standing during their term in office.   Failure to maintain such status or notice of sanction from a governmental agency shall immediately create a vacancy in the office involved.

## B. NOMINATION OF OFFICERS

A Nominating Committee shall offer one or more nominees for the Chief of Staff and Vice Chief of Staff. These nominations must be received no later than 30 days prior to the date of the annual meeting.

The proposed slate of Officers will be mailed or distributed in person with notice of the annual meeting.

## C. ELECTION OF OFFICERS

Officers shall be elected at the annual meeting of the Medical Staff.  Only members of the Active and Associate Staff will be eligible to vote.  Officers may be elected by simple majority vote, subject to the approval of the Governing Body.  When there are three or more candidates for one office and no candidate receives a majority vote, successive balloting shall be held in such a manner that the name of the candidate receiving the fewest votes is omitted from each slate until a majority vote is obtained by one candidate.

## D. VACANCIES IN OFFICE

A vacancy in an office shall occur whenever there is a loss of Medical Staff membership, a change from active to another staff category, loss of good standing in the Medical Staff or by reason of death or resignation. Vacancies in office during the Medical Staff year, except for the Chief of Staff, shall be appointed by the Medical Staff Committee.  If there is a vacancy in the office of Chief of Staff, the Vice Chief of Staff shall automatically serve out the remaining term; thereby creating a vacancy in the office of Vice Chief of Staff.

66

A00432

## E. REMOVAL OF OFFICERS

The Medical Staff Committee has the duty and responsibility to monitor the performance of officers and committee chairmen. The conditions for removal of an elected officer shall include failure to abide by the Bylaws of the Medical Staff, failure to discharge the duties of the office, failure to remain in good standing, misconduct or conviction of a felony. Removal of an elected officer during his/her term may be initiated by a two-thirds majority vote from the Medical Staff Committee unless the removal is automatic based on conditions defined in these Bylaws. All such removals shall be effective only after they have been ratified by the Governing Body.

## F. DUTIES OF OFFICERS

1. **Chief of Staff** – The Chief of Staff shall serve as the chief administrative officer of the Medical Staff and exercise the following responsibilities:

   a.  call, preside at, and be responsible for the agenda for all general meetings of the Medical Staff
   b.  serve as Chairman of the Medical Staff Committee
   c.  act in coordination and cooperation with the Administration and the Governing Body in all matters of mutual concern to the Hospital and the Medical Staff
   d.  serve as an ex officio member without vote of all Medical Staff committees established by the Medical Staff
   e.  be responsible for the enforcement of Medical Staff Bylaws and Rules, Regulations, policies and procedures along with the implementation of sanctions where these are indicated
   f.  serve as the Medical Director for long term care services
   g.  appoint committee chairman to standing and special committees
   h.  represent the views, policies, needs and grievances of the Medical/Adjunct Staff to the CEO and Governing Body and participate in deliberations affecting the discharge of Medical Staff responsibilities
   i.  be a spokesman for the Medical Staff in its external professional and public relationships
   j.  participate in the creation and approval of policies and procedures that impact the delivery of patient care
   k.  promote and provide oversight for the Medical and Adjunct Staff's participation in quality and performance improvement related activities
   l.  coordinate and direct investigations and corrective actions related to the Medical and Adjunct Staff performance

2. **Vice Chief of Staff** – In the absence of the Chief of Staff, he or she shall assume all the duties and have the authority of the Chief of Staff. He or she shall be a member of the Medical Staff Committee and the Nominating Committee. The Vice Chief of Staff shall automatically succeed to the Chief of Staff in the event of a vacancy in that office.

A00433

3. **Immediate Past Chief of Staff** – The duties of the Past Chief of Staff are advisory in nature. He or she shall be a member of the Medical Staff Committee and shall serve as Chairman of the Nominating Committee.

A00434

# ARTICLE XI

## CLINICAL DEPARTMENTS

There shall be four (4) Departments of the Hospital. Each Department shall be organized for the purpose of promoting effectiveness and efficiency in the delivery of care and services and the delineation of privileges. The Chief of Staff or his or her appointed designee(s) shall have oversight responsibilities for the general supervision of clinical care delivered in each area.

## A. DESIGNATION OF DEPARTMENTS

1. MEDICINE - includes Family Practice, Internal Medicine, and its various subspecialties and Laboratory and Radiology.
2. SURGERY - includes General Surgery, Anesthesia, Dentistry, Oral Surgery, Podiatry, Surgical Subspecialties and Pathology.
3. MATERNAL/CHILD HEALTH – includes Gynecology, Obstetrics, Neonatology, GYN Oncology and Pediatrics
4. EMERGENCY MEDICINE – includes Emergency Medicine

## B. ASSIGNMENT TO DEPARTMENTS

Each Medical Staff member shall be assigned to a primary department by the Medical Staff Committee and may be granted clinical privileges in one or more of the Departments as is appropriate to their credentials, skills and the delineation of privileges.

## C. FUTURE DEPARTMENTS

When deemed appropriate, the Medical Staff Committee may create a new Department, eliminate, subdivide or combine Departments subject to the approval of the Governing Body.

69

A00435

## ARTICLE XII

## COMMITTEES

### A. MEDICAL STAFF COMMITTEE

The Medical Staff Committee acts as a committee-of-the-whole and carries out its work within the context of the Hospital functions of governance, leadership and performance improvement. The Medical Staff Committee has the primary authority for activities related to self-governance of the Medical Staff and for performance improvement for the professional services provided by Medical/Adjunct staff members and other practitioners privileged through the Medical Staff process.

The Medical Staff Committee shall be a standing committee and shall consist of all members of the Active and Associate Staff, the Chief of Staff, the Vice Chief of Staff and the Immediate Past Chief of Staff.  The Chief of Staff shall serve as the Chairman of the Committee.  Any fulltime Adjunct Staff shall serve as committee members without the right to vote on issues before the Committee.  The Chief Executive Officer shall serve as an ex offico member without a vote. Other individuals may also serve as ex officio members if their role and contribution is determine to be important to the Committee's ability to fulfill its responsibilities.

The general duties of the Medical Staff Committee shall be:

1. to represent and to act on behalf of the Medical/Adjunct Staff, subject to such limitations as may be imposed by these Bylaws
2. to coordinate the activities and general policies of the Medical Staff
3. to receive and act upon Departmental, ad hoc and committee recommendations
4. to implement Rules and Regulations, policies and procedures of the Medical/Adjunct Staff
5. to provide liaison between the Medical/Adjunct Staff and CEO and Governing Body
6. to make recommendations to the CEO on matters of a medio-administrative nature
7. to make recommendations to the Governing Body on issues that can impact the delivery clinical services and care
8. to fulfill the Medical Staff accountability to the Governing Body for the quality of medical care rendered to patients in the Hospital
9. to provide input and participation on the Performance Improvement process of the Hospital
10. to ensure that the Medical/Adjunct Staff is kept abreast of regulatory and legal activities that could impact the members and the care delivered within the Hospital
11. to review the credentials of all applicants and to make recommendations for membership and clinical privileges to the Governing Body
12. to make recommendations on Medical/Adjunct Staff structure and assignments to the Governing Body
13. to periodically review all information available regarding the performance and clinical competence of Medical/Adjunct Staff members and other practitioners with clinical

70

A00436

privileges and as a result of such reviews to make recommendations for reappointments and renewal or changes in clinical privileges

14. to take all reasonable steps to ensure professional ethical conduct and competent clinical performance on the part of all members of the Medical/Adjunct Staff, including the initiation of and/or participation in Medical/Adjunct Staff corrective or review measures when warranted

15. to cooperate with the Governing Body and the CEO in securing proper execution of the health care policies and procedures of the Hospital and the Medical Staff and in securing compliance with these Bylaws and all Rules, Regulations, policies and procedures

16. to report information to the Medical/Adjunct Staff at large, including other practitioners with clinical privileges

17. to report back to people with a need-to-know in a timely manner on all actions taken

## B. MEETINGS

The Medical Staff Committee shall meet at least once a month, maintain a permanent record of its proceeding and actions, and shall make a report thereof to the Governing Body.

### a. Regular Meetings

Regular meetings of the Medical Staff Committee or a duly appointed committee shall, by standing resolution, be held at the designated time and place for all regular meetings.

### b. Special Meetings

A special meeting of the Medical Staff Committee or duly appointed committee may be called by the Chief of Staff, the respective committee chairperson, or by one-third of the group's then members, but not less than two (2).

## C. ATTENDANCE

Active, Associate and fulltime Adjunct Staff members must attend a minimum of 50% of Medical Staff Committee meetings to maintain good standing within the Medical Staff.

## D. NOTICE OF MEETINGS

Written or oral notice stating the place, day and hour of any special meeting, or of any regular meeting not held pursuant to resolution, shall be given to each member of the committee or Department not less than five (5) calendar days before the time of such meeting by the person or persons calling the meeting.

## E. QUORUM

Unless otherwise specified in these Bylaws, Rules and Regulations, the definition of a quorum shall be established by each Department or committee.

A00437

## F.  MINUTES

Minutes of each regular and special meeting of a Department or committee shall be prepared and shall include a record of the attendance of members and the vote taken on each matter.  The minutes shall be signed by the presiding officer.  The Hospital shall maintain a permanent file of the minutes of each meeting.

## G.  SPECIAL APPEARANCE REQUIREMENTS

At the sole discretion of the Medical Staff Committee or Governing Body, any Member involved in the treatment of a case under review or involved in a special investigation may be required to attend a meeting to discuss this case, providing that the individual is given reasonable advance notice.  Failure on the part of a Medical/Adjunct Staff member or individual holding clinical privileges to comply with this special appearance requirement, after two (2) notices, is deemed a resignation from the Medical Staff.

## H.  OTHER COMMITTEES AND FUNCTIONS

The Medical Staff Committee shall establish, modify or dissolve appropriate committees by resolution or policy, from time to time as needed.  The Medical Staff Committee shall assure appropriate composition, duties, meeting and reporting requirements.   The Medical Staff Committee shall provide for the satisfaction of all functions and duties requiring Medical Staff involvement imposed by accreditation, licensure, or other applicable requirements, including but not limited to: medical records, utilization review, disaster planning, infection control, pharmacy and therapeutics, drug usage, tissue and transfusion review, radiation safety and cancer registry. Other committees or task forces may be formed or dissolved as necessary relating to interdisciplinary coordination and cooperation, quality assurance, and education.

## I.   RIGHTS OF ADJUNCT STAFF COMMITTEE MEMBERS

Persons who are not members of the Medical Staff serving on committees under these Bylaws shall have all rights and privileges of regular members except that they shall not be counted in determining the existence of a quorum nor shall they have a vote.

## J.  RIGHTS OF EX OFFICO MEMBERS

Persons serving under these Bylaws as ex officio members of a committee shall have a rights and privileges of regular members except that they shall not be counted in determining the existence of a quorum and they shall not have voting privileges.

## K.   RIGHTS OF NON-STAFF COMMITTEE MEMBERS

Persons whose presence is requested or required at a Medical Staff meeting to facilitate the activities of the committee and are not members of the Medical Staff or an ex officio member shall have all rights of regular members except that they shall not be counted in determining the existence of a quorum and they shall not have voting privileges.

72

A00438

## L.  CREDENTIALING RESPONSIBILITES

Functioning as a committee-of-the-whole, the Medical Staff Committee shall have the following credentialing responsibilities:

1. to review the credentials of all applicant to the Medical/Adjunct Staff and to make recommendations concerning staff appointments, assignments to the Departments, and delineation of clinical privileges
2. to periodically review all information available regarding the performance and clinical competence of Medical Staff members and other Practitioners with clinical privileges
3. to review applications for reappointment and make recommendations to the Governing Body concerning such reappointments and renewal of or changes in clinical privileges
4. to make recommendations concerning measures to ensure professional, ethical conduct, and competent clinical performance on the part of members of the Medical/Adjunct Staff in accordance with the Medical Staff Bylaws

## M. PHARMACY AND THERAPEUTIC RESPONSIBILITIES

Functioning as a committee-of-the-whole, the Medical Staff Committee shall have the following pharmacy and therapeutic responsibilities:

1. to be responsible for the development and surveillance of all drug utilization policies and practices in order to assure optimal clinical results and minimum potential for hazard
2. to assist in the formulation of broad professional policies regarding the evaluation, use, safety procedures and all other matters relating to drug usage in the Hospital
3. to develop, maintain and periodically review a formulary or drug list for use in the Hospital
4. to make recommendations concerning drugs to be stocked on the nursing unit and by other services
5. to serve as an advisory group to the Medical/Adjunct Staff and the pharmacist on matters pertaining to the choice of available drugs
6. to review drug usage for patient safety, efficacy and cost effectiveness
7. to review non-formulary drug use
8. to review and make recommendations on all significant untoward drug reactions
9. to participate in the review and analysis of medication errors making recommendations for the activities that can reduce the frequency and severity of such errors
10. to provide for periodic drug usage evaluation based on a systematic process including the routine collection and assessment of information in order to identify opportunities to improve the use of drugs and to resolve problems in their use

## N.  UTILIZATION REVIEW RESPONSIBILITIES

Functioning as a committee-of-the-whole, the Medical Staff Committee shall have the following utilization review responsibilities:

73

A00439

1. to be responsible for the development of and surveillance through a program that evaluates the appropriateness of patient admissions, timeliness of patient discharges and the appropriateness of clinical management throughout the patient's stay
2. to review and make recommendations on all referral for questions relating to the appropriateness of patient admissions, timeliness of patient discharges and the appropriateness of clinical management throughout the patient's stay
3. to review and make recommendations related to the delivery of care in reference to current standards of practice

## O. BLOOD UTILIZATION REVIEW RESPONSIBILITES

Functioning as a committee-of-the-whole, the Medical Staff Committee shall have the following blood utilization review responsibilities:

1. to review and evaluate cases in which patients were administered transfusions, including the use of whole blood components
2. to develop and approve policies and procedures relating to the distribution, handling, use and administration of blood and blood components
3. to review and evaluate the ordering practices of blood products

## P. OPERATING ROOM RESPONSIBILITIES

Functioning as a committee-of-the-whole, the Medical Staff Committee shall have the following operating room responsibilities:

1. to provide general oversight of operating room practices
2. to review and evaluate cases in which concerns arise about the management of surgical and recovery room patients
3. to provide general oversight for anesthesia practices
4. to develop and approve policies and procedures relating to approved surgical procedures, capital equipment requests, access to the OR, anesthesia management, and recovery room management

## Q. BIOETHICS RESPONSIBILITIES

Functioning as a committee-of-the-whole, the Medical Staff Committee shall have the following bioethics responsibilities:

1. to develop guidelines for the consideration of cases having bioethics implications
2. to develop and implement procedures for the review of cases having bioethics implications
3. to develop and implement policies and procedures for the care and treatment of patients with bioethics concerns
4. to provide for consultation with concerned parties to facilitate communication and aid conflict resolution
5. to facilitate education of Hospital staff on bioethics matters

74

A00440

## R. PRACTITIONER WELL-BEING RESPONSIBILITIES

Functioning as a committee-of-the-whole, the Medical Staff Committee shall have the following Practitioner health responsibilities:

1. to educate management and Medical Staff about Licensed Independent Practitioner health
2. address prevention of physical, psychiatric and emotional illness
3. to facilitate confidential diagnosis, treatment and rehabilitation of Medical/Adjunct Staff members who suffer from a potential impairment
4. to aid Licensed Independent Practitioners in retaining and regaining optimal professional functioning, consistent with protection of patients

75

A00441

# ARTICLE XIII

## CONFIDENTIALITY

Compliance with the Hospital's policies and procedures for assuring confidentiality is considered a condition of Medical Staff membership. All medical records and patient-specific information, records of peer review and other committee proceedings, quality assurance and risk management materials including incident reports, Medical Staff credentialing records and files, minutes of Medical Staff and Hospital records, data, and related information may not be used for purposes other than patient care, peer review, risk management, and other proper Hospital and Medical Staff functions. Such confidential materials (whether maintained in hard copy, in computer memory or diskette, on microfilm or microfiche, or in any other format), may not be removed from the Hospital, duplicated, transmitted, or otherwise disclosed to parties outside of the Hospital without proper authorization in accordance with Hospital and Medical Staff policies.

In as much as effective credentialing, performance improvement, peer review, and consideration of the qualifications of Medical/Adjunct Staff members and applicants to perform specific procedures must be based on free and candid discussions, and in as much as Practitioners and other participants in these proceedings have the expectations that this confidentiality will be preserved and maintained, any breach of confidentiality of the discussions and deliberations of Medical Staff functions, except in conjunction with information sharing that is regulatorily required or outlined in these Bylaws, is outside appropriate standards of conduct for the Medical/Adjunct Staff and will be deemed disruptive to the Hospital's operations. If it is determined that such a breach has occurred, the Medical Staff Committee and/or Governing Body may undertake such corrective action as it deems appropriate.

A00442

## ARTICLE XIV

## IMMUNITY AND RELEASES

Each representative of the Medical Staff and Hospital and agents of each shall be exempt from liability to the applicant, member or practitioner for damages or other relief by reason of providing information to a representative of Medical Staff or Hospital concerning appointment, reappointment, privileging, performance improvement or peer review activities.  The immunity provided in these Bylaws shall apply to all acts, communication, reports, other information or disclosures performed or made in connection with this or any other health-related institution's or organization's activities concerning:

1. Application for appointment, privileges or specific services
2. Periodic reappraisals for reappointment, privileges or specific services
3. Corrective actions
4. Peer review
5. Quality and performance improvement activities including patient care auditing
6. Hearings and Appellate Reviews
7. Utilization review
8. Appropriate professional conduct
9. Professional qualifications

Any member or person who acts in the name of the Medical Staff or Governing Body without proper authority shall be subject to such disciplinary action as the Medical Staff Committee and Governing Body may deem appropriate.

Provisions of these bylaws and in application forms relating to authorizations, confidentiality of information and immunities from liability are in addition to other protections provided by law and not in limitation thereof.

A00443

## ARTICLE XV
## RULES AND REGULATIONS

The Medical Staff Committee shall adopt Rules and Regulations as may be necessary to assure the proper conduct of Medical Staff business and provision of patient care. Such Rules and Regulations shall be consistent with the Bylaws. Following the Medical Staff Committee approval, a Rule shall become effective following approval by the Governing Body, which approval shall not be withheld unreasonably. Governing Body action is expected at its next regularly scheduled meeting and is not to exceed 60 days.

Medical Staff policies shall be developed as necessary to implement more specifically the general principles found within these Bylaws and the Medical Staff Rules. The policies may be adopted, amended, or repealed by majority vote of the Medical Staff Committee and approval by the Governing Body. In the event there is a conflict between a policy and the Bylaws, the Bylaws shall prevail.

All Rules and Regulations of the Medical Staff shall be reviewed biennially by the Medical Staff Committee. All proposed amendments shall be distributed to all voting members for review twenty-one calendar (21) days prior to voting on the proposed revisions. Special or regular meetings during the month that the documents are distributed will provide an opportunity for members to discuss and clarify issues.

The Medical Staff Committee shall have the power to adopt such amendments to the Rules and Regulations as are, in the committee's judgment, modifications or clarifications, reorganization or renumbering, or amendments made necessary because of punctuation, spelling or other errors of grammar or expression. Such amendments shall be effective immediately and shall be permanent if not disapproved by the Board within ninety (90) days of the adoption by the Medical Staff Committee.

The Medical Staff shall adopt such credentialing and procedural policies and procedures as may be necessary to implement more specifically the general principles found within the Bylaws. Medical Staff policies and procedures are subject to the approval of the Governing Body. These Medical Staff policies and procedures shall be reviewed biennially by the Medical Staff Committee. Such policies and procedures shall be amended or repealed by the Medical Staff Committee subject to the approval of the Governing Body. Revisions reflecting a significant change to the Rules, Regulation, policies or procedures will be shared for comment from and the final changes will be communicated to the Medical/Adjunct Staff-at-large and any other individuals who hold clinical privileges.

A00444

## ARTICLE XVI
## ADOPTION AND AMENDMENT TO BYLAWS

Any proposed repeal, amendment, or adoption of these Bylaws shall be accomplished through a cooperative process involving both the Medical Staff and the Governing Body.

The Bylaws may be amended at any annual or special meeting of the Medical Staff provided that twenty-one (21) calendar days advanced written notice of the proposed amendments is given to the voting membership. Amendments shall require an affirmative vote of two-thirds (2/3) of the members present and eligible to vote and approval of the Governing Body. Neither the Medical Staff nor the Governing Body may unilaterally amend the Medical Staff Bylaws.

### INTERIM AMENDMENT OF BYLAWS

The Bylaws may be temporarily amended by a two-thirds (2/3) affirmative vote at a regular or special meeting of the Medical Staff Committee and subsequent approval by the Governing Body. Such temporary amendments shall be submitted to the Medical Staff at the next Annual meeting or Special Meeting at which time they shall either be affirmed or disbanded by two-thirds (2/3) vote. Review of these Bylaws, Rules and Regulations shall occur at least once every two (2) years and revisions made as may be necessary and appropriate.

### TECHNICAL AND EDITORIAL AMENDMENTS

The Medical Staff Committee shall have the power to adopt such amendments to the Bylaws as are, in its judgment, technical modifications or clarifications, reorganization or renumbering of existing Bylaws, or amendments made necessary because of punctuation, spelling and other errors of grammar and expression or inaccurate cross-reference. Such amendments shall be effective immediately and shall be permanent if not disapproved by the Governing Body within ninety (90) days after adoption by the Medical Staff Committee. The action to amend may be taken by motion and acted upon in the same manner as any other motion before the Medical Staff Committee. Such approved amendments shall be communicated to the Medical Staff at the next Annual Meeting.

### ADOPTION OF BYLAWS

These Bylaws shall be adopted by the affirmative vote of a majority of the members of the Medical Staff attending a Special Meeting called for that purpose and shall be implemented following the approval of the Governing Body.

A00445

**ARTICLE XVII**

**VOTING PROCESS**

Voting on elections, Bylaws, Rules and Regulations and other committee business may be initiated through the distribution of ballots by e-mail, fax, mail or the show of hands at a regular or special meeting. E-mail will be the preferred distribution method when a vote is cast outside of a formal meeting of the Medical Staff. Any voting members who do not have e-mail will receive their ballot by fax or mail. Voting members must sign and date their ballots to be valid, unless they vote electronically or in person at a regularly or specially scheduled meeting of the Medical Staff. Electronic ballots must include the name of the voting member in order to be valid. All votes will be verified by the CEO or his/her designee to ensure that each member who votes has voting rights and to ensure that each vote is only counted once. During the voting period, ballots will always be available to all voting members in the Medical Staff office. Unless otherwise stipulated in these bylaws or in the notice to voting members, completed ballots must be returned within 10 business days of the date that the ballots were distributed.

80

A00446

# ARTICLE VIII

## APPROVAL

These Bylaws have been approved and adopted by the Medical Staff as of _27th_ in the month of _March_, 20_07_

| | |
|---|---|
| _[signature]_ | _3/27/07_ |
| **Chief of Staff** | **Date** |

These Bylaws have been approved for adoption by the ~~Medical Staff~~ _Governing Board_ as of _21st_ in the month of _April_, 20_07_

| | |
|---|---|
| _[signature]_ | _4/21/07_ |
| **Chairperson of the Board** | **Date** |

81

A00447

Response to KSBHA #14-00026

**Patient Presentation:**
This 92 year old white female, is normally active and lives at home with a family member. She presented with a history of feeling weak, lethargic, and some nausea since arising that morning. She denied any chest pain, or stomach, or neck, or arm pain. She was oriented x 4.
Physical Exam: VS pulse 38, BP 120/45, R20, Wt. 90#
neck no JVD, ext. no edema, lungs cta, heart reg rhythm without murmurs, bradycardia noted.
Initial impression was possible 'Dehydration, Viral Gastroenteritis'.

Lab, EKG ordered, Continue home meds: Digoxin, Levothyroxine, Amlodipine, Benazepril, Asp 81mg

The above was obtained by PA Harris Davis. I was new in the community and was unfamiliar with all of the routines and customary practices at the hospital. I was on backup call to PA Harris Davis.

**My Participation:**
When the EKG, and part of the lab was done, the nurse called me presenting the patient to me, with the issue of the bradycardia. I was some distance from the hospital. I was wondering why PA Davis hadn't called me about the patient, and why the nurse didn't tell him about the EKG, and labs. I ordered a dose of Atropine 0.5mgIV(ACLS/Bradycardia), and as the BP was OK and there was no chest pain or other acute distress, I told the nurse that I would be in directly.

I came to the hospital and interviewed and examined the patient. The EKG showed her to be in a Junctional Escape Bradycardia. The H&P hadn't been transcribed yet, so I discussed the patient with PA Davis, who recalled her being in for this problem in the past. Her son said that, some months ago, she had a similar problem and was in hospital for a few days. I reviewed her old discharge summaries and found that she had similar complaint about 6 months previously. At that time she was found to have a diagnosis of Digoxin Toxicity, with Junctional Escape Rhythm, and was treated with watchful waiting for a few days, and when her digoxin level came down she reverted to normal sinus rhythm and was discharged. I noted that she had other issues that could contribute to altered mental status and that this was probably multifactorial(anemia, hyponatremia, digitoxic, age). Her son said she had a cardiac stress test done a few months previously and Dr. Evans told her she passed the test.

I then called the cardiologist on call for Dr. Evans, Dr. Stavens. We had a lengthy conversation about the patient's situation, and he said he would only transport her if he would have an intervention to offer. Dr. Stavens said that if we were to transport the patient to him, he would just watch her until her digoxin level came down, anticipating her reverting to sinus rhythm. Dr. Stavens said he would be very careful with a patient that elderly, that his interventions would not harm her. Dr. Stavens said, after she was recovered and feeling better, he would discuss with her the possibility, that a pacemaker, may be warranted.

The lab continued to be completed and it showed the high Digoxin level that Dr. Stavens anticipated. The lab also showed an incremental increasing of the Troponin&CKmb. I called Dr. Stavens regarding these findings and he said that the elevated Digoxin level could cause an elevation in Troponin&CKmb, as well as contribute to her confusion, and cause the junctional escape rhythm we were seeing. He would not transport her unless she would want to come to Wichita. Dr. Stavens said he would not be doing any interventions on her, based on the information that he had at that time.
*Progress Notes as to the above are enclosed.*

DEFENDANT'S EXHIBIT

PL 102

I received a call to my home from the nurse.  She was concerned over the elevated Troponin&CKmb She thought I was not responding to these raising levels.  I told her that I responded to her junctional rhythm and raising troponin&CKmb levels by consulting her Cardiologist, Dr. Stavens MD.  I told her that Dr. Stavens thought the raising in these levels were caused by an elevation in her Digoxin, and that her hx of heart failure may be contributing.

I then received a call from Jane Chance RN, saying that Dr. Feldmeyer had taken over her care.

I would like to reiterate that **I did respond to the elevation in her cardiac enzymes.  I responded by consulting Cardiologist Dr. Stavens** over the telephone, not once but twice.  **I followed his instructions.**  I also followed the example of Dr Feldmeyer's care on this same patient a few months before.

**Additional Comments:**
*Dr. James Wiley DO, ER Director of Southwest Medical Center at Liberal, reviewed this case and thought "the care provided was appropriate." He also offered to respond to any particulars, if anyone had further questions.

*Cardiologist Dr. Stavens MD, of Cypress Heart Clinic, wrote a letter in support of my care and supplied reports: coronary angiogram, and ventriculogram showing normal LV function, and right coronary, with only 40-50% narrowing, LAD, diagonal, and circumflex with diffuse irregularities.

*The highest the troponin in Meade was 1.05ng/ml(0-.14).  The highest CKmb was 9.5ng/ml.(0-6).  I have never seen such miniscule elevations in these labs.  The Digoxin level was 2.3H (.80-1.5).

*Dr. Feldmeyer ordered the giving of a non-cross matched blood transfusion to this patient, who had stable vital signs and no evidence of active bleeding.

*Meade Hospital sent the medical record to KSBHA, but without the Doctors Progress Notes, and Discharge Summary.  I called Jane Chance and verbally requested these documents as well as the previous Discharge Summaries, and they weren't sent.  Harvey Harris also requested these documents verbally and in writing and Meade Hospital has not sent them.

*The 'Progress Notes' included in this response were obtained from the letter sent to Liberal ER Director,  Dr. James Wiley DO.

*Dr. Feldmeyer said in one of the meetings that he did not call Dr. Stavens, before transporting this patient.

*Cardiologist Dr. Gerasimos Stavens MD, was not criticized, though clearly we were in concordance, with the patient's care.

*Dr. Feldmeyer did not criticize his own care of the patient from months before.  Cardiac Enzymes were not ordered at that time, though she had a junctional escape rhythm and was digitoxic.  This hospital summary has not been provided as requested.

*The patient did not have chest pain in Meade.  I asked her, and her son repeatedly.

*The last VS, prior to transport, showed a pulse of 82 (did she revert to sinus at that time?).

# MEADE DISTRICT HOSPITAL
## ARTESIAN VALLEY HEALTH SYSTEM
### MEADE, KS

## HISTORY AND PHYSICAL

NAME: ███████                          DOB: ██████
NUMBER: 26711
ACCOUNT: 578068                ADMIT DATE: 06/09/13
PATIENT TYPE: I/P              PHYSICIAN: Seeley T Feldmeyer MD
                                           SERVICE TYPE: M

**CHIEF COMPLAINT:**   Weakness, lethargy and nausea.

**HISTORY OF PRESENT ILLNESS:**   This 92-year-old female presented to the Emergency Room this morning in a weakened state. Family relates that the patient had gotten up early this morning to go to the bathroom, after she returned from the bathroom she felt extremely weak and lethargic, nauseated and laid down on the floor and they therefore called the ambulance for transfer.

**ALLERGIES: NKDA.**

**PAST SURGICAL HISTORY:** Essentially noncontributory.

**CURRENT MEDICATIONS:**
1. Aspirin 81 mg. daily.
2. Digoxin, Levoxyl, Amlodipine/Lotrel

**PHYSICAL EXAMINATION:**
GENERAL:  On exam the patient appears to be in moderate distress.
HEENT:  Head is normocephalic.  Normal female hair pattern distribution.  EYES: PERRLA, EMs intact.  Conjunctiva clear.  EARS:  Bilaterally the TMs are dusky, pink and mobile.  Canals clear.  NOSE:  Septum is midline.  Both nares are patent.  Nasal mucosa pale, pink and moist.
MOUTH/THROAT:   Oral and bucca mucosa is slightly pale.  Uvula rises to the midline.  No signs of lesions or exudate.
NECK:  Supple with full and complete range of motion.  Some crepitus noted with flexion, extension and rotation.  No JVD is noted.  No carotid bruits are detected.
CHEST:  Symmetrical and equal in expansion of both hemithoraces.
LUNGS:  Clear to percussion and auscultation.  No wheezes, rales or rhonchi noted.  O2 saturation on room air was 96%.
CARDIAC:  Regular rate and rhythm.  Bradycardic at the moment.  No S1-S2, no S3 or S4.
ABDOMEN:  Soft, slightly scaphoid, nontender.  Bowel sounds are very hypoactive.  No guarding, rigidity, rebound or tenderness noted.  No organomegaly is detected.
GU:  Rectal deferred at the current time.

Confidential pursuant to KSA 65-4915 and 65-4921 et. Seq.

PL 104

MEADE DISTRICT HOSPITAL
ARTESIAN VALLEY HEALTH SYSTEM
MEADE, KS

## HISTORY AND PHYSICAL

NAME: ███████████

NUMBER: 26711

ACCOUNT: 578068

PATIENT TYPE: I/P

DOB: ███████████

ADMIT DATE: 06/09/13

PHYSICIAN: Seeley T Feldmeyer MD

SERVICE TYPE: M

MUSCULOSKELETAL: All extremities present with moderate crepitus with flexion, extension and rotation. Moderate DJD. Strength and symmetry movement is essentially maintained.

NEUROLOGIC: Cranial nerves 2-12 are grossly intact. Deep tendon reflexes 2+/4+ and symmetrical. Patient is alert and oriented, although somewhat sluggish in response and also noted to be very hard of hearing and does not have her hearing aids with her.

ASSESSMENT:     92-year-old female in frail condition with probable viral gastroenteritis
Known hyperkalemia
Dehydration

PLAN: Direct admission for thorough evaluation and treatment of the same.

HD/RW/PJA

D: 6/09/13 06:11

T: 6/10/13 09:26

Electronically reviewed and signed by: Harris Davis, 06/13/13 09:13

Electronically reviewed and co-signed by: Seeley T Feldmeyer MD Family Practice

Cosigned on 06/16/13 at 12:40

Confidential pursuant to KSA 65-4915 and 65-4921 et. Seq.

June 25, 2013

Ray Winger, MD
Box 1198
Meade, Kansas  67864

Dear Dr. Winger:

After reviewing the documentation that you sent, I find that the care provided was appropriate.

If any other details are needed, I will be glad to respond.

Sincerely,

James Wiley, DO

James Wiley DO
Southwest Medical Center
315 W 15th Str.
Liberal, Kansas  67901

Dear Dr. Wiley,

I need assistance in responding to a couple of medical care criticisms. . I would appreciate your response to these issues.

#1  There was a concern that I managed a **'Code-Blue for too long a period of time.'**
The patient, ███████ had an atv accident and suffered a serious intracerebral injury, but much less of injury to his heart.  He responded to fluid and epinephrine to maintaining adequate blood pressure and sinus rhythm.  Glascow of 3, fixed dialated pupils.   Eagle Med would not transport him, because he wasn't 'stable'.

     At this point, I usually find an opportunity to talk with the family and prepare them for a dire outcome.  As I was talking to the wife, she said she wanted me to do 'everything possible if he has any chance at all'.  She repeated this a few times.  I now recognize that she is the legal representative of ███████ and I am obliged to follow her wishes.   When I was an ER Doctor at Irwin Army Hospital, I would transfer him to the ICU under the care the on call hospitalist.   I am at Meade Hospital and we have no such luxury.   We continued to give ACLS care and he succumbed in due course.

Included:  ER/Code Blue Note

#2  There was a concern that I **did not respond to the cardiac enzymes** of the following patient. ███████ 92 yrs, came in to the hospital with weakness, lethargy, and nausea (Digoxin Toxicity). She had no chest pain and no sob or distress.
She had a junctional rhythm with acceptable BP.  I obtained a Dig level (2.13H .80-1.50), and cardiac enzymes.  I called the Cardiologist, Dr. Stavens twice, initially with the initial presentation as his group had treated Ruth and was familiar with her, and later I called Dr Stavens again after the dig level and cardiac enzymes were back.   I followed his instructions which were that he would only recommend transport if he could do an intervention that was warranted.   He said if we were to transport her he would watch her conservatively as we were doing.

Included:  Progress notes of conversation with Dr Stavens, Lab, Dr Savens bio, document showing  Digoxin causing Troponin increase.

Please assist as able,
Thank you,

Ray Winger MD

*14000027*

#1

**MEADE DISTRICT HOSPITAL**
**ARTESIAN VALLEY HEALTH SYSTEM**
**MEADE, KS**

**CODE BLUE NOTE**

NAME: ███                                        DOB: ███
NUMBER: NC                                       ADMIT DATE: 06/09/13
ACCOUNT: 578072                                  PHYSICIAN: Harris Davis
PATIENT TYPE: E.R.                               SERVICE TYPE: E

**EMERGENCY ROOM NOTE/CODE BLUE NOTE**
**DATE:  6-9-13**

This 66-year-old patient arrived in the Emergency Room per ambulance at 15:25.  Patient had, during transport, exhibited nonresponsive behavior.  An IV was started and patient was intubated.  Epinephrine was administered to resume heart rate.  After the arrival in the Emergency Room, we continued the Epinephrine, evaluated the patient on examination we had a patient with multiple unknown trauma who exhibited distal mottling, pupils were fixed and nonresponsive.  The patient was still being bagged for breathing, however he was producing a spontaneous pulse.  At 15:49, pulse ceased, CPR was administered, 1 mg. Epinephrine was administered.  We continued to provide CPR for another minute.  The patient's second attempt to epinephrine IV and at that point time his pulse was obtained at 15:53.  ABGs were obtained at the same time.  We had an active vital sign.  At 16:01 the patient's pulse started to decrease and by 16:03 pulse was again not present.  We continued to give Epinephrine every 3-4 minutes and continued the CPR.  At 16:06 another mg. of Epi was pushed.  CPR was present.  Eagle Med had arrived for transport.  Patient was exhibiting spontaneous pulse.  Again at 16:09 the pulse started to decrease and Epinephrine was again administered.  Continued with CPR.  At 16:12 we continued with the Epinephrine.  After talking to Trauma Surgery in Wichita, and the family, we presented the fact that this patient with fixed pupillary dilation and no central response, was presenting considerable difficulties.  Again, we continued the Epinephrine every 3-4 minutes IV push, followed by a minute or two of CPR, than a minute or two of spontaneous cardiac activity after which it again ceased.  By 16:36, Dr. Winger had talked to the family and we ceased giving Epinephrine.  At 16:37 we ceased bagging.  At 16:39 the patient was pronounced dead.  The family was present and agreed with the above orders.  It is to be noted that the patient was on the ground prior to the ambulance retrieving the patient an unknown length of time.  At no point in time did we ever have a pupillary response, no corneal reflexes were noted.  The patient did not every exhibit spontaneous respirations and pulse was only maintained with constant Epinephrine and almost constant CPR.  As noted, at 16:39 code was called and patient was pronounced deceased.

**Diagnoses:**
1. **Status post ATV accident**
2. **Unresponsive**
3. **Subarachnoid hemorrhage**
4. **Large pneumothorax**
5. **Multiple rib fractures, left**
6. **Contusion/hematoma left kidney**
7. **Aorta & vena cava collapse**

PL 108

#2
1

**MEADE DISTRICT HOSPITAL**
**ARTESIAN VALLEY HEALTH SYSTEM**
**MEADE, KS**

14 -00026

### PROGRESS NOTES

NAME: ███████        DOB: ███████
NUMBER: 26711        ADMIT DATE: 06/09/13
ACCOUNT: 578068      PHYSICIAN: Seeley T Feldmeyer MD
PATIENT TYPE: I/P    SERVICE TYPE: M

06-09-2013

Overall this is an elderly white female that comes in very fatigued, light headed and weak. Initial impression was bradycardia and dehydration with low sodium. She does not have a history of vomiting and diarrhea recently.

**Problem:** Dehydration. Patient has a high glucose of 149 and a low sodium of 128. History of drinking at least four half gallon containers of water every day and also taking salt tablets. Plan on getting a hemoglobin A1C to see that she is not become diabetic and we will slowly rehydrate her with 125 cc an hour of IV fluid and repeat lab daily.

**Problem:** Junctional rhythm. This is an old problem for this lady. She has prior hospitalization that show junctional rhythm and Dr. Evans has seen her, done a stress test on her and found that her heart condition is not remarkable at her age. She has been on cholesterol lower medication in the past but it is not listed as an outpatient medication at the present time. We will do a Digoxin level and monitor her electrolytes.

**Problem:** Anemia. Patient has a hemoglobin/hematocrit of 8 and 27. This is remarkable low considering that she is dehydrated. When she rehydrates I expect this number to go down and she is considerably anemic which would account for her decreased energy level recently. We will need to work up this anemia. We will start with doing a stool guaiac x 3, serum protein electrophoresis as her globulin was high in relation to her albumin and check her serum ferritin level.

**Problem:** Thyroid. She has been on 75 mcg of Thyroxine in the past and we will assess by lab in the morning.

**Problem:** Elevated liver function test. The patient has anemia and elevated liver function test, a history of gallbladder removal. We would like to assess and we will start by getting a liver spleen scan sonogram in the morning.

### ADDENDUM

I had a brief telephone consult with Dr. Stavens that ███████ had a junctional rhythm and that she had this previously and reverted to normal sinus rhythm where digoxin level had come down previously and had been rehydrated. I told him that she was

#2
3»

14-00026

**MEADE DISTRICT HOSPITAL**
**ARTESIAN VALLEY HEALTH SYSTEM**
**MEADE, KS**

**PROGRESS NOTES**

NAME: ▮▮▮▮▮▮                          DOB: ▮▮▮▮▮▮
NUMBER: 26711                       ADMIT DATE: 06/09/13
ACCOUNT: 578068          PHYSICIAN: Seeley T Feldmeyer MD
PATIENT TYPE: I/P                    SERVICE TYPE: M

dehydrated, anemic, high potassium and I anticipated her having a high dig level and then
in fact she did have a high dig level.  She has a reasonably excellent exercise tolerance
for her age at 91. She can walk and do yard work 30 minutes at a time without difficult
two months ago and could walk around the block a couple of months ago when she was
feeling well.  Her only complaint to disability is decrease hearing.  After reviewing the
situation with her he said that he would recommend just continuing the heart enzymes
and call him if anything shows up, hold her Digoxin and that he would expect her digoxin
to be high which it is and he said to discuss with the patient that at some point in the
future she may need to have a pacemaker and that he would be glad to see her as an
outpatient.

RW/BLH
D:  6/09/13 11:54
T: 6/10/13 10:31

Electronically reviewed and signed by:  DCTNAME, RADCRED          SIGNDATE
<<COSIGNATURE_PENDING>>

#2
3

MEADE DISTRICT HOSPITAL
ARTESIAN VALLEY HEALTH SYSTEM ᴠ 14-00026
MEADE, KS

### PROGRESS NOTES

NAME: ████████████                                    DOB: █████
NUMBER: 26711                                   ADMIT DATE: 06/09/13
ACCOUNT: 578068                     PHYSICIAN: Seeley T Feldmeyer MD
PATIENT TYPE: I/P                                 SERVICE TYPE: M

06-09-2013: The patient had an episode earlier this afternoon of not being mentally appropriate. She stood up by the side of the bed and peed on her self and pulled out the IV line. She had an episode of gradual increase in her troponin from the 0.3 initially to 0.11 to 0.31. Her current electrolytes done just a short while ago are potassium 5.0, sodium 129 and chloride at 96. I called Dr. Stavens and he said that the dig toxicity could account for both her mental process and her troponin rising a little bit. He said that the only reason to transfer her would be if they could do something particularly an invasive procedure like a stent or a study. He said with her anemia and various other factors that they could not do it, there would be contraindications of doing it at this time so they could not do more than what we are doing here and he recommended to continue with conservative management. He asked about the patient's feeling about being transported and I said that she did not want to go and so he recommended that she stay here at this time and continue with the management course that we are doing. He also agreed to simplify her blood pressure medications and when I suggested Enalapril and Carvedilol as a recipe to go back to on he agreed emphatically that this was a good idea to simplify her medications. He would recommend to hold off on the HCTZ which could mess up her digoxin and to stay with those two medications in particular Enalapril go up on this initially as long as she had good renal function and then add a little bit of Carvedilol to this later as needed. We will continue our course and observe the patient.


RW/BLH
D: 6/09/13 17:15
T: 6/10/13 12:09

Electronically reviewed and signed by: DCTNAME, RADCRED          SIGNDATE
<<COSIGNATURE_PENDING>>

Reported Date/Time: 06/17/13  9:31
MEDICAL DIRECTOR:
S FELDMEYER, MD.

Meade District Hospital
510 E CARTHAGE STREET
MEADE, KS 67864
LABORATORY -- COMPARATIVE REPORT

PAGE   1

CLIA# 17D0453239

LACUMV2

NAME.:
ACCT#: 578068
ROOM.: 111-A DISCH  6/09/13 ~ NO PENDING ORDERS

ADMIT: 06/09/13

SEX......: F
AGE......: 91 Y
DOB......:
PAT. PHONE:
MR#......: 26711

ATTENDING: FELDMEYER SEELEY MD
SECOND...:
PRIM CARE.:

## CHEMISTRY

| | | | | | | | | REFERENCE | |
|---|---|---|---|---|---|---|---|---|---|
| Collect Dt/tm | 060913 2001 | 060913 2001 | 060913 1755 | 060913 1608 | 060913 1608 | 060913 1608 | 060913 1358 | RANGE | UNITS |
| Report Dt/tm | 060913 2029 | 060913 2028 | 060913 1826 | 060913 1656 | 060913 1638 | 060913 1631 | 060913 1433 | | |
| GLUCOSE | | | 124 H | | | | | 74 - 118 | mg/dL |
| BUN | | | 34 H | | | | | 8 - 26 | mg/dL |
| CREA-S | | | 1.70 H | | | | | 0.44 - 1.00 | mg/dl |
| CALCIUM | | | 8.2 L | | | | | 8.5 - 10.3 | mg/dL |
| BICARBONATE | | | 23 | 23 | | | | 22 - 33 | mEq/L |
| SODIUM | | | 128 L | 129 L | | | | 136 - 144 | mEq/L |
| CHLORIDE | | | 95 L | 96 L | | | | 101 - 111 | mEq/L |
| CKMB | | 9.5 HC | 8.5 HC | | 6.0 | | 4.0 | 0.0 - 6.0 | ng/mL |
| TROPONIN | 1.05 H | | 0.57 H | | | 0.31 H | | 0.00 - 0.14 | ng/mL |
| AGE | | | 91 | | | | | | yrs |
| POTASSIUM | | | 4.8 | 5.0 | | | | 3.6 - 5.1 | MEQ/L |
| eGFR AA | | | 36 | | | | | | |
| eGFR NON AA | | | 30 | | | | | | |

| | | | | | | | | REFERENCE | |
|---|---|---|---|---|---|---|---|---|---|
| Collect Dt/tm | 060913 1358 | 060913 1209 | 060913 1209 | 060913 0523 | 060913 0523 | 060913 0523 | 060913 0523 | RANGE | UNITS |
| Report Dt/tm | 060913 1429 | 060913 1239 | 060913 1238 | 060913 0551 | 060913 0546 | 060913 0544 | 060913 0543 | | |
| GLUCOSE | | | 134 L | | | | 149 H | 74 - 118 | mg/dL |
| BUN | | | 34 H | | | | 33 H | 8 - 26 | mg/dL |
| CREA-S | | | 1.50 H | | | | 1.70 H | 0.44 - 1.00 | mg/dl |
| TOTAL PROTEIN | | | | | | | 7.3 | 6.5 - 8.4 | g/dL |
| ALBUMIN | | | | | | | 3.5 | 3.5 - 5.0 | g/dL |
| GLOBULIN | | | | | | | 3.5 H | 1.5 - 3.0 | g/dL |
| A/G RATIO | | | | | | | 1.0 L | 1.5 - 2.5 | |
| T BILI | | | | | | | 0.9 | 0.3 - 1.2 | mg/dL |
| ALK PHOS | | | | | | | 109 H | 34 - 104 | U/L |
| LDH | | | | | | 281 H | | 98 - 192 | U/L |
| CHOLESTEROL | | | | | | 176 | | 100 - 200 | mg/dL |
| TRIGLYCERIDES | | | | | | 130 | | 0 - 150 | mg/dL |
| HDL | | | | | | 40 | | 40 - 60 | mg/dL |
| LDL | | | | | | 118 H | | 0 - 100 | mg/dL |
| CALCIUM | | | 8.6 | | | | 8.9 | 8.5 - 10.3 | mg/dL |
| MAGNESIUM | | | | | | 1.9 | | 1.8 - 2.5 | mg/dL |
| ALT | | | | | | | 161 H | 14 - 54 | U/L |
| AST | | | | | | | 211 H | 15 - 41 | U/L |
| BICARBONATE | | | 23 | | | | 20 L | 22 - 33 | mEq/L |
| SODIUM | | | 128 L | | | | 128 L | 136 - 144 | mEq/L |
| CHLORIDE | | | 96 L | | | | 95 L | 101 - 111 | mEq/L |
| CK | | | | | | 212 | | 38 - 234 | U/L |
| CKMB | | 3.6 | | 1.8 | | | | 0.0 - 6.0 | ng/mL |
| TROPONIN | 0.11 | | 0.03 | | 0.00 | | | 0.00 - 0.14 | ng/mL |
| AGE | | | 91 | | | | 91 | | yrs |
| POTASSIUM | | | 4.9 | | | | 5.6 HC | 3.6 - 5.1 | MEQ/L |
| eGFR AA | | | 42 | | | | 36 | | |
| eGFR NON AA | | | 35 | | | | 30 | | |

REPORTED DATE/TIME: 06/17/13 09:31

215 Page:   1 CONTINUED

LEGEND:  L-Low, H-High, C-Critical, A-Abnormal, *E-Error

Reported Date/Time: 06/17/13  9:31
MEDICAL DIRECTOR:
S FELDMEYER, MD.

#2

NAME.: ████████████
ACCT#: 578068
ROOM.: 111-A DISCH  6/09/13 - NO PENDING ORDERS

ADMIT: 06/09/13

Meade District Hospital
510 E CARTHAGE STREET
MEADE, KS 67864
LABORATORY -- COMPARATIVE REPORT

SEX.......: F
AGE.......: 91 Y
DOB.......:
PAT. PHONE: ████████
MR#.......: 26711

PAGE    3

CLIA# 17D0453239

LACUMV2

ATTENDING: FELDMEYER SEELEY MD
SECOND...:
PRIM CARE.:

## CHEMISTRY

## TDM & TOXICOLOGY

|  |  | REFERENCE RANGE | UNITS |
|---|---|---|---|
| Collect Dt/tm | 060913 0523 |  |  |
| Report Dt/tm: | 060913 0642 |  |  |
| DIGOXIN | **2.13 H** | 0.80 - 1.50 | ng/mL |

**NEW CHEMISTRY REFERENCE RANGES AS OF 04/19/07**

REPORTED DATE/TIME: 06/17/13 09:31  ██████████                          215 Page:   4 CONTINUED

LEGEND:  L-Low, H-High, C-Critical, A-Abnormal, *E-Error

|  |  | REFERENCE RANGE | UNITS |
|---|---|---|---|
| Collect Dt/tm | 060913 0523 |  |  |
| Report Dt/tm: | 060913 0552 |  |  |
| WBC | 9.0 | 4.5 - 10.5 | K/uL |
| #NEU | **7.00 H** | 2.00 - 6.90 | 10^3ul |
| #LYM | 1.4 | 0.6 - 3.4 | 10^3ul |
| #MON | 0.60 | 0.00 - 0.90 | 10^3ul |
| #EOS | 0.0 | 0.0 - 0.7 | 10^3ul |
| #BAS | 0.0 | 0.0 - 0.2 | 10^3ul |
| %NEU | **77.2 H** | 42.0 - 75.0 | % |
| %LYM | **15.8 L** | 20.0 - 45.0 | % |
| %MON | 6.6 | 0.0 - 12.0 | % |
| %EOS | 0.1 | 0.0 - 6.0 | % |
| %BAS | 0.3 | 0.0 - 1.0 | % |
| RBC | **3.55 L** | 4.20 - 5.40 | M/uL |
| HEMOGLOBIN | **8.3 L** | 12.0 - 16.0 | g/dl |
| HEMATOCRIT | **27 L** | 38 - 47 | % |
| MCV | **75.5 L** | 80.0 - 96.0 | fL |
| MCH | **23.3 L** | 27.0 - 31.0 | pg |
| MCHC | **30.8 L** | 32.0 - 36.0 | g/dL |
| PLATELET | 422 | 150 - 450 | K/uL |
| RDW | **15 H** | 11 - 14 | % |
| MPV | 8 | 0 - 99 | fL |
| MANUAL DIFF | NOT INDICATED |  |  |
| RBC MORPH | INDICATED |  |  |
| HYPOCHROM | 1+ |  |  |
| POIK | 1+ |  |  |
| MICRO | 1+ |  |  |
| ANISO | 1+ |  |  |

REPORTED DATE/TIME: 06/17/13 09:31  ██████████                          215 Page:   3 CONTINUED

LEGEND:  L-Low, H-High, C-Critical, A-Abnormal, *E-Error

PL 113

Digoxin and Troponin i increased - eHealthMe     http://www.ehealthme.com/ds/digoxin/troponin+i+increased

#2
6

## eHealthMe
**Healthcare big data for *ordinary* people**

Login o Sign up

Enter a condition or a drug, separate drugs by a comma    Search

How to?    Check drugs    Check symptoms    Ask a question

### From FDA reports: Digoxin and Troponin i increased

This is a study of Troponin i increased among people who take Digoxin. The study analyzes: the time on Digoxin when people have Troponin i increased, gender and age of these people, the severity of Troponin i increased, how they recovered, and common conditions and drugs used besides Digoxin. In total 50,023 Digoxin users are studied. The study is created by eHealthMe based on reports from FDA and is updated regularly.

*Do you have a question?* Healthcare is personal: one drug can work differently between women and men, or for people of different ages. How do you find patients like you to answer your question, and ensure only patients like you can answer it? Our Personalized Q&A can help. Start now

Erectile Dysfunction Exercises

Bipolar Disorder Test

Early Signs of Dementia

5 Foods to Never Eat

Causes of Fibromyalgia

Lose Belly Fat Quickly

Fibromyalgia Pain Relief

ads

### Digoxin
Digoxin has active ingredients of *digoxin*. It is used in atrial fibrillation/flutter, heart rate irregular, heart failure, heart attack, heart palpitations. Commonly reported side effects of Digoxin include breathing difficulty, atrial fibrillation/flutter, nausea, weakness, hypotension.

### Troponin i increased
Troponin i increased has been reported by people with high blood pressure, chronic myeloid leukaemia, multiple myeloma, depression, pain.

## Cancer Treatment Options
cancercenter.com
There is hope. Chat privately with our oncology info experts today.

eHealthMe enables ordinary people to use healthcare big data from FDA and social media. **10,177,406** healthcare professionals and patients have studied on eHealthMe (their testimonials). Our original studies have been used on these medical publications:



## THE LANCET

PNAS
PROCEEDINGS

more.

**Related study**
- Digoxin side effects

**Related symptom**
- Troponin i increased

**Monitor the drug**
- Digoxin

On May, 28, 2013: **50,023** people reported to have side effects when taking Digoxin.

Among them, **28** people (0.06%) have Troponin i increased.

## 4 Signs of a Heart Attack
AdChoices

Trend of "Troponin i increased in Digoxin" reports



| 2003 | 2004 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|------|------|------|------|------|------|------|------|------|
| 1 | 2 | 1 | 4 | 3 | 5 | 2 | 4 | 6 |

**Time on Digoxin when people have Troponin i increased** :

|  | < 1 month | 1 - 6 months | 6 - 12 months | 1 - 2 years | 2 - 5 years | 5 - 10 years | 10+ years |
|---|---|---|---|---|---|---|---|
| Troponin i increased | 50.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 50.00% |

**Gender of people who have Troponin i increased when taking**

1 of 6

Physicians - Cypress Heart | Wichita, Kansas | Interventional Cardiology, Nuclear Cardiol...   Page 1 of 1

## Physician Information

### Roger Evans, M.D., F.A.C.C., F.A.C.P.

Dr. Evans is board certified in Cardiovascular Disease and
Internal Medicine. He introduced cardiac rehabilitation at
Via Christi, and the heart muscle biopsy technique to the
Wichita area. His other interests include congenital heart
disease. He has twice served as the chairman of the
internal medicine department and recently was president
of the medical staff at the Via Christi Medical Center.



### Gerasimos Stefanatos Stavens M.D.

Dr. Stavens is a graduate of University of Kentucky
College of Medicine and completed his post-graduate
training at St Louis University Hospital/VA Medical Center
in St. Louis, Missouri and Fellowships at Long Island
Medical Center, Duke University Medical Center, New
York Methodist Hospital, and Hartford Hospital. He has
moved to Kansas to fulfill his dream of dedicating his
services to provide high quality healthcare to rural
communities and outreach areas. He is passionate in
promoting cardiovascular disease prevention through
didactic sessions and education to both community and
hospital based settings. His interests also include
invasive and non-invasive cardiology and pacemaker
implantation. He is available for consultation at all times.



Home | Physicians | For Patients | Our Services | Locations | News | Employment | Pay Online
All contents ©copyright 2008 Cypress Heart. All rights reserved.



## Meade District Hospital

# GRAPHIC AND I & O

MEDICAL-SURGICAL

FROM: 06/08/13 23:00    TO: 06/09/13 22:20    Page 1 of 1
(FINAL)

Admit: 06/09/13 05:07    Disch: 06/09/13 22:20    Printed: 8/02/13 at 09:55

FELDMEYER SEELEY MD
ALLERGIES: No Known Dru

AGE: 91  SEX: F
ROOM: 111-A
M/R#: 26711

| Date | | 06/08/13 - 06/09/13 | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Saturday - Sunday | | | | | | | | | | | | | | | | | |
| Hour | | 23-3 | 3-7 | 7-11 | 11-15 | 15-19 | 19-23 | 23-3 | 3-7 | 7-11 | 11-15 | 15-19 | 19-23 | 23-3 | 3-7 | 7-11 | 11-15 | 15-19 | 19-23 |

TEMPERATURE
C / F: 40/104, 39/102, 38/100, 37/99 Normal / 98, 36/97

(temperature graph plotted)

| Pulse Rate | | 38 | 54 | 43 | 43 | 82 | | | | | | | | | | | | | |
| Respiration | | 20 | 19 | 18 | 20 | 24 | | | | | | | | | | | | | |
| B.P. - Sys/Dias | | 119/45 | 146/57 | 130/45 | 117/39 | 150/96 | | | | | | | | | | | | | |
| O2LM | | 2 | 2 | | | 2 | | | | | | | | | | | | | |
| FIO2 | | | | | | | | | | | | | | | | | | | |
| O2SAT | | 99 | 99 | 94 | 96 | 99 | | | | | | | | | | | | | |
| O2 Method | | NC | NC | | | NC | | | | | | | | | | | | | |

O2 Cannula = NC    Simple Mask = SM    Venti Mask = VM    Non Rebreathing Mask = NRM    Partial Rebreathing = PRM    Ventilator = VNT    T-Piece = T    Room Air = RA    Other = O

| Weight / BSA / BMI | | *90 LBS 623.3 CM | KGS:40.82 | | BSA:1.33 BMI:15.94 | | | | | | | | | | | | | | |
| Patient Diet | | 08:28 REGULAR | | 100 % | | | | | | | | | | | | | | | |
| & | | 12:36 REGULAR | | 75 % | | | | | | | | | | | | | | | |
| Percent Consumed | | | | | | | | | | | | | | | | | | | |

| INTAKE/OUTPUT | 23-11 | 11-23 | 24 HRS. | 23-11 | 11-23 | 24 HRS. | 23-11 | 11-23 | 24 HRS. |
|---|---|---|---|---|---|---|---|---|---|
| IV FLUIDS | | 1643 | | | | | | | |
| P.O. ORAL | | 1063 | | | | | | | |
| HEPARIN | | 25 | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| SHIFT TOTAL | | 2731 | 2731 | | | | | | |
| Mixed | | 2 | | | | | | | |
| VOIDED URINE | | 1275 | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| SHIFT TOTAL | | 1275 | 1275 | | | | | | |

Confidential pursuant
to KSA 65-4915 and
65-4921 et. Seq.

PATIENT:  RAMSEY RUTH I    NUMBER: 578068    AGE:  91    SEX: F    ROOM: 111-A    PAGE:  1



Confidential pursuant
to KSA 65-4915 and
65-4921 et. Seq.

PL 117



**CYPRESS HEART**

*Heartfelt Healing*™

Roger W. Evans, M.D., F.A.C.C., F.A.C.P.
Hussam Farhoud, M.D., F.A.C.C., F.S.C.A.I.
Gerasimos S. Stavens, M.D.
David S. Glassman, M.D.

03/02/2014

To Whom It May Concern

RE: ███████████
DOB ███████████   MR# 103254

Dear Sir/Madam:

I was contacted by Dr. Ray Winger to provide this letter, regarding the care provided to ███████████ that is currently being discussed under the Kansas State Board of Healing Arts.

In the evening of 06/09/2013, Dr. Winger called me regarding the clinical condition of ███████████ The patient felt unwell earlier that evening and presented to the Emergency Department with decreased energy, generalized symptoms, and progressive fatigue. She was assessed to be relatively dehydrated by clinical examination and lab work findings and was confirmed to have relative anemia with hemoglobin of 8.0. The telemetry tracings also revealed junctional rhythm, which has been a chronic condition as per Dr. Evans' previous assessment. The initial troponin was negative, but the two consecutive values increased steadily from 0.06 to 0.11. Dr. Winger was requesting further assistance regarding her cardiac care.

I have not been familiar with this patient's cardiac background since she exclusively has seen Dr. Evans in the past. The patient has a documented history of mild dementia, hypothyroidism, hyperlipidemia, moderate mitral regurgitation, hypertension, and left ventricular diastolic dysfunction. She also has a documented history of chronic kidney disease and small size abdominal aortic aneurysm. Now, with new findings of anemia, electrolyte abnormality, and digoxin toxicity, I was asked to consider further management. Although the cardiac markers demonstrated a mild increase in the setting of multiple comorbidities, an invasive management, to me would be relatively contraindicated, and that was my recommendation to Dr. Winger. The reasoning I presented at that point was that if further coronary intervention was required, it would probably not be done until the underlying problem was further investigated. I suggested at that point, I would be more than happy to accept the patient as a transfer, but potentially I would provide similar conservative care as would be done at the local hospital.

This, being not a straight forward clinical picture overall, could certainly be managed in a variety of ways, but, I believe, a more conservative least invasive management would be more appropriate.

Attached, please find copies of the pertinent lab work and a heart catheterization procedure note that was performed the following day by Dr. Sensarma.

I hope this helps in some ways to answer to most of the possible questions that may have been presented during the hearing.

Should you have more questions or concerns regarding the above, please do not hesitate to contact me directly at 316-295-7350.

Sincerely yours,

*G. Stavens*

Gerasimos Stavens M.D.

Procedure/Exam Note

 321966

* Final Report *

## * Final Report *

**Procedure**
DATE OF PROCEDURE:
06/10/13

PROCEDURE DONE:
Left ventriculogram.

Left ventriculogram was done using a pigtail catheter.  Left ventricular
end-diastolic pressure is 11.  No gradient across the aortic valve.  LV ejection
fraction is 60%.  Concentric hypertrophy of the ventricles.

Job Number: 610277

**Signature Line**
[Electronically Signed on: 06/12/2013 04:45 PM CDT]

———————————————————————————
Sensarma, Pronab MD MD


[Verified on: 06/12/2013 04:45 PM CDT]

———————————————————————————
Sensarma, Pronab MD MD


Result type:          Procedure/Exam Note
Result date:          10 June 2013 00:00 CDT
Result status:        Auth (Verified)
Result title:         Procedure
Performed by:         Sensarma, Pronab MD on 11 June 2013 06:39 CDT
Verified by:          Sensarma, Pronab MD on 12 June 2013 16:45 CDT
Encounter info:       544832, KS Med Center, Inpatient, 06/10/13 - 06/11/13
Contributor system:   KMCT_KS_MEDANTEX

Procedure/Exam Note

 - 321966

* Final Report *

## * Final Report *

**Procedure**
DATE OF PROCEDURE:
06/10/13

PROCEDURE:
Abdominal aortogram and visualization of the iliac.

REASON FOR DOING:
We had a real difficult time to cross the wire the abdominal aorta.  A pigtail
catheter was positioned above the renals.  Abdominal aortogram and visualization of
the iliacs were done using 20mL of dye at the rate of 15 mL per second.

DESCRIPTION OF THE ANGIOGRAPHIC FINDINGS:
Abdominal aorta visualized well.  Both right and left renal calcified and diffuse,
but no hemodynamic significant lesion noted.  The patient has aneurysms below
renals, abdominal aneurysm.

Just above the bifurcation of the iliac, aorta has some narrowing about 50%.  Both
right and left common external iliac visualized well.  Diffuse calcific disease but
no hemodynamic significant lesion noted.  Both external and internal iliac
visualized well.  Diffuse calcific disease.

CONCLUSION:
There is abdominal aneurysm there.  May be a sonogram to find out the diameter of
the aneurysm.  Renals have diffuse calcific disease, but no hemodynamic
significance.

Job Number: 610276

**Signature Line**
[Electronically Signed on: 06/12/2013 04:45 PM CDT]

Sensarma, Pronab MD MD

Result type:          Procedure/Exam Note
Result date:          10 June 2013 00:00 CDT
Result status:        Auth (Verified)
Result title:         Procedure
Performed by:         Sensarma, Pronab MD on 11 June 2013 06:39 CDT
Verified by:          Sensarma, Pronab MD on 12 June 2013 16:45 CDT
Encounter info:       544832, KS Med Center, Inpatient, 06/10/13 - 06/11/13
Contributor system:   KMCT_KS_MEDANTEX

Printed by:    Meikle, Richelle RN
Printed on:    03/03/14 15:16 CST

Procedure/Exam Note                      - 321966

* Final Report *

## * Final Report *

**Procedure**
DATE OF PROCEDURE:
06/10/13

The patient came with non-ST MI.  The patient's troponin went up to 2.5.  The
patient had chest pain and bradycardia.

PROCEDURE DONE:
Retrograde left heart catheterization, left ventriculogram, and coronary angiogram.

TECHNIQUE:
Right groin area was prepped.  A #6-French sheath was introduced.  Right and left
coronary angiograms were done using a Judkins left for the left and 3DRC for the
right.  Left ventriculogram was done using a pigtail catheter.

DESCRIPTION OF THE ANGIOGRAPHIC FINDINGS:
Left ventricle visualized well.  Overall contractility looked good.  LV ejection
fraction 60%.

DESCRIPTION OF THE CORONARIES:
Left coronary ostium normal.  Left main normal.  LAD has some diffuse calcific
disease, 30% to 40%.  No hemodynamic significant lesion noted.  Circumflex fairly
good sized vessel.  Gives marginal branch.  Again, some calcium and diffuse disease
noted.  No hemodynamic significant lesion noted.  Right coronary artery is dominant
vessel.  Gives PDA and posterolateral branch.  In the mid portion about 40% to 50%
narrowing.

RECOMMENDATION:
Medical management.

CONCLUSION OF THE TEST:
1.   Good LV function.
2.   Coronary angiogram shows right has about 40% to 50% narrowing.  LAD and the
diagonal have some diffuse irregularity and also circumflex has diffuse
irregularity.  Medical management.


Job Number: 610276


Result type:            Procedure/Exam Note
Result date:            10 June 2013 00:00 CDT
Result status:          Auth (Verified)
Result title:           Procedure
Performed by:           Sensarma, Pronab MD on 11 June 2013 06:39 CDT
Verified by:            Sensarma, Pronab MD on 12 June 2013 16:45 CDT
Encounter info:         544832, KS Med Center, Inpatient, 06/10/13 - 06/11/13
Contributor system:     KMCT_KS_MEDANTEX


Printed by:    Meikle, Richelle RN                              Page 1 of 2
Printed on:    03/03/14 15:16 CST                               (Continued)


PL 121

Reported Date/Time: 06/17/13  9:31
MEDICAL DIRECTOR:
S. FELDMEYER, MD.

Meade District Hospital
510 E CARTHAGE STREET
MEADE, KS. 67864
LABORATORY -- COMPARATIVE REPORT

PAGE    1

CLIA# 17D0453239

LACUMV2

NAME.:
ACCT#: 578068
ROOM.: 111-A DISCH  6/09/13 - NO PENDING ORDERS

ADMIT: 06/09/13

SEX.......: F
AGE.......: 91 Y
DOB.......:
PAT. PHONE:
MR#.......: 26711

ATTENDING: FELDMEYER SEELEY MD
SECOND...:
PRIM CARE.:

## CHEMISTRY

| Collect Dt/tm: | 060913 2001 | 060913 2001 | 060913 1755 | 060913 1608 | 060913 1608 | 060913 1608 | 060913 1358 | REFERENCE | |
|---|---|---|---|---|---|---|---|---|---|
| Report Dt/tm: | 060913 2029 | 060913 2028 | 060913 1826 | 060913 1656 | 060913 1638 | 060913 1631 | 060913 1433 | RANGE | UNITS |
| GLUCOSE | | | 124 H | | | | | 74 - 118 | mg/dL |
| BUN | | | 34 H | | | | | 8 - 26 | mg/dL |
| CREA-S | | | 1.70 H | | | | | 0.44 - 1.00 | mg/dl |
| CALCIUM | | | 8.2 L | | | | | 8.5 - 10.3 | mg/dL |
| BICARBONATE | | | 23 | 23 | | | | 22 - 33 | mEq/L |
| SODIUM | | | 128 L | 129 L | | | | 136 - 144 | mEq/L |
| CHLORIDE | | | 95 L | 96 L | | | | 101 - 111 | mEq/L |
| CKMB | | 9.5 HC | 8.5 HC | | 6.0 | | 4.0 | 0.0 - 6.0 | ng/mL |
| TROPONIN | 1.05 H | | 0.57 H | | | 0.31 H | | 0.00 - 0.14 | ng/mL |
| AGE | | | 91 | | | | | | yrs |
| POTASSIUM | | | 4.8 | 5.0 | | | | 3.6 - 5.1 | MEQ/L |
| eGFR AA | | | 36 | | | | | | |
| eGFR NON AA | | | 30 | | | | | | |

| Collect Dt/tm | 060913 1358 | 060913 1209 | 060913 1209 | 060913 0523 | 060913 0523 | 060913 0523 | 060913 0523 | REFERENCE | |
|---|---|---|---|---|---|---|---|---|---|
| Report Dt/tm: | 060913 1429 | 060913 1239 | 060913 1238 | 060913 0553 | 060913 0546 | 060913 0544 | 060913 0543 | RANGE | UNITS |
| GLUCOSE | | | 134 H | | | | 149 H | 74 - 118 | mg/dL |
| BUN | | | 34 H | | | | 33 H | 8 - 26 | mg/dL |
| CREA-S | | | 1.50 H | | | | 1.70 H | 0.44 - 1.00 | mg/dL |
| TOTAL PROTEIN | | | | | | | 7.0 | 6.5 - 8.4 | g/dL |
| ALBUMIN | | | | | | | 3.5 | 3.5 - 5.0 | g/dL |
| GLOBULIN | | | | | | | 3.5 H | 1.5 - 3.0 | g/dL |
| A/G RATIO | | | | | | | 1.0 L | 1.5 - 2.5 | |
| T BILI | | | | | | | 0.9 | 0.3 - 1.2 | mg/dL |
| ALK PHOS | | | | | | | 109 H | 34 - 104 | U/L |
| LDH | | | | | | 281 H | | 98 - 192 | U/L |
| CHOLESTEROL | | | | | | | 176 | 100 - 200 | mg/dL |
| TRIGLYCERIDES | | | | | | | 130 | 0 - 150 | mg/dL |
| HDL | | | | | | | 40 | 40 - 60 | mg/dL |
| LDL | | | | | | | 118 H | 0 - 100 | mg/dL |
| CALCIUM | | | 8.6 | | | | 8.9 | 8.5 - 10.3 | mg/dL |
| MAGNESIUM | | | | | | | 1.9 | 1.8 - 2.5 | mg/dL |
| ALT | | | | | | | 161 H | 14 - 54 | U/L |
| AST | | | | | | | 211 H | 15 - 41 | U/L |
| BICARBONATE | | | 23 | | | | 20 L | 22 - 33 | mEq/L |
| SODIUM | | | 128 L | | | | 128 L | 136 - 144 | mEq/L |
| CHLORIDE | | | 96 L | | | | 95 L | 101 - 111 | mEq/L |
| CK | | | | | | 212 | | 38 - 234 | U/L |
| CKMB | | 3.6 | | 1.8 | | | | 0.0 - 6.0 | ng/mL |
| TROPONIN | 0.11 | | 0.03 | | 0.00 | | | 0.00 - 0.14 | ng/mL |
| AGE | | | 91 | | | | 91 | | yrs |
| POTASSIUM | | | 4.9 | | | | 5.6 HC | 3.6 - 5.1 | MEQ/L |
| eGFR AA | | | 42 | | | | 36 | | |
| eGFR NON AA | | | 35 | | | | 30 | | |

REPORTED DATE/TIME: 06/17/13 09:31

LEGEND:  L-Low, H-High, C-Critical, A-Abnormal, *E-Error

215 Page:    1 CONTINUED

Reported Date/Time: 06/17/13  9:31
MEDICAL DIRECTOR:
S FELDMEYER, MD.

#2
3

NAME.: ███████
ACCT#: 578068
ROOM.: 111-A DISCH  6/09/13 - NO PENDING ORDERS
ADMIT: 06/09/13

Meade District Hospital
510 E CARTHAGE STREET
MEADE, KS 67864
LABORATORY -- COMPARATIVE REPORT

PAGE   3

CLIA# 17D0453239

LACUN/2

SEX......: F
AGE......: 91 Y
DOB......: ███████
PAT. PHONE: ███████
MR#......: 26711

ATTENDING: FELDMEYER SEELEY MD
SECOND...:
PRIM CARE.:

## CHEMISTRY

### TDM & TOXICOLOGY

|  | | REFERENCE RANGE | UNITS |
|---|---|---|---|
| Collect Dt/tm  060913 0523 | | | |
| Report Dt/tm:  060913 0642 | | | |
| DIGOXIN | 2.13 H | 0.80 - 1.50 | ng/mL |

NEW CHEMISTRY REFERENCE RANGES AS OF 04/19/07

215 Page:   4 CONTINUED

REPORTED DATE/TIME: 06/17/13 09:31  ███████

LEGEND:  L-Low, H-High, C-Critical, A-Abnormal, *E-Error

| Collect Dt/tm  060913 0523 | | REFERENCE RANGE | UNITS |
|---|---|---|---|
| Report Dt/tm:  060913 0552 | | | |
| WBC | 9.0 | 4.5 - 10.5 | K/uL |
| #NEU | 7.00 H | 2.00 - 6.90 | 10^3ul |
| #LYM | 1.4 | 0.6 - 3.4 | 10^3ul |
| #MON | 0.60 | 0.00 - 0.90 | 10^3ul |
| #EOS | 0.0 | 0.0 - 0.7 | 10^3ul |
| #BAS | 0.0 | 0.0 - 0.2 | 10^3ul |
| %NEU | 77.2 H | 42.0 - 75.0 | % |
| %LYM | 15.8 L | 20.0 - 45.0 | % |
| %MON | 6.6 | 0.0 - 12.0 | % |
| %EOS | 0.1 | 0.0 - 6.0 | % |
| %BAS | 0.3 | 0.0 - 1.0 | % |
| RBC | 3.55 L | 4.20 - 5.40 | M/uL |
| HEMOGLOBIN | 8.3 L | 12.0 - 16.0 | g/dl |
| HEMATOCRIT | 27 L | 38 - 47 | % |
| MCV | 75.5 L | 80.0 - 96.0 | fL |
| MCH | 23.3 L | 27.0 - 31.0 | pg |
| MCHC | 30.8 L | 32.0 - 36.0 | g/dL |
| PLATELET | 422 | 150 - 450 | K/uL |
| RDW | 15 H | 11 - 14 | % |
| MPV | 8 | 0 - 99 | fL |
| MANUAL DIFF | NOT INDICATED | | |
| RBC MORPH | INDICATED | | |
| HYPOCHROM | 1+ | | |
| POIK | 1+ | | |
| MICRO | 1+ | | |
| ANISO | 1+ | | |

REPORTED DATE/TIME: 06/17/13 09:31  ███████

LEGEND:  L-Low, H-High, C-Critical, A-Abnormal, *E-Error

215 Page:   3 CONTINUED

**Response to  KSBHA #14-00027**

**What Happened.**
█████████ 66 year old white male, suffered an unwitnessed ATV accident, which left him on the ground with the ATV resting on his chest and head for a prolonged period of time (probably>1hr).  He was found, unresponsive to any stimulation (verbal commands, pain, or reflexes, fixed dilated pupils) on discovery.  He also had no pulse, no spontaneous respiration. He was dark blue in color on initial discovery (blue according to the wife, cyanotic by EMS report).  Ventilation support with a pocket mask and cardiac compressions were done by the police on their arrival (2 hours after last contact).

Ventilation support, and cardiac compressions, and epinephrine yielded continuous unresponsiveness, and asystole.   Spontaneous respiration effort by the patient was always difficult to assess, as the medical support continuously gave the patient Oxygen, and forced ventilation support via bag mask initially, and then via direct intubation after the EMS arrived.

There was more than a 2 hour period of time between his last contact and his discovery and assistance by bystanders and police.  I believe at least 1 hour of time lapsed between the accident and medical assistance.  It is not likely that one of his age, would be performing an agriculture errand without assistance or support or contact (cell phone), for such a long time.

**Manner of Death:**
Two things speak to the manner of death.   He was found supine/unresponsive with the ATV resting on his head and chest for a prolonged time, and he was described as blue/cyanotic by witnesses.  I believe that he could not breath with the weight of the ATV on his chest wall, although his heart must have circulated blood for some time in order to achieve cyanosis. He retained excessive $CO_2$, and was deprived $O_2$ to his brain to cause brain swelling and brain death.

Cyanosis:
The blue color a person has is due to the binding of $CO_2$ on the hemoglobin, and the blood is circulated repeatedly until the $O_2/CO_2$ binding sites are filled with $CO_2$. Example:
A baby is born blue because his heart is working and not breathing, yet turns pink after a few breaths.  A petulant child may 'hold his breath until he turns blue'.  Before gas measurements, and still, a surgeon and anesthesiologist communicate often when operating in a situation that may impede mechanical breathing (ex. retracting upwards of the ribcage)...saying that the patient's blood is getting dark...and need to change position or relax until the anesthesiologist can get rid of the $CO_2$.



DEFENDANT'S EXHIBIT 19

PL 124

**Medical Response:**

First responders:
Bystanders and Police found the patient unresponsive, with no pulse and no respiration. They removed the ATV from atop his head and chest and gave pocket mask ventilation and chest compressions without objective change from being unresponsive, no pulse and no voluntary respiration.

EMS:
Found the patient unresponsive, with no pulse and no respiration.
They initiated CPR giving the patient:
cardiac monitoring, O2, the patient was intubated and bagged, IV access obtained, cardiac compressions, epinephrine IV repeatedly.
Field outcome: CPR continuously, AED Pads in place, cardiac rhythm-asystole, patient intubated and bagged with O2, non responsive.

ER:
I was on backup call to PA Harris Davis. PA Davis called me to help as soon as the EMS was called. Because I was backup call, PA Davis did all the paperwork regarding the ER activity. I had only been in Meade for a few weeks and didn't know the names of the Nurses and Ancillary Staff, just PA Harris. I was told that about 4 of the ER Nurses were ACLS Certified.


The patient arrived neurologically unresponsive, no reflexes, pupils fixed and dilated, eyes open continuously with no corneal reflex. He was pulseless with no cardiac electrical activity. His color was acceptable as pale/pink. He was intubated with continuous bagging of O2. Respirations were better on the right than the left and the RT person thought the tube was in the right main bronchus and repositioned the ET tube. Capnography unavailable. Glasgow Coma Scale of 3 (no response to eye opening, no verbal response, and no motor response). After an administration of Epi., I noted that he had a short burst of cardiac activity that dissipated into a bradycardia and then to occasional beat, none of which yielded a pulse as good as the cardiac compressions, this lasted only about 30 seconds. I suspected that we may not be seeing a cardiac event, but a profound Vagal response from Brain Swelling, which would only give a bradycardia, and ordered Atropine, which was given. I noted that after the atropine was given, the Epinephrine yielded a sinus rhythm and acceptable pulse/blood pressure. I then asked the RT person who was bagging the patient to hyperventilate him to try to get CO2 from his brain and perhaps get the postulated cerebral swelling down (fixed dilated pupils). Pulse Oxymetry readings were verbally reported 100%, when I was in the ER. Cardiac compressions were infrequent at this point, just Epi every 3 minutes seemed sufficient to yield a cardiac producing pulse and acceptable blood pressure.

PL 125

I asked where the trauma patients were referred from Meade, as I had only been on staff for a few weeks. Everyone said that they used 'Eagle Med' from Wichita. Eagle Med was contacted and they proceeded. I examined the patient's neck manually, noted the larynx and neck anatomy seemed unremarkable and placed a Cervical Collar. We contacted the Eagle Med Trauma Physician at least 3 times. Each time we communicated with the Eagle Med Supervising Physician we communicated the condition of the patient, and the Eagle Med Physician repeatedly guarded against being optimistic regarding a good patient outcome. He finally said that, "you may be able to get him here....but he will never leave".

The Eagle Med Team arrived, but said that they could not transport the patient in his current state. They needed the patient to be stable in order to transport.
I continued to examine the patient neurologically and could not find any hint of improvement. He continued to exhibit a Glasgow Coma Scale of 3, with no corneal response to pain, nor pupillary response to light, no motor response (not even any deep tendon reflexes), no verbal (though ET placed).

**Transitional Moment**
As a physician approaches the situation in which the ER Patient will in all probability 'not survive', the recipient of his care becomes the family, and not just the ER Patient. I had only been in Meade for a few weeks and did not know many people. I asked if PA Harris Davis or any of the Nurses knew the family well, as in a small town, pop. 1000, it is not unusual for a nurse to be intimate with community members. I then left the ER room in the care of PA Harris Davis and went to talk to the patient's wife. When a Surgeon, or ER Physician needs someone to talk to the family in his behalf, it is with the understanding that his skill is needed at the patient's side. The Surgeon, or ER Physician, would not go to the family if they thought that their presence with the patient may improve the outcome. The decision to leave the ER, and go and talk to the family is the time that I was prepared to 'call off the code' and allow the patient a peaceful end to these efforts.

I took the wife and couple of others into a private setting. I did what I usually do in these situations, using timely pauses to initiate suspicions that things weren't going well. I then told the wife that the patient was 'not responding to our best efforts'. I then allowed time to settle in with the family, and said nothing. The wife talked about how they had both signed DNR's, but these were at home, how she knew 'he wouldn't want this', she wanted to cell phone their children. She then said something I did not want to hear...she said I was 'to do every thing possible, if he had any chance'. I felt that the patient was in a coma and the wife was his legal representative and spoke for him. The nurses notes said I tried to get the wife to sign a DNR. This is false. I just wanted her to back away from her position of doing everything possible. I wanted her to just say..'do your best', or 'do what you think is right', or 'do what ███ would have wanted'.

I worked in the ER setting of a larger hospital at Irwin Army Hospital, Fort Riley.  I had many options with a critical patient.  I could sent them to the ICU, get immediate specialist referral, Lifeflight to Stormont-Vail.  Now, here at Meade, pop 1000, with Eagle Med refusal to transport, no ICU, no local specialists, my options were very small.  While dealing with the family, I had planned, if any hint of neurological activity, I would start epinephrine or dopamine drip and land transport to Liberal (40mi.). I continued to examine the patient's neurological status until the code was called.  The lack of any hint of neurological activity was the reason to be guarded in proceeding with more aggressive emergency measures.

The issue of the Postmortem finding of pneumothorax.
I believe the pneumothorax was caused by left fractured ribs, in association with the aggressive cardiac compressions with positive airway pressure ET tube bagging over the course of the Code.
Initial findings:
* Respirations were appreciated bilaterally, with right greater than left, causing repositioning of the ET tube by RT.  Capnography not available.
* The neck was examined prior to placement of the C-Collar and found unremarkable (without deviation of the trachea).
* Chest Ray for ET placement showed  no deviation of mediastinal structures and no pneumothrorax was noted.
* Initial pulse oxymetry readings were reported 100%.  Capnography not available.

Late CPR notes:
* Several left ribs fractured. Not initially recognized on the CXR, but reported on the radiology interpretation.
* Neck anatomy covered by C-Collar.
* As the code progressed, and the patient stopped responding to just the Epi injections, the Cardiac Compressions, and ET bagging became more vigorous and continuous.
* Subsequent Pulse Oxymetry was not reported to me, but to the RT person managing the ET bagging effort.  I was with the wife, during the later stages of the 'Code'.  The RT person was an experienced staff person, approx 50+yrs, adept at intubation, etc. by report of PA Harris.
* Reassessment of the patient was focused toward the neurological status.
* Management of a pneumothorax was taught to me by Paul O'Connor DO, ER Director at Irwin Army Hospital, to be 16ga angiocath with 3-way stopcock.  The statement that the ET bagging is treatment for pneumothorax is false, and taken out of context in response to another question.
*The Postmortem CT of the Chest has different findings than the CXR findings, taken only short time before death (approx 1  hr).

**Summary:**

The 66 white male suffered a life ending ATV accident. The manner of death was the prolonged resting of the ATV on his chest and head, depriving the patient from breathing. I believe the various responders were exceptional for a small community, to bring the patient into a position whereby vital systems would have supported the patient, if he had not suffered irreversible brain death from O2 deprivation.

I believe the criticism is unwarranted. I have never heard in my life of anyone proposing that there be a specified length of time for a 'code blue' resuscitation effort. How long should a 'code' last? Should there be a different time limit for older patients than younger ones? What is the criteria? I am also sure, that if there had been any hint of neurological activity, or anyone ,RT, etc., would have said anything about difficulties, that the respiratory status would be quickly reevaluated and the pneumothorax managed. The lack of communication to me by RT or PA Harris regarding any respiratory issues may well be the result of an atmosphere of criticism, that impedes anyone from saying anything.

The ER Setting is one under the microscope. It seems like everyone has a better idea, and criticism. The experienced ER Physician has vastly more going on in his head than the support staff can possibly imagine. Example: using atropine for cerebral event, or hyper-expansion of stomach with air due to a missed attempt to ventilate, and not a cardiac event. How long does the atropine last, and how much will it impair the pupilary light response? I remember Paul O'Connor DO, ER Director at Irwin Army Hospital telling me of a time when he moonlighted at a small hospital, and the the evening nurse telling him that 'we don't use electricity on our patients'. We then talked about how the lack of leadership in the ER setting, or the atmosphere of criticism is detrimental to good care.

Ray Winger MD

Patient Name: Carida, Stu

#578072

## Prehospital Care Report

MEADE COUNTY EMS
725 W CARTHAGE PO BOX 1136
MEADE, KS 67864-1136

Incident Date: 06/09/2013

Call #: A13149

Patient Care #: 1
Life Threat: Yes

| Patient Information | | |
|---|---|---|
| **Name:** ████████ | | |
| **Address:** 2310 Plum | **Age:** 66 Years | **D.O.B:** ████ |
| | **Gender:** Male | **SSN:** ████ |
| Hays, Ellis, KS 67601 | **Weight:** 113.398 KG. / 250.00 LB | **Race:** White |
| | **Phone:** 7856233271 | **Ethnicity:** Not Hispanic or Latino |

**Closest Relative/Guardian**

| | | |
|---|---|---|
| **Name:** ████████ | | |
| **Address:** 2310 Plum  Hays, KS 67601 | **Relationship:** Spouse | |
| | **Phone #:** 7856233271 | |

| Provider Impression | |
|---|---|
| **Primary Impression** | **Secondary Impression** |
| Traumatic Injury | Cardiac Arrest |

### Summary of Events — Narrative

**SUBJECTIVE:**

Called for a reported ATV accident at 2 mi N of Fowler on 26-Road in the city of Fowler. On arrival, found a 66 year Male patient weighing 113 KG. Chief complaint of Traumatic Injury. Secondary complaint(s) of Unresponsive, No Pulse, No Respirations. Events surrounding incident: Bystanders report the patient was involved in an unwitnessed ATV accident. Bystanders do not know how long the patient has been down. Spouse reports the last time she spoke with the patient was 1230. Bystanders state that when they arrived they found patient lying on his back on the ground with the 4-wheeler laying on top of his head and chest. Bystanders removed the ATV off of the patient and found the patient unresponsive with no pulse and no respirations. Chest compressions were started at 1239 per Ford Co Stu dispatch after speaking to the fth.

The patient's medical history, medications and allergies are noted below.

**OBJECTIVE:**

At 14:49, the patient was found in the middle of a field lying supine on the ground. First responders and Law enforcement were performing CPR using pocket mask. Initial assessment revealed the patient had a GCS of 3 (Eye = 1, Verbal = 1, Motor = 1), P = 0, R = 0. Other significant physical exam findings: Patient is unresponsive. 1 cm lac just above left eyebrow noted, bleeding controlled. No other obvious deformities or injury noted at this time. Patient's skin is cyanotic, warm and dry.

**ASSESSMENT:**

The field impression of the patient was Traumatic Injury and Cardiac Arrest.

**PLAN:**

Treatments were administered as follows:

14:42: Assessment-Adult per Protocol (Standing Order) was performed successfully after 1 attempt.
14:42: CPR-Start Compressions and Ventilations per Protocol (Standing Order) was performed successfully after 1 attempt.
14:49: Oxygen by Positive Pressure Device 15 LPM Inhalation per Protocol (Standing Order). The patient's response was Unchanged.
14:49: Assessment-Adult per Protocol (Standing Order) was performed successfully after 1 attempt.
14:50: Airway-Positive Pressure Ventilation per Protocol (Standing Order) was performed successfully after 1 attempt.
14:53: Defibrillation-Placement for Monitoring/Analysis per Protocol (Standing Order) was performed successfully after 1 attempt.
14:54: ECG Monitor was applied. Interpretation was Asystole. Ectopy: No Ectopy Noted. Lead: Pads.
14:55: Venous Access-Extremity 18 Ga per Protocol (Standing Order) was performed successfully after 1 attempt.
14:55: Saline Lock 18 Ga per Protocol (Standing Order) was performed successfully after 1 attempt.
14:56: Epinephrine 1:10,000 1 MG Intravenous per Protocol (Standing Order). The patient's response was Unchanged.
14:56: Spinal Immobilization-Long Back Board per Protocol (Standing Order) was performed successfully after 1 attempt.
14:58: Airway per Protocol (Standing Order) was performed successfully after 1 attempt.
15:01: CPR-Start Rescue Breathing without Compressions per Protocol (Standing Order) was performed successfully after 1 attempt.
15:02: Airway-Endotracheal Intubation 8.0 per Protocol (Standing Order) was performed successfully after 1 attempt.
15:04: Airway-End Tidal CO2 Monitoring per Protocol (Standing Order) was performed successfully after 1 attempt.
15:06: Epinephrine 1:10,000 1 MG Intravenous per Protocol (Standing Order) was performed successfully after 1 attempt.
15:13: Venous Access-Extremity 18 Ga per Protocol (Standing Order). The patient's response was Unchanged.
15:24: Epinephrine 1:10,000 1 MG Intravenous per Protocol (Standing Order) was performed unsuccessfully after 1 attempt.

The outcome of field treatment was: CPR continued. The patient's response was Unchanged. AED pads placed to analyze rhythm, Asystole per B. Adams, MICT. CPR continued using BVM with 15 L O2. IV established to patient's right AC. Initial patient intubation in the field deferred due to bright ambient light. Patient log rolled and placed onto LSB and secured. Epinephrine given via IV per protocol. Patient placed on stretcher and secured. ROSC noted at 1500, compressions stopped. ET Tube placed per protocol. Ford County EMS arrived on scene to assist. Monitoring of patient continued enroute. Continued with assisted ventilations enroute. Epi X 2 given enroute. ET Tube placed per The patient was transported to MEADE DISTRICT HOSPITAL Lights and Sirens. Medical control contact established with Meade District Hospital enroute via radio per 946,

**Confidential pursuant to KSA 66-4915 and 65-4921 et. Seq.**

---

Inc. Date: 06/09/2013
Incident #: 13EMS071

Patient Name: ████████
Call #: A13149

MEADE COUNTY EMS

Page 1
Date Printed: 06/11/2013 16:44

NURSE'S NOTES:   1500 - Staff et H. Davis, PA, et Dr Winger in trauma room awaiting trauma visit. T. Holguin, RN. 1525 - Pt arrived via EMS on spine board. Pt's pupils fixed et dilated et unresponsive. CPR in progress by D. Godfrey and Brian, EMT. Pt has ET tube in place w/bag et mask breathing by EMS staff. 18g iv site in place to right ac in place at admit. P. Lubbers, RT, takes over bag and mask breathing for patient. ET tube pulled back approx 2cm by P. Lubbers, RT. Spine board in place et c-collar placed on patient by EMS staff per verbal order of Dr Winger. Normal saline started w/gravity tubing wide open to right ac iv site w/o diff. - TH. 1530 - S. Woods, Rn, started iv site w/20cath using aseptic technique x1 attempt - TH. 1532 - 16 fr foley placed w/frank blood return of approx 200cc. Pt's abdomen distended w/no bilat lungs sounds noted. UA collected et sent to lab. Epinephrine 1mg given ivp by this nurse. HR pc ivp at 93. BP 59/26. 1537 - Atropine .4mg given ivp by S. Woods, RN. HR at 78. 1547 - BP: 58/28. 1550 - Dr Winger attempting to place str ng tube w/no success to left nare. 1549 - Epi 1mg given ivp by S. Woods, RN. 1552 - Epi ivp given by S. Woods, RN. 1554 - Eagle Med on the ground at airport for transfer to Wesley Trauma Center. H. Davis, PA, et Dr Winger talked to Wesley Trauma Center Bruce Thomas regarding pt care et transport at approx 1545. - TH. 1555 - BP 228/135. P: 149. 1556 - BP: 187/106. 1559 - Pt 126 et O2 at 90% via ambu bag. 1600 - No heartbeat et PEA noted on monitor. Compressions started by Brian, EMT. 1602 - Epi given ivp by S. Woods, RN. Compressions stopped. Carotid pulse at 140. 1603 - No pulse noted et compressions started by Brian, EMT. Dr Winger ordered to give epi 1mg every 3 minutes. Epi 1mg given iv by S. Woods, RN. No pulse noted. - TH. 1604 - Compressions resumed by Brian, EMT. 1606 - Epi ivp given by S. Woods, RN. CPR in progress. 1608 - Eagle Med staff in trauma room for possible transport. Dr Winger in Room 112 w/family asking them "if they want to transfer the patient or not. Dr Winger explains to wife that he needs a DNR signed by the wife if she decides not to transfer." This nurse in room et DR Winger states "I will let you talk to her." (referring to me talking to the family.) This nurse comforts states "I am so confused. I know he wouldn't want this. I need to call my daughter." Pt's wife on phone with daughter asking her "what to do." Pt's wife states "He has a DNR in place" This nurse explains to pt that in trauma and/or emergency situation that the DNR really has no impact. Pt verbalizes understanding and is confused on the questions that Dr Winger is asking her. Wife is upset and is asking this nurse questions about her husband. Wife wants to know if he "is going to be brain dead" or "is there any chance." This nurse explains to pt's wife that his pupils were fixed et dilated upon arrival and not breathing on his own. Wife informed that dr will have to explain condition of pt. Pt's wife states "that is how he was when I found him in the field. I talked to him about 1230 on the phone today and was supposed to meet him about 2 at the barn. I went to the barn and he wasn't there. I then started walking around and saw the 4-wheeler on top of him. The 4-wheeler was on top of his chest and his head. His eyes were like that when I found him. His tongue was swollen. I couldn't get it off of him." She then states "I called for help and 4 (people) came to remove the ATV from him." Pt's wife states "there was no response from him" and she does not know for sure how long he had been down. 1609- No pulse et H. davis, PA, starts compressions. Epi ivp given by S. Woods, RN. 1610 - New bag of NS started. No pulse noted. Mottling noted to bilat lower extremities. Pupils fixed et dilated. Pt unresponsive. - TH. (Cont'd)

| TRANSFERRED TO | | VIA |
|---|---|---|
| Transfer Agency Notify Time: | Transfer Agency Arrival Time: | Transfer Agency Departing Time: |
| FAMILY NOTIFIED / RELATIONSHIP: | | |
| BELONGINGS / VALUABLES TO: | | |

☐ Family   ☐ Patient   ☐ Police
☐ Other:

| Primary RN: | S Woods RN | 2nd RN: | T Holguin RN | 3rd RN: | C. Powell, LPN |
|---|---|---|---|---|---|
| Physician: | Raymond Winger, MD | Resp Staff: | P Lubbers | Lab Staff: | D Kernell |
| Imaging Staff: | R Cabelloro | Other: | D. Godfrey, EMS | Other: | Brian, EMT |

Confidential pursuant
to KSA 65-4915 and
65-4921 et. Seq.
PL 130



| Time | Component | Unit # | CC's Infused | RN #1 | RN #2 |
|------|-----------|--------|--------------|-------|-------|
|      |           |        |              |       |       |
|      |           |        |              |       |       |
|      |           |        |              |       |       |
|      |           |        |              |       |       |

NURSE'S NOTES:   (6-9-13) (cont'd) 1612 - Pt is on EMS cardiac monitor and Dr Winger requests to keep pt on EMS's monitor. epi given ivp by S. Woods, RN. Wife in room stated "I don't want to transport." Eagle Med here et states "pt will not be transported anyway if not stable." No pulse and no response from patient. 1618 - Dr Winger in room giving orders for more epi to be given. Epi given ivp by Brian, EMT staff. H. Davis, PA, discussing possibly calling the code. Dr Winger holds pt wife's hand et has her look into pt's eyes. Dr Winger talking to pt's wife asking her "what she wants to do." Pt's wife visibly upset et confused. 1621 - H. Davis talking to trauma surgeon on phone regarding pt. - TH. 1622 - Epi ivp given by S. Woods, RN. Pt unresponsive et no pulse noted. 1625 - Epi given by EMS staff Brian. 1626 - Dr Winger orders "keep giving epi 1mg every 3minutes and keep bagging." 1628 - Pt's wife at side. 1629 - Epi given ivp by EMS staff Brian. 1631 - Hr noted on monitor at 148. No carotid pulse noted. 1632 - Epi given ivp by EMS staff Brian. 1633 - HR 152 on monitor. No carotid pulse noted. Family exited room Paula Lubbers continues to bag patient. 1635 - Epi 1mg given by EMS staff Brian. 1636 -Dr Winger told that he needs to make decision on calling the code by this nurse and H. Davis, and Paula Lubbers and Starla Woods, RN. 1637 - H. Davis, states "no more bagging." 1638 - Wife back in room 1639 - H. Davis calls code. Pt pronounced at 1639. 1643 - Family and friends in with patient along with medical staff. 1700 - Dr Winger orders to have everything removed from patient. Dr Winger orders to remove et tube, iv et and all tubing. This nurse explains to  Dr Winger that nothing can be removed from patient until decision is made for autopsy. 1717 - Orders received from Dr Winger and H. Davis, PA, that there will be no autopsy and to remove all tubes and iv's so that the wife can see her husband." Iv's removed x2 and c-collar removed et et tube removed per Dr Winger's orders. C. Powell, LPN, witnessed orders and assisted in removing iv's. 1720 - Family in room with patient. C. Powell, LPN, in with patient. 1725 - Priest in to be with family. 1730 - This nurse called Midwest Transplant Network et was asked questions regarding xray, labs, etc and questions about autopsy. This nurse told them I would call them back. This nurse then called Dr Feldmeyer and he state that there should be an autopsy if it was unattended death. Dr Feldmeyer ordered a CT scan of the pt's body. This nurse asked Dr Feldmeyer to come in to visit with the family when he got back in town. He stated that their life insurance may have to have an autopsy. I then discussed it with the wife and she requests no autopsy be done. Dr Feldmeyer notified of pt's wife's decision. This nurse called Midwest Transplant Network back et talked to different staff member and they visited with pt's wife regarding donation. 1800 - Pt's body taken to special care room et family at bedside. Nursing staff close by. 1820 - Raygan, Xray, in to take pt to ct room for ct scan. 1840 - Pt back to special care room. Pt's wife requests Hays memorial chapel to do arrangements. This nurse called Rick at Hays Memorial Chapel to set up pickup. 2000 - Trevin Bachman called to state someone from Sublette will be picking up patient and Trevin notified of pt's wishes to donate eyes/tissue. 2010 - Rick from Hays Memorial Chapel called back to talk to wife. Pt's wife notifies this nurse pc phone conversation that she refuses donation at this time. Midwest Transplant notified et paperwork will be faxed to them. 2000 - Dr Feldmeyer visiting w/family explaining CT of pt. 2050 - Funeral home here to pick up.pt's body. Family came in to room to view pt pc discharge. - T. Holguin, RN.

PHYSICIAN ADMITTING SIGNATURE

DISCHARGE TIME: 2050

TRANSFERRED TO: _____   VIA _____

Transfer Agency Notifying Nurse          Transfer Agency Arrival Time          Transfer Agency Departure Time

FAMILY NOTIFIED / RELATIONSHIP: _____

BELONGINGS / VALUABLES TO: _____

☐ Family   ☐ Patient   ☐ Police
☐ Other _____

Confidential pursuant to KSA 65-4915 and

Primary Nurse          Recorder

MEADE DISTRICT HOSPITAL
ARTESIAN VALLEY HEALTH SYSTEM
MEADE, KS

CODE BLUE NOTE

NAME: ███████████
NUMBER: NC
ACCOUNT: 578072
PATIENT TYPE: E.R.

DOB: ███████
ADMIT DATE: 06/09/13
PHYSICIAN: Harris Davis
SERVICE TYPE: E

## EMERGENCY ROOM NOTE/CODE BLUE NOTE
DATE: 6-9-13

This 66-year-old patient arrived in the Emergency Room per ambulance at 15:25. Patient had, during transport, exhibited nonresponsive behavior. An IV was started and patient was intubated. Epinephrine was administered to resume heart rate. After the arrival in the Emergency Room, we continued the Epinephrine, evaluated the patient on examination we had a patient with multiple unknown trauma who exhibited distal mottling, pupils were fixed and nonresponsive. The patient was still being bagged for breathing, however he was producing a spontaneous pulse. At 15:49, pulse ceased, CPR was administered, 1 mg. Epinephrine was administered. We continued to provide CPR for another minute. The patient's second attempt to epinephrine IV and at that point time his pulse was obtained at 15:53. ABGs were obtained at the same time. We had an active vital sign. At 16:01 the patient's pulse started to decrease and by 16:03 pulse was again not present. We continued to give Epinephrine every 3-4 minutes and continued the CPR. At 16:06 another mg. of Epi was pushed. CPR was present. Eagle Med had arrived for transport. Patient was exhibiting spontaneous pulse. Again at 16:09 the pulse started to decrease and Epinephrine was again administered. Continued with CPR. At 16:12 we continued with the Epinephrine. After talking to Trauma Surgery in Wichita, and the family, we presented the fact that this patient with fixed pupillary dilation and no central response, was presenting considerable difficulties. Again, we continued the Epinephrine every 3-4 minutes IV push, followed by a minute or two of CPR, than a minute or two of spontaneous cardiac activity after which it again ceased. By 16:36, Dr. Winger had talked to the family and we ceased giving Epinephrine. At 16:37 we ceased bagging. At 16:39 the patient was pronounced dead. The family was present and agreed with the above orders. It is to be noted that the patient was on the ground prior to the ambulance retrieving the patient an unknown length of time. At no point in time did we ever have a pupillary response, no corneal reflexes were noted. The patient did not every exhibit spontaneous respirations and pulse was only maintained with constant Epinephrine and almost constant CPR. As noted, at 16:39 code was called and patient was pronounced deceased.

Diagnoses:
1. Status post ATV accident
2. Unresponsive
3. Subarachnoid hemorrhage
4. Large pneumothorax
5. Multiple rib fractures, left
6. Contusion/hematoma left kidney
7. Aorta & vena cava collapse

Confidential pursuant to KSA 65-4915 and 65-4921 et. Seq.

PL 132

MEADE DISTRICT HOSPITAL
ARTESIAN VALLEY HEALTH SYSTEM
MEADE, KS

CHEST X-RAY REPORT

NAME: ███████
NUMBER: NC
ACCOUNT: 578072
PATIENT TYPE: E.R.

DOB: ███████
ADMIT DATE: 06/09/13
PHYSICIAN: Harris Davis
SERVICE TYPE: E

CHEST X-RAY

Date: 06-09-2013

Chest x-ray at 15:42 shows an endotracheal tube with its tip well above the carina. Extensive subcutaneous emphysema is noted over the left thorax and I suspect there are multiple rib fractures seen on the left side of the chest. It is difficult to exclude any pneumothorax. The heart is not enlarged.

IMPRESSION:

1.   MULTIPLE RIB FRACTURES OF THE LEFT THORAX WITH EXTENSIVE SUBCUTANEOUS EMPHYSEMA PRESENT. I CAN NOT EXCLUDE A PNEUMOTHORAX.
2.   THE ENDOTRACHEAL TUBE IS NOTED WITH ITS TIP WELL ABOVE THE CARINA.

CWF/BLH
D: 6/09/13 20:15
T: 6/10/13 08:36

Electronically reviewed and signed by: Carl W Fieser MD, Radiologist     06/10/13 10:42

Confidential pursuant to KSA 65-4915 and 65-4921 et. Seq.

PL 133

MEADE DISTRICT HOSPITAL
ARTESIAN VALLEY HEALTH SYSTEM
MEADE, KS

CAT SCAN REPORT

NAME: ███████
NUMBER: NC
ACCOUNT: 578072
SERVICE TYPE: E

DOB: ███████
ADMIT DATE: 06/09/13
PHYSICIAN: Harris Davis
PATIENT TYPE: E.R.

**CT CHEST**

Date: 06-09-2013

Postmortem examination. Axial images with sagittal and coronal reconstructions of the chest were performed. There is extensive subcutaneous emphysema around the chest particularly on the left side. There is a large pneumothorax on the left lung with complete collapse of the lung and shift of the mediastinum compatible with a tension pneumothorax. There are bilateral pleural effusions present. Multiple rib fractures are seen on the left thorax. The vertebral bodies are in good alignment.

**IMPRESSION:**

1. BILATERAL PLEURAL EFFUSIONS WITH A LARGE PNEUMOTHORAX ON THE LEFT CHEST WITH SHIFT OF THE MEDIASTINUM TO THE RIGHT COMPATIBLE WITH A TENSION PNEUMOTHORAX. THIS SHIFT OF THE MEDIASTINUM WAS NOT SEEN ON THE CHEST X-RAY WITH THE ENDOTRACHEAL TUBE PRESENT.
2. THERE IS EXTENSIVE SUBCUTANEOUS EMPHYSEMA AND SOME MEDIASTINAL EMPHYSEMA NOTED.
3. MULTIPLE RIB FRACTURES ARE SEEN IN THE LEFT THORAX.

CWF/BLH
D: 6/10/13 14:56
T: 6/10/13 15:20

Electronically reviewed and signed by:  Carl W Fieser MD, Radiologist        06/25/13
09:02

Confidential pursuant
to KSA 65-4915 and
65-4921 et. Seq.