WINGER 00001

SCANNED
RECEIVED
JUL 1 5 2013
KSBHA



# Kansas

## STATE BOARD OF HEALING ARTS
### REPORT OF ADVERSE FINDINGS
Pursuant to K.S.A. 65-28,121 and 65-4923(a)(1) and (a)(2)

This information must be provided to the State Board of Healing Arts within 30 days whenever the privileges of any person licensed to practice the healing arts are terminated, suspended, or restricted, whenever practice privileges are surrendered or limited, or whenever there is a finding of standards of care not met, with injury occurring or reasonably probable; or possible grounds for disciplinary action. **Mail to:  Complaint Coordinator, Kansas State Board of Healing Arts, 800 SW Jackson, Lower Level-Suite A, Topeka KS  66612; Telephone (785) 296-7413**

Reporting Facility: Meade District Hospital       Date: 07/09/2013

Reporting Person: Jane Chance, RN, Risk Manager       Telephone No.: 873-5542
<span style="font-size:small">Include Name / Title</span>

Address:  PO Box 820 510 East Carthage Meade Kansas
<span style="font-size:small">Include Street, City, State and Zip</span>

Date of Incident: 06/09/2013    Patient Name: [redacted]

Date of Birth: [redacted]   SSN: [redacted]   Medical Record No.: Acct# 578068 MR# 26711
<span style="font-size:small">Last 4 Only</span>

Location of Incident: Hospital Acute Inpatient

Licensee Involved: Raymond Winger, MD #0417959
<span style="font-size:small">Include Name and License Number (Use a separate form for each licensee involved.)</span>

Description of Incident:

See attached summary

Description of Sanction, Corrective or Disciplinary Action:

See attached summary

Has the internal review process been completed?

See attached summary

Additional records relevant to this incident (other treatment, coroner, external consultant, etc.):

Kansas Medical Center Report - Gerasimos Stavens, MD

(Use Additional Pages if Needed)                              (KSBHA 12/2011)

**EXHIBIT**

**C**

WINGER 00002

**Medical Record # 26711**          **Account # 578068**

On 06/09/2013 at 0455 a 91 year old female presented to the ER with complaints of nausea times two days, increased weakness and feeling faint. The patient was very lethargic and slow to respond, at times appearing confused. Vital signs were BP 134/45, Pulse 38, Respirations 20, Temp 96.7 axillary and SaO2 96% on room air. Patient was seen by a PA in the ER and admitted to Acute Care under care of Dr. Winger with diagnosis of hyperkalemia, dehydration and gastroenteritis. Bradycardia had been noted in the initial exam. Kayexalate 15 gm was given at 0556. Routine medications were ordered: ASA, Amlodipine, Digoxin, Levoxyl, Ziac, Zofran prn and Lortab prn. Chem 7 was ordered to be repeated in the evening. Chem 7 and CBC in the am.

0720    Patient's HR was 32. Sinus bradycardia noted and patient was asymptomatic. Dr. Winger was notified and he asked if the PA had been notified. Dr. Winger was informed that if there is an issue in the hospital with a patient, the physician is notified for orders not the PA. Order for Atropine 0.4mg was received and given.

0800    Dr. Winger was notified that HR was now in the 50-60 range. No orders received.

0810    PA was in the hospital awaiting another ER and nurse informed him that this patients HR was in low 30's. Asked PA to call Dr. Winger to start the process of getting cardiologist consult. The PA called Dr. Winger regarding need for cardiac consult. States he will be in to make a plan at 0900.

0905    Dr Winger here to review patients chart and orders EKG.

0941    Nurse asked if he would like to contact a cardiologist but he declined saying he was going to have to take a time out to deal with movers as he was moving into a house. Orders Atropine 0.5mg. Nurse stated that Atropine comes in 0.4mg IV. States do you give 0.8mg or 1.2mg. Nurse told Dr. Winger that 0.4mg is to be given. Order received for Atropine 0.4mg IV times one.

**Confidential pursuant to KSA 65-4915 and 65-4921 et. Seq.**

WINGER 00003

0955   HR in 40's Atropine 0.4 mg was given.

1015   Dr Winger here

1102   Orders received to hold digoxin and recheck level in morning. Draw CBC, CMP, HgbA1C, serum protein phoresis, Ferritin, TSH and Free T4, hold BP medications, complete liver and spleen scan, daily weight, cardiac monitor, intake and output and not wake patient for night vital signs. Dr. Winger was then told that all cardiac patients and those on the floor on cardiac monitor receive VS every 4 hours. He was then asked if he was going to contact the cardiologist. Dr. Winger asked why to which the nurse responded because she is a cardiac patient and should have a consult. Dr. Winger asked why do you think she is a cardiac patient? The nurse responded because she has a very low HR. Request was again made for cardiology consult and he responded that he would call him after noon.

1115   Patient was found standing by bedside. IV pulled, monitor leads and gown off. IV restarted.

1243   The nurse called cardiac labs to Dr. Winger. Notified him of previous lab levels and current levels. Increase of troponin, myoglobin, BUN, creatinine and that potassium was 4.9. No further orders received.

1435   The nurse called Dr. Winger to report increase in Troponin from 0.03 to 0.11 and CKMB was at 208 and Myoglobin increase. Informed him that patient is beginning to pick at things and have hollow gaze. He stated he would be down in a little bit.

1640   Dr. Winger notified that Troponin increased to 0.32 with increase of myoglobin and CKMB.

1651   Dr. Winger decreased IVF to 50 ml/hr.

1659   Dr. Winger speaking with cardiologist and states Dr. Stavens requests she stay here and continue course of treatment. HR in 40's.

1826   Dr. Winger was notified of Troponin at 0.57, CKMB critically high at 8.5 and Myoglobin at 240. He states that is fine. Nurse asked if he was going

Confidential pursuant to KSA 65-4915 and 65-4921 et. Seq.

WINGER 00004

Page 3 of 7

to let the patient die and replied he did not think she was dying. Dr. Winger states that Dr. Stavens and he did not think so. Nurse called APRN Case Manager and was advised to call second physician who was out of town and discuss the plan of care with him.

1830 Dr. Feldmeyer calls back. History since admission was given. Dr. Feldmeyer assumed care. Orders were received to start Heparin at 1000 units/hour and give 5000 unit bolus. Labs were ordered to be rechecked at 2000. He stated he would come see patient as soon as he arrived in town as he was enroute home. Orders were carried out.

1900 Dr. Winger was notified that Dr. Feldmeyer is assuming care.

2032 Troponin 1.05, CKMG 9.5 and Myoglobin 184. Dr. Feldmeyer called. EKG ordered and told to continue Heparin. Stated he was 20 miles from hospital and would be there.

2050 Dr. Feldmeyer in to see patient.

2106 Dr. Feldmeyer visiting with Dr. Stavens. Transfer arranged and orders received for transfer to Kansas Medical Center. Eagle Med was notified of transfer request.

2112 Orders given to start 3rd IV site and initiate a Nitro drip.

2145 Blood Cross match ordered and not completed at this time for infusion of O+ PRBC. Dr. Feldmeyer ordered to "give the most compatible blood we have." Dr. Feldmeyer signed for consent of non-cross matched blood to be given.

2200 Eagle Med in with patient. Orders given to Eagle Med per Dr. Feldmeyer for Nitro Drip at 7mcg/kg/hr and infuse 1 unit of O+ PRBC.

2220 Patient care turned over to Eagle Med. Patient enroute to Kansas Medical Center in Andover.

Confidential pursuant to KSA 65-4915 and 65-4921 et. Seq.

WINGER 00005

| CK | Troponin | CKMB | Myoglobin | Potassium | Hgb | Dig | Pulse |
|---|---|---|---|---|---|---|---|
| 212 | 0.0 | 1.8 | 178 | 5.6 | 8.3 | 2.13 | 38 |
| | 0.03 | 3.6 | 240 | 4.9 | | | 54 |
| | 0.11 | 8.5 | 184 | | | | 43 |
| | 0.31 | 9.5 | | | | | 42 |
| | 0.57 | | | | | | |
| | 1.05 | | | | | | |

Lab values at Kansas Medical Center in Andover:

| CK | Troponin | CKMB | Myoglobin | Potassium | Hgb | Dig |
|---|---|---|---|---|---|---|
| 388 | 2.5 | 14.7 | | 3.7 | 8.9 | 0.74 |

Initial assessment was acute coronary artery syndrome/non-ST elevation MI. Recommend heart catheterization with possible intervention.

Retrograde left heart catheterization, left ventriculogram and coronary angiogram were done on 6/10/2013.  LAD has diffuse calcific disease 30-40%.  PDA and posteriolateral branch 40-50% narrowing. Good LV function.   Recommendation was for medical management.  Circumflex has diffuse irregularity.

**Issues of Care:**

The chart was sent for outside review through Docs Who Care (DWC). The reviewer noted that there seems to have been significant delay in transferring this patient to the care of a cardiologist.  It is uncertain to the reviewer whether that is truly a reluctance on the part of the cardiologist to have the patient transferred or whether the local physician failed to impress the need for the transfer.  Further both physician and physician assistant seem to fail to recognize the seriousness of the situation in the patient and the fact that she was an active 91 year old.

Confidential pursuant
to KSA 65-4915 and
65-4921 et. Seq.

WINGER 00006

Page 5 of 7

The potential seriousness of the patient's bradycardia seems to have been ignored by the PA and the physician. From the reviewers extensive experience in rural areas he would have made an early decision to transfer the patient to the cardiologist in case the patient went into complete heart block and needed pacing. Once it became clear that the patient had rising cardiac enzyme levels the patient should have been transferred to the cardiologist care. There is nothing gained for the patient by waiting to transfer. It is evident there was considerable frustration on the nurses part that the physician seemed to be ignoring what was being reported. Further it appears that the physician was putting his personal situation above that of the patient. Finally there seems to have been some lack of familiarity in the usage of Atropine.

**Initial Standard of Care:**

In view of the potential of a negative outcome for this patient caused by the delays in the decision to transfer her the standard of care for this patient must be a three.
On 6/20/2013, after return of the review, Medical Staff Risk Management Committee met to consider the reviewer findings. Dr. Winger was given opportunity to present his rationale for treatment to the committee. Dr. Winger stated that there is incidence of elevated Troponin levels with use Digoxin to which he attributed the rise in Troponin. Occurrence rate of such incidence was less than 1%. He requested that he be given the opportunity to provide written response to DWC. All agreed. Dr. Winger stated at committee meeting that he had spoken to another physician who had agreed to do a review.

Following the meeting, the Risk Manager told Dr. Winger that a reviewer had been contracted and that it was not following the process in place to seek a review "on his own" without notification of Risk Management and permission of Medical Records. He said initially he called an area hospital Medical Staff Secretary to request a peer review. The physician did not agree to doing the review and told Dr. Winger he should contact KFMC. Dr. Winger said KFMC was very expensive. At this time the Risk Manager told

Confidential pursuant to KSA 65-4915 and 65-4921 et. Seq.

WINGER 00007

Page 6 of 7

Dr. Winger he could provide his response to DWC and that would complete the review process. He said he could not get that done until 6/24/2013.

On 6-24-2013 Dr Winger informed me that he had sent everything he had to a physician in Liberal. He stated that in talking with the physician on the phone, he thought the letter would come back that the care was appropriate and if that was the case there would be no need to write a response to DWC.

The review solicited by Dr. Winger was received back on 7-1-2013. Dr. Winger's comments to the reviewer were as follows:
"There was a concern that I did not respond to the cardiac enzymes of the following patient. ███████ 92 years came in to the hospital with weakness, lethargy and nausea (Digoxin Toxicity). She had no chest pain and no shortness of breath or distress. She had a junctional rhythm with acceptable BP. I obtained a Dig level (2.13) and cardiac enzymes. I called the cardiologist, Dr. Stavens twice, initially with the initial presentation as his group had treated Ruth and was familiar with her, and later I call Dr. Stavens again after the dig level and cardiac enzymes were back. I followed his instruction which were that he would only recommend transport if he could do an intervention that was warranted. He said if we were to transport her he would watch her conservatively as we were doing.

The review letter solicited by Dr. Winger simply stated "After reviewing the documentation that you sent, I find the care provided was appropriate. If any other details are needed I will be glad to respond."

**Corrective Action:** On 6-10-2013 Dr. Winger was temporarily suspended from the Emergency Department on-call schedule. On 6-20-2013 Dr. Winger was required to complete the Advance Trauma Life Support course.

Confidential pursuant to KSA 65-4915 and 65-4921 et. Seq.

WINGER 00008

Page 7 of 7

**Final Standard of Care:** On 7-2-2013, Medical Staff Risk Management Committee met to again discuss the incident. Dr. Winger was allowed opportunity to discuss the incident. He discussed the relation of elevated Troponin to Digoxin toxicity and said he was following the direction of Dr. Stavens. Attention was brought to the fact that the outside review did not address the issues in question by the DWC review. Dr. Winger was then excused from the meeting.

Again on 7-2-2013, the Medical Staff Risk Management Committee met for final determination of standard of care. The committee agreed with the initial reviewer assignment of standard of care three. Rationale for determination was non treatment of a Non ST elevation MI. The patient was not treated for an MI or possible coronary artery thrombosis or anything else that would have caused harm such as anemia. The reviewer felt the MI should be treated first and all other problems such as anemia and Digoxin toxicity secondly. The incidence of elevated Troponin levels with Digoxin toxicity is negligible which was the basis for Dr. Winger's non treatment of the elevated Troponin. Decision was then made to ask for resignation or terminate with cause.

On 7-2-2013, the CEO met with Dr. Winger to inform him of findings and gave the option of termination with cause or resignation. Dr. Winger said he would make his decision by 7-5- 2013.

On 7-5-2013, Dr. Winger submitted his letter of resignation.

On 7-8-2013, a letter was mailed to Dr. Winger stating the CEO's refusal of terms for resignation and Dr. Winger was terminated with cause for failure to practice his profession at a standard that is consistent with the standards of care required of physicians in the community.

_Janel Chance_          _7-9-13_

Risk Manager          Date

Confidential pursuant to KSA 65-4915 and 65-4921 et. Seq.

WINGER 00103



**SCANNED**

# Kansas

RECEIVED

JUL 1 5 2013

KSBHA

## STATE BOARD OF HEALING ARTS
### REPORT OF ADVERSE FINDINGS
Pursuant to K.S.A. 65-28,121 and 65-4923(a)(1) and (a)(2)

This information must be provided to the State Board of Healing Arts within 30 days whenever the privileges of any person licensed to practice the healing arts are terminated, suspended, or restricted, whenever practice privileges are surrendered or limited, or whenever there is a finding of standards of care not met, with injury occurring or reasonably probable; or possible grounds for disciplinary action. **Mail to:  Complaint Coordinator, Kansas State Board of Healing Arts, 800 SW Jackson, Lower Level-Suite A, Topeka KS  66612; Telephone (785) 296-7413**

Reporting Facility: Meade District Hospital          Date: 07/09/2013

Reporting Person: Jane Chance, RN, Risk Manager     Telephone No.: 873-5542
*Include Name / Title*

Address:  PO Box 820 510 East Carthage Meade Kansas
*Include Street, City, State and Zip*

Date of Incident: 06/10/2013   Patient Name: ▮▮▮▮▮▮▮

Date of Birth: ▮▮▮▮   SSN: ▮▮▮▮   Medical Record No.: 578072
*Last 4 Only*

Location of Incident: Emergency Room

Licensee Involved:  Raymond Winger, MD #0417959
*Include Name and License Number (Use a separate form for each licensee involved.)*

Description of Incident:

See attached summary

Description of Sanction, Corrective or Disciplinary Action:

See attached summary

Has the internal review process been completed?

See attached summary

Additional records relevant to this incident (other treatment, coroner, external consultant, etc.):

Post-mortem CT

(Use Additional Pages if Needed)                    (KSBHA 12/2011)

WINGER 00104

**Medical Record 578072**

On 06/09/2013 at 1525 a 66 year old male arrived in the ER by ambulance with injuries sustained in an ATV accident. The patient was found in the field with the ATV on top of his chest and head. Patient arrived in the ER with ET tube and IV in place. CPR was in progress. Epinephrine was administered to resume the heart rate. During transport he exhibited nonresponsive behavior. Patient was on spine board. The above named licensee and a PA were present with nursing staff when the patient arrived. The patient arrived with multiple unknown traumatic injuries and exhibited distal mottling, pupils fixed and nonresponsive. C-collar was placed per Dr. Winger request. Second IV line was started. A Foley catheter was inserted with return of 200 ml of frank blood. Patient's abdomen was distended with diminished bilateral breath sounds.

1532    Epinephrine 1mg was given IVP.   Heart rate (HR) 93 BP 59/26.

1537    Atropine 0.4mg IVP  HR  78

1542    Chest x-ray obtained.  Impression was "Multiple rib fractures of the left thorax with extensive subcutaneous emphysema present.  I can not exclude a pneumothorax.  The endotracheal tube is noted with its tip well above the carina."

1545    Dr. Winger talked to Wesley Trauma Center regarding patient transport

1547    BP 58/28

1549    Epinephrine 1 mg  IVP

1552    Epinephrine 1mg IVP

1555    BP 228/135 HR 149

1556    BP 187/106

1559    HR 126 SaO2 90% via ambu bag

1600    No heart beat. PEA noted on monitor.   Compressions started

1602    Epinephrine 1mg IVP  Compressions stopped, carotid pulse 140

1603    No pulse. Compression started.  Dr. Winger ordered epinephrine to be given every 3 minutes. Epinephrine 1mg IVP given.  No pulse was noted.

1606    Epinephrine 1mg IVP, CPR in progress.

1608    Eagle Med staff in trauma room for possible transport.  Dr. Winger in waiting room with family asking them if they want to transfer the patient or not. Dr. Winger explains to wife that he needs a DNR signed by her if she decides not to

Confi-------------nt
to F.-- -------- ---.J
65-4821 -------eq.

WINGER 00105

Page 2 of 6

transfer. Dr. Winger told the nurse he would let her talk to the wife. The nurse gave support to the wife who stated "I am so confused. I know he wouldn't want this. I need to call my daughter." Patient's wife called daughter asking her what to do. Wife states "He has a DNR in place." The nurse explained to patient that in trauma or emergency situations that the DNR has no impact. Patient verbalizes understanding and is confused on questions that Dr. Winger is asking her.

1609   Epinephrine 1mg IVP given. No pulse. CPR in progress. Mottling noted to bilateral lower legs, pupils fixed and dilated. Patient is unresponsive.

1612   Epinephrine 1mg IVP given. Wife in room stated "I don't want transport". Eagle Med in room and states "Patient will not be transported anyway if he is not stable." No pulse and no response from patient.

1618   Dr Winger in room giving orders for more epinephrine. Epinephrine 1 mg given IVP. PA discussed calling the code. Dr. Winger holds patient's wife's hand and has her look into his eyes. Dr. Winger was talking to patient's wife asking her "what she wants to do". Patient's wife upset and confused.

1621   PA talking with trauma surgeon on phone

1622   Epinephrine 1mg IVP given. Patient unresponsive and no pulse noted.

1625   Epinephrine 1mg IVP given.

1626   Dr. orders "Keep giving epinephrine every 3 minutes and keep bagging."

1628   Patient's wife at side

1629   Epinephrine 1mg IVP

1631   HR on monitor 148. No carotid pulse.

1632   Epinephrine 1mg IVP given

1633   HR 152 on monitor. No carotid pulse. Family left room.

1635   Epinephrine 1mg given IVP

1636   Dr. told by staff and PA that he needs to make a decision on calling the code

1637   PA gives order for no more bagging.

1638   Wife back in room.

1639   PA called code.   Patient was pronounced dead.

Confidential pursuant
to ... and
C... ... Seq.

WINGER 00106

Page 3 of 6

**Issues of Care:**

Chart was sent for outside review.  The reviewer stated that it appears that the patient suffered life-ending injuries and the post-mortem CT helps confirm that.  The attempts to resuscitate the patient were not well organized without anyone taking clear control and yet the physician seems to be tentative in talking with family and guiding the efforts. First concern is that the patient might have a tension pneumothorax.  He suggested a simple insertion of a 16 gauge needle into the chest would have confirmed this and may have helped with the resuscitation efforts.  A chest tube could have been inserted.  The reviewer saw no indication that this was considered.  In actual fact the massive injuries probably would have taken his life.  However, in some trauma situations treating a tension pneumothorax can be lifesaving.  Another concern is that the code was carried on too long.  There was no benefit if nothing else is being done.  It also appeared that the physician did not deal very compassionately with the wife.

**Initial Standard of Care:**  Standard of care two was assigned by our outside reviewer from Docs Who Care (DWC). The reviewer summarized that the organization of this effort was not what it should have been but in this case it does not appear to have contributed to the bad outcome.

On 6-20-2013, after return of the review, Medical Staff Risk Management committee met to consider the reviewer findings.  Dr. Winger's concern about the review was that on one hand he was being asked to do more (treat potential pneumothorax) and on the other he was asked to do less (call the code).  Dr. Winger was given opportunity to present his rationale for treatment to the committee.  Dr. Winger stated that bagging the patient was treatment for tension pneumothorax.  He requested that he be given the opportunity to provide written response to DWC.  All agreed.  Dr. Winger stated at committee meeting that he had spoken to another physician who had agreed to do a review.

Following the meeting, the Risk Manager told Dr. Winger that a reviewer had been contracted and that it was not following the process in place to seek a review "on his

Confidential pursuant
to KS/.        and
65-4921 et. Seq.

WINGER 00107

Page 4 of 6

own" without notification of Risk Management and permission of Medical Records. He said initially he called an area hospital Medical Staff Secretary to request a peer review. The physician did not agree to doing the review and told Dr. Winger he should contact KFMC. Dr. Winger said that KFMC was very expensive. At this time the Risk Manager told Dr. Winger he could provide his response to DWC and that would complete the review process. He said he could not get that done until 6-24-2013.

On 6-24-2013 Dr. Winger, informed me that he had sent everything he had to a physician in Liberal. He stated that in talking with the physician on the phone, he thought the letter would come back that the care was appropriate and if that was the case there would be no need to write a response to DWC.

The review solicited by Dr. Winger was received back on 7-1-2013.  Dr. Winger's comments to the reviewer were as follows:
"There was concern that I managed a "Code Blue for too long a period of time". The patient, ▮▮▮▮▮▮▮, had an ATV accident and suffered a serious intra-cerebral injury, but much less of injury to his heart. He responded to fluid and epinephrine to maintaining adequate pressure and sinus rhythm. Glascow of 3 , fixed dilated pupils. Eagle Med would not transport him because he wasn't "stable". At this point, I usually find an opportunity to talk with the family and prepare them for a dire outcome. As I was talking to the wife, she said she wanted me to do "everything possible if he has any chance at all". She repeated this a few times. I now recognize that she is the legal representative of ▮▮▮▮▮▮, and I am obliged to follow her wishes. When I was an ER doctor at Irwin Army Hospital, I would transfer him to the ICU under the care of the on call hospitalist. I am at Meade Hospital and we have no such luxury. We continued to give ACLS care and he succumbed in due course.

The letter simply stated "After reviewing the documentation that you sent, I find the care provided was appropriate. If any other details are needed I will be glad to respond."

Confidential pursuant to KSA ▮▮▮▮▮ and 65-4921 et. Seq.

WINGER 00108

**Page 5 of 6**

**Corrective Action:** On 6-10-2013, Dr. Winger was temporarily suspended from the Emergency Department on-call schedule.  On 6-20-2013, the physician was assigned responsibility for completion of the Advance Trauma Life Support Course.

**Final Standard of Care:**  On 7-2-2013, Medical Staff Risk Management Committee met to again discuss the incident.  Dr. Winger was allowed opportunity to discuss the incident. He discussed the issue of on one hand you want me to do more and on the other hand you want me to do less.  Attention was brought to the fact that the outside review he sought did not address the issues in question by the DWC review.  Dr. Winger was then excused from the meeting.

Again on 7-2-2013, the Medical Staff Risk Management Committee met for final determination of standard of care.    The patient presented initially with glaringly visible subcutaneous emphysema and tension pneumothorax which was unrecognized and untreated.  The chest x-ray report stated "extensive subcutaneous emphysema present" and "cannot exclude pneumothorax".  He did not treat priorities in order.  The immediate cause of death was left untreated.  In dealing with the family, he gave no assessment of the problems.  His question to them was "what do you want to do?"  Dr. Winger did not bring understanding, closure and comfort to the family.  He did not make the decision to call the code.  He did not lead or make any treatment decisions or respond to the critical needs of this patient.  Therefore due to the potential for injury or death from unrecognized and untreated tension pneumothorax, the final standard of care was determined to be three.   Decision was then made to ask for resignation or terminate with cause.

On 7-2-2013, the CEO met with Dr. Winger to inform him of findings and gave the option of termination with cause or resignation.  Dr. Winger said he would make his decision by 7-5-2013.

On 7-5-2013, Dr. Winger submitted his letter of resignation.

Confidential pursuant to KSA 65-4915 and 65-4921 et. Seq.

WINGER 00109

Page 6 of 6

On 7-8-2013, a letter was mailed to Dr. Winger stating the CEO's refusal of terms for resignation and Dr. Winger was terminated with cause for failure to practice his profession at a standard that is consistent with the standards of care required of physicians in the community.

_Jane Chance RN_                    _7-9-13_
Risk Manager                        Date

**Confidential pursuant**
to K.S.A. 65-4915 and
65-4921 et. Seq.