**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **RAYMOND WINGER M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 13-cv-1428-JTM/GLR** |
| | ) | |
| **MEADE DISTRICT HOSPITAL,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM**
**IN OPPOSITION TO SUMMARY JUDGMENT**

The Hospital's Motion for Summary Judgment confirms the central facts at the heart of Dr. Winger's claims:

- Dr. Winger had an employment contract with a one-year term;

- The Hospital terminated Dr. Winger's contract "for cause";

- The Hospital reported Dr. Winger to the Kansas Board of Healing Arts and the National Practitioner's Data Bank; and yet

- The Hospital never provided Dr. Winger with a due process hearing.

Despite these admitted facts, the Hospital contends it is entitled to summary judgment. On the contrary, the above admitted facts demonstrate that the Hospital has violated Dr. Winger's property and liberty rights by failing to provide him due process.

**RESPONSE TO ALLEGED UNCONTROVERTED FACTS**

1. Admitted. The contract, to which the Hospital cites, also provides for a one year term of employment. Winger Exhibit 16; Winger Depo., p. 149.

1

2.  Admitted.  The contract provided that the contract could be terminated "for cause" and this quoted language was a part of the definition of a for cause termination. Winger Exhibit 16, paragraph 1; Winger Depo., p. 149.

3.  Admitted.

4.  Admitted.

5.  Controverted.  Dr. Winger clarified his testimony later, after defense counsel gave him the opportunity to review how the bylaws define the different types of privileges. He testified that he was granted "provisional" privileges rather than "temporary" privileges, as those terms are defined under the bylaws.  The transcript reads:

> (THEREUPON, Defendant's Deposition Exhibit No 17 was marked for identification.)
> BY MR. KANAGA:
> Q.  And these are the medical staff bylaws we were discussing earlier. And if you'll turn with me to page, the page labeled 386.  And under provisional status section F, in that first paragraph it mentions that individuals who are granted a privilege for the first time shall be in a provisional status.  Members shall remain in provisional status for a minimum period of 12 months and may remain for a maximum of 24 months.  Is that correct?
> A.  That's – yes.
> Q.  Okay.  So at the time these incidents took place and at the time your employment was terminated you were still on a provisional status, correct?
> A.  Correct.
>
> Winger Depo., p. 136.

Dr. Winger confirmed this again later in the deposition. Winger Depo., pp.  149-151.

See also Plaintiff's additional facts A, B and C, below.

6.  Controverted.  See the response to paragraph 5, above.

7.  Admitted in part; controverted in part.  To the extent that the Hospital is attempting to imply from this statement of fact that Dr. Winger was somehow not an active member

of the medical staff, it is controverted.  The contract specifically provides that Dr.

Winger was a member of the active staff. Winger Exhibit 16, paragraph 2G; Winger

Depo., p. 149.

8.  Controverted.  See the response to paragraph 5, above.

9.  Admitted.

10. Admitted.

11. Admitted in part; controverted in part.  Admitted that there were reports of concern

by nursing staff about Dr. Winger's care.  Denied that the reports by nursing staff

may fairly be described as a concern about "substandard" care.  For example, some of

the concerns were that he was "disorganized" in the ER, stepped out of the ER at a

moment the nurse thought inappropriate, let a Code Blue go on too long, and was not

compassionate enough to a patient's wife.  Winger depo, p. 133.

12. Admitted.

13. Admitted.

14. Admitted in part, Controverted in part.  Admitted that there was a meeting on June

20, 2013.  Controverted that Dr. Winger testified that the purpose of the meeting was

"to provide him an opportunity to explain his rationale for the treatment he provided."

Further, Dr. Dr. Winger testified he had not received a copy of the Docs Who Care

letters prior to the meeting.  Winger depo., p. 98:11-12.

15. Admitted in part; controverted in part.   Admitted that Risk Management agreed to

allow Dr. Winger to submit something to DWC. Controverted that this constituted

part of the "peer review process."  As explained below, the peer review process under

the bylaws requires a hearing and Dr. Winger was not given a hearing. See
paragraphs 50 to 61, below.

16. Admitted.

17. Admitted in part; controverted in part.  After Dr. Winger had an opportunity to review
the letters by Docs Who Care and learned they had already completed their review
and reached a conclusion, he decided he should to get an opinion from another
physician.  Winger depo., pp. 100-101.

18. Admitted.

19. Admitted in part; controverted in part.  To the extent that the Hospital implies that
this is the entire reason Dr. Winger chose to get a letter from Dr. Wiley, it is
inaccurate.  After Dr. Winger had an opportunity to review the letters by Docs Who
Care and learned they had already completed their review and reached a conclusion,
he decided he should to get an opinion from another physician.  Winger depo., pp.
100-101.

20.  Admitted that in order for Dr. Winger to get an opinion form another doctor, it was
necessary to provide that doctor with patient files.

21. Admitted.

22. Admitted in part; controverted in part.  Admitted that Dr. Winger did not ask for, and
the Hospital did not provide, authority for Dr. Winger to share patient information
before he produced it.  Controverted that the Hospital never authorized this.  The
Hospital did not mention this as a basis for its termination of Dr. Winger.  Winger
Exhibit 13.  Thus, a jury could infer that the Hospital had implicitly authorized it or
subsequently ratified it.

23. Admitted.

24. Controverted.  Dr. Winger testified he did not believe that he had breached the confidentiality agreement. Winger Depo., pp. 115:12 - 116:8.

25. Admitted.

26. Controverted.  Dr. Wiley referred to "the documents that you sent."  Dr. Winger provided those documents to the Risk Management committee.  Winger Declaration, paragraph 6.

27. Admitted.

28. Admitted.

29. Admitted in part; controverted in part.  Dr. Wiley's letter did not make any specific reference to the points raised by Doctors Who Care.  To the extent that this is all the Hospital's means by saying Dr. Wiley's letter "did not provide any response to the DWC assessment", then it is admitted.  But if the Hospital means to imply that Dr. Wiley's letter did not contradict the opinions of Doctors Who Care, that is controverted.  Dr. Wiley's letter found Dr. Winger had no deviations from the standard of care. Winger Depo., Ex. 10.; Winger Depo., p. 108

30.  Admitted in part; controverted in part.  Plaintiff admits only that deposition Exhibit 12 says what it says.  To the extent that the Hospital is implying any facts beyond the language of deposition Exhibit 12, it is controverted as unsupported by the record cited by the Hospital.

31. Admitted.

32. Admitted.

33. Admitted.

34. Admitted.  The letter from Mr. Thomas, deposition exhibit 15, stated Dr. Winger was not entitled to any due process or appeal.  Winger Depo., p. 126; Ex. 15.

35.  Admitted in part; controverted in part.  Admitted that the Hospital made the report.  Controverted that the report was "required."  This is not a "fact" which is supported by the cited record – it is more of a mixed question of law and fact.  Further, this is a conclusion that presumes that Dr. Winger was not entitled to due process – which is a central dispute in this case.  Obviously if Dr. Winger was entitled to full due process and it was not provided, then the report not only was not "required" but was unjustified.

36. Admitted.

37. Controverted.  The cited testimony does not support the statement that Dr. Winger "has not claimed that any of the information provided in the reports is false information."  The line of questioning was about why Dr. Winger submitted information to the Kansas Board of Healing Arts.  Dr. Winger did not concede that all information provided by the Hospital was true.  Further, there is evidence that the Board of Healing Arts thinks the Hospital has failed to produce all of the requested records, contrary to the Hospital's affidavit in response to the Board's subpoena. (see paragraph 62, below).

38. Admitted that Dr. Winger testified that a few weeks before his November 2014 deposition he found a temporary position as a doctor.   He had previously applied without success to at least 10 hospitals and clinics.  Winger depo., pp. 17-18.

39. Admitted.

40. Admitted.

41. Admitted; but Dr. Winger testified "I've given the documentation to them." Winger depo., p. 142.

42. Admitted.

43. Admitted.

44. Admitted in part; controverted in part.  Dr. Winger testified the contract states what it states and that he was not told anything further, "one way or the other" about temporary accommodations or payments to family members being covered as "moving expenses."  Winger Depo., p. 144.

## ADDITIONAL FACTS

45. Dr. Winger and the Hospital entered into a "Physician Employment Agreement" dated April 1, 2013 providing that Dr. Winger would be employed for a one-year term beginning on May 6, 2013. Winger Depo. Ex. 16, paragraph 1; Winger depo. p. 149.

46. The Physician Employment Agreement provided that Dr. Winger was hired as a member of the "active staff" at the hospital, stating:  "The Physician will maintain, throughout the term of this Agreement, **status as a member of the Active Medical Staff** of the Hospital in accordance with the bylaws, rules, regulations and protocals of the Hospital and its Medical Staff." (emphasis added).  Winger Depo. Ex. 16, paragraph 2 G; Winger depo. p. 149.

47. "Active Staff" is the highest category of staff.  The Bylaws provide that "[c]andidates for the Active Staff must have served on the Associate Staff for at least one year prior to becoming eligible for advancement to the Active Staff."  Winger Depo. Ex. 17, p. A00426; Winger depo. p. 149.

48. The Bylaws contain Article IV, entitled "Appointment to the Medical Staff".   It provides that "The Governing Body shall make appointments, reappointments, grant clinical privileges or make revocations of appointments to the Medical/Adjunct Staff." It addresses "Initial Appointment" in Section A.   That section begins "Initial appointments to any category of the Medical/Adjunct Staff shall be provisional for a minimum period of one (1) calendar year."   It further provides that "Members on provisional status are accorded all rights to the category to which they have been assigned. Winger Depo. Ex. 17, p. A00395; Winger depo. p. 149.

49. The Medical Staff Bylaws provide that all active staff member begin with "provisional" privileges: "All initial appointees to Active, Courtesy, Consulting and Adjunct Staff, or appointees to the Active, Associate, Courtesy, Consulting, or Adjunct Staff after termination of a prior appointment, and individuals who are granted a privilege for the first time shall be in a provisional status." Winger Depo. Ex. 17, page A00386, Paragraph F; Winger depo. p. 136.

50. The Bylaws provide that an active staff members' provisional status may not be revoked without a hearing process.  They provide: "If deemed necessary to assure appropriate patient care, provisional privileges can be canceled at any time by the Governing Body.  In such a case, the Practitioner shall have the opportunity to exercise the procedural rights as outlined in Article VIII." Winger Depo. Ex. 17, page A00386, Paragraph F; Winger depo. p. 136.

51. The procedural rights under Article VIII are also triggered by the "Corrective Action" Process under Article VII.

a.  Under this procedure, allegations of misconduct are to be investigated.  During the investigation, the CEO has "the authority to suspend all or any portion of the clinical privileges of a Medical /Adjunct Staff member . . . ."  If an investigation is to be conducted the CEO shall notify "the affected practitioner for which an investigation is to be undertaken and the conduct being considered."  Further, although at this stage this is not a full hearing under Article VIII, the practitioner "shall be given an opportunity to provide information to the Committee in a manner and upon such terms, as the committee deems appropriate."  Winger Depo. Ex. 17, page A00411; Winger depo. p. 136.

b.  This informal investigation nevertheless includes the Practitioner's right to explain his side of the story: "If the Practitioner elects to interview during the investigation, the goal shall be to discuss, explain or refute information directly relate to the behavior or actions that lead to the investigation."  The Medical Staff Committee shall recommend actions to the CEO, including the recommended corrective action and whether to seek "outside peer review."  Winger Depo. Ex. 17, page A00412; Winger depo. p. 136.

c.  The Governing Body ultimately decides whether to take an adverse action.  "If the decision of the Governing Body is adverse, the Practitioner shall be entitled to notice of the recommendation by the Chief Executive Officer in accordance with the provisional [sic] of Article VIII and shall otherwise be entitled to all the rights provided in Article VIII of the Bylaws. Winger Depo. Ex. 17, page A00413; Winger depo. p. 136.

52. The procedural rights provided in Article VIII of the Medical Staff Bylaws begin with a right to hearing.  Indeed, Section A is entitled "Right to Hearing."  It provides, in part, that a practitioner who is having his privileges revoked "shall have a right to a hearing before a panel of individuals appointed by the Chief of Staff."  Winger Depo. Ex. 17, page A00418, Paragraph F; Winger depo. p. 136.

53.  The procedures provide for a right to fair notice.  Article VIII sets for the procedural requirements of the hearing in subsection B, entitled "Hearing Requirements".  It requires, among other things, that within 5 days of any "adverse recommendation" by the medical staff committee that the Hospital provide "written notice" to the physician containing (1) a statement of the proposed adverse action; (2) the reason for the adverse action; (3) the time limits within which to request a hearing; and (4) a summary of the rights to a hearing. Winger Depo. Ex. 17, page A00419; Winger depo. p. 136.

54. The procedures provide for a right to an unbiased tribunal composed of other active staff.  Upon timely requesting a hearing, the Chief of Staff "shall appoint a Hearing committee of not less than three (3) members of the Active Staff."  Further, the physician is entitled to a hearing before a "Hearing Officer" who shall be an "attorney at law qualified to preside over quasi-judicial Hearings."  Winger Depo. Ex. 17, page A00419; Winger depo. p. 136.

55. The procedures provide for a right to legal counsel.  Specifically, "[t]he Practitioner requesting the Hearing shall be entitled to be accompanied by an attorney or one other person of the Practitioner's choice."  Winger Depo. Ex. 17, page A00420; Winger depo. p. 136.

56. The procedures further provide for fair notice of the evidence the Governing Body will rely on at the hearing.  The rules provide "The Hospital shall provide the Practitioner and the chair of the panel with a list of the witnesses expected to testify at the Hearing on behalf of the Hospital."   Further, "[p]rior to the Hearing, upon written request, the affected practitioner shall be given a copy of the records of the Medical Staff Committee and if the Governing Body has considered the matter, the records of the Governing Body, which relate to the consideration of the Practitioner's matter." Winger Depo. Ex. 17, page A00420; Winger depo. p. 136.

57. The rules provide that at the hearing, the physician may "call and cross-examine witnesses" and "introduce evidence determined to be relevant by the panel . . ." Winger Depo. Ex. 17, page A00420; Winger depo. p. 136.

58. The rules provide that after the hearing "the affected Practitioner . . . . shall be entitled to submit a written memoranda concerning any issue . . . ."  Winger Depo. Ex. 17, page A00421; Winger depo. p. 136.

59. The rules provide that the panel shall make a written report and recommendation to the Medical Staff Committee or Governing Body . . ." Winger Depo. Ex. 17, page A00421; Winger depo. p. 136.

60. The procedures also provide for an appeal.  Upon request of an appeal, the Chairperson of the Governing Body shall appoint a committee of three board members to consider the appeal.   The appeal review committee may receive and consider additional evidence.  Winger Depo. Ex. 17, page A00422 - 423; Winger depo. p. 136.  Ultimately the appeal is to be considered by the entire Board of Directors.  Id., at A00424.

61. Dr. Winger was terminated without being given notice of the alleged misconduct or any notice of his rights, without being given a hearing at which he could have counsel, call witnesses or challenge evidence, and without having an unbiased tribunal.  Indeed, the termination letter expressly stated Dr. Winger was not entitled to any of the procedural protections in the Bylaws.  Winger Depo., Ex. 15, p. A00184; Winger Depo., p. 125.

62. The Kansas Board of Healing Arts issued subpoenas to the Hospital.  The Hospital responded to those subpoena's indicating it was producing all requested records.  These records do not include notes that Dr. Winger generated as part of his treatment of one of the patients.  Winger Declaration, paragraph 7.  Further, the Board inquired about what appeared to be missing records.  The Hospital has responded that it does not have these records and has not produced them.  Board Documents, attached.

63. Dr. Winger has applied for jobs with numerous hospitals and clinics.  Based on his interviews, it is clear that they are aware of the revocation of his privileges and the report to the National Practitioner Data Bank. Winger Declaration, paragraph 8.

## ARGUMENT

**1. The 1983 Claims.**

The Hospital violated Dr. Winger's constitutional rights by (1) depriving him of his contractually based property interest in his employment without due process of law and for (2) depriving him of his full right to free association by reporting to the Kansas Board of Healing Arts an alleged deviation from the standard of care without having provided him with due process.

The Hospital has challenged Dr. Winger's Section 1983 claims arguing that he had no property interest or free association interest at stake in this case.  Neither of these challenges is correct.

### A.  *Dr. Winger Had a Property Interest in His Contract.*

#### 1.  *Dr. Winger Had a One-Year Employment Contract Terminable only For Cause or with 60 Days' Notice.*

The Hospital's argument that Dr. Winger had no property interest in his employment fails for one primary reason: Dr. Winger and the Hospital signed an employment contract with a one year term that could only be terminated "for cause".

Dr. Winger and the Hospital entered into a "Physician Employment Agreement" dated April 1, 2013 providing that Dr. Winger would be employed for a one-year term beginning on May 6, 2013. Winger Depo. Ex. 16, paragraph 1; Winger depo. p. 149.  Section 4 of the contract was entitled "Termination."  It specifically provided that it could be terminated "without cause" only on 60 days advance notice.  *Id.,* subsection 4A.  Otherwise, termination required good cause: "This Agreement may be terminated immediately at any time by the Hospital for 'good cause.'"  *Id.,* subsection 4B.  The contract defined 11 types of "good cause."  *Id.*

Significantly, the "for cause" provision was mutual.  Paragraph 4C provided that the Physician could terminate without notice only for "good cause" as well.  Winger Depo. Ex. 16, paragraph 4C; Winger depo. p. 149.

#### 2.  *The Hospital Terminated Dr. Winger "For Cause."*

The Hospital terminated Dr. Winger by letter dated July 1, 2013, signed by CEO Michael Thomas.  That letter stated:

I am hereby terminating said contract pursuant to paragraph 4.   Termination, subparagraph B.  **With Cause**, item ix, and I recite:

> ix.  failure of the Physician to practice his profession at a standard that is consistent with the standard of care required of physicians in the community.

Winger Depo., Ex. 15, p. A00184; Winger  Depo., p. 125.

This determination was made after an investigation, but without any hearing.  Dr. Winger was never given notice of any procedural rights, nor did he ever get a hearing at which he could present evidence and rebut evidence.  The termination letter explained why this occurred, stating that because he was granted "temporary" privileges Dr. Winger was not entitled to any of the procedural protections in the Bylaws and could not appeal.  Winger Depo., Ex. 15, p. A00184; Winger  Depo., p. 125.

The Hospital's arguments based on the bylaws misses the point.  Dr. Winger is entitled to due process because of his property right based on his contract.  As explained below, because Dr. Winger had a contract with a term that could be terminated immediately only for cause, he had a property right as a matter of Kansas law which cannot be taken by any government actor without due process.  Let us turn to this point of Kansas law next.

### 3. *Kansas Law Recognizes a Property Interest in Employment Contracts for a Term that are Terminate "For Cause."*

Although Section 1983 is a federal statute giving teeth to the protections in the United States Constitution, the question of whether a public employee has a sufficient interest in their employment to qualify as a "property" interest is a matter of *state* law.  *Bishop v. Wood*, 426 U.S. 564 (1972).   It is well understood that a public employee who can legally be terminated "without cause" does not have any property interest in the employment.  *Lentz v. Dewey*, 64 F.3d 547, 551

14

(10th Cir. 1995).  But if the public employee's legal protections in the employment are sufficient to create a property interest, then a termination of that employment requires due process.  *Id.*

The general rule in Kansas is that where two parties enter into an employment relationship without defining any durational period, the employment is terminable at the will of either party without any good cause or notice.  *Morriss v. Coleman Co.,* 241 Kan. 501, 510, 738 P.2d 841 (1987).  The employment at-will doctrine is said to be reinforced by the principle of mutuality of obligations.  *Morriss*, 241 Kan. at 510.  If the employee is free to quit at any time, then the employer must be free to dismiss at any time.  *Id.*

But where the employment relationship has a specific duration, the mutuality concern is absent and the presumption is that good cause is required for the employer to terminate the employment.  Thus, for example, a teacher with a contract of employment for a particular school term is not an "at will" employee such that the employer must have "good cause" to terminate. *Wertz v. Southern Cloud United School Dist.,* 218 Kan. 25, 30, 542 P.2d 339 (1975).

The Kansas Supreme Court has explained that a termination of a public employee "for cause" requires substantial due process.  In *Gorham v. City of Kansas City,* 225 Kan. 369, 374, 590 P.2d 1051 (1979), the Kansas Supreme Court held that two police officers who were subject to a memorandum of understanding such that they could be terminated only "for cause" had a property right in the employment.  In explaining this holding, the Court quoted one of its prior decisions about the meaning of "good cause":

> The word 'cause' . . . means what is sometimes spoken of as legal cause, or just cause, a substantial, reasonable or just cause, related to matters of a substantial nature pertaining to duties or obligations imposed. (Citations omitted.)
> The word carries with it the necessity of an appropriate charge, or accusation, notice of the charge with an opportunity to present a defense, and a fair hearing before an official or tribunal authorized to conduct such a hearing, and a decision on the merits of the charge.

225 Kan. At 473-74, *quoting Wichita Council v. Security Benefit Ass'n,* 138 Kan. 841, 28 P.2d 976 (1934).  Thus, under the governing Kansas law, a public employee whose employment may be terminated only "for cause" has a right to proper notice of the allegations, an opportunity to present a defense and a "fair hearing before an official or tribunal authorized to conduct such a hearing." *Id.*

It is not surprising, then, that the Tenth Circuit has found that a Kansas public employee with a contract that allows termination only "for cause" has a property interest for purposes of Section 1983:

> In contrast, where the employee is terminable only for cause, the Kansas Supreme Court recognizes the employee has a property interest in continued employment under state law. Under those circumstances, the Constitution requires that some level of due process be afforded in order to effectuate a deprivation of this interest.

*Farthing v. City of Shawnee,, Kan.* 39 F.3d 1131, 1136 (10th Cir. 1994).

Because Dr. Winger's employment contract was terminable only for cause, he therefore had a property interest in his employment at the Hospital.  Thus, it follows that Dr. Winger was entitle to due process.

Before we examine the contours of what due process requires in this context, we should consider the other right at issue to better understand the context.  Let us turn next to Dr. Winger's other legally protected interest – his liberty interest in his professional reputation.

### B.   *As a Physician, Dr. Winger Has a Liberty Interest in Protecting his Professional Reputation.*

The Hospital argues that Dr. Winger's claim to a violation for a liberty interest fails for two reasons: (1) the Hospital is entitled to statutory immunity because Dr. Winger has failed to identify any "false" information in the Hospital's report to the KBHA; and (2) Dr. Winger's allegations about the reports to the KBHA and the National Practitioner Data Bank do not involve a

16

constitutionally protectable liberty interest.  Hospital's Brief, pp. 16-17).  Let us address these arguments in turn.

### 1.  *The Hospital's Immunity Defense Fails.*

The Hospital argues it is entitled to immunity for reporting Dr. Winger to the Kansas Board of Healing Arts, citing 42 U.S.C. 11137(c) which provides immunity for reports "without knowledge of the falsity of the information contained in the report."  The Hospital further cites the Tenth Circuit's opinion in *Brown v. Presbyterian Healthcare Servs.,* 101 F.3d 1324 (10th Cir. 1996) for how the statute is to be applied.

The Tenth Circuit in *Brown*, however, found the defendants were not entitled to immunity and upheld a jury verdict against the defendants.  A careful review of *Brown* demonstrates that procedural anomalies, similar to those present in here, are sufficient to destroy the immunity defense.  Indeed, the procedural deficiencies in the present case go deeper than in *Brown,* because in *Brown* the plaintiff at least was given a full hearing.  Let us turn to a detailed discussion of the *Brown* case.

Dr. Brown was a board certified family practice physician.  Dr. Williams, who was a direct competitor, initiated "informal" peer review on Dr. Brown at Lincoln County Medical Center.  The subject patient records were submitted to an outside reviewer, which resulted in Dr. Brown agreeing to consult with an obstetrics specialist in high-risk cases. 101 F.3d at 1327.  Subsequently, Dr. Williams instituted formal peer review proceedings claiming that Dr. Brown was not abiding by her agreement to consult in high-risk cases.  A panel of three physicians was appointed to conduct a hearing, at which both Dr. Brown and Dr. Williams testified.  The panel reviewed two of Dr. Brown's charts.  The hearing panel found Dr. Brown had breached her agreement and recommended removal of her privileges. 101 F.3d at 1328.  The hospital ultimately revoked the

privileges and submitted a report to state Board of Medical Examiners, coding it "Incompetence/Malpractice/Negligence." *Id.* As required by statute, this was then passed on by the Board of Medical Examiners to the National Practitioner Data Bank. *Id.*

Brown's case went to a jury and she prevailed on various theories. The defendants appealed, claiming the district court erred in failing to rule in their favor on their immunity defense. 101 F.3d 1332. The hospital had raised immunity under 42 U.S.C. § 1112. The *Brown* court found that the evidence demonstrated a reasonable fact question as to the fairness of the procedures used by the hospital, and thus it was not entitled to immunity under that provision. 101 F.3d at 1333.

One of the other defendants raised the immunity defense under 42 U.S.C. §11137(c). The Tenth Circuit found the district court was correct in finding the defense did not apply. There was evidence that the defendant knew had access to the hospital's peer review findings, and that the defendant's report to the National Practitioner Data Bank was false in describing the hospital as having found Dr. Brown to have engaged in negligence and incompetence. 101 F.3d at 1334.

Similar reasoning applies here. Obviously Dr. Winger has demonstrated that he was not provided fair due process procedures. Further, there is evidence that the Hospital has not provided all relevant evidence in its possession to the Board of Healing Arts. One of Dr. Winger's notes is missing. And it appears that the Board is concerned that other pertinent records have not been produced either. Yet the Hospital supplied an affidavit to the Board that it has supplied all of the records in its possession. This is sufficient to raise a question as to the factual accuracy of the reports to the Board of Healing Arts and, ultimately, to the National Practitioner Data Base. A jury could conclude that the hospital did not provide Dr. Winger with a fair process, and has not produced all records, because it knows that the charges against him are false.

### 2. *Dr. Winger Has Raised a Liberty Interest.*

Dr. Winger has alleged that the wrongful termination for cause, the cancelation of his privileges, the report to the KBHA and the report to the National Practitioner Data Bank have harmed his professional reputation as a physician. Indeed, because any revocation of privileges for misconduct requires a report to the Board of Healing Arts, and ultimately the National Data Bank, the Hospital's conclusion regarding the charges implicated not only his contractual rights but also his liberty interest in his professional reputation.

The Hospital argues that Dr. Winger has failed to state a claim because he has failed to show that any third party has even requested information from the National Data Bank. Hospital's Brief, p. 17. Dr. Winger testified at his deposition that he had applied at numerous hospitals and clinics for employment. Although he was not asked about it, many of those clinics have asked Dr. Winger about the loss of privileges and Meade. And one has specifically asked about the report on the National Data Bank. (Winger Declaration).

### 3. *Dr. Winger's Liberty Interest is Substantial and Important.*

Every hospital that receives an application for clinical privileges is required by law to access the reports about that physician with the National Practitioner Data Bank. 45 C.F.R. § 60.10. Thus, it is understood that anyone Dr. Winger applies with will learn of the Hospital's decision.

It is well recognized that a loss of privileges represent a substantial risk of harm to a physician's professional reputation and career. E.g. *Darlak v. Bobear,* 814 F.2d 1055, 1061 (5th Cir. 1987); *Daly v. Sprague*, 675 F.2d 716, 727 (5th Cir. 1982). Especially in situations involving a small community hospital, where there may be no other hospital nearby, the revocation of privileges is likely to prevent a physician from being able to practice his profession. *Kiracofe v. Reid Mem'l Hosp.,* 461 N.E. 2d 1134, 1142 (Ind. Ct. App. 1984) (where hospital is the only one

in town, "the denial of hospital privileges, in many cases, is tantamount to denying a physician the opportunity to practice his or her chosen profession."); *Greissman v. Newcomb Hosp.,* 192 A.2d 817, 824-25 (N.J. 1963) (noting that "Doctors need hospital facilities and a physician practicing in the metropolitan Vineland area will understandably seek them at the Newcomb Hospital.")

Likewise, the reports to the Kansas Board of Healing Arts and the National Data Bank implicate Dr. Winger's liberty right in his professional reputation.  The United States Supreme Court has recognized similar liberty interest in not being "blacklisted".  Consider *Wisconsin v. Constantineau,* 400 U.S. 433 (1971), in which a state statute allowed the police to distribute a list of known "excessive" drinkers to liquor stores.  The Supreme Court found that being blacklisted in this way was "degrading" and that "a person's good name, reputation, honor or integrity" was at stake and that the blacklisted individual was entitled to notice and an opportunity to be heard." *Id.,* at 437.

The Supreme Court has required due process for other similar situations involving actions by the state likely to stigmatize.  In *Goss v. Lopez,* 419 U.S. 565 (1975), the Supreme Court held a high school had violated the rights of a group of students by suspending them without any hearing.  The Court noted that the suspensions implicated the liberty interests of the students because of the potential harm to their reputations:

> The Due Process Clause . . . *forbids arbitrary deprivations of liberty.* 'Where person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' the minimal requirements of the Clause must be satisfied.  School authorities here suspended [the high school students] from school for periods of up to 10 days based on charges of misconduct.  If sustained and recorded, those charges *could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment.*

*Id.*, at 574-75 (emphasis added).

Obviously the listing of Dr. Winger on the National Data Bank implicates reputational concerns even greater than those in *Constantineau* and *Goss.*

The Hospital cites a number of cases for the proposition that a former employer reporting an employee's weaknesses generally does not implicate a liberty interest.  Hospital Brief, pp. 17-18.  These cases are distinguishable, because Dr. Winger was terminated, had his privileges revoked, was reported to the Kansas Board of Healing Arts, and was also reported to the National Practitioner Data Bank.

For example, the Hospital cites *Paul v. Davis,* 424 U.S. 701 (1976).  In *Paul,* the plaintiff had been arrested for shoplifting and was then placed on a registry of "active" shoplifters.  This was done without due process.  The Supreme Court found no violation of the Due Process Clause.  It distinguished *Constantimeau* and *Goss,* finding that this alleged harm to the plaintiff's reputation, in isolation, was insufficient to implicate any liberty interest. *Id.,* at 712.  The court noted that the plaintiff also needed to have had "a right or status previously recognized by state law" that was "distinctly altered or extinguished." *Id.,* at 711.

Unlike the plaintiff in *Paul,* Dr. Winger did have his status changed.  He lost his privileges and was terminated.  Thus, it follows that Dr. Winger's liberty interest required due process before making the report to the Kansas Board of Healing Arts and National Practitioner Data Base.  These affiliated losses of rights bring this case more in line with the kind of affiliated tangible loss of rights at issue in *Constantimeau* (right to buy a legal product) and *Goss* (right to attend public school), and distinguish it from *Paul.*.

The Tenth Circuit has adopted this kind of analysis of a liberty interest.  In *Setliff, M.D. v. Memorial Hospital,* 850 F.2d 1384 (10th Cir. 1988), the plaintiff alleged an investigation into his care had harmed his reputation.  Unlike Dr. Winger, the physician did not have his privileges

revoked and was not terminated.  The physician claimed, however, that his reputation had been harmed just from the investigation.  Quoting the *Paul* case, The Tenth Circuit rejected that this impact on his reputation, apart from any tangible impact on his employment, invoked any liberty interest: "However, as the Supreme Court has stated, injury to one's 'reputation alone, apart from some more tangible interests such as employment,' is not subject to the requirements of due process." *Setliff v. Memorial Hosp.,* 850 F.2d at 1396.  The *Setliff* court then listed various cases illustrating the kinds of interests that can be sufficient, together with stigma, to state a liberty interest, citing *Bailey v. Kirk,* 777 F.2d 567, 579 (10th Cir. 1985) as such an example involving a loss of employment.  *Id.*

Thus, in the Tenth Circuit, where a property interest has been deprived by the same conduct that also created the stigma, both property and liberty interests are implicated.  *Bailey v. Kirk,* 777 F.2d 567, 579 (10th Cir. 1985) indeed is a good example of this.  *Bailey* involved a policeman who, as a classified employee, could only be terminated "for cause."   He alleged he was suspended without pay and without due process.  He was accused of "misappropriation" of police property.  Ultimately, he alleged, he was forced to resign employment due to harassment by his supervisors.  777 F.2d at 570-71.  The Court summed up how the property claim interrelated to the liberty claim:

> In Parts II and III we have held that plaintiff had a protected property interest in continued employment with the City. Plaintiff also alleged sufficient facts on which he may establish a liberty interest concerning his claim of constructive discharge. He averred that he "was accused of misappropriation of police property by the police chief even though there were no grounds for said accusations."

777 F.2d at 580.

The *Bailey* court then expressly distinguished the *Paul* case, noting that "[h]ere, however, plaintiff had *an accompanying loss of employment* . . . ."*Id.,* at n. 18 (emphasis added).  The same distinction applies here – as Dr. Winger was asked to resign but then ultimately fired.

The *Bailey* opinion is significant on another point.  The Tenth Circuit in *Bailey* adopted the view that the "publication" requirement can be met merely by proving the false charges are contained in the files related to the employee and likely would be produced to prospective employers.  777 F.2d 567, 580 n. 18 (10th Cir.1985) (*citing Burris v. Willis Indep. Sch. Dist.*, 713 F.2d 1087, 1092 (5th Cir.1983)).  Other circuits agree: *Hughes v. City of Garland*, 204 F.3d 223, 228 (5th Cir.2000); *Copeland v. Philadelphia Police Dep't,* 840 F.2d 1139, 1148 (3d Cir.1988); *Clark v. Mann*, 562 F.2d 1104, 1116 (8th Cir.1977) (the file "would be available to prospective employers"); *Buxton v. City of Plant City*, 871 F.2d 1037, 1045–46 (11th Cir.1989) ("possibility" that potential employers will see the information); *Brandt v. Bd. of Coop. Educ. Servs.*, 820 F.2d 41, 44–45 (2d Cir.1987) ("[T]he public disclosure requirement has been satisfied where the stigmatizing charges are placed in the discharged employee's personnel file and are likely to be disclosed to prospective employers.").

The *Bailey* opinion is significant on yet one more point.  It is not just false factual "information" that can form the basis of a deprivation of liberty.  The dissemination of false "charges" can also be the basis for such a claim.  Thus, in *Bailey* the false information was the false charge that the policeman had "misappropriated" department property.  777 F.2d at 580.  *See also Russillo v. Scarborough,* 935 F.2d 1167, 1172 (10th Cir. 1991) (dismissing Section 1983 liberty interest claim against former employer because it had not made any false "charges" against the plaintiff).

The Tenth Circuit has held that one's reputation in the medical profession is a protectable liberty interest and that "publication" of negative information need not be widespread to damage that interest.  *Watson v. University of Utah Medical Center*, 75 F.3d 569, 579 (10th Cir. 1996) involved a Section 1983 claim by a nurse against her former employer, a Hospital, and a number

of other employees of the Hospital.  The Tenth Circuit, for example, has held a nurse stated a viable Section 1983 claim where she alleged her supervisors told the "entire nursing staff" that she had "illegally" delivered a baby.

Dr. Winger has shown much more than this.  He has shown that prospective employers already have knowledge of the false and unjustified charges against him, even though he has not been provided any due process to defend himself against them. Indeed, prospective employers are required to access the National Practitioner Data Bank, so all prospective employers will know about these charges for the rest of Dr. Winger's career.

The Hospital argues that Dr. Winger has not claimed any of the "information" in the reports to the Board of Healing Arts or the National Practitioner Data Bank was false.  Hospital Brief, pp. 17-18.  But in doing so, Counsel set this up as a dichotomy between "information" and "opinion". For purposes of the kind of "false" claims that will support a Section 1983 claim, that is a false dichotomy.

Counsel did not ask Dr. Winger whether the charges against him were false.  Clearly Dr. Winger thinks the charges are false – that was his point in submitting a letter from another doctor reaching a different conclusion than Docs Who Care.

In sum, Dr. Winger has established a liberty interest.  In light of the property interest and the liberty interest at stake, let us turn now to the extent of the process that was due.

### C.  Dr. Winger Was Entitled to a Full Due Process Hearing Process.

The determination of the process that is due, given the rights at stake, is a question of federal law.  "While a property right can only be created by state law, once a property right is established, the determination of what process is due before that right can be deprived is a question answered by the federal Constitution" *Kingsford v. Salt Lake City Sch. Dist.*, 247 F.3d 1123, 1128

(10th Cir.2001).   At a minimum, the Supreme Court has stated that "[a]n essential principle of due process is that a deprivation of ... property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' " *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Specifically, "notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (citations omitted).

The extent of the right that is due is context dependent. *Mathews v. Eldridge,* 424 U.S. 319 (1976).   Generally, termination of a public employment property right requires at least a fair hearing. *Goudeau v. Independent School,* 823F.2d 1429, 1431 (10th Cir. 1987).

Here, the context is important.  The Hospital justifies its having reported to the Kansas Board Healing Arts that it found a deviation from the standard of care by pointing out that such a report is a legally required consequence of its decision.   But it is precisely the weight of this consequence that requires greater procedural protections than the Hospital provided to Dr. Winger. And it is the weight of this consequence that explains why the Bylaws provide such robust procedural protections to physician in virtually every other context (according to the Hospital). Regardless of whether the Bylaws, properly interpreted, required that the procedural protections are to be applied to Dr. Winger, the degree of protections they typically provide is significant and indicative of what is at stake whenever a doctor is accused of failing to perform up to the applicable standard of care.  The Bylaws provide a physician accused of wrongdoing with a very detailed procedure of notice of the charges and the evidence to be used against him, notice of his rights to counsel and a hearing, the right to present evidence and rebut evidence, including calling witnesses, an impartial tribunal of other physicians and an appeal procedure. These robust

procedures reflect the significance of the matters at stake for any physician accused of failing to act within the standard of care, including Dr. Winger.

Given this context, as a matter of law Dr. Winger was entitled to a full-blown evidentiary hearing, and all of the appurtenances to such a hearing. This would include fair notice of the allegations and the evidence against him, notice of the procedures to be applied, a right to counsel, a hearing with an opportunity to present and rebut evidence, and a determination by an unbiased tribunal. Dr. Winger was not provided any of this.

### D. The Hospital Failed to Provide Dr. Winger with Due Process.

Dr. Winger was terminated without being given notice of the alleged misconduct or any notice of his rights, without being given a hearing at which he could have counsel, call witnesses or challenge evidence, and without having an unbiased tribunal. Indeed, the termination letter expressly stated Dr. Winger was not entitled to any of the procedural protections in the Bylaws. Winger Depo., Ex. 15, p. A00184; Winger Depo., p. 125.

The Hospital attempts to pass off the investigation as a due process hearing. But there is no question this was no due process hearing. This was a "Corrective Action" investigation under Article VII of the Bylaws. Indeed, it is under Subsection A of the Corrective Action policies that the Medical Staff Committee may recommend the CEO to "seek outside peer review." Winer Depo. Ex. 17, p. A00412. And ultimately, the investigation in Dr. Winger's case resulted in "medical staff" taking "corrective action". Winger Depo., Ex. 12.

But this investigation process is not designed to be a due process hearing. Dr. Winger was never given advance notice of allegations and evidence, there was no hearing at which he was allowed to call witnesses and contradict evidence, and there was no unbiased tribunal that made a

final decision.  Indeed, the Corrective Action procedures emphasize that the investigation is not a substitute for the due process procedure: "The interview shall not constitute a hearing, but shall be *preliminary*, and none of the procedural rights provided in these Bylaws with respect to the hearing shall apply thereto." Winger Depo. Ex. 17, p. A00412 (emphasis added).  The due process hearing rights to not apply at the investigation stage precisely because it is "preliminary".  But after the investigation is over, the physician will then be provided a full due process hearing.  The Corrective Action procedures of Article VII provide that "If the decision of the Governing Body is adverse, the Practitioner shall be entitled to notice of the recommendation by the Chief Executive Officer in accordance with the provisions of Article VIII and shall otherwise be entitled to all of the rights provided in Article VIII of the Bylaws."  Winger Depo. Exhibit 17, p. A00413.

In Dr. Winger's case, he was investigated under the Corrective Action procedure and then was terminated without being given any due process hearing.  In sum, Dr. Winger was given the opportunity to be investigated, but not the opportunity to have a fair hearing.

One final point.  Due process requires informing the parties about the process that is being provided.  "*Revealed* procedures – procedures seen and comprehended – are essential to an individual's effective and comfortable participation in the agency's application of its standards to her." Alfred C. Aman, Jr. & William T. Mayton, Administrative Law § 7.6.1, at 171 (2nd ed. 2001). How can one meaningfully participate in the process if one does not know the procedural rules by which the participation will be governed? In this case, the Hospital had a very detailed set of due process hearing and appeal procedures.  The Hospital admits that it did not apply those procedures, arguing that pursuant to the Bylaws they did not apply to Dr. Winger.   Dr. Winger disagrees, but even if one assumes that they did not apply – the logical next question is "If not those rules, what

procedural rules did apply?"  There are none.  The Hospital never provided Dr. Winger with any procedural notice of any kind – including no notice of any applicable rules.

### E.  The Hospital's Arguments that Due Process Was not Required Are Not Persuasive.

The Hospital argues that the contract required Dr. Winger to maintain his privileges.  Thus, they argue, if he lost his privileges he was in breach.  (Hospital's Brief, p. 14).  Further, the Hospital argues that Dr. Winger had been given only "temporary" privileges, which could be revoked without any due process hearing.

The cases cited by the Hospital are distinguishable.  For example, the Hospital cites L*e Baud v. Frische,* 156 F.3d 1243 (10th Cir. 1998).  Hospital Brief, p. 14.  But unlike Dr. Winger, the physician in that case never claimed to have a written employment agreement for a specific term and providing that he could be terminated only for cause.   As the L*e Baud* court explained, "Plaintiff, however, has failed to provide any evidence in the record as to the length of his appointment . . . ." *Id.,* at *3.  Here Dr. Winger was an employee with a contract providing a one year duration that could be terminated only for cause.

Because the physician in *Le Baud* had no express employment contract, he was left to argue that the employee handbook and bylaws implied a property interest.  The L*e Baud* court discussed whether the bylaws might create a property interest, concluding they did not, primarily because the term "property" cannot be "'defined by the procedures for its deprivation.'" *Id., at 3, quoting Cleveland Bd. Of Educ. v. Loudermill,* 470 U.S. 532, 541 (1985).

The Hospital seems to be arguing that despite Dr. Winger's express contract, under *De Baud* he has no property interest because the bylaws do not create one.  This argument is unpersuasive for three reasons.  First, it ignores that Dr. Winger relies on his written contract, not the bylaws, as the basis for his property interest.  Second, because *De Baud* did not involve a

written contract, the court there had no occasion to rule that the language in the bylaws could somehow undermine the property interest otherwise created by a written contract.  Finally, given that Dr. Winger was a member of Active Staff and had a provisional appointment, under the bylaws he was entitled to the full due process rights established in the bylaws.

The Hospital attempts to defend its actions by emphasizing that Dr. Winger was operating under "temporary" privileges which could be revoked at any time without appeal. There are three problems with this argument.  First, the Hospital has failed to demonstrate that Dr. Winger was operating under "temporary" privileges.  On the contrary, the Employment Contract states that he is a member of Active Staff.  And the Bylaws state that new members of Active Staff operate under "provisional" privileges.   Under the Bylaws, revoking provisional privileges invokes the due process protections of the Bylaws.

Second, the Bylaws specifically provide that "Corrective Actions" trigger the due process procedures of the Bylaws.  Dr. Winger was not terminated because he failed to keep his privileges. He was terminated because an investigation under the "Corrective Action" procedure found he failed to practice within the standard of care.  This triggered the due process protections found in Article VIII.  The "Corrective Action" procedures found in Article VII provide that "If the decision of the Governing Body is adverse, the Practitioner shall be entitled to notice of the recommendation by the Chief Executive Officer in accordance with the provisions of Article VIII and shall otherwise be entitled to all of the rights provided in Article VIII of the Bylaws."  Winger Depo. Exhibit 17, p. A00413.

Finally, if the Hospital attempts to argue that Dr. Winger was terminated for failing to maintain his privileges, and that the Hospital was free to revoke those privileges for any reason because they were "temporary", this argument also fails.  Kansas recognizes the "doctrine of

prevention" as a substantive contract principle.  The doctrine of prevention provides that a party to a contract cannot derive any benefit or escape any liability from his own failure to cause or failure to seek the happening of a condition precedent.  *Morton Buildings, Inc. v. Dep't of Human Res.*, 10 Kan. App. 2d 197, 201, 695 P.2d 450 (1985) (*citing Wallerius v. Hare*, 194 Kan. 408, 399 P.2d 543 (1965)).  A condition precedent is something that must happen or be performed before a right can accrue to enforce the main contract. 10 Kan. App. 2d at 200.  A party who fails to satisfy a condition precedent may avoid the consequences of his failure if it is caused by the conduct of the other party to the agreement.  *Id*.  Thus, "the party who has demanded the condition precedent cannot hinder, delay or prevent its happening *for the purpose of avoiding performance of the contract*."  *Id*. (emphasis in original; *quoting Wallerius*, 194 Kan. at 412).

   As applied here, the Hospital entered into a contract requiring Dr. Winger to maintain his privileges.  Under the doctrine of prevention, the Hospital cannot avoid its obligations under the contract by terminating his privileges without good cause.

### F.  The Hospital Acted Through a Policymaker.

   The Hospital argues that Dr. Winger cannot meet the requirements of *Monell v. New York City Dep. Of Social Services,* 436 U.S. 658, 694 (1978) in showing that the actions taken against Dr. Winger were "attributable to official municipal policy." Hospital's Brief, pp. 18-19.  Thus, the Hospital argues, Dr. Winger's Section 1983 claims should be dismissed.  This is should be rejected because it rests on a misunderstanding of *Monell*.

   The actions at the center of Dr. Winger's claims were not taken by low-level employees. They were the actions of high level personnel.  Indeed, the termination letter came from the CEO and informed Dr. Winger that he would be provided no evidentiary hearing or appeal.  Further, the Hospital has not claimed that the CEO was acting outside his authority; on the contrary, the

Hospital has ratified his actions and rests its defense on the correctness of this decision.  Under circumstances such as these, the actions of the high-level decision-maker constitute "official" policy and meet the requirements of *Monell*.

The Tenth Circuit rejected the kind of argument being advanced by the Hospital *Simmons v. Uintah Health Care Special Serv. Dist.,* 506 F.3d 1281 (2007).  Simmon had been the administrator of a community nursing home.  After a bench trial, the district court found the Board of the defendant had failed to follow its own policies and, thus, that its actions failed to be "official" for purposes of Section 1983.   *Id.,* at 1283.  The Tenth Circuit reversed, holding that "[m]unicipalities are equally answerable for actions undertaken by their final policymakers, whether or not those actions conform to their own preexisting rules."   *Id.*

In reaching this holding, the Tenth Circuit examined *Monell,* which begins with the premise that Section 1983 does not impose respondeat superior liability on municipalities – "they are responsibility only for their *own* actions." *Id.,* at 1284.  Thus, *Monell* held, one way a plaintiff may hold a municipality liable for the actions of an employee is if the employee was following official policy. *Id.,* at 1285.  But, the Tenth Circuit noted, that is not the only way.  The Tenth Circuit noted that in *Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986), the U.S. Supreme Court that a municipality may also act through its decision-makers.  Thus, the Tenth Circuit explained:

> While *Monell* found liability on the basis of an "official policy as the moving force of the constitutional violation," 436 U.S. at 694, 98 S.Ct. 2018, it fell to the Court in *Pembaur* to establish that actions taken by a municipality's final policymakers also represent acts of "official policy" giving rise to municipal liability. *Pembaur*, 475 U.S. at 481, 106 S.Ct. 1292.

506 F.3d at 1285.

The Tenth Circuit explained that this makes sense, and that if follows that a municipality is liable for the actions of its final policy makers regardless of whether there is any policy on the subject or

"even actions by final policymakers taken in defiance of a policy or custom that they themselves adopted." *Id.,* at 1285.  As a consequence, the Tenth Circuit reversed the lower court.  *Id.,* at 1287.

Applying the reasoning of the Tenth Circuit in *Simmons*, it is clear that Dr. Winger has established that the actions taken against him were those of the Hospital and not the unjustified or authorized actions of lower-level employees.  Dr. Winger is not relying on respondeat superior liability.  He seeks to hold the Hospital liable for the actions of its CEO in terminating his employment contract without an evidentiary hearing.  The Hospital has not argued that these actions were outside the scope of authority by the CEO, and even if they were not, the Hospital has certainly ratified them in this case.

**2.  Dr. Winger's Claim for Contract Damages Has Merit.**

The contract between Dr. Winger and the Hospital provided that he would be compensated up to $4,000.00 for moving expenses.  Dr. Winger turned in expenses for a hotel when he first moved to Meade and for certain expenses in moving his property to Meade. The Hospital refused to pay these.  These totaled $1,200.00.  They clearly are covered by the contract and should have been paid.

Submitted by:

WITHERS, GOUGH, PIKE, PFAFF & PETERSON, LLC
O.W. Garvey Building
200 W. Douglas, Suite 1010
Wichita, KS 67202
316.267.1562 (Telephone)
316.303.1018 (Facsimile)


_____s/Donald N. Peterson, II_____
Donald N. Peterson, II, #13805
Sean M. McGivern, #22932
***Attorneys for Plaintiff***

32

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2014, I served the foregoing via electronic

transmission to the following:

Alan L. Rupe #08914
Mark A. Kanaga #25711
Kutak Rock LLP
1605 N. Waterfront Parkway, Suite 150
Wichita, Kansas 67206
Telephone: (316) 609-7900
Facsimile: (316) 630-8021
alan.rupe@kutakrock.com
mark.kanaga@kutakrock.com

_____s/Donald N. Peterson, II_____
Donald N. Peterson, II, #13805
Withers, Gough, Pike, Pfaff & Peterson, LLC
200 W. Douglas, Ste. 1010
Wichita, KS  67202
Phone:  (316) 267-1562
Fax:  (316) 303-1018
E-Mail: dpeterson@withersgough.com
*Attorneys for Plaintiff*