IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Raymond Winger, M.D.,
      Plaintiff,

vs.                       Case No. 13-1428-JTM

Meade District Hospital,
      Defendant.

MEMORANDUM AND ORDER

      This is an action by Dr. Raymond Winger against his former employer, Meade District Hospital, under 42 U.S.C. § 1983, alleging that the Hospital deprived him of due process when it terminated his employment. The Hospital has moved for summary judgment, arguing that Dr. Winger received explicitly limited "temporary privileges" at the hospital, that he was properly terminated following reports of deviations from the standard of care, and that he did not have a right to any particular procedural rights under the terms of the Employment Agreement and Hospital Bylaws. For the reasons provided herein, the court grants the motion.

      Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable

doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985).  The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance.  *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

*Findings of Fact*

The Hospital hired Winger on May 6, 2013, under a Physician Employment Agreement. Under the Agreement, Winger agreed to

> maintain, throughout the term of this Agreement, status as a member of the Active Medical Staff of the Hospital in accordance with the bylaws, rules, regulations and protocols of the Hospital and its Medical Staff.  Failure to maintain membership as an Active Medical Staff shall constitute a breach of this Agreement by the Physician.  While a member, the Physician shall comply with all provisions of the Medical Staff Bylaws, as well as any other Hospital bylaws, rules, regulations and protocols and shall participate in the quality assessment review, utilization reviews, and risk management functions in the Hospital.

The Agreement could be terminated for "failure of the Physician to practice his profession at a standard that is consistent with the standards of care required of physicians in the community." In addition, the Agreement could be terminated through "default by the Physician in the performance of any term, condition, provision or requirement of this Agreement."

In his deposition, Winger explicitly acknowledged that, when he was hired, he was given "temporary privileges based on [the Hospital's CEO's] own personal power."

The plaintiff's Response to the Motion for Summary Judgment attempts to minimize this admission by citing a subsequent passage in his deposition, wherein Winger asserts he was appointed "on a provisional basis" under Section F of the Bylaws.

But Winger's earlier testimony, and the documentary evidence, is not ambiguous. Winger agreed he could only receive temporary privileges because the necessary "particular paperwork … to be done by another institution" had not been completed "because they didn't have the personnel to do that at Meade." Thus, the Hospital's CEO "said that he was granting me temporary privileges based on his own personal power." As a result, given the absence of necessary approval by the Medical Staff Committee, Winger was "operating under those temporary privileges" authorized by the CEO's "own personal power." Winger admits that the CEO did not tell him he would be brought on in a provisional status for a period of time, and later become an active physician with full privileges.

The passage of the Bylaws cited by Winger recognizes a limited, provisional status for physicians given initial privileges, but otherwise does nothing to no modify the explicit May 9, 2013 ,"<u>TEMPORARY PRIVILEGES</u>" agreement (emphasis in original), signed by the CEO and Hospital Chief of Staff, stating that "[w]e hereby grant a temporary privilege to Raymond Winger, MD. This privilege shall endure until the Medical Staff Credentialing Committee can act upon the initial application."

In further response, the plaintiff stresses that Section G of the Employment Agreement indicates that the was "a member of the active staff at the hospital." (Dkt. 26, at 3). This portion of the Agreement provides that "[t]he Physician will maintain, throughout the term of this Agreement, status as a member of the Active Medical Staff of the Hospital in accordance with the bylaws, rules, regulations and protocols of the Hospital and its Medical Staff." But this provision does not somehow negate the explicit recognition in the By-Laws of some staff members as "temporary" staff without due process rights, and the equally explicit designation of Winger as precisely such a "temporary" staff member. Read in full and in context, the Employment Agreement and Hospital Bylaws provide that "provisional" status, with attendant due process rights, takes effect only after an application has been approved by the Medical Staff Committee; it is uncontroverted that the Committee never approved Winger's application. As Winger testified, he knew during this time that he "would be operating under those temporary privileges."

Article III, Paragraph P of the By-Laws expressly provide that the CEO "may, at any time, upon the recommendation of the Chief of Staff, terminate an applicant's or Staff Member's temporary privileges without hearing or appeal." And Article VI, Paragraph D provides:

> Temporary clinical privileges are those privileges granted on a case-by-case basis when there is an important patient care need that warrants an immediate authorization to practice for a limited period of time while the full credentials information is being approved. Temporary privileges may be granted by the CEO with recommendations from the Chief of Staff and only after appropriate license, adequate liability coverage and clinical competence has been established along with the National Practitioner Data Bank having been queried … The CEO or Governing Board Chairman may terminate temporary privileges at any time without eligibility for the procedural rights outlined in Article VIII.

Because his appointment was expressly "interim" or "temporary," Winger was not entitled to the panoply of due process rights which existed for physicians who did not fall into these categories.

It is uncontroverted that several members of the nursing staff reported that Winger's

June 9, 2013 treatment of two patients was substandard. The Hospital's Risk Management Committee called a special meeting the following day and decided to have the treatments reviewed by a third-party peer review organization, Docs Who Care (DWC).

On June 15, 2013, DWC reported to the Hospital a level 2 deviation from the standard of care with one patient, and a level 3 deviation from the standard of care with the second patient.

On June 20, 2013, the Risk Management Committee met with Winger about the treatment. As Winger later testified, the Committee gave him the opportunity "to have input to Docs Who Care, tell them my side." It is uncontroverted, however, Winger never gave any response to DWC. He believed it would not be productive to respond to DWC. Winger decided not to participate in the Hospital's proffered third-party peer review, and instead sent the patients' confidential medical information to Dr. James Wiley (D.O.). Winger testified that he did so because he felt Wiley's letter "would be coming any day and it would be just as good as [DWC]'s letter." In his letter to Wiley, Winger gave confidential patient medical information on the two patients, including patient identifiers (name, etc.) and the patients' health conditions, treatment received, progress notes, and lab reports.

However, on May 7, 2013, Winger had signed a confidentiality statement and acknowledgment as part of his employment, under which he agreed not disclose "[m]edical information, risk management, peer review, medical staff, credentialing, quality assurance and hospital proprietary information … to unauthorized sources outside the [Hospital]."

The Hospital did not authorize Winger to send the two patients' confidential medical information to Dr. Wiley. Dr. Wiley did not provide care to the two patients, nor was Winger's provision of this information to Dr. Wiley part of providing care to the two patients. Dr. Wiley was not an authorized person to receive the confidential medical

information of the Hospital's patients.[1]

On June 25, 2013, Dr. Wiley wrote a brief letter stating that he found the care provided to the two patients was appropriate. Wiley did not provide any indication of what information he reviewed in reaching his conclusion. In fact, the letter from Dr. Wiley was wholly conclusory and did not provide any detail about the patients' cases whatsoever.

On July 2, 2013, the Risk Management Committee held another meeting to consider Winger's response. At that meeting, Winger provided the letter from Dr. Wiley, but did not otherwise provide any response to the DWC assessment.

Winger was then excused from the meeting, and the Hospital Risk Management Committee decided to terminate his temporary practice privileges because Winger had been given the ability to respond to the third party reviewer previously and did not do so. The Risk Management Committee determined that he had failed to provide the standard of care required of physicians in the community.

Michael Thomas, the Hospital CEO, then met with Winger and told him of the decision. Thomas and Winger discussed the possibility of resignation or termination. On July 3, Winger offered his resignation.

---

[1] The plaintiff admits he disclosed confidential patient information but asserts the Hospital waived any right to enforce the confidentiality agreement. By failing to explicitly cite the breach of the confidentiality agreement in the termination notice, Dr. Winger argues that "the Hospital implicitly authorized it or subsequently ratified it." (Dkt. 26, at 4). But the Agreement expressly provides that "[t]he waiver of either party of the breach of any provision of this Agreement shall not operate as, or be construed or deemed to be a waiver of any subsequent breach by either party." Kansas law disfavors waiver of contractual rights, and such waiver will be found only where there is "evidence that manifests, in an unequivocal manner, an intent that is inconsistent with the intent to claim a right." *Razorback Contractors v. Board of Cty. Com'rs*, 43 KanApp.2d 527, 545, 227 P.3d 29 (2010) (citing *Patrons Mut. Ins. Ass'n v. Union Gas System, Inc.*, 250 Kan. 722, 725–26, 830 P.2d 35 (1992)). Further, "an inference of waiver cannot be drawn when the unambiguous language of the contract states a contrary intention." *Idbeis v. Kansas Spine Hosp.*, No. 97,179, 2008 WL 4291443, *5 (Kan. Ct. App. Sept. 19, 2008) (citing *Postal Savings & Loan Ass'n. v. Freel*, 10 Kan.App.2d 286, 287, 698 P.2d 382 (1984)). Here, the plaintiff points to no such unequivocal evidence of waiver, and the contact unambiguously disavows such an intent.

Thomas again met with Winger on July 8, 2013, and gave him a letter terminating his employment, referencing the terms of the Physician Employment Agreement and the Hospital's Medical Staff Bylaws.

On July 16, 2013, the Hospital reported the termination of Winger's temporary practice privileges to the Kansas State Board of Healing Arts.

Winger is continuing to participate in a review of his care by the Board of Healing Arts. He testified he is doing so to rebut the medical opinions of either the Hospital or DWC. However, he has not claimed that any of the information provided in the reports is false information.

The Board of Healing Arts subsequently asked the Hospital to provide additional treatment records. The Hospital responded by stating that it has no such additional records. The plaintiff suggests that the Hospital failed to provide all the records in its possession, based upon a comparison of the number of pages subsequently produced by the Board for his review. But at least some of the information was withheld based upon a claim of privilege. Thus, plaintiff has no evidence, based on his personal knowledge, that the Hospital failed to turn over all the relevant medical records to the Board.

The plaintiff also asserts in his Response that "[b]ased on his interviews" with prospective employers, "it is clear that they are aware of the revocation of his privileges and the report to the National Practitioner Data Bank." This assertion is based on Winger's affidavit, which fails to show the source of this alleged knowledge. Winger averred that

> During interviews, these institutions *often* make clear they are aware of the termination of privileges by Meade. For example, the person at Oakley Hospital specifically asked about the "data bank entries." Others have just indicated that they have some knowledge of the events *without explaining where they obtained it.*

(Emphasis added).

The Employment Agreement between Winger and the Hospital provided that the latter

7

>will pay not to exceed $4,000 for expenses directly attributable to the moving and transportation of Physicians home and office furnishings to Meade, Ks. Hospital will reimburse Physician within 10 days of the submission of qualified receipts.

The Hospital paid approximately $2,800.00 in moving expenses for Winger.

Winger testified that he does not possess any documentation for the additional $1,200 in moving expenses he seeks in this lawsuit, stating, "I've given the documentation to them." Of the additional expenses, $250 represents money paid to his son and his son's friends for allegedly moving his belonging out of storage in Meade, Kansas, to his home. The remainder of the alleged moving expenses are a rental bill from Circle O Motel and RV Park. The Hospital never told Winger that he would be reimbursed for temporary housing as a moving expense or that sums paid to family members would be reimbursed as moving expenses.

*Conclusions of Law*

Winger asserts that the Hospital violated his constitutional right to procedural due process when it revoked his temporary privileges and terminated his employment. In such due process claims, "the deprivation by state action of a constitutionally protected interest ... is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). The plaintiff asserting a claim of procedural due process "must prove two elements: that he possessed a constitutionally protected liberty or property interest such that the due process protections were applicable, and that he was not afforded an appropriate level of process." *Couture v. Board of Educ. of Albuquerque Pub. Sch.*, 535 F.3d 1243, 1256 (10th Cir.2008) (internal quotation marks omitted).

Summary judgment is appropriate as to Dr. Winger's § 1983 due process claim of a deprivation of the property interest in his continued employment. "[A] property interest is determined by whether the terms of employment created by contract, federal statue, city

charter or an employee manual 'create a sufficient expectancy of continued employment to constitute a property interest which must be afforded constitutionally guaranteed due process.'" *Vinyard v. King*, 728 F.2d 428, 432 (10th Cir. 1984) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)) (footnotes and citations omitted). In determining the extent of an asserted property interest in an employment agreement, the court looks to relevant contractual agreements and, if applicable, controlling organization rules and bylaws. *See Le Baud v. Frische*, No. 97-6109, 1998 WL 537504, *3 (10th Cir. Aug. 20, 1998). Here, the documents defining Dr. Winger's rights essentially gave the Hospital discretion to the terminate his privileges, and thus the relationship itself.

The plaintiff in his Response to the Motion for Summary Judgement seeks to exclusively rely on the provision in the Employment Agreement providing that, during his first year of employment, he could be terminated either with cause, or — if given 60 days notice — without cause.[2] In so doing, the plaintiff essentially seeks to divorce the Employment Agreement from the Hospital Bylaws.[3] However, the Agreement itself

---

[2] Otherwise, the plaintiff relies on Kansas state court cases finding a protected property interest in continued employment. The cases are clearly distinguishable, as they are based upon extra-contractual limitations on the discretionary power of an employer. *See Wertz v. Southern Cloud United School Dist.*, 218 Kan. 25, 29, 542 P.2d 339 (1975) (public school teachers hold property interest against the "state and its agencies, including school boards, as distinguished from actions of a private individual in terminating a contract" (citing *Board of Regents v. Roth*, 408 U.S. 564 (1972))); *Gorham v. City of Kansas City*, 225 Kan. 369, 590 P.2d 1051 (1979) (police officer held property interest in light of public employment and collective bargaining agreement). Kansas decisions have not broadly expanded cases such as *Wertz* and *Gorham* to all public employment. *See Prager v. State Dep't of Rev.*, 271 Kan. 1, 41, 20 P.3d 39 (2001) (*Wertz* "is really a contract law case peculiar to a public school teacher"); *Kosik v. Cloud County Comm. Col.*, 250 Kan. 507, 827 P.2d 59, 63 (1992) (citing *Gorham* for proposition that "a public employee ... has a property interest in continued employment" where the right to terminate is restricted by a collective bargaining agreement). Here the plaintiff points to no comparable statutes or collective bargaining limitations on the discretion of the public Hospital defendant.

[3] Thus, plaintiff stresses that he "relies on his written contract, not the bylaws, as the basis for his property interest." (Dkt. 26, at 28). This argument is directly at odds with the Response's otherwise repeated invocation of the Bylaws as a source of various procedural rights for Winger.

9

explicitly incorporates the Bylaws:

> The Physician will maintain, throughout the term of this Agreement, status as a member of the Active Medical Staff of the Hospital in accordance with the bylaws, rules, regulations and protocols of the Hospital and its Medical Staff. Failure to maintain membership as an Active Medical Staff shall constitute a breach of this Agreement by the Physician. While a member, the Physician shall comply with all provisions of the Medical Staff Bylaws, as well as any other Hospital bylaws, rules, regulations and protocols and shall participate in the quality assessment reviews, utilization reviews, and risk management functions in the Hospital.

The Bylaws expressly provide that temporary privileges, such as those held by Winger, could be revoked at any time, without any procedural rights.

In his Response, Winger details the many procedural rights accorded certain physicians under Article VIII of the By-Laws. But plaintiff's argument depends entirely on reading certain portions of the By-Laws in isolation, while simultaneously ignoring other provisions explicitly recognizing the special status of a physician with "temporary privileges." The procedural rights provided under Article VIII are expressly qualified; they are extended to physicians — "[e]xcept as provided herein."

As noted earlier, the By-Laws otherwise expressly recognize the special class of physicians with "[t]emporary clinical privileges," which may be granted "when there is an important patient care need that warrants an immediate authorization to practice for a limited period of time while the full credentials information is being approved." (Art. VI. ¶ D). These temporary privileges arise when an appointment is made prior to the approval of the Medical Staff Committee. Such temporary privileges can be terminated "at any time without eligibility for the procedural rights outlined in Article VIII." (*Id*.) They may be ended "at any time ... without hearing or appeal." (Art. III, § P). It is uncontroverted that Winger knew his application had not been approved by the Medical Staff Committee, and he admitted in his deposition he knew he was given only temporary privileges.

In sum, the court determines that the uncontroverted evidence fails to establish that Winger, as a physician with explicitly temporary privileges, had a right to any particular

10

procedures for review for the revocation of such privileges. In any event, the Hospital accorded Winger the opportunity to respond to the substance of the complaints raised by the nursing staff, but he did not do so directly. The plaintiff's multiple breaches of the Employment Agreement — losing his Hospital privileges,[4] failing to cooperate in the risk assessment investigation, making unauthorized disclosure of confidential patient information — represent breaches of the Agreement justifying the termination.

Summary judgment is also appropriate as to the plaintiff's claim that the Hospital deprived him of a liberty interest in his reputation by reporting the results of its investigation to the state board of medical examiners. First, the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. § 11137(c) (1994), requires such reports within 30 days of an adverse peer-review determination. Accordingly, the Hospital was immune for following through with its HCQIA reporting obligation, absent evidence that the information was false, and the Hospital knew it was false. 42 U.S.C. § 11133(a)(1). *See Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1333 (10th Cir.1996). Here, Dr. Winger has failed to show that the information sent to the board of healing arts was false or incomplete in any material way. Further, he has failed to show that the Hospital knew its report was false. The Hospital is accordingly entitled to immunity under the HCQIA.

---

[4] In his Response, plaintiff argues (Dkt. 26, at 30) that the Hospital cannot invoke the loss of privileges as grounds for termination of the Employment Agreement under the "doctrine of prevention," citing *Morton Buildings v. Dep't of Human Res.*, 10 Kan. App. 2d 197, 201, 695 P.2d 450 (1985)). But the doctrine of prevention, which holds that "a party to a contract cannot derive any benefit or escape any liability from his own failure to cause or failure to seek the happening of a condition precedent," has no application here, because the maintenance of hospital privileges was not a condition *precedent* under the contract. *See Morton*, 10 Kan.App.2d at 200 ("A condition precedent is something that it is agreed must happen or be performed before a right can accrue to enforce the main contract" (citing *Sweet v. Stormont Vail Reg'l Med. Ctr.*, 231 Kan. 604, 610, 647 P.2d 1274 (1982)). Rather, the obligation to maintain privileges was a *continuing* requirement throughout Winger's employment. Further, the doctrine is not applicable if the party allegedly thwarting of the condition is justified in its conduct, or if such action is expressly "permitted by the contract." 10 Kan.App.2d at 201 (citing 5 WILLISTON ON CONTRACTS, § 677A, at 235). As noted earlier, the Employment Agreement and incorporated Hospital Bylaws explicitly provide that the Hospital could revoke temporary privileges at any time, without procedural review.

11

Moreover, the liberty interest claim fails in itself, since such claims require proof that the defendant published false information "impugn[ing] the good name, reputation, honor, or integrity" of the plaintiff, thereby "foreclos[ing] other employment opportunities." *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994).

First, as noted earlier, the plaintiff has failed to show that the report to the state Board of Healing Arts is false in any material way.

Second, while the Hospital report may call into question plaintiff's judgment, it does not directly attack his character. "The Supreme Court has indicated that for statements to be stigmatizing they must rise to such a serious level as to place the employee's good name, reputation, honor, or integrity at stake." *Asbill v. Housing Auth. of Choctaw Nat'n*, 726 F.2d 1499, 1503 (citing *Board of Regents v. Roth*, 408 U.S. 564, 573 (1971)). In *Asbill*, the court contrasted an employer's report that the plaintiff had overstepped his authority with

> a charge of dishonesty or immorality [— which] attach like a "badge of infamy" to an employee—how can they be satisfactorily explained or justified to future employers? Thompson's statements, on the other hand, do not directly attack the character or integrity of Asbill. Rather, they indicate that Asbill disagreed with him on the question of his authority. Considering the circumstances, Asbill could explain this disagreement to future employers in a much more satisfactory manner than a statement denigrating her morality, credibility, or integrity.

*Id.*[5]

Further, the plaintiff has also failed to show that the Hospital "published" the information, other than following through with its obligation to report to the state board

---

[5] The plaintiff cites *Bailey v. Kirk*, 777 F.2d 567, 579 (10th Cir. 1985) as "a good example" of similar stigmatizing conduct. *Bailey*, however, presented the claim of a police chief constructively discharged after being accused of the theft of public property for which "there were no grounds." *Id.* at 580. In finding a potential liberty interest deprivation, the court simply recognized its prior holdings that "accusations of dishonesty, such as are involved in a charge of 'stealing', are sufficiently 'stigmatizing' to implicate a liberty interest." *Id.* at 580 n. 18 (citing *Sipes v. United States*, 744 F.2d 1418, 1422 (10th Cir. 1984); *Walker v. United States*, 744 F.2d 67, 69 (10th Cir. 1983); *Lentsch v. Marshall*, 741 F.2d 301, 304 (10th Cir. 1984). The charges against Dr. Winger do not involve intentional theft, and the evidence before the court establishes that they were not groundless.

of healing arts, which in turn reported the information to the National Practitioner Data Bank. *See* 45 C.F.R. § 60.9(b). Such limited, mandatory reporting is not "publication" sufficient to trigger a liberty interest claim. *See Pfenniger v. Exempla, Inc.*, 116 F.Supp.2d 1184, 1196 (D. Col. 2000) ("information contained in the [National Practitioner] Data Bank is not available to the general public, but is restricted to a limited group of persons and entities," and "communications are not made public ... cannot form the basis of a claim for impairment in one's good name and reputation" (citing *Bishop v. Wood*, 426 U.S. 341, 348 (1976)).

Finally, the plaintiff, who continues to work as a physician, has failed to demonstrate that the Hospital's report has "foreclosed" other employment opportunities. As noted earlier, the plaintiff has no personal knowledge that other employers have refused to consider him because of the report by Meade Hospital to the Kansas State Board of Healing Arts. He alleges vaguely that some employers have "indicated they have some knowledge of the events without explaining where they obtained it." He cites only one instance in which a prospective employer actually asked him about the "data bank entries." But Winger acknowledged in his deposition that the National Practitioner Data Bank contained entries *in addition to* the 2013 Hospital Report. There is no evidence that the Meade Hospital report itself has caused any direct damage to Winger's employment.

Accordingly, there is no showing that the defendant's actions have *foreclosed* plaintiff's chances for employment. As the Tenth Circuit noted in *Asbill*, a report which simply has the tendency to "make an employee 'somewhat less attractive' to employers [is] hardly ... the kind of 'foreclosure of opportunities amounting to a deprivation of liberty.'" 726 F.2d at 1503 (quoting *Board of Regents v. Roth*, 408 U.S. at 574 n. 13).

Citing *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011), the Hospital also argues that it cannot in any event be held liable under § 1983 because the plaintiff has failed to show that the termination was the result of any policy or procedure of the Hospital. The

13

plaintiff argues that such evidence is not necessary, since the decision of the Hospital CEO was effectively the decision of the "final policymaker." *See Simmons v. Uintah Health Care Special Serv. Dist.*, 506 F.3d 1281 (2007).

The court finds that, even if the plaintiff had otherwise demonstrated the existence of a § 1983 claim, the Hospital would be entitled to summary judgment on the grounds cited. As noted earlier, the plaintiff's entire case relies on wholly ignoring the Bylaws' explicit recognition of emergency "temporary privileges" which could be revoked by the CEO without appeal or hearing, ignoring the explicit appointment of Winger as having "<u>TEMPORARY PRIVILEGES</u>," and ignoring Winger's testimony that he knew he was appointed with temporary privileges. That is, plaintiff asks the court to turn a blind eye to these agreements and this evidence and pretend the "temporary privileges" status did not exist; in such event, Winger would have provisional privileges status, and be entitled to the panoply of procedural protections accorded to such staff under Article VIII of the Bylaws. But, even if the court were so inclined, the Bylaws establish that the Hospital CEO is *not* the final decision maker under Article VIII. Rather, the Bylaws provide that the Medical Staff Committee and Governing Board are the final decision-makers as to any "corrective action" and subsequent procedural review. (Bylaws, Art. VII, ¶ A, at 45-47; Art. VIII, ¶ B, at 53-54). Plaintiff has failed to show any adverse action by these entities and has otherwise failed to show any policy or procedures by the Hospital in deprivation of his rights.

Finally, the Hospital argues that summary judgment should be granted as to Winger's claims for moving expenses, and his request for punitive damages. The plaintiff makes no response to the request to strike the punitive damages claim, which is hereby granted as unopposed pursuant to D.Kan.R. 7.4 and for good cause. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981).

In the argument section of the Response, the plaintiff does assert that an additional $1200 in moving expenses are "clearly covered by the contract." (Dkt. 26, at 32). The

assertion is wholly conclusory, however, and the plaintiff makes no attempt to explain how or why the additional "moving" expenses fall under the terms of the contract. The Employment Agreement provides that the Hospital will pay up to $4000 for "expenses directly attributable to the moving and transportation of Physicians home and office furnishings to Meade, KS."

The uncontroverted facts establish that the additional expenses reflect both temporary housing for Winger at the Circle O Motel and RV Park in Meade, and compensation for Winger's son and his friends in subsequently moving various items "out of storage [at a storage facility in Meade] over to the house and put it away." The plaintiff's response to the Hospital's factual assertion states simply that "Dr. Winger testified the contract states what it states." (Dkt. 26, at 7).

The contract provides that the Hospital would compensate the plaintiff for the expense of moving "to Meade." The Employment Agreement does not provide that the Hospital would pay for *lodging* expenses in Meade after Winger's arrival, or for the expense of moving the plaintiff's property *around* or *within* the town.

IT IS ACCORDINGLY ORDERED this 9th day of March, 2015, that the defendant's Motion for Summary Judgment (Dkt. 24) is hereby granted.

                                                   s/ J. Thomas Marten
                                                 J. THOMAS MARTEN, JUDGE