IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RAYMOND WINGER, M.D.,

  Plaintiff,

    vs.        Case No. 13-1428-JTM

MEADE DISTRICT HOSPITAL,

  Defendant.

MEMORANDUM AND ORDER

  The general background of the case was set forth by the court in its Order of March 9, 2015 (Dkt. 29), granting the motion for summary judgment of defendant Meade District Hospital as to the due process claims of plaintiff Dr. Raymond Winger. Winger appealed this decision to the Tenth Circuit, which affirmed in part and reversed in part the decision of this court. The matter is now before the court on the remand of Dr. Winger's claim for deprivation without due process of his property interest in continued employment by the Hospital, and the Hospital's motion for summary judgment on that claim.

  The relevant summary judgment standards are set forth in the court's Order of March 9, 2015, and are incorporated here. The facts establish that several members of the Hospital nursing staff reported that Winger gave substandard care to two patients on June 9, 2013. The following day, the Hospital's Risk Management Committee called a special

meeting and decided the treatments should be reviewed by a third-party peer review organization, Docs Who Care (DWC).

It is uncontroverted that on June 15, 2013, DWC reported to the Hospital a level 2 deviation from the standard of care with one patient, and a level 3 deviation from the standard of care with the second patient.

On June 20, 2013, the Hospital's Risk Management Committee met with Meade. The minutes of the meeting indicate that Winger "asked that he be allowed the opportunity to provide a response to the reviewer." As Winger testified, "I wanted to have input to Docs Who Care, tell them my side." The Hospital determined that the final standard of care would not be decided until after Winger responded.

Winger had seen the DWC letters either at the meeting or before it, and knew that DWC reported two separate situations in which there were deviations from the standard of care.

It is uncontroverted that Winger gave no response to DWC, and declined to participate in the Hospital's proffered third-party peer review. Instead, sometime between June 9 and June 25, 2013, Winger sent a letter to Dr. James Wiley seeking his opinion on whether the treatment of the two patients violated the standard of care. The letter to Dr. Wiley included confidential medical information of the two patients.

On June 25, 2013, Dr. Wiley wrote a brief letter stating that he found the care provided to the two patients was appropriate. The letter merely stated, "After reviewing the documentation that you sent, I find that the care provided was appropriate." The letter

was conclusory and provided no detail about the patients' cases.

On July 2, 2013, the Risk Management Committee held another meeting to consider Winger's response. Winger testified that, during that meeting, he had the chance to speak to the charges:

> Mickey said something to the effect that you have been criticized on taking care of these two patients, what have you got to say. And it was open and I was supposed to defend my care. And then I did that....

Either at the July 2 meeting or before, Winger provided the letter from Dr. Wiley. It is uncontroverted that Winger otherwise gave no response to the DWC assessment.

It is also uncontroverted that Winger "knew that these cases were under review," reviewed the patients' information, and had an opportunity to provide his side of the story. He testified:

> Q. We talked a little bit about when you were told that there would be a meeting coming up and so forth. On the—we looked at an exhibit prior where you had been told on June 20th that the cases were under review, and you were given an opportunity to provide your side of the story to Docs Who Care, correct?
>
> A. Correct.
>
> Q. So at least by that point you knew that these cases were under review, correct?
>
> A. Correct.
>
> Q. Okay. And then you had testified that even prior to that date you had sent the patients' information on to Doctor Wiley, correct?
>
> A. I believe so.
>
> Q. Okay. So then even prior to June 20th you knew these cases were under

>  review and you were putting together your response together through Doctor -- Doctor Wiley, correct?
>
>  A. Correct.

The plaintiff's Response acknowledges that he initially indicated that he would speak with DWC, "but later thought better of it," and "decided there was no point in doing so." (Dkt. 49, at 7). He stresses that he was not told that the July 2 meeting "was his only opportunity to tell his side of things." (*Id*. at 8).

In its prior Order, the court determined that "the Hospital accorded Winger the opportunity to respond to the substance of the complaints raised by the nursing staff, but he did not do so directly." (Dkt. 29, at 11).

It is uncontroverted that on July 2, 2013, the Hospital Risk Management Committee terminated Winger's temporary practice privileges "because he had been given the ability to respond to the third party reviewer previously and did not to do so." (Dkt. 43, ¶ 18, Dkt. 49, at 8) The Risk Management Committee determined that plaintiff had failed to provide the standard of care required of physicians in the community. Later that same day, the Hospital's CEO, Michael Thomas, met with Winger and told him of the Committee's decision. Thomas and Winger discussed the possibility of resignation or termination.

Winger offered his resignation the next day. On July 8, 2013, Thomas again met with Winger and gave him a letter terminating his employment, referencing the Physician Employment Agreement and the Hospital's Medical Staff Bylaws.

In opposing the motion for summary judgment, the defendant stresses his

deposition testimony that he was not given copies of the DWC letters "that I could keep." The defendant notes, however, that immediately after the cited portion of the deposition, Winger testified that "Jane Chance or somebody gave me a copy and then later in the day I— they were—they had disappeared. I don't know where they went to."

Whether or not Winger was given copies of the DWC letters *before* the June 20, 2013 meeting, it is uncontroverted that he was at least shown copies of the letters during that meeting, and had a chance to generally understand the nature of the charges against him. Winger's exposure to the DWC letters was sufficient that he could write to Dr. Wiley to obtain his opinion of the treatment of the two patients prior to the July 2 meeting.

The plaintiff also presents additional facts regarding the substance of the charges in the DWC letters. He alleges they are conclusory (Dkt. 49, at 11-12), and references his 2014 deposition testimony that he had contacted a Wichita cardiologist as to the treatment of one of the patients.[1] He further stresses that he was not given a full evidentiary hearing, including the chance to cross-examine opposing witnesses or to call his own witnesses. (*Id*. at 12). Plaintiff also presents as a number of supposed factual findings (Dkt. 49, ¶¶ 3, 4, 6, 10) which lack any supporting evidence. These requested findings fail to comply with D.Kan.R. 56.1(b)(2) (requiring "references to the record").

In light of the evidentiary record, the court will grant the defendant's motion for

---

[1] However, the information contained in these paragraphs was not presented to the Risk Management Committee. As noted earlier, the plaintiff acknowledges that he "declined to participate in the Hospital's proffered third-party peer review." (Dkt. 49, at 5).

5

summary judgment. The plaintiff's response argues that the process accorded him failed to include the ability to cross examine witnesses against him, citing decisions such as *McClure v. Independent School Dist. No. 16*, 228 F.3d 1205 (10th Cir. 2000), because the charges reflected in the DWC letter "would have a substantial impact on one's future employability." (Dkt. 49, at 13).

However, the plaintiff's liberty interest is no longer a part of the case. The Pretrial Order distinguishes the plaintiff's due process claims, indicating that his liberty interest claim of damage to reputation was based upon post-termination reports to state health agencies, not the termination itself:

> Winger has a protectable property interest in his employment with the Hospital because Winger had an employment contract with the Hospital, which is a local governmental entity created by Kansas statute. Winger's property interest has been damaged by the Hospital's termination of his employment contract without due process.
>
> Winger has a protectable liberty interest in his reputation. Winger's liberty interest has been damaged by reports made by the Hospital to the Kansas Board of Healing Arts on July 09, 2013 and the National Practitioner Data Bank on July 09, 2013 without due process.

(Dkt. 23, at 5).

This court granted summary judgment as to both claims. The court found that Winger had no property interest in his employment. (Dkt. 29, at 10-11). The court also granted summary judgment as to "the plaintiff's claim that the Hospital deprived him of a liberty interest in his reputation." (*Id*. at 11.)

The Tenth Circuit reversed the dismissal of the property interest claim, finding that

"Winger's employment agreement gave him a property interest in sixty days of continued employment." (Dkt. 37, at 4). However, the court affirmed the dismissal of Winger's liberty or reputation interest claim.

> Winger next claims the Hospital infringed on his liberty interest in his professional reputation by reporting his termination to the state board. But as the district court noted, hospitals are required to report the termination of a physician's clinical privileges to the Board of Medical Examiners, see 42 U.S.C. § 11133(a)(1)(A), and may not be held liable for such reports "without knowledge of the falsity of the information contained in [them]," see § 11137(c). Winger identifies only one piece of evidence suggesting the Hospital reported false information: the Hospital claimed it gave the board all the records in its possession, but one of Winger's notes was missing. Because Winger has not demonstrated any facts from which a rational trier of fact could conclude "knowledge of the falsity" of the reports, the district court properly concluded that the Hospital is entitled to summary judgment on this claim.

(*Id.* at 6).

The only remaining issue in the case, therefore, is whether the Hospital deprived Winger of his property interest in sixty days of continued employment without due process. The Tenth Circuit did not explicitly resolve that claim because the issue was not fully briefed, and in light of the possibility that "there may be disputed facts regarding the notice provided, the nature of the meetings, and Winger's opportunity to defend himself." (*Id.* at 5). However, the court set forth the applicable standard for review:

> Having concluded Winger possessed a property interest in continued employment, we ask whether the Hospital deprived him of it without due process. This is a question of federal law. *See Kingsford* [*v. Salt Lake City Sch. Dist.*], 247 F.3d [1123,] 1128 [(10th Cir. 2001)]. In the employment context, due process requires a hearing with: (1) oral or written notice of the charges; (2) an explanation of the evidence; and (3) "an opportunity for the employee to present his side of the story." *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th

>  Cir. 2009). "A full evidentiary hearing is not required," but the employee must "be given notice and an opportunity to respond." *Id.* (quotation omitted).

(*Id.*)

The facts set forth previously are uncontroverted, and establish the defendant's right to summary judgment as to plaintiff's property interest claim. The evidence shows that Winger knew the general nature of the charges against him in the DWC letters at least by the time of the June 20 meeting of the Risk Management Committee. He originally indicated to the Committee that he would contact the DWC directly, then changed his mind, and sought to support his defense by consulting a third party, Dr. Wiley. Winger knew enough of the charges to refer the matter — along with confidential medical information of the two patients involved — to Dr. Wiley, and for Dr. Wiley to submit a letter opining that there was no deviation from the standard of care in the two patients. Winger presented the Wiley letter to the Committee before or during its July 2 meeting. Winger testified that, at the meeting, the charges were again summarized, "[a]nd it was open and I was supposed to defend my care. And then I did that...."

Winger was given notice of the charges, an explanation of the evidence, and an opportunity to present his side of the story.

IT IS ACCORDINGLY ORDERED this 14th day of December, 2016, that the defendant's Motion for Summary Judgment (Dkt. 42) is hereby granted.

                <u>s/ J. Thomas Marten</u>
                J. THOMAS MARTEN, JUDGE